ACCEPTED
12-11-00303-cv
TWELFTH COURT OF APPEALS
TYLER, TEXAS
3/13/2015 4:46:09 PM
CATHY LUSK
CLERK

No. 12-11-00303-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
3/13/2015 4:46:09 PM
CATHY S. LUSK
Clerk

**IN THE TWELFTH COURT OF APPEALS
AT TYLER**

**ENBRIDGE PIPELINES (EAST TEXAS) L.P.**
**Appellant**

**v.**

**GILBERT WHEELER, INC.**
**Appellee**

**On Remand from Texas Supreme Court**
**Original Appeal from the 273RD District Court of Shelby County, Texas**

**APPELLANT'S SUPPLEMENTAL BRIEF ON REMAND**

**FLOWERS DAVIS, P.L.L.C.**
**1021 ESE South Loop 323**
**Suite 200**
**Tyler, Texas 75701**
**(903) 534-8063**
**(903) 534-1650 Facsimile**
**JULIE P. WRIGHT**
**jpw@flowersdavis.com**
**State Bar No. 00794883**
**THOMAS H. BUCHANAN**
**State Bar No. 03290500**
**ATTORNEYS FOR APPELLANT**

## IDENTITY OF PARTIES AND COUNSEL

**Appellant:** Enbridge Pipelines (East Texas) L.P.

**Lead Appellant's Counsel:** Julie P. Wright
Flowers Davis, PLLC
1021 ESE South Loop 323
Suite 200
Tyler, Texas 75701
(903) 534-8063
(903) 534-1650 Facsimile

**Apellee:** Gilbert Wheeler, Inc.

**Appellee's Counsel:** Mr. Don Wheeler
101 Tenaha Street
Center, Texas 75935
(936) 598-2925
(936) 598-7024 Facsimile

Mr. Darrin Walker
6134 Riverchase Glen Dr.
Kingwood, Texas 77345
(281) 358-2295
(281) 358-5602 Facsimile

Identity of Parties and Counsel ................................................................... ii

Table of Contents ....................................................................................... iii

Index of Authorities ................................................................................ iv-v

I.   Effect of the Supreme Court's Decision on the Original Appellate Issues
     raised by Enbridge ..........................................................................2

II.  Apparent Changes in Law Resulting from Supreme Court's Decision ..............8

III. Supplemental Issues Presented in light of Supreme Court's Decision.............12

**ISSUE NO. 1**   The record contains no objective evidence from Kathryn Wheeler or from any of Wheeler's experts as to the aesthetic or utilitarian value of the 1.69 acre of cleared trees, or any evidence of any other objective damages.

**ISSUE NO. 2**   Alternatively, if this Court determines that the record contains some evidence as to the aesthetic or utilitarian value of the trees, the record is factually insufficient to support an award of $288,000 in damages as found by the jury. In that event, Enbridge requests that this Court remand this matter for a new trial consistent with the Supreme Court's decision, this Court's decision, and further orders of this Court.

IV. Conclusion and Prayer ................................................................................26

Certificate of Compliance .............................................................................27

Appendix ....................................................................................................29

# INDEX OF AUTHORITIES

*Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*,
747 S.W.2d 785 (Tex. 1988)......................................................................12

*Cain v. Bain*, 709 S.W.2d 175 (Tex. 1986) ...............................................24

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005)...............................13

*Dow Chemical Co. v. Francis*, 46 S.W.3d 237 (Tex. 2001)......................24

*Gilbert Wheeler, Inc. v Enbridge Pipelines (East Texas)L.P.*
449 S.W.3d 474 (Tex. 2014)..............................................1-5, 7-10, 14, 26

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742 (Tex. 2003)....................13

*Lucas v. Morrison*, 286 S.W.2d 190 (Tex. 1956) ...........................8, 10, 15

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997) .......13

*Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex. 1989) ..............24

*Porras v. Craig*, 675 S.W.2d 503 (Tex. 1984) .......................................8, 14

*Strickland v. Medlen*, 397 S.W.3d 184 (Tex. 2013) ..................................14

*Thota v. Young*, 366 S.W.3d 678 (Tex. 2012) ...........................................11

*Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706 (Tex. 2003)..................13

**STATUTES AND RULES:**

TEX. R. APP. P. 9.4(i)(1) ............................................................................27

TEX. R. APP. P. 9.4(i)(2)(B)........................................................................27

TEX. R. APP. P. 43.2...................................................................................27

TEX. R. APP. P. 43.3................................................................................27

TEX. R. APP. P. 43.4................................................................................27

No. 12-11-00303-CV

In The Twelfth Court of Appeals
At Tyler

_____

ENBRIDGE PIPELINES (EAST TEXAS) L.P.
Appellant

v.

GILBERT WHEELER, INC.
Appellee

_____

On Remand from Texas Supreme Court
Original Appeal from the 273RD District Court of Shelby County, Texas

_____

**APPELLANT'S SUPPLEMENTAL BRIEF ON REMAND**
_____

TO THE HONORABLE TWELFTH COURT OF APPEALS AT TYLER:

COMES NOW ENBRIDGE PIPELINE (EAST TEXAS) L.P., Defendant below and Appellant herein, and submits this Appellant's Supplemental Brief on Remand, and would respectfully show unto the Court that, even in light of the Texas Supreme Court's decision in *Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas) L.P.* 449 S.W.3d 474 (Tex. 2014), this matter must be reversed and rendered in Enbridge's favor because the trial record contains no evidence of intrinsic value (aesthetic or utilitarian) upon which a judgment could be rendered.

1

Alternatively, if this Court concludes that there is some evidence in the record of intrinsic value damages so as to preclude a rendition in Enbridge's favor, Enbridge is entitled to a new trial on the issue because the Supreme Court significantly changed the law governing the measures of damages applicable to this case, and, as a result, has changed the manner in which the evidence should be presented to the jury and in which charge issues should be submitted to a jury. Enbridge is entitled to have a jury make a determination as to whether and to what extent Wheeler Inc. has been damaged – under the new law.

## I. EFFECT OF THE SUPREME COURT'S DECISION ON THE ORIGINAL APPELLATE ISSUES RAISED BY ENBRIDGE

**ISSUE NO.1**     Wheeler, Inc.'s claim, based upon breach of Right of Way Agreement provisions, sounded exclusively in contract as a matter of law. It was therefore error to deny Enbridge's Motion for Directed Verdict as to Wheeler, Inc.'s trespass claim; it was error to submit Question Nos. 3, 4, and 5 to the jury based upon a trespass claim; and it was error to deny Enbridge's Motion for Judgment Notwithstanding the Verdict relating to Wheeler, Inc.'s trespass claim.

The Supreme Court unequivocally agreed that the claim sounded in breach of contract. It stated first that "[i]n today's case, we consider whether [the general rule for compensating an owner for injuries to real property] applies when the wrongful conduct causing the injury stems from <u>breach of contract rather than tort</u>." *Wheeler, Inc.,* 449 S.W.3d at 476. (emphasis added). It later stated that

"[o]ur analysis takes into consideration the fact that the property in question was injured due to a <u>breach of contract</u>, as well as the fact that the injury involves loss of trees." *Wheeler, Inc.,* 449 S.W.3d at 478. (emphasis added).

However, although the Supreme Court determined that breach of contract was a correct theory of liability, it further noted that "it is not immediately clear whether the trial court erred in submitting Wheeler's [trespass] claim to the jury… However, we need not resolve that question to conclude that, even if the submission of the trespass cause of action was error, it was harmless." … *Wheeler, Inc.,* 449 S.W.3d at 485-86.

**ISSUE NO. 2**    The trial court erred in submitting Questions No. 3, 4, and 5 to the jury based upon a trespass cause of action because there was no evidence or no legally sufficient evidence to support submission of a trespass cause of action to the jury.

This issue was not considered or resolved by the Supreme Court.

**ISSUE NO. 3**    The trial court erred in submitting the breach of contract theory to the jury based upon a cost-to-restore measure of damages. The evidence conclusively established that temporary damages were barred as a matter of law in this case, and that the only proper measure of damages was the diminution in fair market value. Therefore the trial court erred in denying Enbridge's Motion for Directed Verdict as to this issue, it erred in refusing to submit Enbridge's properly submitted question as to breach of contract based upon diminution of fair market value, and such error was calculated to and probably did cause the rendition of an improper verdict.

The Supreme Court deemed the injury to the property to be permanent as a matter of law, "due to the parties' agreement and the application of the economic feasibility exception." *Wheeler, Inc.,* 449 S.W.3d at 484. The Supreme Court held that "because the injury [to the property] is deemed permanent, … the trial court improperly instructed the jury to calculate damages based on the cost to restore the property. In turn, the trial court's judgment may not be upheld based on the jury's calculation of such damages." *Id.*

The Supreme Court recognized that the proper measure of damages in this case was, and is, diminution in fair market value. It also recognized prior law which allowed recovery of intrinsic value damages when the injury does not diminish the value of the property, and further created a new avenue for awarding intrinsic value damages based upon a finding of nominal diminution in value.

**ISSUE NO. 4**     Because cost-to-restore damages were barred as a matter of law, there is no evidence or legally insufficient evidence in the record to support the jury's verdict, and Enbridge is entitled to a reversal of the trial court's judgment.

This issue was not considered or resolved by the Supreme Court. However, even when considered in the light of the Court's new law, Enbridge is still entitled to a reversal of the trial court's judgment. The only evidence contained in the record upon which the jury could have based either of its damage awards -- the

4

$300,000 award or the $288,000 award – was either 1) the personal sentimental value as testified by Kathryn Wheeler, which may not be considered; or 2) the testimony of Wheeler's two cost-to-restore experts, Gregory David and Lynwood Smelser.

**ISSUE NO. 5**     Enbridge is entitled to rendition of judgment based upon the only competent evidence of record regarding diminution of fair market value, which conclusively establishes that the property suffered a diminution in value of $3,000.00, because Wheeler, Inc.'s only controverting expert on diminution of value should have been excluded.

The Supreme Court stated in footnote 5 that "[t]he jury agreed with Wheeler that there was no loss in fair market value, but Enbridge challenges the sufficiency of the evidence to support that finding. We need not decide the issue because the result is the same even if we assume there was a $3,000 loss in far market value." *Wheeler, Inc.,* 449 S.W.3d at 485. Even if we accept the Supreme Court's analysis as accurate, this Court must render a take nothing judgment in favor of Enbridge because the record contains no evidence to support the intrinsic value finding (as briefed in the Supplemental Issues on Remand herein below).

Enbridge's Conditional Issues which Supreme Court determined<br>that this Court should consider and resolve

**ISSUE NO. 6**     The trial court erred in failing to exclude the testimony of Plaintiff's expert witnesses Gregory David and Lynwood Smelser because their testimony was wholly based upon cost-

5

to-restore damages, because cost-to restore damages were barred as a matter of law as the measure of recovery, because the only proper measure of damages in this case was diminution in fair market value, and because David and Smelser were not real estate appraisers or the landowners and could therefore not opine as to the diminution in fair market value.

This issue was not considered or resolved by the Supreme Court.

**ISSUE NO. 7**     The trial court erred in excluding Enbridge's rebuttal testimony of Dr. Gary Kronrad related to Gregory David's testimony and Daniel Plume's testimony because the grounds of objection asserted by Wheeler, Inc. were factually incorrect and were wholly unsupported by the record.

This issue was not considered or resolved by the Supreme Court.

**ISSUE NO. 8**     The trial court erred in submitting the trespass claim to the jury based upon an intrinsic value measure of damages, as requested by Wheeler, Inc., because said questions were not properly predicated upon a requisite finding of permanent injury.

This issue was considered and resolved by the Supreme Court as addressed in Issue No. 3 above.

**ISSUE NO. 9**     The evidence of record is legally insufficient to support the jury finding of intrinsic value damages because Wheeler, Inc.'s only expert on diminution of value should have been excluded, and thus, there was no competent evidence in the record demonstrating that the diminution in value to Wheeler, Inc.'s entire 153 acre tract was "zero", and there could be no finding of intrinsic value damages absent such a finding.

This issue was considered and resolved by the Supreme Court.

**ISSUE NO. 10**     The evidence of record is legally insufficient to support the jury's finding of intrinsic value damages because the record

6

> contains undisputed evidence which conclusively established that the lost trees had a market value separate and apart from the 153 acre tract.

This issue was mentioned in footnote 4 of its opinion, but not resolved by the Supreme Court.

Wheeler, Inc., and now the Supreme Court, misunderstand the second part of this issue as raised by Enbridge regarding the market value of the severed timber. Enbridge did not and does not contend that such market value should have been submitted to the jury as a measure of damages (as stated by the Supreme Court in footnote 4). *Wheeler, Inc.,* 449 S.W.3d at 486. To the contrary, Enbridge's position is that Wheeler, Inc. was precluded from submitting an intrinsic value question to the jury because the record contains uncontradicted evidence that the trees had a specific market value separate and apart from the land. That testimony was presented by Gary Kronrad (RR 8, pp. 133-45), Jeff Williams (RR 8, pp. 198-202), and Mark Tietz (RR 8, pp. 207-213), and heard by the jury, and may form the basis of a modified judgment by this Court.

The confusion likely arises because Wheeler, Inc. attempted to subvert existing case authority in order to recover more than the applicable law would allow. Wheeler, Inc. attempted to recover for the loss of 1.69 acres of forest wood/timber [which do have a market value when severed from the land] as

7

though each of the "trees" were ornamental / shade trees [which do not have a market value when severed from the land]. According to the Supreme Court, in order to recover for ornamental / shade trees, as in the *Lucas v. Morrison* case, the plaintiff must show that the destroyed trees have no market value when severed from the land. *Wheeler, Inc.,* 449 S.W.3d at 484, fn. 4; *Lucas v. Morrison*, 286 S.W.2d 190, 191 (Tex. 1956). If attempting to recover for loss of acreage of forest/timber, as in *Porras v. Craig*, no such requirement exists. *Wheeler, Inc.,* 449 S.W.3d at 484, fn. 4, *Porras v. Craig*, 675 S.W.2d 503, 506 (Tex. 1984).

The legal analysis utilized by the Supreme Court makes sense in theory, but it applied the wrong case to the facts at hand. Here, Wheeler, Inc. was precluded from submitting an intrinsic value question to the jury for both reasons – 1) these were not ornamental / shade trees, they were native forest timber, and 2) that timber had a specific market value separate and apart from the land.

**ISSUE NO. 11**     The trial court erred in refusing to submit questions/instructions to jury on Enbridge's defense of non-agreement.

This issue was not considered or resolved by the Supreme Court.

## II.  APPARENT CHANGES IN THE LAW RESULTING FROM THE SUPREME COURT'S DECISION

Rather than directly addressing or refuting Enbridge's issues presented to this Court, the Supreme Court has made a concerted effort to commingle, blend

8

and blur Wheeler, Inc.'s two fatally submitted causes of action – breach of contract and trespass – together in an obvious result-oriented effort to allow Wheeler, Inc. one more chance to hold on to a jury award, which cannot stand according to longstanding Texas case authority **or** under the new law created by the Supreme Court in this case.

In what appears to be a very result-oriented opinion, the Supreme Court held that Wheeler, Inc.'s breach of contract theory of liability was correct, but that cost of repair was an improper measure of damages. It also held that the determination as to whether the injury is temporary or permanent is <u>now</u> a question of law, and on that basis, rejected the entirety of this Court's analysis based upon long standing law governing charge submissions. *Wheeler, Inc.,* 449 S.W.3d at 481. It also could not (would not) decide whether trespass was a proper theory of liability under these facts, but opined that in any event, it believed that the error in submitting the trespass theory of liability was harmless error because it found that intrinsic value damages could be recoverable under either theory of liability. "Because breach of contract was a valid theory of liability on which Wheeler prevailed, it is of no moment that the intrinsic value of trees jury question was submitted in conjunction with a trespass cause of action." *Wheeler, Inc.,* 449 S.W.3d at 486.

The Supreme Court further, for the first time, defined intrinsic value as aesthetic or utilitarian value which could be objectively measured (i.e. by an expert), *Wheeler, Inc.,* 449 S.W.3d at 482-83, and allowed for the possibility of additional objective intrinsic damages if an expert provided the proper predicate. *Id.* at 483. It expressly excluded from intrinsic value, the subjective sentimental value which might be placed upon the trees/property by the owner. *Id.* And, for the first time, the Supreme Court held that intrinsic value damages could be predicated upon either a zero finding of diminution in value or upon an amount of "nominal damages." *Id.* It set no parameters for assessing "nominal damages" but determined, under these facts, and contrary to its holding in *Lucas v. Morrison,* that $3000 was "nominal" as a matter of law. *Id.* at 485. (In *Lucas*, the Supreme Court stated that "nominal damage is damages in name only. It should be in some trivial amount and is usually in the sum of $1." *Lucas v. Morrison*, 286 S.W.2d 190, 191-92 (Tex. 1956)).

The Court did not state whether the breach of contract theory of liability (submitted in this charge with an improper measure of damages) could be somehow tied to the evidence in the record of the $3000 diminution in value (rejected by the jury which found $0) to support the intrinsic value damage finding (submitted under a separate theory of liability) so as to allow this Court to render a

10

judgment for the Wheelers for the intrinsic value damages. And, Enbridge has found no cases allowing damages submitted under one theory of liability to be cross-tied to another theory of liability to support a judgment.

And, it left open this court's analysis of the remaining issues raised by Enbridge in light of its opinion – including specifically the issues Enbridge raised conditionally in the event the Court of Appeals determined that remand for a new trial would be appropriate.

The Supreme Court's decision makes new law which was not in effect during trial of this case or during the initial appeal. Enbridge does not agree with the Supreme Court's position that the error in submitting the trespass was harmless; and in fact the case cited by the Supreme Court in support of that position does not stand for that proposition. That case involved submission of a single theory of liability and multiple defensive issues, not multiple theories of liability each with separate measures of damages. *Thota v. Young*, 366 S.W.3d 678, 693-94 (Tex. 2012).

However, if Enbridge had known that a possibility existed that trespass would be held to be proper, either in and of itself, or as harmless error, and if Enbridge had known that the Court would decide that it was no longer necessary to have a finding of zero diminution in value, but instead allow "nominal

diminution," and if Enbridge had known that the Court would clarify the intrinsic value of the trees to be specifically limited to aesthetic or utilitarian value (or some other objective criteria proffered by an expert who lays the proper predicate), Enbridge would have tried its case differently and would have also included a legal and factual sufficiency of the evidence to support the intrinsic value award from the jury.

It is well settled that on original submission, parties are not required to address the question of whether, in the event the trial court's judgment is reversed, the party who prevailed at trial is entitled to recover based on the jury's favorable findings under an alternative theory. *See Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.,* 747 S.W.2d 785, 787 (Tex.1988). Therefore, upon remand to this Court following the Supreme Court's reversal, Enbridge respectfully submits its remaining issues, as noted above, to the Court for consideration, along with the following additional issues which it is entitled to raise in light of the Supreme Court's ruling.

### III. SUPPLEMENTAL ISSUES PRESENTED IN LIGHT OF THE SUPREME COURT'S DECISION

**ISSUE NO. 1**      The record contains no objective evidence from Kathryn Wheeler or from any of Wheeler's experts as to the aesthetic or utilitarian value of the 1.69 acre of cleared trees, or any evidence of any other objective damages.

12

## A. Standard of Review

In a legal sufficiency review, the Court "must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex.2003). Such an issue will be sustained when "'(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'" *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). "The final test ... must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

## B. Argument and Case Authority

Here, reviewing the testimony, there is a complete absence of a vital fact necessary to uphold Wheeler, Inc.'s verdict.

The Supreme Court stated that in "cases involving real property injured by the destruction of trees, even when the proper measure of damages is the loss in the fair market value of the property to which the trees were attached, and the value of the land has not declined, we have held that the injured party may nevertheless recover for the intrinsic value. This exception was created to compensate landowners for the loss of the aesthetic and utilitarian value that trees confer on real property." *Wheeler, Inc.,* 449 S.W.3d at 482. It noted that "a tree's intrinsic value is not "rooted in an owner's subjective emotions" nor does it encompass the tree's "sentimental value" to the owner. But rather, the intrinsic value of a tree lies in "its ornamental (aesthetic) value and its utility (shade) value." *Strickland v. Medlen*, 397 S.W.3d 184, 190 (Tex. 2013)(citing *Porras v. Craig*, 675 s.W.2d 503, 506 (Tex. 1984).

Aesthetic is defined as "of or relating to art or beauty." MERRIAM WEBSTER'S, online. Therefore, aesthetic value of trees on property would be the monetary enhancement or value added to the realty based upon the beauty or appearance of the trees. Likewise, utilitarian is defined "to be useful or practical rather than attractive; functional, serviceable…" MERRIAM WEBSTER'S, online. Therefore, utilitarian value of trees on property would be monetary enhancement

14

or value attributable to their usefulness as shade for cattle (i.e. as in *Lucas v. Morrison*) or wind barriers.

Wheeler, Inc. sought monetary damages solely based upon the cost-to-restore for its claimed loss of trees and stream damages as follows:

(1) "Tree loss" damages, based on the calculations of Gregory P. David (Plaintiff's arborist expert) using three methods: Depreciated Replacement Costs, Cost of Cure - Existing Tree Density and USACE Cost of Cure. Significantly, all three methods utilized by Gregory P. David assign monetary damages for "the cost to reforest the land" (i.e., the cost to replant numerous species of trees on the subject 1.69-acre Right-of-Way area) and for "costs to irrigate and maintain" the replanted trees for three years. (RR 7, 238-305)

(2) "Cost of Stream Restoration", based on the calculations of Lynwood Smelser, PE (Plaintiff's engineering expert), for monetary damages related to (a) excavation, backfilling and compacting, (b) pile driving, (c) erosion control - grading, fertilizing and seeding, (d) ground cover, (e) shrub purchase - planting and temporary maintenance, (f) hand labor (6-8 laborers at 160 hours), and (g) five years annual maintenance on all the aforementioned elements of damage. (RR 6, 100-180).

Neither of these proffered experts provided any such aesthetic or utilitarian value testimony whatsoever. Gregory David testified exclusively as to the cost to restore the 1.69 acre cleared area to its original condition. He did not opine as to the aesthetic value that the cleared trees added to the property, and he did not opine as to the utilitarian value attributable to those trees.

Q: Mr. David, why is it that you would be the appropriate person to talk to, to evaluate damages or what it's going to cost to replace trees and landscape – the trees on this particular piece of property…?

A: Well, I think it's because I did a lot of this kind of work.

Q: If we were trying to cut this timber down and sell it down at the local sawmill, is that what your evaluation is?

A: No.

Q: What's the difference?... between cutting this timber down and just sending it down to the sawmill versus pushing all this timber down and trying to get it back to its …like it was?

A: Well the timber value at the sawmill, or the pulp mill or whatever that forest product value is, is a definable, you know, market value. It's what the mill is going to give us for it minus the cost to harvest it and get it there. And the cost actually going in and reforest the land, restore it to the way it was before or best we can, in this case is quite a bit higher than what the timber product value is. (RR 7, pp. 248-49).

Q: And you heard Mr. Smelser's testimony this morning, was that accurate as far as the tree types and sizes and those types of things that you were evaluating?...

A: …we don't need to go back through the pictures and what was there and their usefulness and those type of things. (RR 7, p. 252).

16

A: What the Wheelers loved about the place is the natural setting, and so it would recreate a natural setting.

A: It's just a natural mix of forest, and so we would just try to recreate that. (RR 7, pp. 298-99).

Lynwood Smelser did testify generally regarding the purposes served by plants, animals, trees, etc. in an ecosystem, and did opine that certain species of trees found on the property (and likely included in the cleared area) provided habitat, and food (i.e. nuts and berries) for animals. However, he did not opine as to the aesthetic value that the cleared trees added to the property, and he did not opine as to the utilitarian value attributable to those trees. His valuation testimony was limited exclusively to the cost of restoration of the stream.

Q: Have you prepared a presentation where a determination was made by a survey as the number of different types of species of trees that were destroyed by Enbridge in doing their pipeline right of way? (RR6, p. 104).

A: inventory of what's out there on the land. (RR6, p. 105).

Q: what a forest is really worth.

A: values and benefits of different plants.

A: we want to make them aware of the benefits of various plants other than their commercial value. (RR6, p. 111).

A: shows the interdependence of how organisms depend on each other. (RR6, p. 112).

A: The ground dwellers are the heart of life on earth. Without them, there wouldn't be any life on earth. (RR6, p. 114).

17

Q: And as far as the vegetation that was actually surveyed, can you tell what was surveyed and where it was surveyed from to come up with the number of different trees that were taken?

A: Yes. Since all the vegetation in the right of way was destroyed and the soil had been disturbed, what we want to do, as close as we can, say what that right of way looked like. So what we did was set up four sample plots adjacent to the cleared area, and I forget the size of them. And then what we did was survey those, inventory everything in there that was four inches in diameter at 12 inches high off the ground. We surveyed everything in there. (RR6, p. 116).

A: what their value is other than the commercial value. (RR6, p. 118).

A: There are some benefits of a forest ecosystem that applies everywhere. It's a forest ecosystem. They provide food for organisms; they provide cover and shelter for wildlife; they provide habitat for reproduction of wildlife; they provide water conservation to the root systems and everything, to keep the soil from washing away; they provide nutrients to make the soil fertile so plants will grow in it. (RR6, p. 118-119).

A: Aesthetic values. They're beautiful to look at, okay, to some people. Then, of course, they provide buffers against weather, bad wind and whatever. (RR6, p. 119).

Q: And what values do they have that you've been able to determine? (RR6, p. 120).

A: Canopies of short leaves provide the protection from the winds and cold to many animals. (RR6, p. 122).

A: soil conservation. And it's extensively used by wildlife for food and cover. (RR6,p. 123).

A: White Oak trees are used a lot as ornamental trees.

18

A: It's used in like an ornamental landscape application for tropical affect. (RR6, p. 124).

A: It's an extremely valuable plant for wildlife because it seeds, fruit, flowers, twigs, bark, and leaves are utilized by various animals. It's highly regarded for landscaping and urban forestry purposes. (RR6, p. 125).

A: It provides food and cover to small and large animals. (RR6, p. 126).

Q: Cost to restore the stream back to its –as near back as you could, original condition. (RR 6, p. 131).

Q: Therefore, we would ask that he not be allowed to testify as to those costs to repair because the property measure of damages is a diminution of value of property. (RR6, p. 132).

Q: Did you prepare a stream restoration plan?

A: I was asked to do it in order to restore the stream to the condition that it probably was in at the time it was cleared and destroyed. (RR6, p. 138).

Q: determine what would be the reasonable necessary cost to do this work as of November 2007? (RR6, p. 141).

Q: As far as that cost in '07 to restore that's shown of Exhibit 5 of 51 – to $66,000 (RR6, p. 142).

Q: So, you know whether it was straight or not, you don't know?

A: No.

Q: So – but what you did was you went back out there and you put …a couple of big curves on it; did you not?

A: Yes, sir.

Q: And does that serve any function?

19

A: Certainly it does.

Q: What function does that serve?

A: It slows the water velocity down when the water's flowing through there. Keeps it from eroding the soil.

Q: How fast is that – is that stream, what you call a stream? Is that a live stream?

A: No. It's intermittent.

Q: Okay. And basically it – so that the jury will understand – intermittent stream means that when it rains, water runs through it.

A: Yeah.

Q: So if it's not raining, it's not wet, that's dry.

A: Yes. (RR6, pp. 148-49).

Q: Okay. But let me ask you this: The ecology is still the same, the environment?

A: No.

Q: It's changed?

A: It's changed. Drastically.

Q: It's no longer a forest?

A: That's right. (RR6, p. 154).

Q: Now how big of an area was changed?

A: about 1.7 acres. (RR6, Page 155).

Q: That is a forest out there, isn't it?

A: That's right.

Q: It's not anybody's lawn.

A: No

Q: No. It's --it's the woods.

A: It's a forest.

Q: Well, it's not a lawn –

A: No.

Q: --at somebody's house. (RR6, p. 160).

A: They don't manicure it and all that kind of stuff…,

Q: It's the –

A: -- the forest is being natural.

Q: All the trees that were growing out there on that tract of land were native indigenous trees, were they not?

A: Yes.

Q: There wasn't a planted tree, there wasn't a fruit tree out there?

A: Not that I am aware of.

Q: And there was no planted ornamental trees that you were aware of?

A: No (RR6, p. 161).

Q: Do you have an opinion that the reasonable person would go out and spend the type of money that we're talking about here, $51,381 or $66,193 to restore that stream?

A: If I wanted it restored. (RR6, p. 166).

Q: …you're not giving any estimate as to the replacement value or cost of those trees.

21

Q: Yours deals solely with the stream restoration?

A: Yeah. (RR6, p.177).

A: It's got all kinds of curves and bends and everything in it.

Q: And then what you did on your stream restoration is try to recreate that natural curves and bend?

A: Yeah. (RR6, p.180).

Further, the record contains no evidence of any such damages from Kathryn Wheeler (assuming she as the landowner could qualify as an expert to testify regarding same for the property of her corporation). She offered only testimony regarding the sentimental value of the property to her and family.

Q: Now, on this 1532-acre tract, what was that used for?

A: Well, it was just to go up and enjoy.

Q: Was it used for recreation?

A: Recreation (RR 7, p. 192).

A: we would just go over there and have a different scenery (RR 7, p. 194).

A: and it's always been just a little puddle of water there that we always checked to see if something was in it.

Q: sanctuary, respite, whatever?

Q: Hunting?

A: they did hunt deer. (RR 7, p. 195).

Q: …it's stamped with his memory out there, correct?

22

A: very much so. (RR 7, p. 197).

Q: …use of the property for your family, Gilbert Wheeler, Inc., you your husband?

A: Strictly for recreation.

A: a place for family and friends

A: enjoy animals and nature; it's beautiful at night. (RR 7, p. 200).

Q: You don't have an expertise in planting trees or refurbishing property and doing things like that, correct?

A: I do not. (RR 7, p. 206).

A: I do not have those big oak trees that I get them big acorns off of, the squirrels and all that. (RR 7, p. 210).

Q: Do you know what the land was worth on the fair market value, if you were intending to sell it?

A: I do not.

A: the 153 acres was designated for family get-togethers. (RR 7, p. 212).

**ISSUE NO. 2**   Alternatively, if this Court determines that the record contains some evidence as to the aesthetic or utilitarian value of the trees, the record is factually insufficient to support an award of $288,000 in damages as found by the jury. In that event, Enbridge requests that this Court remand this matter for a new trial consistent with the Supreme Court's decision, this Court's decision, and further orders of this Court.

## A. Standard of Review

In reviewing a factual-sufficiency challenge to a finding of fact on an issue on which appellants did not have the burden of proof, this Court must consider and

weigh all of the evidence and set aside the judgment only if the evidence that supports the challenged finding is so weak as to make the judgment clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In so doing, this court must examine both the evidence supporting and that contrary to the judgment. *See Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989).

## B. Argument and Case Authority

As noted above, the only evidence offered by Wheeler, Inc. which even conceivably mentions any aesthetic value or utilitarian value was offered by Lynwood Smelser. That testimony is unquestionably factually insufficient to support the jury's verdict or a judgment of $288,000, as the evidentiary support for the challenged finding of intrinsic value damages is so weak as to make a judgment based upon the jury's verdict awarding those damages clearly wrong and manifestly unjust. In that regard, even if Smelser's testimony regarding workings of an ecosystem and the benefit the trees provided to the natural forest habitat could be somehow considered as evidence of the aesthetic or utilitarian nature of the trees, he provided no testimony whatsoever as to the value added to the forest habitat by the presence of those trees.

24

Moreover, testimony provided from one of Enbridge's experts, Dr. Gary Kronrad, which was admitted without objection by Wheeler, Inc. establishes that the trees at issue were not the sort of "aesthetic" or "utilitarian" trees for which intrinsic value damages may be recovered (whether considered under prior caselaw or under the Supreme Court's newly created guidelines).

Dr. Gary Kronrad testified as follows:

A: Now, I know hardwoods were growing on that property, but I assumed that you could have grown pine on it. I know much more valuable, so I used the value for pine when valuing this land.

Q: And did you see any ornamental trees in this area when you did your evaluation?

A: No, sir.

Q: Did you see any fruit trees when you did this evaluation?

A: No, sir.

Q: Did you see any particular special use that that area would be put to, say, for a wind break?

A: No, sir.

Q: And that area that was cleared, was it—did it have any specialized use other than just being a part of the forest?

A: I saw nothing unusual about that piece of property. It looked like the area around it. (RR 8, p. 145).

If this Court determines, despite the testimony of Dr. Kronrad, that somehow the scant testimony of Smelser might possibly rise to the new tests created by the Supreme Court, Enbridge requests that this matter be remanded for a new trial so that Enbridge may prepare its case to meet the new evidentiary requirements and again preserve error for appeal.

## IV. CONCLUSION AND PRAYER

The Supreme Court specifically acknowledged its longstanding obligation to decide cases in a manner that would "ensure that the landowner was adequately, but not excessively compensated." *Wheeler, Inc.,* 449 S.W.3d at 482. However, in reaching its result, it ignored longstanding case authority governing multiple facets of this appeal, ranging from real property law to review of charge error. To allow Wheeler, Inc. to hold onto its improper and unsupported verdict of $288,000 is the windfall that the Supreme Court ostensibly said it was trying to avoid. In short, it is logically, objectively, inconceivable that removal of approximately 600 feet of native trees in the woods in Shelby County, on less than 2 acres, is worth $288,000.

**WHEREFORE, PREMISES CONSIDERED,** Enbridge respectfully requests that this Court sustain its issues presented in Appellant's Brief as addressed above, sustain its supplemental issues presented herein above, and

26

render the judgment that the trial court should have rendered; alternatively, if, and only if, this Court determines that this matter should be remanded based upon those issues, Enbridge respectfully requests that this Court instruct the trial court accordingly, in order to provide guidance as to those issues upon retrial; Enbridge further prays for an award of its costs of court and appellate costs. TEX. R. APP. P. 43.2, 43.3, and 43.4.

Respectfully submitted,

**FLOWERS DAVIS, P.L.L.C.**
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063
(903) 534-1650 Facsimile

/s/    Julie P. Wright
JULIE P. WRIGHT
State Bar No. 00794883
THOMAS H. BUCHANAN
State Bar No. 03290500
ATTORNEYS FOR APPELLANT
ENBRIDGE PIPELINES (EAST TEXAS) L.P.

## CERTIFICATE OF COMPLIANCE

I certify that this Appellant's Supplemental Brief on Remand complies with the limitation of TEX. R. APP. P. 9.4(i)(2)(B) because it contains 5,846 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

/s/    Julie P. Wright
JULIE P. WRIGHT

27

## CERTIFICATE OF SERVICE

I hereby certify and state that a true and correct copy of this document has been provided to and served on the following via electronic mail and/or certified mail, return receipt requested, on this the 13th day of March 2015:

Mr. Don Wheeler
101 Tenaha Street
Center, Texas 75935

J. Mark Mann
300 West Main St.
Henderson, Texas 75652

Mr. Darrin Walker
6134 Riverchase Glen Dr.
Kingwood, Texas 77345

/s/    Julie P. Wright
JULIE P. WRIGHT

# APPENDIX

*Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas) L.P.* .........................Tab A

Case Authorities ............................................................................................Tab B

*Boyce Iron Works, Inc. v Southwestern Bell Telephone Co.*
*Cain v. Bain*
*City of Keller v. Wilson*
*Dow Chemical Co. v. Francis*
*King Ranch, Inc. v. Chapman*
*Lucas v. Morrison*
*Merrell Dow Pharms., Inc. v. Havner*
*Plas-Tex, Inc.v. U.S. Steel Corp.*
*Porras v. Craig*
*Strickland v. Medlen*
*Thota v. Young*
*Wal-Mart Stores, Inc. v. Miller*

# TAB A


449 S.W.3d 474, 57 Tex. Sup. Ct. J. 1465
**(Cite as: 449 S.W.3d 474)**

Reversed and remanded.

West Headnotes

**[1] Damages 115 ⬤⟿109**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k107 Injuries to Real Property
            115k109 k. Temporary injuries. Most Cited Cases

**Damages 115 ⬤⟿110**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k107 Injuries to Real Property
            115k110 k. Permanent and continuing injuries. Most Cited Cases

**Limitation of Actions 241 ⬤⟿55(6)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k55 Torts
            241k55(6) k. Continuing injury in general. Most Cited Cases

    The distinction between temporary and permanent injury to real property guides courts in determining: (1) whether damages are available for future or only past injuries; (2) whether one or a series of suits is required; (3) whether claims accrue, and thus, limitations begin, with the first or each subsequent injury; and (4) the proper measure of damages for injury to real property.

**[2] Damages 115 ⬤⟿69**

115 Damages
   115III Grounds and Subjects of Compensatory Damages

---

Supreme Court of Texas.
GILBERT WHEELER, INC., Petitioner,
v.
ENBRIDGE PIPELINES (EAST TEXAS), L.P.,
Respondent.

No. 13–0234.
Argued Feb. 27, 2014.
Decided Aug. 29, 2014.
Rehearing Denied Dec. 19, 2014.

**Background:** Landowner brought action against pipeline company for breach of contract and trespass arising from company's destruction of trees in preparing easement area for pipeline construction. After a jury trial, the 273rd Judicial District Court, Shelby County, Charles R. Mitchell, J., entered judgment on verdict in favor of landowner. Company appealed. On rehearing, the Court of Appeals, James T. Worthen, C.J., 393 S.W.3d 921, reversed and remanded. Landowner sought review.

**Holdings:** The Supreme Court, Lehrmann, J., held that:
(1) as a matter of first impression, application of the distinction between cases involving permanent and temporary injury to real property is not limited to causes of action that sound in tort;
(2) an injury to real property is considered permanent if it cannot be fixed or it is substantially certain that the injury will recur;
(3) injury to landowner's land due to pipeline company's destruction of trees in preparing easement area for pipeline construction was "permanent" as a matter of law; and
(4) a landowner may recover for the intrinsic value of the trees on his property so long as the diminution in the fair market value of the land is essentially nominal; overruling *Lamar Cnty. Electric Coop. Ass'n v. Bryant*, 770 S.W.2d 921, and *Garey Constr. Co. v. Thompson*, 697 S.W.2d 865.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

449 S.W.3d 474, 57 Tex. Sup. Ct. J. 1465
**(Cite as: 449 S.W.3d 474)**

115III(C) Interest
115k66 Interest
115k69 k. Torts. Most Cited Cases

**Damages 115 ⚷109**

115 Damages
115VI Measure of Damages
115VI(B) Injuries to Property
115k107 Injuries to Real Property
115k109 k. Temporary injuries. Most Cited Cases

If land is temporarily, but not permanently, injured by the negligence or wrongful act of another, the owner is entitled to recover the amount necessary to repair the injury, and put the land in the condition it was at the time immediately preceding the injury, with interest thereon to the time of the trial.

**[3] Damages 115 ⚷110**

115 Damages
115VI Measure of Damages
115VI(B) Injuries to Property
115k107 Injuries to Real Property
115k110 k. Permanent and continuing injuries. Most Cited Cases

The true measure of damages in case of permanent injury to land is the difference between the value of the land immediately before the injury and its value immediately after.

**[4] Damages 115 ⚷103**

115 Damages
115VI Measure of Damages
115VI(B) Injuries to Property
115k103 k. Mode of estimating damages in general. Most Cited Cases

When restoration of damaged property is not possible, courts award damages equal to the loss in fair market value of the property as a whole.

**[5] Damages 115 ⚷117**

115 Damages

115VI Measure of Damages
115VI(C) Breach of Contract
115k117 k. Mode of estimating damages in general. Most Cited Cases

Application of the distinction between cases involving permanent and temporary injury to real property, in which the measure of damages for permanent injury is the difference in value and the damages for temporary injury is the cost of repair, is not limited to causes of action that sound in tort, rather than contract; both courts and parties benefit from the application of general principles with respect to calculating damages, and there is no reason to compensate a party differently because the wrongful conduct that caused the identical injury stems from breaching a contract rather than committing a tort.

**[6] Damages 115 ⚷118**

115 Damages
115VI Measure of Damages
115VI(C) Breach of Contract
115k118 k. Effect of provisions of contract. Most Cited Cases

Contracting parties are free to specify in an agreement how damages will be calculated in the event of a breach.

**[7] Damages 115 ⚷110**

115 Damages
115VI Measure of Damages
115VI(B) Injuries to Property
115k107 Injuries to Real Property
115k110 k. Permanent and continuing injuries. Most Cited Cases

An action or consequence may qualify as permanent, such that the proper measure of damages is the difference in value, if it is ongoing, continually happening, or occurring repeatedly and predictably.

**[8] Damages 115 ⚷110**

115 Damages
115VI Measure of Damages

115VI(B) Injuries to Property

115k107 Injuries to Real Property

115k110 k. Permanent and continuing injuries. Most Cited Cases

An injury to real property is considered "permanent," such that the proper measure of damages is the difference in value, if: (1) it cannot be repaired, fixed, or restored; or (2) even though the injury can be repaired, fixed, or restored, it is substantially certain that the injury will repeatedly, continually, and regularly recur, such that future injury can be reasonably evaluated.

**[9] Damages 115 ☞109**

115 Damages

115VI Measure of Damages

115VI(B) Injuries to Property

115k107 Injuries to Real Property

115k109 k. Temporary injuries. Most Cited Cases

An injury to real property is considered "temporary," such that the proper measure of damages is the cost of repair, if: (1) it can be repaired, fixed, or restored; and (2) any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty.

**[10] Damages 115 ☞208(1)**

115 Damages

115X Proceedings for Assessment

115k208 Questions for Jury

115k208(1) k. In general. Most Cited Cases

Whether an injury to real property is temporary or permanent is a question of law for the court to decide.

**[11] Damages 115 ☞208(1)**

115 Damages

115X Proceedings for Assessment

115k208 Questions for Jury

115k208(1) k. In general. Most Cited Cases

When the facts relating to whether an injury to real property is permanent or temporary are disputed and must be resolved to correctly evaluate the nature of the injury, the court, upon proper request, must present the issue to the jury.

**[12] Damages 115 ☞109**

115 Damages

115VI Measure of Damages

115VI(B) Injuries to Property

115k107 Injuries to Real Property

115k109 k. Temporary injuries. Most Cited Cases

**Damages 115 ☞110**

115 Damages

115VI Measure of Damages

115VI(B) Injuries to Property

115k107 Injuries to Real Property

115k110 k. Permanent and continuing injuries. Most Cited Cases

Supreme Court applies with some flexibility general rule that the proper measure of damages for permanent damage to real property is the cost to restore or replace, and the proper measure for temporary damage is loss of use, considering the circumstances of each case to ensure that an award of damages neither over- nor under-compensates a landowner for damage to his property; the purpose of the law in every case, is to compensate the owner for the injury received, and the measure of damages which will accomplish this in a given case ought to be adopted.

**[13] Damages 115 ☞109**

115 Damages

115VI Measure of Damages

115VI(B) Injuries to Property

115k107 Injuries to Real Property

115k109 k. Temporary injuries. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Damages 115 &#x21dd;110**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k107 Injuries to Real Property
            115k110 k. Permanent and continuing injuries. Most Cited Cases

Economic feasibility exception to the general rule that the cost to restore is the proper measure of damages to real property applies when the cost of required repairs or restoration exceeds the diminution in the property's market value to such a disproportionately high degree that the repairs are no longer economically feasible; in those circumstances, a temporary injury is deemed permanent, and damages are awarded for loss in fair market value.

**[14] Damages 115 &#x21dd;112**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k107 Injuries to Real Property
            115k112 k. Growing crops, grass, shrubbery, or trees. Most Cited Cases

When a landowner can show that the destruction of trees on real property resulted in no diminishment of the property's fair market value, or in so little diminishment of that value that the loss is essentially nominal, the landowner may recover the intrinsic value of the trees lost, that is, the ornamental and utilitarian value of the trees.

**[15] Damages 115 &#x21dd;110**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k107 Injuries to Real Property
            115k110 k. Permanent and continuing injuries. Most Cited Cases

**Damages 115 &#x21dd;112**

115 Damages

115VI Measure of Damages
   115VI(B) Injuries to Property
      115k107 Injuries to Real Property
         115k112 k. Growing crops, grass, shrubbery, or trees. Most Cited Cases

Injury to landowner's land due to pipeline company's destruction of trees in preparing easement area for pipeline construction was "permanent" as a matter of law under economic feasibility exception to the general rule that the cost to restore was the proper measure of damages to real property, where cost to restore the land to the condition it was in before company cleared the right of way was at least $300,000 and the diminution of value was no more than $3,000, and, thus, restoration of the land was technically possible, but exceeded the diminution in market value to such a disproportionately high degree that the repairs were no longer economically feasible.

**[16] Damages 115 &#x21dd;112**

115 Damages
   115VI Measure of Damages
      115VI(B) Injuries to Property
         115k107 Injuries to Real Property
            115k112 k. Growing crops, grass, shrubbery, or trees. Most Cited Cases

A landowner may recover for the intrinsic value of the trees on his property so long as the diminution in the fair market value of the land is essentially nominal; overruling *Lamar Cnty. Electric Coop. Ass'n v. Bryant*, 770 S.W.2d 921, and *Garey Constr. Co. v. Thompson*, 697 S.W.2d 865.

**\*476** Don Wheeler, Wheeler & Russell, Center, TX, J. Mark Mann, Mann Tindel Thompson, Henderson, TX, Darrin M. Walker, Law Office of Darrin Walker, Kingwood, TX, for Petitioner, Gilbert Wheeler, Inc.

Julie Wright, J. Mitchell Beard, Stuart Hene, Thomas H. Buchanan, Morgan Elliott, Flowers Davis PLLC, Tyler, TX, Macey Reasoner Stokes, Baker Botts LLP, Houston, TX, for Respondent.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Justice LEHRMANN delivered the opinion of the Court.

This case presents various issues regarding the proper manner of compensating a landowner for the destruction of trees on his property. As a general rule, when an injury to real property is temporary, the owner is entitled to damages commensurate with the cost of restoring his property, but when an injury to the same property is permanent, the owner is entitled to damages commensurate with the loss in the fair market value to the property as a whole. In today's case, we consider whether this general rule applies when the wrongful conduct causing the injury stems from breach of contract rather than tort. Concluding that it does, we also review a common law exception to this general rule, which under certain circumstances entitles the landowner to damages in keeping with the intrinsic value of the trees that were destroyed. Because we conclude that the exception properly applies in this case, and hold that any error in the jury charge related to such damages was harmless, we reverse the judgment of the court of appeals and remand the case to that court to address the remaining issues.

## I. Facts

The Wheeler family, by way of closely held corporation Gilbert Wheeler, Inc. (Wheeler), owns a 153–acre tract of land in Shelby County called "the Mountain." The property, which the Wheelers use as a family retreat, is heavily wooded and transected**\*477** by a natural stream. When Enbridge Pipelines, L.P. determined that it needed to construct a pipeline across the property, it engaged INA Field Services to approach Wheeler about obtaining an easement. Wheeler agreed to grant Enbridge a right of way, but insisted that Enbridge install the pipeline by boring underground in order to preserve the trees on the property. Wheeler agreed to a contract that reflected this stipulation in explicit terms. Because this was an unusual provision, Enbridge was required to specifically approve the contract.

Soon after the parties executed the agreement,

Enbridge hired a construction company to build the pipeline, but failed to inform the contractors about the provision requiring them to use the boring method to install the pipeline. As a result, in clearing the right of way the construction company cut down several hundred feet of trees and bulldozed the ground. In the process, the workers also channelized the stream that once meandered through the woods.

Wheeler sued Enbridge for breach of contract and trespass. The suit proceeded to a jury trial, and the court charged the jury on both claims. Enbridge objected to the trespass submission, arguing that Wheeler's claims sounded only in contract. Enbridge also requested a question concerning whether the damage to the Mountain was temporary or permanent, contending that the question was a necessary predicate to determine whether the jury should award damages commensurate with the cost to restore the trees and stream or damages commensurate with the loss in the Mountain's fair market value. Wheeler contended that the distinction was irrelevant. Ultimately, the trial court submitted the charge without the question, and the jury found Enbridge liable for the damage to Wheeler's property on both trespass and breach-of-contract theories. In conjunction with the breach-of-contract claim, the jury awarded $300,000 to compensate Wheeler for the reasonable cost to restore the property. In conjunction with the trespass claim, the jury found no loss in the Mountain's fair market value and awarded Wheeler $288,000 in damages for the intrinsic value of the trees Enbridge destroyed. Wheeler elected to recover the damages awarded for breach of contract.

Enbridge appealed, arguing that the trial court erred in failing to submit the predicate question of whether the injury to the Mountain was temporary or permanent. Enbridge also contended that the injury was permanent as a matter of law, that cost-to-restore damages were therefore improperly awarded, and that Wheeler could not recover damages for the intrinsic value of the trees because that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

measure of damages was unavailable and not properly submitted to the jury in any event. Wheeler countered that the temporary-versus-permanent distinction did not apply because its case sounded in contract. Wheeler argued in the alternative that it could recover for the intrinsic value of the trees destroyed without respect to the temporary-versus-permanent distinction. The court of appeals agreed with Enbridge and held that, because Wheeler had failed to secure a finding as to whether the injury to the property was temporary or permanent, Wheeler had waived its entitlement to a damage award. For that reason, the court of appeals rendered a take-nothing judgment in Enbridge's favor. Wheeler petitioned this Court for review.

## II. Analysis

Wheeler's petition raises broad concerns about the boundaries of the temporary-versus–permanent distinction and its application to the calculation of damages for injury to real property. In order to resolve**\*478** the confusion surrounding this distinction, we take this opportunity to clarify its contours.

### A. Temporary–Versus–Permanent Injury to Real Property

Applying the distinction between temporary and permanent injury to real property has proven a vexing task for litigants and courts alike. After all, injury to real property often appears permanent in the sense that the exact real estate in question—a demolished house or destroyed tree—no longer exists. However, as discussed below, the law recognizes that such items frequently can be replaced in an adequate manner, rendering the landowner suitably compensated. To further complicate matters, Texas courts have attempted to categorize various aspects of a legal claim, including a party's conduct, an event or occurrence, a condition, an injury or harm, and the damages resulting from an injury or harm, as either temporary or permanent.

[1] Further muddling things are the multiple purposes served by characterizing an injury to real property as temporary or permanent. The distinction guides courts in determining: "(1) whether

damages are available for future or only past injuries; (2) whether one or a series of suits is required; and (3) whether claims accrue (and thus limitations begins) with the first or each subsequent injury." *Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 275 (Tex.2004). The present case illustrates a fourth application of the distinction: it guides the proper measure of damages for injury to real property.[FN1] To that end, we have applied the distinction in evaluating real-property damages across many different theories of liability. *See, e.g., Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909, 921 (Tex.2013) (trespass); *Natural Gas Pipeline Co. v. Justiss,* 397 S.W.3d 150, 152 (Tex.2012) (nuisance); *State v. Bristol Hotel Asset Co.,* 293 S.W.3d 170, 172 (Tex.2009) (eminent domain); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 235 (Tex.2004) (negligence).

> FN1. We specifically recalled this "different purpose" for the temporary-versus-permanent distinction in *Schneider.* 147 S.W.3d at 270 n. 12. We note that these purposes are not exclusive. We have held, for example, that a landowner may receive injunctive relief to prevent certain future trespasses if the trespass is "continuing." *See, e.g., R.R. Comm'n of Tex. v. Manziel,* 361 S.W.2d 560, 567 n. 2 (Tex.1962).

In today's case, we focus on the significance of classifying injury to real property as temporary or permanent in the context of properly compensating the injured landowner. Our analysis takes into consideration the fact that the property in question was injured due to a breach of contract, as well as the fact that the injury involves loss of trees.

### B. Application of Distinction to the Measure of Damages for Injury to Real Property

[2][3][4] As early as 1889, we stated that "[i]f land is temporarily but not permanently injured by the negligence or wrongful act of another, the owner would be entitled to recover the amount neces-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sary to repair the injury, and put the land in the condition it was at the time immediately preceding the injury, with interest thereon to the time of the trial." *Trinity & S. Ry. Co. v. Schofield,* 72 Tex. 496, 10 S.W. 575, 576–77 (1889). The companion rule, of equally venerable provenance, states that "the true measure of damages in case of permanent injury to the soil is the difference between the value of the land immediately before the injury and its value immediately after." **\*479***Fort Worth & D.C. Ry. Co. v. Hogsett,* 67 Tex. 685, 4 S.W. 365, 366 (1887). These rules are premised on the notion that the ordinary measure of damages is the cost to restore the property. When restoration is not possible, however, we award damages equal to the loss in fair market value of the property as a whole.

### 1. Application of Distinction to the Breach–of–Contract Claim

Wheeler argues that, with respect to calculating damages for injury to real property, the temporary-versus-permanent distinction has no place when those damages stem from breach of contract rather than tort. Wheeler notes that contract damages serve to give a plaintiff the benefit of his bargain, i.e., to place the plaintiff in the position he would have occupied if the contract had been performed. Wheeler contends that restoration costs will give it the benefit of its bargain under the right-of-way agreement and thus are the proper measure of damages regardless of whether the injury to the Mountain is characterized as temporary or permanent.

We have never directly addressed this issue, and the courts of appeals are not in agreement. Some have held that calculating damages for injury to real property requires application of "general principles" across causes of action, whether sounding in contract or tort. *Hall v. Hubco, Inc.,* 292 S.W.3d 22, 32 n. 4 (Tex.App.-Houston [14th Dist.] 2006, pet. denied); *see also Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture,* 50 S.W.3d 531, 545–46 (Tex.App.-El Paso 2001, no pet.) (holding that cost to restore was the appropriate measure of damages for temporary injury to real property

caused by breach of a lease agreement). Others have been more flexible in evaluating damage awards. *See, e.g., P.G. Lake, Inc. v. Sheffield,* 438 S.W.2d 952, 954–55 (Tex.Civ.App.-Tyler 1969, writ ref'd n.r.e.) (declining to apply the temporary-versus-permanent distinction where an oil and gas lessee breached his contract to repair the leased premises); *see also B.A. Mortg. Co. v. McCullough,* 590 S.W.2d 955, 956–57 (Tex.Civ.App.-Fort Worth 1979, no writ) (affirming cost-to-restore damages in a case involving permanent injury to land because "the reasonableness of applying a given measure of damages in a given case unavoidably hinges on the peculiarities of the case" (citation and internal quotation marks omitted)).

[5][6] We hold that application of the temporary-versus-permanent distinction in cases involving injury to real property is not limited to causes of action that sound in tort rather than contract. Of course, contracting parties are free to specify in an agreement how damages will be calculated in the event of a breach, but when they do not, both courts and parties benefit from the application of general principles with respect to calculating damages for such injury. In this case, we find persuasive our prior holding that, with respect to right-of-way agreements like the one at issue here, "the measure of damages for breach of an easement that restricted a right to cut trees would be the same as the measure for negligently cutting trees." *DeWitt Cnty. Electric Coop., Inc. v. Parks,* 1 S.W.3d 96, 105 (Tex.1999). This stands to reason because the injury in question under either cause of action is the same. We see no reason to compensate a party differently because the wrongful conduct that caused the identical injury stems from breaching a contract rather than committing a tort. Further, the exceptions to the general rules in this area, discussed below, operate to ensure landowners are adequately compensated. Accordingly, we hold that the temporary-versus-permanent distinction underlies the determination of the proper measure of **\*480** damages for both the trespass and breach-of-contract claims at issue.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Definitions of Temporary and Permanent Injury**

[7] Having clarified the significance of whether injury to real property is temporary or permanent with respect to measuring the resulting damages, we turn to how that determination is made. We have previously defined a permanent action or consequence in accordance with its ordinary meaning—that is, as a thing which will continue indefinitely, or at least for a very long time. *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 558 (Tex.2004). But we have also recognized that the same action or consequence "need not be eternal" or "perpetual" to qualify as permanent. *Schneider,* 147 S.W.3d at 277. On the contrary, an action or consequence may qualify as permanent if it is ongoing, continually happening, or occurring repeatedly and predictably. *Gragg,* 151 S.W.3d at 558; *Schneider,* 147 S.W.3d at 272; *Atlas Chem. Indus., Inc. v. Anderson,* 524 S.W.2d 681, 684–85 (Tex.1975); *Brazos River Auth. v. City of Graham,* 163 Tex. 167, 354 S.W.2d 99, 106 (1961). Identifying the opposites of the same themes, we have defined as temporary those actions and consequences that do not last for long periods of time, are not ongoing, are not likely to occur again, occur only sporadically, or occur unpredictably. *Schneider,* 147 S.W.3d at 272; *Atlas,* 524 S.W.2d at 685; *Brazos River Auth.,* 354 S.W.2d at 108.

[8][9] For the sake of clarity, we reformulate these definitions in the following way. An injury to real property is considered permanent if (a) it cannot be repaired, fixed, or restored, *or* (b) even though the injury can be repaired, fixed, or restored, it is substantially certain that the injury will repeatedly, continually, and regularly recur, such that future injury can be reasonably evaluated. Conversely, an injury to real property is considered temporary if (a) it can be repaired, fixed, or restored, *and* (b) any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty. These definitions apply to cases in which entry onto

real property is physical (as in a trespass) and to cases in which entry onto real property is not physical (as with a nuisance). With these definitions in hand, we turn to whether the jury or the court is the proper entity to determine whether an injury to real property is temporary or permanent.

**3. Whether Injury to Real Property Is Temporary or Permanent Is a Question of Law**

We held long ago that "[w]hether the injury [to real property] amounts to total or only partial destruction of value, or whether it be permanent or temporary, as well as the extent of the injury and the resulting amount of damages, are all questions for the determination of the jury under proper instructions." *Trinity & S. Ry. Co. v. Schofield,* 72 Tex. 496, 10 S.W. 575, 577 (1889). However, we have more recently clarified, in the context of a nuisance suit, that "[j]urors must still decide the frequency, extent, and duration of noxious conditions ... [b]ut jurors cannot decide questions such as whether damages can be estimated with reasonable certainty, whether principles of res judicata allow one or a series of suits, or when limitations ought to accrue." *Schneider,* 147 S.W.3d at 281. Accordingly, we instructed that jurors should determine whether a nuisance works temporary or permanent injury only "to the extent there is a dispute **\*481** regarding what interference has occurred or whether it is likely to continue." *Id.*

[10][11] Because this instruction should apply with equal force in cases considering the appropriate measure of damages for injury to real property, we hold that whether an injury is temporary or permanent is a question of law for the court to decide. At the same time, we recognize that questions regarding the facts that underlie the temporary-versus-permanent distinction must be resolved by the jury upon proper request. Said another way, when the facts are disputed and must be resolved to correctly evaluate the nature of the injury, the court, upon proper request, must present the issue to the jury, relying on the definitions we have provided in this opinion.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**4. Exceptions to the General Rule as to Damages**

[12] As noted above, the general rule in cases involving injury to real property is that the proper measure of damages is the cost to restore or replace, plus loss of use for temporary injury, and loss in fair market value for permanent injury. However, we apply this rule with some flexibility, considering the circumstances of each case to ensure that an award of damages neither over– nor under-compensates a landowner for damage to his property. We maintain that the purpose of the law "in every case, is to compensate the owner for the injury received, and the measure of damages which will accomplish this in a given case ought to be adopted." *Pac. Express Co. v. Lasker Real–Estate Ass'n,* 81 Tex. 81, 16 S.W. 792, 793 (1891). For that reason, Texas courts have appealed to a number of exceptions to the general rule when it would compensate a landowner unjustly. Two of those exceptions are at issue in this case.

**a. The Economic Feasibility Exception**

[13] In cases involving temporary injury, Texas courts have recognized the so-called economic feasibility exception to the general rule that the cost to restore is the proper measure of damages. This exception applies when the cost of required repairs or restoration exceeds the diminution in the property's market value to such a disproportionately high degree that the repairs are no longer economically feasible. In those circumstances a temporary injury is deemed permanent, and damages are awarded for loss in fair market value. *See N. Ridge Corp. v. Walraven,* 957 S.W.2d 116, 119 (Tex.App.-Eastland 1997, pet. denied); *see also Hubco,* 292 S.W.3d at 32; *Jim Walter Homes, Inc. v. Gonzalez,* 686 S.W.2d 715, 717 (Tex.App.-San Antonio 1985, writ dism'd). In *North Ridge,* a landowner sued for injury to his property caused by unrelated spills of saltwater and oil. 957 S.W.2d at 117. Although these injuries were capable of being remediated, and therefore temporary, the combined cost to complete the restoration would have "exceeded the maximum value of the entire 100–acre tract by more than six times." *Id.* at 119.

As a result, the court of appeals concluded that the repairs were not economically feasible as a matter of law, and awarded damages in keeping with the loss in the property's fair market value. *Id.* at 119–20.

Although this Court has not expressly recognized the economic feasibility exception, we have applied it, or something very similar to it, when necessary to prevent a landowner from being over-compensated. Two cases with similar facts illustrate the application of this exception. In *Pacific Express,* a landowner sued to recover damages for the negligent destruction of his house, which by most accounts would be considered a temporary injury because the house could be rebuilt. 16 S.W. at 793. **\*482** We held, however, that the house should be treated "as a part of the land," and the measure of damages should be "the difference between the value of the land immediately before and after a house on it is injured or destroyed." *Id.* at 794. We reached that result because declining local land values led us to conclude that to award the landowner the cost of restoring the home "would be to give to him more than would be just compensation." *Id.* at 793. By contrast, we reached the opposite result in *Coastal Transport Co. v. Crown Central Petroleum,* 136 S.W.3d 227, 235 (Tex.2004). In that case, fire destroyed a landowner's facility. *Id.* at 229. The injury was found to be temporary, and the trial court awarded an amount commensurate with the cost of replacing the facility, rather than the much larger sum the jury found constituted the property's lost market value. *Id.* at 230, 235. The landowner argued that the injury was permanent, as the facility had been totally destroyed, but we held that the landowner was "entitled to recover only the amount of money necessary to rebuild its facility and to compensate for its loss of use during the interim." *Id.* at 235. This, we explained, was a measure sufficient to place the landowner "in the same position [it] occupied prior to the injury." *Id.* (citations and internal quotation marks omitted).

Though we reached divergent results in these

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cases, in each instance we explained that our holding was necessary to ensure that the landowner was adequately, but not excessively, compensated. Consistent with these decisions, we confirm today our recognition of the economic feasibility exception to the general rule governing the measure of damages for temporary injury to real property.

### b. The Intrinsic Value of Trees Exception

In cases involving real property injured by the destruction of trees, even when the proper measure of damages is the loss in the fair market value of the property to which the trees were attached, and the value of the land has not declined, we have held that the injured party may nevertheless recover for the trees' intrinsic value. This exception was created to compensate landowners for the loss of the aesthetic and utilitarian value that trees confer on real property. In *Porras v. Craig,* a landowner sued his neighbor for cutting down trees on his property, some as large as four feet in diameter. 675 S.W.2d 503, 504 (Tex.1984). The parties agreed that the damage to the land was permanent, and we noted that the usual measure of damages for permanent injury to real property is "the difference in the market value of the land immediately before and immediately after" the injury occurs. *Id.* However, we observed that Texas courts of appeals had begun to apply "a conditional measure of damages, ... contingent on a showing of no reduction in market value," which compensated landowners for the intrinsic value of the trees that were destroyed. *Id.* at 506. We recognized the exception and remanded the case for a new trial in the interest of justice. *Id.*

We recently revisited this exception in *Strickland v. Medlen.* 397 S.W.3d 184 (Tex.2013). In that case, we considered whether pet owners could recover noneconomic damages for the negligent loss of their dog. *Id.* at 185. We concluded that they could not, as more than a century of case law has classified pets as personal property. *Id.* (citing *Heiligmann v. Rose,* 81 Tex. 222, 16 S.W. 931, 932 (1891)). Ultimately, we held that the plaintiffs could recover only the objective, economic value of

their pet. *Id.* at 198. In arriving at this conclusion, we distinguished *Porras.* We explained that *Porras* presented no obstacle to the result in *Strickland* **\*483** because a tree's intrinsic value is not "rooted in an owner's subjective emotions," nor does it encompass the tree's "sentimental value" to its owner. *Id.* at 190. Rather, the intrinsic value of a tree lies in "its ornamental (aesthetic) value and its utility (shade) value." *Id.* (citing *Porras,* 675 S.W.2d at 506). We also do not rule out other elements of objective value to the extent an expert lays a proper predicate.

[14] Applying *Strickland,* we confirm and clarify this exception to the general rule governing damages for permanent injury to real property. Specifically, we affirm that when a landowner can show that the destruction of trees on real property resulted in no diminishment of the property's fair market value, or in so little diminishment of that value that the loss is essentially nominal, the landowner may recover the intrinsic value of the trees lost; that is, the ornamental and utilitarian value of the trees. We recognize that in *Porras* we stated that the exception applies when there is "no" diminution in market value, *Porras,* 675 S.W.2d at 506, but we decline to limit the exception so strictly. *See Moran Corp. v. Murray,* 381 S.W.2d 324, 328 (Tex.Civ.App.-Texarkana 1964, no writ) (holding that intrinsic value measure of damages is proper when the plaintiff shows "that destruction of the trees did not have a significant effect upon the market value of the land"). If we were to permit application of the exception when the property suffered no loss in fair market value but not permit application of the same exception when the property suffered what amounts to a nominal loss in value, we would controvert the purpose of a damage award, which is to adequately compensate the injured party. *See Pac. Express,* 16 S.W. at 793.

### III. Application

Having considered our case law concerning the temporary-versus-permanent distinction, we turn to the matter at hand. First, we consider whether

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Wheeler was required to submit a question asking the jury to characterize the injury to the Mountain as temporary or permanent. Second, we consider the propriety of the jury's award of cost-to-restore damages. Finally, we consider whether the jury question concerning the intrinsic value of the trees was properly submitted.

### A. Absence of a Temporary–Versus–Permanent Jury Question

The court of appeals ultimately held that Wheeler's claims failed because it had neglected to request, and in fact actively opposed, a jury question concerning whether the injury to the Mountain was temporary or permanent. The court of appeals stated that "whether injury to real property is permanent or temporary is a question of fact." 393 S.W.3d at 925. As a result, it reasoned that "before damages for injury to real property may be awarded, the plaintiff must first obtain a finding on whether the injury to the land was permanent or temporary." *Id.* The court relied on Texas Rule of Civil Procedure 279 to hold that, because Wheeler had declined to include a necessary predicate question, and Enbridge had objected to that omission, Enbridge was entitled to rendition of judgment in its favor. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). [FN2] As explained above, the court of appeals' analysis is predicated on an erroneous **\*484** premise—that the temporary-versus-permanent distinction is a question of fact. We therefore reject its conclusion.

> FN2. In *Payne,* we applied Rule 279 to hold that when an element of a party's claim is omitted from the jury charge, and the opposing party objects to the omission, a finding on the element may not be deemed in the prevailing party's favor. 838 S.W.2d at 241.

[15] Any dispute about the underlying facts of the case at bar has no bearing on the classification of the injury to the Mountain as temporary or permanent. Wheeler presented evidence that the cost to restore the Mountain to the condition it was in before Enbridge cleared the right of way was somewhere between $585,745 and $857,589. The jury ultimately found that the reasonable cost to restore the Mountain was $300,000. Although Enbridge contested the opinions of Wheeler's experts, at the very least they show that restoration was possible, rendering the injury temporary under the definitions supplied above. There was also competing expert testimony that the loss in the Mountain's fair market value was either $0 (according to Wheeler's expert) or $3,000 (according to Enbridge's expert). Under these circumstances, when restoration of the land is technically possible but exceeds the diminution in market value to such a disproportionately high degree that the repairs are no longer economically feasible,[FN3] the injury is deemed permanent. *See Pac. Express,* 16 S.W. at 793–94. Moreover, the parties now agree that the injury is a permanent one.

> FN3. We note that even the lower range of cost-to-restore damages presented by Wheeler's experts significantly exceeded the fair market value of the entire 153–acre property. The amount of cost-to-restore damages awarded by the jury was approximately 78% of the value of the entire property.

We hold that whether the injury to the Mountain was temporary or permanent is a question of law and that Wheeler therefore was not required to submit a jury question on that issue. Indeed, it would have been error for the trial court to include such a question in the charge. *Grohman v. Kahlig,* 318 S.W.3d 882, 887 (Tex.2010). Instead, applying the definitions supplied in this opinion, we hold that the injury to the Mountain is deemed permanent as a matter of law due to the parties' agreement and the application of the economic feasibility exception.

Because the injury is deemed permanent, however, the trial court improperly instructed the jury to calculate damages based on the cost to re-

store the property. In turn, the trial court's judgment may not be upheld based on the jury's calculation of such damages. Accordingly, we turn to the jury's award of intrinsic value damages.

### B. The Intrinsic Value of Trees Jury Question

The jury independently awarded Wheeler $288,000 in damages for the intrinsic value of the trees that were destroyed. Enbridge contends that Wheeler is barred from recovering such damages because (1) the loss of trees caused some diminution in the Mountain's fair market value, and (2) the intrinsic value jury question was submitted in conjunction with the trespass cause of action, which was itself improperly submitted.[FN4]

> FN4. Enbridge also argues that Wheeler failed to show that the destroyed trees had no market value as timber separate and apart from the real property to which they were attached, rendering intrinsic value damages improper. *E.g., Lucas v. Morrison,* 286 S.W.2d 190, 191 (Tex.Civ.App.-San Antonio 1956, no writ). When we recognized intrinsic value damages in *Porras,* we did not require the plaintiff to make such a showing, which makes sense because that measure applies to trees that serve ornamental or shade purposes. 675 S.W.2d at 506.

[16] In its first argument, Enbridge contends that Wheeler may not recover the intrinsic value of the trees that were **\*485** destroyed because Wheeler did not adduce legally sufficient evidence that the value of the Mountain was not at all diminished by the destruction. In support of this argument, Enbridge cites the opinions of several courts of appeals. *See, e.g., Lamar Cnty. Electric Coop. Ass'n v. Bryant,* 770 S.W.2d 921, 923 (Tex.App.-Texarkana 1989, no writ); *Garey Constr. Co. v. Thompson,* 697 S.W.2d 865, 867 (Tex.App.-Austin 1985, no writ). But, as we have already explained, a landowner may recover for the intrinsic value of the trees on his property so long as the diminution in the fair market value of the land is essentially nom-

inal. To the extent these opinions hold otherwise, we expressly overrule them.

In this case, the record indicates that the fair market value of the Mountain as of the date of the injury was $383,000. As noted above, Wheeler's expert testified that the destruction of the trees had not diminished the value of the Mountain at all, while Enbridge's expert testified that the Mountain had been reduced in value by $3,000. Assuming that the latter figure is the correct one,[FN5] the fair market value of the Mountain was reduced by less than one percent. This negligible reduction in fair market value is essentially nominal and does not preclude application of the intrinsic value exception.

> FN5. The jury agreed with Wheeler that there was no loss in fair market value, but Enbridge challenges the sufficiency of the evidence to support that finding. We need not decide that issue because the result is the same even if we assume there was a $3,000 loss in fair market value.

Enbridge also suggests an independent ground on which the jury's damage award must be invalidated. In the jury charge, the question that asked the jury to consider the intrinsic value of the trees was posed in connection with a liability question on Wheeler's trespass cause of action. Relying on *DeWitt County Electric Cooperative, Inc. v. Parks,* 1 S.W.3d 96 (Tex.1999), Enbridge argues that Wheeler cannot recover on its trespass claim as a matter of law and that, as a result, the jury question related to the intrinsic value of the trees is infirm.

In *Parks,* certain landowners entered into a contract with an electrical services cooperative for an easement across the landowners' property. *Id.* at 99. The right-of-way agreement that created the easement gave the cooperative certain rights with regard to the trees that were located on or near the easement. *Id.* When the cooperative cut down several trees, the landowners sued, alleging breach of contract and negligence among other claims. *Id.* We

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

considered whether the plaintiffs could maintain their negligence claim independently of their contract claim. *Id.* at 105. Ultimately, we held that when a contract between two parties "spells out the parties' respective rights about whether trees may be cut, the contract and not common-law negligence governs any dispute about whether trees could be cut or how trees were cut." *Id.* That is, we held that the landowners' claims sounded only in contract, not in negligence, and we affirmed the trial court's grant of directed verdict to the cooperative on the landowners' negligence claims. *Id.* However, in *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* we held that the existence of a contract did not prevent a plaintiff from bringing an additional claim for fraudulent inducement. 960 S.W.2d 41, 43 (Tex.1998). Because in the instant suit Wheeler brought a claim for trespass-distinct from both the negligence claim in *Parks* and the fraudulent inducement claim in *Formosa Plastics*—it is not immediately**\*486** clear whether the trial court erred in submitting Wheeler's claim to the jury.

However, we need not resolve that question to conclude that, even if the submission of the trespass cause of action was error, it was harmless. We have held that the submission of an improper jury question may be harmless when an appellate court determines that the verdict was based on a valid theory of liability. *Thota v. Young,* 366 S.W.3d 678, 693–94 (Tex.2012). And, as we have already stated, the temporary-versus-permanent dichotomy and its concomitant rules and exceptions—including the intrinsic value exception—govern the proper measure of damages on Wheeler's breach-of-contract claim. *See Parks,* 1 S.W.3d at 105. Because breach of contract was a valid theory of liability on which Wheeler prevailed, it is of no moment that the intrinsic value of trees jury question was submitted in conjunction with a trespass cause of action.

### IV. Remaining Issues

Enbridge raised several issues in the court of appeals that were not reached because of that court's disposition of the case. Some of those issues were argued in the parties' briefing to this Court and have been discussed in this opinion. However, several were not, including various challenges to the trial court's admission of Wheeler's experts' testimony, exclusion of Enbridge's experts' testimony, and failure to submit a jury question on one of Enbridge's breach-of-contract defenses. As these issues were not briefed in this Court, we hereby remand the case to the court of appeals to address them.

### V. Conclusion

The court of appeals erred in rendering judgment for Enbridge based on the trial court's failure to submit a jury question on whether the injury to the Mountain was temporary or permanent. For the reasons discussed above, we reverse the court of appeals' judgment and remand the case to that court to address the remaining issues in a manner consistent with this opinion.

Tex.,2014.
Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas), L.P.
449 S.W.3d 474, 57 Tex. Sup. Ct. J. 1465

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB B



747 S.W.2d 785
**(Cite as: 747 S.W.2d 785)**

▷

Supreme Court of Texas.
BOYCE IRON WORKS, INC., Petitioner,
v.
SOUTHWESTERN BELL TELEPHONE COMPANY, Respondent.

No. C–6376.
April 6, 1988.

Action was brought against telephone company for property damage resulting from fire started during burglary of plaintiff's premises. The 200th Judicial District Court, Travis County, Paul R. Davis, Jr., J., held for plaintiff, and telephone company appealed. The Austin Court of Appeals, Third Supreme Judicial District, 726 S.W.2d 182, Shannon, C.J., reversed, and plaintiff brought error. The Supreme Court, Mauzy, J., held that plaintiff who obtained favorable jury verdicts on theories of negligence and deceptive trade practices was entitled to seek recovery under alternative negligence theory once judgment on deceptive trade practices theory was reversed on appeal.

Reversed and remanded.

West Headnotes

**[1] Judgment 228 ⚷198**

228 Judgment
    228VI On Trial of Issues
        228VI(A) Rendition, Form, and Requisites in General
            228k198 k. Verdict and Findings of Jury. Most Cited Cases

When party tries case on alternative theories of recovery, and jury returns favorable findings on two or more theories, party has right to judgment on theory entitling him to greatest or most favorable relief.

**[2] Appeal and Error 30 ⚷1194(1)**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(F) Mandate and Proceedings in Lower Court
            30k1193 Effect in Lower Court of Decision of Appellate Court
                30k1194 Construction and Operation in General
                    30k1194(1) k. In General. Most Cited Cases

When jury returns favorable findings on two or more alternative theories, prevailing party need not formally waive alternative findings, and thus may seek recovery under alternative theory if judgment on one theory is reversed on appeal.

**[3] Appeal and Error 30 ⚷1194(1)**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(F) Mandate and Proceedings in Lower Court
            30k1193 Effect in Lower Court of Decision of Appellate Court
                30k1194 Construction and Operation in General
                    30k1194(1) k. In General. Most Cited Cases

Plaintiff who obtained favorable jury verdicts on theories of negligence and deceptive trade practices was entitled to seek recovery under alternative negligence theory once judgment on deceptive trade practices theory was reversed on appeal; plaintiff did not waive his right to recover under negligence theory by failing to complain when trial court entered judgment on deceptive trade practices theory.

**\*786** Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, Marlin L. Gilbert, San Antonio, David H. Donaldson, Jr., Pamela Stanton Baron, Graves, Dougherty, Hearon & Moody, Austin, for respondent.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

747 S.W.2d 785
**(Cite as: 747 S.W.2d 785)**

Mack Kidd, Thomas R. Harkness, Kidd, Whitehurst, Harkness & Watson, Douglas W. Alexander, Brown, Maroney, Rose, Barber & Dye, Austin, for petitioner.

MAUZY, Justice.

Boyce Iron Works, Inc. sued Southwestern Bell Telephone Company on alternative theories of negligence and violations of the Deceptive Trade Practices—Consumer Protection Act when a fire destroyed Boyce's offices. In accordance with a jury verdict, the trial court rendered judgment on Boyce's DTPA claim, awarding $229,596.88 actual damages, $110,937.99 in prejudgment interest, and $500,000.00 in additional damages and attorneys' fees. The court of appeals reversed and rendered judgment that Boyce take nothing. 726 S.W.2d 182. We reverse the judgment of the court of appeals and remand the cause to that court for further consideration.

Boyce maintained a silent burglar alarm to secure its premises. At approximately 5 p.m. on Friday, October 9, 1981, Boyce employees became aware of a problem in the telephone line that connected the system to the alarm company's office. Boyce officials did not notify Southwestern Bell because they believed that it was Southwestern Bell's policy that no repairs were performed after business hours, and that Monday would be the earliest that the line could be repaired.

During the early morning hours on October 10, 1981, burglars started a fire that consumed the Boyce premises. Boyce brought suit against Southwestern Bell and Master Burglar Alarm. The case was tried on alternative theories of negligence and violations of the DTPA. The jury found that Master Burglar Alarm was negligent and the judgment awarded Boyce $25,000.00 in damages. Master Burglar Alarm is not a party on appeal. The jury answered issues against Southwestern Bell on both theories of recovery. A judgment was rendered against Southwestern Bell, granting the more favorable relief available under the DTPA. The judgment incorporated the jury's verdict "for all purposes." The court of appeals reversed, **\*787** concluding that no evidence supported the finding that Southwestern Bell's misrepresentations were a "producing cause" of Boyce's actual damages. 726 S.W.2d at 187. In cross-point, Boyce urged that if the court reversed the DTPA judgment, it should nevertheless render judgment for Boyce on its alternative negligence theory. The court of appeals rendered judgment that Boyce take nothing, concluding that Boyce waived its cross-point because no complaint was made in the trial court.

[1] Boyce's first point of error, regarding the cross-point before the court of appeals, is dispositive in this case. When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief. *Hargrove v. Trinity Universal Insurance Co.,* 152 Tex. 243, 256 S.W.2d 73 (1953). *See also* 31 J. Wicker, *Texas Practice* § 306 (1985). Furthermore, under Tex.R.Civ.P. 301 the trial court's judgment must award the prevailing party all the relief to which he may be entitled.

[2] in the trial court, Boyce moved for judgment seeking damages under the DTPA. The motion contained no waiver of the alternative negligence findings. In fact, the final judgment incorporated all jury findings, for all purposes. Under this court's holding in *Birchfield v. Texarkana Memorial Hospital,* 747 S.W.2d 361, (Tex.1987), an election by the prevailing party is not necessary. When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal.

[3] Generally, before a party may complain by cross-point on appeal, the error must have been brought to the trial court's attention. *West Texas Utilities Co. v. Irvin,* 161 Tex. 5; 336 S.W.2d 609 (1960). However, that rule does not apply in this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

case because Boyce received a favorable judgment and had no reason to complain in the trial court. Under *Chesshir v. First State Bank,* 620 S.W.2d 101 (Tex.1981), Boyce had no duty to complain in the trial court before raising this cross-point before the court of appeals. In fact, Boyce was not required under *Chesshir* to raise the issue of alternative grounds for recovery until the court of appeals rendered its judgment reversing the DTPA judgment. 620 S.W.2d at 101. *Accord Houston First American Savings v. Musick,* 650 S.W.2d 764, 770 (Tex.1983); *McKelvy v. Barber,* 381 S.W.2d 59, 62 (Tex.1964). Boyce had no duty to complain in the trial court when it recovered all relief available under its DTPA claim. By incorporating the jury's findings in the court's judgment, Boyce did everything it could to preserve the right of recovery under the alternative theory.

The court of appeals erred in concluding that Boyce waived its right to recover under the alternative negligence theory. We hold that the court of appeals erred in failing to consider Boyce's negligence claims. We therefore reverse the judgment of the court of appeals and remand the cause to that court for consideration of Boyce's negligence claims.

Tex.,1988.
Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.
747 S.W.2d 785

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

709 S.W.2d 175
**(Cite as: 709 S.W.2d 175)**



Supreme Court of Texas.
James CAIN, d/b/a James Cain Company, et al., Petitioners,
v.
James Lee BAIN et ux., Respondents.

No. C–4764.
Feb. 12, 1986.
Rehearing Denied June 4, 1986.

Purchasers of home brought action against real estate agency for violations of Deceptive Trade Practices Act, after being unable to sell house which they procured through agency because of foundation defect. The 215th District Court, Harris County, Charles L. Price, granted agency's motion for directed verdict and rendered take-nothing judgment against purchasers, and purchasers appealed. The Texarkana Court of Appeals, Sixth Court of Appeals District, reversed, determining that flaws and evidence of defects in house did not point unerringly to substantial foundation defect, such that purchasers were put on notice of defect, as jury found, and agency petitioned for writ of error. The Supreme Court held that proper standard of review for Court of Appeals in determining factual sufficiency of evidence is to consider and weigh all evidence and set aside verdict only if it is so contrary to overwhelming weight of evidence as to be clearly wrong and unjust.

Court of Appeals affirmed in part, reversed in part, and cause remanded thereto.

West Headnotes

**Appeal and Error 30 ⟨⟩989**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)1 In General

            30k988 Extent of Review
               30k989 k. In General. Most Cited Cases

**Appeal and Error 30 ⟨⟩1003(5)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1003 Against Weight of Evidence
               30k1003(5) k. Great or Overwhelming Weight or Preponderance. Most Cited Cases

Proper standard of review which Court of Appeals should have used in reviewing jury verdict to determine factual sufficiency of evidence was to consider and weigh all evidence, and to set aside verdict only if it was so contrary to overwhelming weight of evidence as to be clearly wrong and unjust.

**\*175** Ross, Banks, May, Cron & Cavin by John A. Cavin, Houston, for petitioners.

Ross, Banks, May, Cron & Cavin, Gordon A. Holloway, and N. Carlene Rhodes, Houston, for respondents.

PER CURIAM.
James and Karen Bain purchased a 20-year-old house in 1976 from George and Carroll Banks. The real estate agent for the transaction was an employee of James Cain Company. In 1978, the Bains tried to sell their house but were unable to find a buyer because of a foundation defect. They sued James Cain Company for violations of the Texas Deceptive Trade Practices Act. The trial court granted Cain's Motion for Directed Verdict and rendered a take nothing judgment against the Bains. In an unpublished opinion, the court of appeals reversed the trial court's judgment. Tex.R.Civ.P. 452.

The trial court submitted Issue No. 7 asking the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

jury:

Do you find from a preponderance of the evidence that on or before October 13, 1977 the Plaintiffs James Lee Bain and wife Karen Sue Bain either had knowledge of such substantial foundation structural defect, or were on notice of such facts as would cause a reasonable, prudent person to make inquiry which could lead to the discovery of such defect by the exercise of reasonable diligence?

Answer: "We do" or "We do not"

Answer: We do

The evidence revealed that when the Bains moved into the house they noticed a bulge under one window, a crack in the kitchen wall, and a sticking door. Within six or seven months after occupying the house, they noticed a foundation crack near the patio. Karen Bain testified that during the spring or summer of 1977 she was told there might be a slab problem with the house.

The Bains presented some evidence to the contrary. They consulted with a foundation**\*176** expert in April 1978, who informed them that there was not a substantial foundation defect. Also, they argue the flaws in the house could have been indicative of problems other than a foundation defect, such as ordinary subsidence problems common to the Houston area, or the effects of age, dampness and weathering on a 20-year-old house.

On appeal, the Bains asserted that the jury finding that they were on constructive notice of the foundation defect was against the great weight and preponderance of the evidence. The court of appeals reversed the trial court's judgment and remanded the cause, holding the flaws and evidence of defects in the house "do not point unerringly to a substantial foundation defect." This is not the correct standard of review for a challenge to the sufficiency of the evidence.

When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985); *In Re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

The court of appeals imposed a different standard—that the evidence supporting the jury's finding must point "unerringly" to the conclusion found by the jury. The court also held the evidence was "much too slight and indefinite" to support the jury verdict. The jury's task is to decide a fact issue based on the preponderance of the evidence. We hold that the court of appeals has decided this case under an inappropriate standard of law. There is some evidence to support the jury verdict. Therefore, pursuant to Rule 483, we grant Cain's application for writ of error and, without hearing oral argument, reverse the judgment of the court of appeals on the insufficiency of evidence point and remand the cause to that court to consider the insufficiency points of error under the proper test. We affirm the judgment of the court of appeals in all other respects.

Tex.,1986.
Cain v. Bain
709 S.W.2d 175

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

▷

Supreme Court of Texas.
The CITY OF KELLER, Petitioner,
v.
John W. WILSON, Grace S. Wilson, Johnny L.
Wilson and Nancy A. Wilson, Respondents.

No. 02–1012.
Argued Oct. 19, 2004.
Decided June 10, 2005.
Rehearing Denied Sept. 2, 2005.

**Background:** Landowners brought action against city to recover damages for inverse condemnation and for violations of Water Code. The 96th District Court, Tarrant County, Jeff Walker, J., entered judgment on jury verdict in favor of landowners. City appealed. The Fort Worth Court of Appeals, 86 S.W.3d 693, affirmed. City filed petition for review.

**Holdings:** The Supreme Court, Brister, J., held that:
(1) both the "exclusive" and "inclusive" standards for no-evidence review are correct, in that the two standards reach the same result, and
(2) no evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking.

Judgment of Court of Appeals reversed; case remanded.

O'Neill, J., filed concurring opinion in which Medina, J., joined.

West Headnotes

**[1] Eminent Domain 148 ☞266**

148 Eminent Domain
   148IV Remedies of Owners of Property; Inverse Condemnation
      148k266 k. Nature and grounds in general. Most Cited Cases
   To recover damages from city for inverse condemnation, landowners had to prove the city intentionally took or damaged their property for public use, or was substantially certain that would be the result. Vernon's Ann.Texas Const. Art. 1, § 17.

**[2] Appeal and Error 30 ☞1001(3)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(3) k. Total failure of proof. Most Cited Cases
   The traditional scope of no-evidence review does not disregard contrary evidence if there is no favorable evidence, or if contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite.

**[3] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(1) k. In general. Most Cited Cases
   When conducting a legal-sufficiency review, evidence can be disregarded whenever reasonable jurors could do so, an inquiry that is necessarily fact-specific.

**[4] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1001 Sufficiency of Evidence in Support

30k1001(1) k. In general. Most Cited Cases

When courts conducting legal-sufficiency review use the "exclusive" standard and disregard contrary evidence, they must recognize certain exceptions to it.

**[5] Libel and Slander 237 👉19**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k19 k. Construction of language used. Most Cited Cases

Publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself.

**[6] Appeal and Error 30 👉840(3)**

30 Appeal and Error

30XVI Review

30XVI(A) Scope, Standards, and Extent, in General

30k838 Questions Considered

30k840 Review of Specific Questions and Particular Decisions

30k840(3) k. Review of constitutional questions. Most Cited Cases

A court reviewing legal sufficiency, in an action alleging a defamatory publication, cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.

**[7] Contracts 95 👉143.5**

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143.5 k. Construction as a whole. Most Cited Cases

Reviewing courts must construe contracts as a whole; courts do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless.

**[8] Contracts 95 👉164**

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k164 k. Construing instruments together. Most Cited Cases

Writings executed at different times must be considered together if they pertain to the same transaction.

**[9] Appeal and Error 30 👉1001(1)**

30 Appeal and Error

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1001 Sufficiency of Evidence in Support

30k1001(1) k. In general. Most Cited Cases

In reviewing intentional infliction of emotional distress claims for legal sufficiency, appellate court considers the context and the relationship between the parties.

**[10] Appeal and Error 30 👉1001(1)**

30 Appeal and Error

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1001 Sufficiency of Evidence in Support

30k1001(1) k. In general. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

When conducting legal-sufficiency review, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did.

**[11] Appeal and Error 30 ⚷989**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)1 In General
        30k988 Extent of Review
          30k989 k. In general. Most Cited Cases

If evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded when conducting legal-sufficiency review, even if that means rendering judgment contrary to the jury's verdict.

**[12] Judgment 228 ⚷19**

228 Judgment
  228I Nature and Essentials in General
    228k19 k. Evidence to sustain judgment. Most Cited Cases

**Judgment 228 ⚷232**

228 Judgment
  228VI On Trial of Issues
    228VI(A) Rendition, Form, and Requisites in General
      228k232 k. Defects and objections. Most Cited Cases

Incompetent evidence is legally insufficient to support a judgment, even if admitted without objection.

**[13] Appeal and Error 30 ⚷989**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)1 In General

        30k988 Extent of Review
          30k989 k. In general. Most Cited Cases

Evidence showing supporting evidence to be incompetent cannot be disregarded when conducting legal-sufficiency review, even if the result is contrary to the verdict.

**[14] Appeal and Error 30 ⚷989**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)1 In General
        30k988 Extent of Review
          30k989 k. In general. Most Cited Cases

**Evidence 157 ⚷568(1)**

157 Evidence
  157XII Opinion Evidence
    157XII(F) Effect of Opinion Evidence
      157k568 Opinions of Witnesses in General
        157k568(1) k. In general. Most Cited Cases

When expert testimony is required, lay evidence supporting liability is legally insufficient; in such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.

**[15] Appeal and Error 30 ⚷989**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)1 In General
        30k988 Extent of Review
          30k989 k. In general. Most Cited Cases

If an expert's opinion is based on certain assumptions about the facts, an appellate court con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

ducting legal-sufficiency review cannot disregard evidence showing those assumptions were unfounded.

**[16] Appeal and Error 30 ⬅️837(1)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
        30k837 Matters or Evidence Considered in Determining Question
          30k837(1) k. In general. Most Cited Cases

An appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.

**[17] Appeal and Error 30 ⬅️1001(3)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)2 Verdicts
          30k1001 Sufficiency of Evidence in Support
            30k1001(3) k. Total failure of proof. Most Cited Cases

Evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent.

**[18] Appeal and Error 30 ⬅️1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)2 Verdicts
          30k1001 Sufficiency of Evidence in Support
            30k1001(1) k. In general. Most Cited Cases

In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla, and thus is legally insufficient, if jurors would have to guess whether a vital fact exists.

**[19] Appeal and Error 30 ⬅️996**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)1 In General
          30k996 k. Inferences from facts proved. Most Cited Cases

When the circumstances are equally consistent with either of two facts, neither fact may be inferred, and the appellate court must view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances.

**[20] Appeal and Error 30 ⬅️1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)2 Verdicts
          30k1001 Sufficiency of Evidence in Support
            30k1001(1) k. In general. Most Cited Cases

When the circumstantial evidence of a vital fact is meager, a reviewing court conducting legal-sufficiency review must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

**[21] Appeal and Error 30 ⬅️837(1)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
        30k837 Matters or Evidence Considered in Determining Question

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

30k837(1) k. In general. Most Cited Cases

An appellate court conducting a legal-sufficiency review cannot disregard undisputed evidence that allows of only one logical inference; by definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it.

**[22] Evidence 157 ☞594**

157 Evidence
 157XIV Weight and Sufficiency
 157k594 k. Uncontroverted evidence. Most Cited Cases

**Trial 388 ☞141**

388 Trial
 388VI Taking Case or Question from Jury
 388VI(A) Questions of Law or of Fact in General
 388k141 k. Uncontroverted facts or evidence. Most Cited Cases

Jurors are not free to reach a verdict contrary to undisputed evidence that allows of only one logical inference; indeed, uncontroverted issues need not be submitted to a jury at all.

**[23] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
 30XVI Review
 30XVI(I) Questions of Fact, Verdicts, and Findings
 30XVI(I)2 Verdicts
 30k1001 Sufficiency of Evidence in Support
 30k1001(1) k. In general. Most Cited Cases

Undisputed contrary evidence becomes conclusive, and thus cannot be disregarded when conducting legal-sufficiency review, when it concerns physical facts that cannot be denied.

**[24] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
 30XVI Review
 30XVI(I) Questions of Fact, Verdicts, and Findings
 30XVI(I)2 Verdicts
 30k1001 Sufficiency of Evidence in Support
 30k1001(1) k. In general. Most Cited Cases

Undisputed contrary evidence may become conclusive, such that it cannot be disregarded when conducting legal-sufficiency review, when a party admits it is true.

**[25] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
 30XVI Review
 30XVI(I) Questions of Fact, Verdicts, and Findings
 30XVI(I)2 Verdicts
 30k1001 Sufficiency of Evidence in Support
 30k1001(1) k. In general. Most Cited Cases

Evidence is conclusive, such that it cannot be disregarded during legal-sufficiency review, only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case.

**[26] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
 30XVI Review
 30XVI(I) Questions of Fact, Verdicts, and Findings
 30XVI(I)2 Verdicts
 30k1001 Sufficiency of Evidence in Support
 30k1001(1) k. In general. Most Cited Cases

For purposes of conducting legal-sufficiency review, undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence

may or may not be undisputed.

**[27] Appeal and Error 30 ☜1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(1) k. In general. Most Cited Cases

Proper legal-sufficiency review prevents reviewing courts from substituting their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth.

**[28] Appeal and Error 30 ☜989**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)1 In General
            30k988 Extent of Review
               30k989 k. In general. Most Cited Cases

When evidence contrary to a verdict is conclusive, it cannot be disregarded when conducting legal-sufficiency review.

**[29] Appeal and Error 30 ☜1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(1) k. In general. Most Cited Cases

The standard for legal sufficiency works in tandem with the standard of review—whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated.

**[30] Appeal and Error 30 ☜930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

Cases involving what a party knew or why it took a certain course of action are not amenable to legal-sufficiency review under the "exclusive" standard, under which all contrary evidence is disregarded.

**[31] Appeal and Error 30 ☜994(2)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)1 In General
            30k994 Credibility of Witnesses
               30k994(2) k. Province of jury. Most Cited Cases

**Appeal and Error 30 ☜1003(3)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1003 Against Weight of Evidence
               30k1003(3) k. Province of jury or trial court. Most Cited Cases

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.

**[32] Appeal and Error 30 ☜999(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

Findings

> 30XVI(I)2 Verdicts
>> 30k999 Conclusiveness in General
>>> 30k999(1) k. In general. Most Cited Cases

**Evidence 157 ☞588**

157 Evidence
> 157XIV Weight and Sufficiency
>> 157k588 k. Credibility of witnesses in general. Most Cited Cases

Jurors may choose to believe one witness and disbelieve another, and reviewing courts cannot impose their own opinions to the contrary.

**[33] Appeal and Error 30 ☞930(1)**

30 Appeal and Error
> 30XVI Review
>> 30XVI(G) Presumptions
>>> 30k930 Verdict
>>>> 30k930(1) k. In general. Most Cited Cases

Reviewing courts must assume jurors decided all of credibility questions in favor of the verdict if reasonable human beings could do so.

**[34] Evidence 157 ☞594**

157 Evidence
> 157XIV Weight and Sufficiency
>> 157k594 k. Uncontroverted evidence. Most Cited Cases

Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.

**[35] Evidence 157 ☞570**

157 Evidence
> 157XII Opinion Evidence
>> 157XII(F) Effect of Opinion Evidence
>>> 157k569 Testimony of Experts
>>>> 157k570 k. In general. Most Cited Cases

Uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.

**[36] Trial 388 ☞140(1)**

388 Trial
> 388VI Taking Case or Question from Jury
>> 388VI(A) Questions of Law or of Fact in General
>>> 388k140 Credibility of Witnesses
>>>> 388k140(1) k. In general. Most Cited Cases

Jury's decisions regarding credibility must be reasonable.

**[37] Evidence 157 ☞594**

157 Evidence
> 157XIV Weight and Sufficiency
>> 157k594 k. Uncontroverted evidence. Most Cited Cases

Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.

**[38] Evidence 157 ☞588**

157 Evidence
> 157XIV Weight and Sufficiency
>> 157k588 k. Credibility of witnesses in general. Most Cited Cases

Jurors are not free to believe testimony that is conclusively negated by undisputed facts.

**[39] Appeal and Error 30 ☞930(1)**

30 Appeal and Error
> 30XVI Review
>> 30XVI(G) Presumptions
>>> 30k930 Verdict
>>>> 30k930(1) k. In general. Most Cited Cases

Whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal-sufficiency review.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[40] Trial 388 🔑143**

388 Trial
   388VI Taking Case or Question from Jury
      388VI(A) Questions of Law or of Fact in General
         388k143 k. Conflicting evidence. Most Cited Cases

It is the province of the jury to resolve conflicts in the evidence.

**[41] Appeal and Error 30 🔑930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

Courts reviewing all the evidence in a light favorable to jury's verdict must assume that jurors resolved all conflicts in accordance with that verdict.

**[42] Appeal and Error 30 🔑930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

In every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal-sufficiency review.

**[43] Trial 388 🔑141**

388 Trial
   388VI Taking Case or Question from Jury
      388VI(A) Questions of Law or of Fact in General
         388k141 k. Uncontroverted facts or evidence. Most Cited Cases

**Trial 388 🔑142**

388 Trial
   388VI Taking Case or Question from Jury
      388VI(A) Questions of Law or of Fact in General
         388k142 k. Inferences from evidence. Most Cited Cases

Even if evidence is undisputed, it is the province of the jurors to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess.

**[44] Appeal and Error 30 🔑930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

Courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal-sufficiency review.

**[45] Appeal and Error 30 🔑930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

Both the "exclusive" standard for scope of no-evidence review, under which contrary evidence is disregarded, and the "inclusive" standard, under which reviewing court considers all of the evidence in the light favorable to verdict, are correct; the two standards reach the same result.

**[46] Appeal and Error 30 🔑999(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

30XVI(I)2 Verdicts

30k999 Conclusiveness in General

30k999(1) k. In general. Most Cited Cases

A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within the zone of reasonable disagreement.

**[47] Appeal and Error 30 ☞930(1)**

30 Appeal and Error

30XVI Review

30XVI(G) Presumptions

30k930 Verdict

30k930(1) k. In general. Most Cited Cases

**Appeal and Error 30 ☞996**

30 Appeal and Error

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)1 In General

30k996 k. Inferences from facts proved. Most Cited Cases

Whether a reviewing court conducting legal-sufficiency review starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it; but if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it.

**[48] Trial 388 ☞139.1(4)**

388 Trial

388VI Taking Case or Question from Jury

388VI(A) Questions of Law or of Fact in General

388k139.1 Evidence

388k139.1(1) Province of Court and Jury

388k139.1(4) k. Sufficiency of evidence. Most Cited Cases

Legal sufficiency of the evidence is a question of law, not of fact.

**[49] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error

30XVI Review

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1001 Sufficiency of Evidence in Support

30k1001(1) k. In general. Most Cited Cases

**Judgment 228 ☞185(5)**

228 Judgment

228V On Motion or Summary Proceeding

228k182 Motion or Other Application

228k185 Evidence in General

228k185(5) k. Weight and sufficiency. Most Cited Cases

**Judgment 228 ☞199(3.9)**

228 Judgment

228VI On Trial of Issues

228VI(A) Rendition, Form, and Requisites in General

228k199 Notwithstanding Verdict

228k199(3.9) k. Where directed verdict or binding instructions would have been proper. Most Cited Cases

**Trial 388 ☞168**

388 Trial

388VI Taking Case or Question from Jury

388VI(D) Direction of Verdict

388k167 Nature and Grounds

388k168 k. In general. Most Cited Cases

The test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict (JNOV), and appellate no-evidence review.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

**[50] Evidence 157 ☞597**

157 Evidence
   157XIV Weight and Sufficiency
     157k597 k. Sufficiency to support verdict or finding. Most Cited Cases

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.

**[51] Appeal and Error 30 ☞930(1)**

30 Appeal and Error
   30XVI Review
     30XVI(G) Presumptions
       30k930 Verdict
         30k930(1) k. In general. Most Cited Cases

Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

**[52] Eminent Domain 148 ☞300**

148 Eminent Domain
   148IV Remedies of Owners of Property; Inverse Condemnation
     148k294 Evidence
       148k300 k. Weight and sufficiency. Most Cited Cases

**Evidence 157 ☞571(1)**

157 Evidence
   157XII Opinion Evidence
     157XII(F) Effect of Opinion Evidence
       157k569 Testimony of Experts
         157k571 Nature of Subject
           157k571(1) k. In general. Most Cited Cases

No evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking, although landowners' expert testified that flooding was inevitable, city knew that development would increase runoff at the head of drainage system, and prior drainage plan had required drainage ditch across landowners' property; three sets of engineers had certified that revised plans met city's codes and regulations and thus would not increase downstream flooding, and no evidence showed that city knew more than it was told by the engineers. Vernon's Ann.Texas Const. Art. 1, § 17.

**[53] Eminent Domain 148 ☞315**

148 Eminent Domain
   148IV Remedies of Owners of Property; Inverse Condemnation
     148k315 k. Appeal and error. Most Cited Cases

In conducting legal-sufficiency review of finding that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking, appellate court could not disregard contrary evidence explaining why city had approved the revised drainage plans; critical question in the case was city's state of mind, i.e., whether city knew or should have known that flooding was substantially certain, and appellate court could not evaluate what city knew by disregarding most of what it was told. Vernon's Ann.Texas Const. Art. 1, § 17.

**[54] Evidence 157 ☞570**

157 Evidence
   157XII Opinion Evidence
     157XII(F) Effect of Opinion Evidence
       157k569 Testimony of Experts
         157k570 k. In general. Most Cited Cases

When a case involves scientific or technical issues requiring expert advice, jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so.

**\*807** Dabney D. Bassel, Larry Bracken, Law

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

Snakard & Gambill, P.C., Fort Worth, Douglas H. Conner III, L. Stanton Lowry, Boyle & Lowry, L.L.P., Irving, for petitioner.

James B. Barlow, Barlow & Garsek, Fort Worth, Robert L. Russell Bush, Bush & Morrison, Arlington, David R. Casey, Hurst, for respondents.

Jay Doegey, Assistant City Attorney for the City of Corpus Christi, Texas, Corpus Christi, Theodore P. Gorski Jr., Office of the City Attorney for City of Fort Worth, Mark G. Daniel, Evans Gandy Daniel & Moore, Fritz Quast, Taylor Olson Adkins Sralla & Elam, LLP, Fort Worth, Monte Akers, Texas Municipal League, Austin, Michael A. Bucek, Senior Assistant City Attorney, Irving, Robert F. Brown, Brown & Hofmeister, L.L.P., Richardson, Bruce S. Powers, Assistant County Attorney, Michael A. Stafford, Harris County Attorney, Houston, for Amicus Curiae.

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, and Justice GREEN joined, and in which Justice O'NEILL and Justice MEDINA joined as to Parts I through IV.

Must an appellate court reviewing a verdict for legal sufficiency start by considering all the evidence or only part? Over the years, we have stated both as the proper scope of review. While some see the standards as opposing, we disagree; like a glass that is half-full or half-empty, both arrive at the same point regardless of where they start.

But both standards must be properly applied. Rules and reason sometimes compel that evidence must be credited or discarded whether it supports a verdict or contradicts it. Under either scope of review, appellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. As we find the evidence here meets neither standard, we reverse.

## I. Factual and Procedural History

The City of Keller is one of several fast-growing communities on the outskirts of **\*808** Fort Worth.[FN1] As part of that growth, the City approved plans for two new subdivisions, Estates of Oak Run and Rancho Serena, including plans for storm water drainage.

> FN1. The City of Fort Worth asserts in an amicus brief that in 2001 alone it approved 325 subdivision plats creating 5,857 residential lots within its extraterritorial jurisdiction, which of course excludes surrounding communities.

The Wilsons own property southeast of the new subdivisions, with a tract owned by Z.T. Sebastian lying between. Before development, surface water flowed generally north to south from the land where the subdivisions were built, across the Sebastian and Wilson properties, and into the Little Bear Creek Watershed.

In 1991, the City adopted a Master Drainage Plan providing for drainage easements across both the Sebastian and Wilson properties, and thence into Little Bear Creek. The City's codes require developers to comply with the Master Plan, to provide drainage for a 100–year rain event, and to avoid increasing the volume or velocity of water discharged upon downhill properties.

The developers of Oak Run and Rancho Serena submitted plans to the City indicating they would buy a drainage easement and build a ditch forty-five feet wide and more than two hundred yards long across the Sebastian property, and deed both to the City upon completion.[FN2] The plans also included detention basins on the subdivision properties, but omitted any drainage easement or ditch across the Wilsons' property. The City's director of public works approved the developers' plans, and the City accepted the works on completion.

> FN2. Evidence at trial and briefs by amici indicate that cities normally acquire title to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

these easements to ensure they are properly mowed and maintained after the developers' departure.

In accordance with the Master Plan, the City built a box culvert south of the Wilsons' property. But as the developers' drainage ditch ended at the Wilsons' north property line, there was no link between the two. The Wilsons alleged and the jury found this omission increased flooding on the Wilsons' property, ruining eight acres of farmland the jury valued at almost $300,000.

[1] To recover damages for inverse condemnation, the Wilsons had to prove the City intentionally took or damaged their property for public use, or was substantially certain that would be the result.[FN3] They do not allege the City intentionally flooded their land, but do allege it approved revised plans that it knew were substantially certain to have that effect.

> FN3. TEX. CONST. art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004).

The City contends no evidence supports the jury's finding of an intentional taking. It presented evidence that engineers for the developers, for the City, and for an outside firm the City retained all certified that the revised drainage plan complied with the City's codes and regulations—including the ban against increasing downstream runoff. Thus, the City asserts it had no reason to be substantially certain the opposite would occur, until it did.

A divided court of appeals rejected this contention.[FN4] In its legal sufficiency review, the court refused to consider the various engineers' certifications because "we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary."[FN5] The City challenges **\*809** this omission as applying the wrong scope of review.

> FN4. 86 S.W.3d 693, 715, 717.

> FN5. *Id.* at 700.

We have on many occasions stated the scope of review precisely as the court of appeals says (the "exclusive" standard).[FN6] But we have also stated that a reviewing court must consider "*all* of the evidence" in the light favorable to the verdict (the "inclusive" standard).[FN7] Sometimes we have mentioned neither reviewing all evidence nor disregarding some part of it.[FN8] Finally, we have sometimes expressly mentioned both.[FN9]

> FN6. *See, e.g., Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003) (per curiam); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 69 (Tex.2000); *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990); *Burkard v. ASCO Co.,* 779 S.W.2d 805, 806 (Tex.1989) (per curiam); *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988); *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1912).

FN7. *See, e.g., St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Burk Royalty v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 97 (1955); *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 498 (1952).

FN8. *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *La.-Pac. Corp. v. Andrade,* 19 S.W.3d 245, 247 (Tex.1999); *Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex.1998); *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998).

FN9. *See, e.g., Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *compare Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 363 (1957) ("We may consider *only* that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result.") (emphasis added), *with Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 298 S.W.2d 79, 81 (1956) ("[T]he duty of this Court [is] to examine and consider *all* of the evidence bearing on the controlling issues, and having done so to decide whether there is evidence of probative value to support the answers made by the jury to the issues.") (quotation omitted) (emphasis added), *and Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 698 (1914) ("[W]e must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict.... In considering this question, we must take into account all of the facts and circumstances attending the transaction.").

Although this Court has used both the exclusive and the inclusive standards interchangeably over the years, commentators say the two are different. FN10 Because this **\*810** important issue is dispositive here, we address it in some detail, and reserve for another day the City's arguments that a governmental entity cannot be liable for approving a developer's plans, or accepting rather than constructing the works at issue.

FN10. *See, e.g.,* W. Wendell Hall, *Standards of Review in Texas,* 34 ST. MARY'S L.J. 1, 159–62 (2002); William V. Dorsaneo, III, *Judges, Juries, & Reviewing Courts,* 53 SMU L.R. 1497, 1498, 1507–11 (2000); Phil Hardberger, *Juries Under Siege,* 30 ST. MARY'S L.J. 1, 40–41 (1998). *But see* William Powers, Jr., *Judge & Jury in the Texas Supreme Court,* 75 TEX. L.REV. 1699, 1699–1700, 1704–19 (1997) (concluding the Court is not changing the no-evidence standard of review but is moving away from broad definitions of duty and toward particularized definitions of duty).

## II. Contrary Evidence That Cannot Be Disregarded

The question presented here is not a new one. More than 40 years ago, then Justice Calvert FN11

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

addressed the standards for reviewing legal and factual sufficiency in the most-cited law review article in Texas legal history.[FN12] Frustrated that despite this Court's efforts to explain those standards "a growing number of recent decisions indicate a continuing misunderstanding,"[FN13] the author summarized and attempted to clarify Texas law up to 1960.[FN14] The article's impact remains substantial today, having been cited more than 100 times by Texas courts in the last five years.

> FN11. Robert W. Calvert was an associate justice of this Court from 1950 to 1960, and Chief Justice from 1961 to 1972.

> FN12. Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361 (1960).

> FN13. *Id.* at 361.

> FN14. "Most of what has been said here is repetitious of what has been said before in the cited cases and articles. The purpose of the writer here has been to try to bring former writings on the subject into compact form and under somewhat closer analysis." *Id.* at 371.

According to the article:

"No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.[FN15]

> FN15. *Id.* at 362–63.

We have quoted a similar formulation on many occasions.[FN16]

> FN16. *See, e.g., King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (per curiam); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 3 (Tex.1991); *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

Notably, Justice Calvert then proceeded to put the question before us in the proper context:

It is in deciding "no evidence" points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding.[FN17]

> FN17. Calvert, *supra* note 12, at 364.

[2] Clearly, the traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence**811** (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above).

[3][4] As the following examples show, this has remained the rule since. We do not presume to categorize all circumstances in which contrary evidence must be considered in a legal sufficiency review. Evidence can be disregarded whenever

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

reasonable jurors could do so,[FN18] an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

> FN18. *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *Uniroyal,* 977 S.W.2d at 340; *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

### A. Contextual Evidence

In Justice Calvert's first situation—a complete absence of evidence of a vital fact—it is generally irrelevant whether a reviewing court considers contrary evidence.[FN19] If supporting evidence is absent, opposing evidence cannot change that result. But in a number of cases, the lack of supporting evidence may not appear until all the evidence is reviewed in context.

> FN19. Calvert, *supra* note 12, at 364 ("If there is an absolute absence of evidence of a vital fact ... an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.").

[5][6] For example, publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself.[FN20] A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.[FN21]

> FN20. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 158–59 (Tex.2004); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Guisti v. Galveston Tribune,* 105 Tex. 497, 150 S.W. 874, 877–78 (1912).

> FN21. *Bentley v. Bunton,* 94 S.W.3d 561,

581 (Tex.2002) (considering remarks in context of series of talk-show programs); *Turner,* 38 S.W.3d at 115 (holding defamation includes story in which details are right but gist is wrong).

[7][8] Similarly, reviewing courts must construe contracts as a whole; we do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless.[FN22] Even writings executed at different times must be considered together if they pertain to the same transaction.[FN23]

> FN22. *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 292 (Tex.2004).

> FN23. *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999).

[9] It is not just writings that reviewing courts must consider in context. For example, in reviewing intentional infliction of emotional distress claims for legal sufficiency, "we consider the context and the relationship between the parties."[FN24] Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer[FN25] may be legally insufficient between**\*812** business parties.[FN26] In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not.[FN27]

> FN24. *Tiller v. McLure,* 121 S.W.3d 709, 714 (Tex.2003) (per curiam); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 610–11 (Tex.2002); *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999).

> FN25. *See George Grubbs Enters., Inc. v. Bien,* 881 S.W.2d 843, 852–53 (Tex.App.-Fort Worth 1994) (holding that efforts to pressure deaf-mute consumer to buy car were legally sufficient evidence of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

intentional infliction), *rev'd on other grounds,* 900 S.W.2d 337, 338 (Tex.1995).

FN26. *See Tiller,* 121 S.W.3d at 714 (holding efforts to pressure widow of contracting party to complete project were legally insufficient evidence of intentional infliction).

FN27. *See, e.g., id.* at 713–14 (discussing contrary evidence showing defendant's reasonable concerns about timeliness of plaintiff's work); *Sears,* 84 S.W.3d at 612 (discussing contrary evidence that defendant believed claimant was involved in suspicious dealings).

[10] More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did.[FN28] If a witness's statement "I did not do that" is contrary to the jury's verdict, a reviewing court may need to disregard the whole statement, but cannot rewrite it by disregarding the middle word alone.

FN28. *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684, 685 (Tex.2004) (holding no evidence supported defect as comments from deposition "were read out of context").

[11] Thus, if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

### B. Competency Evidence

[12][13] It has long been the rule in Texas that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection.[FN29] Thus, evidence showing it to be incompetent cannot be disregarded, even if the result is contrary to the verdict. If the rule were otherwise, incompet-

ent evidence would *always* be legally sufficient, because the evidence showing it to be incompetent could never be considered.

FN29. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 n. 1 (Tex.2004) (citing *Henry v. Phillips,* 105 Tex. 459, 151 S.W. 533, 538 (1912)). This rule was changed for hearsay evidence in 1983. *See* TEX.R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

Thus, for example, if an eyewitness's location renders a clear view of an accident "physically impossible," it is no evidence of what occurred, even if the eyewitness thinks otherwise.[FN30] Similarly, an employee's testimony that he was in the course and scope of his employment is legally insufficient to support a verdict against his employer if the evidence shows that legal conclusion to be incompetent.[FN31]

FN30. *Tex. & P. Ry. Co. v. Ball,* 96 Tex. 622, 75 S.W. 4, 6 (1903).

FN31. *Minyard Food Stores, Inc. v. Goodman,* 80 S.W.3d 573, 579 (Tex.2002) (holding defamation was not in course and scope of employment as duties required employee to cooperate in investigation but not to lie); *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 360 (Tex.1971) (holding truck driver was not in course of employment during social visit to his father).

[14][15] This exception frequently applies to expert testimony. When expert testimony is required, lay evidence supporting liability is legally insufficient.[FN32] In **\*813** such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.[FN33] And if an expert's opinion is based on certain assumptions about the facts, we cannot

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

disregard evidence showing those assumptions were unfounded.[FN34]

> FN32. *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782–83 (1949) (affirming directed verdict against malpractice claim as inadequate expert testimony from doctor of same school or practice as defendant rendered proof legally insufficient).

> FN33. *See Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996).

> FN34. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995) (holding opinion that spray caused frostbite was legally insufficient as it assumed absence of redness when plaintiff admitted the contrary); *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was).

[16] After we adopted gate-keeping standards for expert testimony,[FN35] evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well.[FN36] Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.[FN37] Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified.[FN38]

> FN35. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995) (adopting reasoning of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

> FN36. *Merrell Dow Pharms., Inc. v. Havn-*

*er,* 953 S.W.2d 706, 714, 720 (Tex.1997).

> FN37. *Id.* at 711, 724–30.

> FN38. *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254–57 (Tex.2004).

[17] Thus, evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

### C. Circumstantial Equal Evidence

As noted above, Justice Calvert believed the exclusive standard applied only when a no-evidence challenge asserted the evidence was no more than a scintilla.[FN39] But he went on to note a "variation" that required contrary inferences to be considered when the equal-inference rule applied.[FN40]

> FN39. Calvert, *supra* note 12, at 364.

> FN40. *Id.* at 364–65.

[18][19] In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists.[FN41] "When the circumstances are equally consistent with either of two facts, neither fact may be inferred."[FN42] In such cases, we must "view each piece of circumstantial **\*814** evidence, not in isolation, but in light of all the known circumstances."[FN43]

> FN41. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (holding evidence that truck caught fire unaccompanied by proof identifying any defect did not exceed a scintilla, as jurors would have to guess cause); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997); *W. Tel. Corp.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 900 (Tex.1937); Calvert, *supra* note 12, at 365.

FN42. *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991); *see also Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984) (citing *Tex. Sling Co. v. Emanuel,* 431 S.W.2d 538, 541 (Tex.1968) ).

FN43. *Lozano,* 52 S.W.3d at 167.

Justice Calvert argued there was "no necessity for the variation" because drawing an inference based on meager evidence was unreasonable whether or not the reviewing court considered the opposing inferences.[FN44] Nevertheless, he recognized that "[t]he opposing inference is present and it does no harm to note its presence."[FN45]

FN44. Calvert, *supra* note 12, at 365.

FN45. *Id.*

In subsequent cases this Court has continued to note rather than disregard the presence of equal but opposite inferences, often because lower courts have overlooked them. Thus, for example, one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite—that a sloppy shopper recently did both.[FN46] Similarly, when injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes.[FN47]

FN46. *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 938 (Tex.1998).

FN47. *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *McCann,* 99 S.W.2d at 900.

[20] Thus, when the circumstantial evidence of

a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

**D. Conclusive Evidence**

[21][22] Next, Justice Calvert noted that Texas courts conducting a no-evidence review traditionally do not disregard contrary evidence that conclusively establishes the opposite of a vital fact.[FN48] He argued that this is to some extent not a "true" no-evidence claim, as proponents may have to show not only that no evidence supports the verdict but that the opposite was proved as a matter of law.[FN49] There are several types of conclusive evidence. First, an appellate court conducting a legal sufficiency review cannot "disregard undisputed evidence that allows of only one logical inference."[FN50] By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence;[FN51] indeed, uncontroverted issues **\*815** need not be submitted to a jury at all.[FN52]

FN48. Calvert, *supra* note 12, at 363–64. But other commentators disagree. *See* Powers, *supra* note 10, at 1703–10. We have held that a "conclusively and as a matter of law" point may be asserted under a "no evidence" point. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 113 (Tex.1976). And the cases in this section note that conclusive proof is often asserted by parties that do *not* carry the burden of proof. *See also Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to the contrary; if there is no such evidence, the court then examines the entire record to see if the contrary finding is established as a matter of law).

FN49. Calvert, *supra* note 12, at 363–64. *But see, e.g., Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991) ("Cecil's points

that (1) there was no evidence to support the findings and (2) the contrary of each finding was established as a matter of law will hereinafter collectively be referred to as her "no evidence" points.").

FN50. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002) (plurality op.) (quoting *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex.1997)).

FN51. *Tex. & N.O.R Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 528, 530 (1947); *see also Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963) (finding evidence of suicide undisputed after disregarding disputed portion of facts).

FN52. *Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Wright v. Vernon Compress Co.,* 156 Tex. 474, 296 S.W.2d 517, 523 (1956) ("[T]he trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 822 (1947) ( "Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination."); *S. Underwriters v. Wheeler,* 132 Tex. 350, 123 S.W.2d 340, 341 (Tex.1939).

Reviewing legal sufficiency in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; the evidence must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not.

[23] Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Thus, no evidence supports an impaired-ac-

cess claim if it is undisputed that access remains along 90 percent of a tract's frontage.[FN53] Evidence that a buyer believed a product had been repaired is conclusively negated by an accompanying letter to the contrary.[FN54] And an insured's liability has not been determined by an "actual trial" if the insured did not appear, present evidence, or challenge anything presented by his opponent.[FN55]

FN53. *County of Bexar v. Santikos,* 144 S.W.3d 455, 460–61 (Tex.2004).

FN54. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 97–98 (Tex.2004).

FN55. *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998).

[24] Undisputed contrary evidence may also become conclusive when a party admits it is true. Thus, a claimant's admission that he was aware of a dangerous premises condition is conclusive evidence he needed no warning about it.[FN56] Similarly, an ex-employee's admission that she obtained other employment may prove conclusively that she did not detrimentally rely on a defendant's promise to re-hire her.[FN57] And jurors may not find that an indictment was based on a defendant's misleading report when the district attorney admits it was his own mistake.[FN58]

FN56. *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709–10 (Tex.2003) (per curiam).

FN57. *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 930 (Tex.1996).

FN58. *King v. Graham,* 126 S.W.3d 75, 78–79 (Tex.2003) (per curiam) (holding no evidence supported malicious prosecution claim as district attorney admitted prosecution was due to item he overlooked rather than any false statements by defendants).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[25] It is impossible to define precisely when undisputed evidence becomes conclusive. For example, an injured employee's return to work may prove conclusively that an injury was not total,[FN59] or it may not.[FN60] Circumstances in which a body is found may conclusively establish suicide,[FN61] or allow **\*816** jurors to infer otherwise.[FN62] Evidence is conclusive only if reasonable people could not differ in their conclusions,[FN63] a matter that depends on the facts of each case.

> FN59. *Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204, 206 (Tex.1962) (return to regular job in which use of hand was required conclusively established claimant did not suffer total loss of use).
>
> FN60. *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309–10 (Tex.1986) (return to work did not conclusively establish injury was not total as claimant could not do regular work and employer voluntarily accommodated her with lesser duties).
>
> FN61. *See, e.g., Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963).
>
> FN62. *See Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 552 (Tex.1976).
>
> FN63. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 340 (Tex.1998); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

[26] There is another category of conclusive evidence, in which the evidence *is* disputed. Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Thus, for example, in *Murdock v. Murdock,* we found no evidence to support a verdict establishing the defendant's paternity when blood tests conclusively proved he was not the child's father.[FN64] The evidence was directly disputed—the child's mother testified she had conjugal relations with no one else during the relevant time.[FN65] Nevertheless, we held there was no evidence to support the paternity verdict because of conclusive evidence to the contrary.[FN66]

> FN64. 811 S.W.2d 557, 560 (Tex.1991).
>
> FN65. *Id.* at 558.
>
> FN66. *Id.* at 560. In defense of jurors, it should be noted that the trier-of-fact in *Murdock* was a judge.

Similarly, in *Texas & New Orleans Railroad Co. v. Compton,* we found no evidence that a railroad's negligence caused an automobile to slam into the sixtieth car of a slow-moving train.[FN67] Again, the evidence was hotly disputed—while railroad witnesses testified that warning signs were in place at the crossing, the car's driver and a passenger testified they saw nothing, and would have been able to stop if they had.[FN68] Nevertheless, we held there was no evidence to support the claim because, if the driver could not see the side of a train before he hit it, he could not have seen a crossing sign either.[FN69]

> FN67. 135 Tex. 7, 136 S.W.2d 1113, 1115 (1940).
>
> FN68. *Id.*
>
> FN69. *Id.*

Of course, there are few instances in which disputed evidence is conclusive, and many instances in which undisputed evidence is not. As our sister court has noted, testimony by a paid informant is legally sufficient to support a conviction, even if "[t]wenty nuns testify that the defendant was with them at the time, far from the scene of the crime ... [and] [t]wenty more nuns testify that they saw the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

informant commit the crime." [FN70] But a more famous clerical hypothetical by Judge Learned Hand shows the opposite limit:

> FN70. *Clewis v. State,* 922 S.W.2d 126, 133 n. 12 (Tex.Crim.App.1996) (en banc) (citation omitted).

If, however, it were proved by twenty bishops that either party, when he used the words [in a contract], intended something else than the usual meaning which the law imposes upon them, he would still be held.... [FN71]

> FN71. *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

While jurors may generally believe either sinners or saints, their discretion is limited when it is proved beyond question that an "eyewitness" was actually far away in prison or totally blind on the day of the crime.

[27][28] Proper legal-sufficiency review prevents reviewing courts from substituting**\*817** their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

### E. Clear–and–Convincing Evidence

[29] Since the time of Justice Calvert's article, new claims and burdens of proof have arisen that require additions to the four types of no-evidence review Justice Calvert considered exhaustive. Beginning with the United States Supreme Court's opinion in *Jackson v. Virginia,* appellate courts have recognized that, while "one slender bit of evidence" may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof requires a higher standard of review. [FN72] As we recently stated, the standard for legal sufficiency works in tandem with the standard of review—"whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated." [FN73] If the rule were otherwise, legally sufficient evidence to support a preponderance-of-the-evidence verdict would satisfy the higher burdens as well, thus rendering their differences meaningless. [FN74]

> FN72. 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

> FN73. *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004).

> FN74. Our sister court reviews the legal sufficiency of criminal convictions by considering "*all evidence* which the jury was permitted, whether rightly or wrongly, to consider" in the light most favorable to the prosecution. *Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App.2004); *see also Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex.Crim.App.2005).

Accordingly, we have held that a legal sufficiency review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of parental termination, [FN75] defamation, [FN76] and punitive damages. [FN77] In such cases, again, evidence contrary to a verdict cannot be disregarded.

> FN75. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002).

> FN76. *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

> FN77. *Garza,* 164 S.W.3d at 627.

### F. Consciousness Evidence

[30] Further, we have had to particularize legal-sufficiency review in cases involving what a party knew or why it took a certain course, as they are not amenable to review under the exclusive standard.

Long before gross negligence had to meet a clear-and-convincing burden, we recognized in

*Burk Royalty Co. v. Walls* that no-evidence review of such findings had to include "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts." [FN78] As then Chief Justice Greenhill noted in concurring, speeding and running a red light may not be legally sufficient evidence of gross negligence if one's wife and daughter are bleeding to death in the back seat. [FN79] Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of. [FN80]

> FN78. 616 S.W.2d 911, 922 (Tex.1981).

> FN79. *Id.* at 926 (Greenhill, C.J., concurring).

> FN80. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234–35 (Tex.2004).

For the same reasons, the exclusive standard of review has proven problematic in insurance bad-faith cases. Liability in **\*818** such cases requires proof that the insurer denied coverage after it became reasonably clear. [FN81] But that standard will always be met if reviewing courts must disregard any evidence that coverage was unclear. [FN82] Subsequent cases show that reviewing courts are in fact looking at *all* the evidence to determine whether coverage was reasonably clear. [FN83]

> FN81. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55–56 (Tex.1997).

> FN82. *See id.* at 51 (noting same problem with previous test whether insurer had reasonable basis for denying claim).

> FN83. *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262–63 (Tex.2002) (finding no evidence of bad faith based in part on defendant's correspondence showing misunderstanding regarding settlement terms); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998)(affirming bad-faith verdict

after noting that insurer gave contradictory reasons for not interviewing potential arsonists); *Minn. Life Ins. Co. v. Vasquez,* 133 S.W.3d 320, 330 (Tex.App.-Corpus Christi 2004, pet. filed) (finding some evidence of bad faith because, though insurer showed hospital stymied its efforts to obtain records, insurer failed to seek same information from other sources); *Allstate Tex. Lloyds v. Mason,* 123 S.W.3d 690, 704–06 (Tex.App.-Fort Worth 2003, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer reasonably relied on expert report); *Allison v. Fire Ins. Exch.,* 98 S.W.3d 227, 249–50 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.) (affirming bad-faith verdict after reviewing insurer's reasons for delay and insured's responsive evidence); *Oram v. State Farm Lloyds,* 977 S.W.2d 163, 167 (Tex.App.-Austin 1998, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer's interpretation of exclusion was reasonable though incorrect).

This problem arises in other contexts as well. In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard that reason. [FN84] Government officials will never be entitled to immunity if we consider only evidence suggesting they should have acted differently. [FN85] And limitations will never run under the discovery rule if reviewing courts must disregard all evidence that claimants knew of their claims. [FN86]

> FN84. *Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 740 (Tex.2003) (per curiam) (noting liability may be established by proof of discrimination plus proof employer's reason was pretext); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 452 (Tex.1996) (same).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN85. *See, e.g., Univ. of Houston v. Clark,* 38 S.W.3d 578, 583 (Tex.2000) (noting good-faith test considers *all* circumstances on which official acted).

FN86. *See, e.g., PPG Indus., Inc. v. JMB/ Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 94 (Tex.2004) (holding no evidence supported jury verdict applying discovery rule based on contrary evidence that claimant's predecessor knew 3,000 windows had failed).

This is not to say a reviewing court may credit a losing party's explanations or excuses if jurors could disregard them. For example, while an insurer's reliance on an expert report may foreclose bad faith recovery,[FN87] it will not do so if the insurer had some reason to doubt the report.[FN88] But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.

FN87. *See, e.g., Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189, 194–95 (Tex.1998) (finding no evidence insurer denied claim in bad faith due to conflicting medical evidence).

FN88. *See, e.g., State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding some evidence showed expert report was pretext and thus denial of claim had no reasonable basis).

## III. Contrary Evidence That Must Be Disregarded

As trials normally focus on issues that jurors could decide either way, reviewing **\*819** courts must disregard evidence contrary to the verdict far more often than they must consider it. Just as no-evidence review that starts by disregarding contrary evidence often must end up considering considerably more, no-evidence review that begins by considering all the evidence must usually end up considering considerably less.

Again, we do not presume to categorize all circumstances in which contrary evidence must be disregarded; a few examples serve to demonstrate that even under the inclusive standard, viewing all the evidence in a light favorable to the verdict often requires that much of it be disregarded.

### A. Credibility Evidence

[31][32] Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.[FN89] They may choose to believe one witness and disbelieve another.[FN90] Reviewing courts cannot impose their own opinions to the contrary.[FN91]

FN89. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003); *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex.1993); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Edrington v. Kiger,* 4 Tex. 89, 93 (1849).

FN90. *McGalliard,* 722 S.W.2d at 697; *Silcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex.1986); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 563 (1952) (holding it was up to jurors "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses"); *Houston, E. & W.T. Ry. Co. v. Runnels,* 92 Tex. 305, 47 S.W. 971, 972 (1898).

FN91. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

[33] Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.[FN92]

FN92. *Runnels,* 47 S.W. at 972.

For example, viewing the evidence in the light favorable to the verdict means that if both parties in a traffic accident testify they had the green light, an appellate court must presume the prevailing party did and the losing party did not. If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. When all the evidence is viewed in the light most favorable to the jury verdict, some of it must be completely discounted. Though not disregarded at the outset, the end result is the same.

This has always been our practice in cases using the inclusive scope of review. Thus, we have concluded that a bailee sold cotton without the bailor's consent, despite the former's denials, because the jury verdict favored the latter.[FN93] And we have affirmed a gross negligence verdict based on testimony that the defendant's speed was 80 miles per hour, without mentioning his own testimony to a speed half that.[FN94]

FN93. *Cochran v. Wool Growers Cent. Storage Co.,* 140 Tex. 184, 166 S.W.2d 904, 907 (1942) (noting the Court "read the entire statement of facts").

FN94. *Harbin v. Seale,* 461 S.W.2d 591, 594 (Tex.1970); *compare Harbin v. Seale,* 454 S.W.2d 271, 272 (Tex.Civ.App.-Dallas 1970) (reporting defendant's testimony that he was traveling only 40 miles per hour), *rev'd,* 461 S.W.2d 591 (Tex.1970).

[34][35] Nor is it necessary to have testimony from both parties before jurors**\*820** may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.[FN95] Thus, an architect's uncontradicted testimony that he relied on a 20–year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties.[FN96] Nor was an insured's uncontradicted testi-mony about lost furnishings binding on jurors when the fire scene contained several indications of arson but few of burnt furniture.[FN97] Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.[FN98]

FN95. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 653–54 (Tex.1999) (holding evidence allowed jurors to disbelieve defendant's experts' testimony even though plaintiff's expert's testimony was shown to be in error); *Runnels,* 47 S.W. at 972; *Cheatham v. Riddle,* 12 Tex. 112, 118 (1854).

FN96. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 100 (Tex.2004).

FN97. *Anchor Cas. Co. v. Bowers,* 393 S.W.2d 168, 169–70 (Tex.1965).

FN98. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338 (Tex.1998); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986).

[36][37][38][39] Of course, "[t]he jury's decisions regarding credibility must be reasonable."[FN99] Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.[FN100] And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

FN99. *Bentley v. Bunton,* 94 S.W.3d 561, 599 (Tex.2002).

FN100. *See* TEX.R. CIV. P. 166a(c); *Wal–Mart Stores, Inc. v. Reece,* 81 S.W.3d 812, 817 (Tex.2002) (finding no evidence

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that store knew of puddle based in part on uncontradicted testimony by only employee in the area); *In re Doe 4,* 19 S.W.3d 322, 325 (Tex.2000); *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998) (holding reporter's detailed explanation of foundation of report established lack of malice as matter of law).

### B. Conflicting Evidence

[40][41] It is the province of the jury to resolve conflicts in the evidence.[FN101] Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict.[FN102]

> FN101. *See, e.g., Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 754 (Tex.1993); *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 601 (Tex.1993); *Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 365 (1957); *Howard Oil Co. v. Davis,* 76 Tex. 630, 13 S.W. 665, 667 (1890) (holding reviewing court must uphold jury verdict despite strong evidence to the contrary if evidence is conflicting).

> FN102. *See, e.g., Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 592 (Tex.1999); *Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex.1992); *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966).

Again, this has always been the case even in those cases using the inclusive scope of review. For example, in such cases we have sometimes detailed only the evidence that supported a jury's fraud finding.[FN103] We have affirmed a bad-faith verdict for legal sufficiency despite "significant evidence" that the insurer acted in **\*821** good faith.[FN104] We have found some evidence of lost profits, even though income tax returns showed the contrary.[FN105] And we have affirmed a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident.[FN106]

> FN103. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48–49 (Tex.1998).

> FN104. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 286 (Tex.1998).

> FN105. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262–63 (Tex.1983).

> FN106. *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 502 (1952).

In none of these cases did we state that the scope of review required us to disregard evidence contrary to the verdict; instead, we started by considering the entire record in each. But in each case we either discounted or never mentioned conflicting evidence contrary to the verdict because viewing the evidence in the light favorable to the verdict required us to do so.

Of course, it is not always clear whether evidence is conflicting. Evidence is not conflicting just because the parties cannot agree to it. For example, evidence that a hospital controlled a doctor's rotation and patient assignments raises no material conflict with evidence that a different entity controlled the details of medical treatment, as only the latter is material in a malpractice case.[FN107] Similarly, evidence showing the terms of one loan does not conflict with undisputed evidence that the parties never reached an agreement regarding the terms of another.[FN108]

> FN107. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542–43 (Tex.2002) (plurality op.).

> FN108. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

[42] But in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the

conflicting evidence in their legal sufficiency re-
view.

### C. Conflicting Inferences

[43] Even if evidence is undisputed, it is the
province of the jury to draw from it whatever infer-
ences they wish, so long as more than one is pos-
sible and the jury must not simply guess. Thus, in
product liability cases jurors may find evidence of a
defect from subsequent modifications, even if there
were plenty of other reasons for the changes.[FN109]
Even if a defendant admits approaching an intersec-
tion from the wrong way on a one-way street, jurors
may infer the plaintiff failed to keep a proper
lookout, as that is one possible inference from the
accident itself.[FN110] Similarly, jurors may infer
that relatives tore down posters of a missing child
to assist the child's father, even though another in-
ference was that the signs simply embarrassed
them.[FN111]

> FN109. *Uniroyal Goodrich Tire Co. v.
> Martinez,* 977 S.W.2d 328, 341–42
> (Tex.1998).

> FN110. *De Winne v. Allen,* 154 Tex. 316,
> 277 S.W.2d 95, 98–99 (1955).

> FN111. *Lozano v. Lozano,* 52 S.W.3d 141,
> 144 (Tex.2001) (per curiam); *id.* at 162–63
> (Hecht, J., concurring and dissenting).

[44] Accordingly, courts reviewing all the
evidence in a light favorable to the verdict must as-
sume jurors made all inferences in favor of their
verdict if reasonable minds could, and disregard all
other inferences in their legal sufficiency review.

### IV. Reconciling the Standards

[45] Having noted the dual lines of authority
stating the scope of no-evidence review, and the
proper application and exceptions to each, we turn
to the question of which one is correct. For the
reasons **\*822** discussed below, we believe the an-
swer is both.

### A. Goals: The Standards Must Be The Same

[46] Whether a court begins by reviewing all
the evidence or disregarding part in a legal-
sufficiency review, there can be no disagreement
about where that review should end. If the evidence
at trial would enable reasonable and fair-minded
people to differ in their conclusions, then jurors
must be allowed to do so.[FN112] A reviewing court
cannot substitute its judgment for that of the trier-
of-fact, so long as the evidence falls within this
zone of reasonable disagreement.[FN113]

> FN112. *See Tarrant Reg'l Water Dist. v.
> Gragg,* 151 S.W.3d 546, 552 (Tex.2004);
> *Coastal Transp. Co. v. Crown Cent. Petro-
> leum Corp.,* 136 S.W.3d 227, 234
> (Tex.2004); *Ford Motor Co. v. Ridgway,*
> 135 S.W.3d 598, 601 (Tex.2004); *Mobil
> Oil Corp. v. Ellender,* 968 S.W.2d 917,
> 922 (Tex.1998); *Merrell Dow Pharm., Inc.
> v. Havner,* 953 S.W.2d 706, 711
> (Tex.1997); *Burroughs Wellcome Co. v.
> Crye,* 907 S.W.2d 497, 499 (Tex.1995);
> *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10,
> 25 (Tex.1994); *Orozco v. Sander,* 824
> S.W.2d 555, 556 (Tex.1992); *Kindred v.
> Con/Chem, Inc.,* 650 S.W.2d 61, 63
> (Tex.1983); *Corbin v. Safeway Stores, Inc.,*
> 648 S.W.2d 292, 297 (Tex.1983) (per curi-
> am).

> FN113. *See* William Powers, Jr. & Jack
> Ratliff, *Another Look at "No Evidence" &
> "Insufficient Evidence,"* 69 TEX. L.R. 515,
> 517–20 (1991).

[47] Similarly, there is no disagreement about
how a reviewing court should view evidence in the
process of that review. Whether a reviewing court
starts with all or only part of the record, the court
must consider evidence in the light most favorable
to the verdict, and indulge every reasonable infer-
ence that would support it.[FN114] But if the evid-
ence allows of only one inference, neither jurors
nor the reviewing court may disregard it.[FN115]

> FN114. *Gragg,* 151 S.W.3d at 552; *St.*

*Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Havner,* 953 S.W.2d at 711; *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 75 (Tex.1997) (Hecht, J., concurring); *Preferred Heating & Air Conditioning Co. v. Shelby,* 778 S.W.2d 67, 68 (Tex.1989) (per curiam); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 898 (Tex.1937).

FN115. *See St. Joseph Hosp.,* 94 S.W.3d at 519–20 (Tex.2002) (plurality op.); *Giles,* 950 S.W.2d at 51 n. 1 (citing *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912) and *Tex. & N.O. Ry. Co. v. Rooks,* 293 S.W. 554, 556–57 (Tex.Comm'n.App.1927)).

Given these premises, it is no coincidence that the two standards should reach the same result—indeed they *must.* Any scope of appellate review smaller than what reasonable jurors could believe will reverse some verdicts that are perfectly reasonable; any scope of review larger than what reasonable jurors could believe will affirm some verdicts that are not.

[48] Further, the two must coincide if this Court is to perform its constitutional duties. Although factual sufficiency has been the sole domain of the intermediate appellate courts in Texas since 1891, our jurisdiction has always included legal sufficiency, as that is a question of law, not of fact.[FN116] Construing either standard to require us to do less would be just as unconstitutional as construing either to allow us to do more.

FN116. *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 620 (Tex.2004)

(citing *Choate v. San Antonio & A.P. Ry.,* 91 Tex. 406, 44 S.W. 69, 69 (1898); *Muhle v. N.Y., T. & M. Ry.,* 86 Tex. 459, 25 S.W. 607, 608 (1894)).

This is not to say judges and lawyers will always agree whether evidence is legally**\*823** sufficient. As discussed more fully below, reasonable people may disagree about what reasonable jurors could or must believe. But once those boundaries are settled, *any* standard of review must coincide with those boundaries—affirming jury verdicts based on evidence within them and reversing jury verdicts based on evidence that is not. Any standard that does otherwise is improperly applied.

### B. Other Motions: The Standards Must Be The Same

[49] Just as the scope of no-evidence review must coincide with its goals, the scope of review should not depend upon the motion in which it is asserted. Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise. Accordingly, the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.

Our statements of the standard for reviewing a directed verdict present the same mixed bag found with general no-evidence review. We have most often used the exclusive standard, stating that courts reviewing directed verdicts must consider only evidence supporting the nonmovant's case and disregard all contrary evidence.[FN117] But we have also stated that reviewing courts should use the inclusive standard, considering all the evidence in a light contrary to the directed verdict.[FN118] And we have sometimes stated both, requiring reviewing courts to consider all the evidence in a light contrary to the directed verdict and then to disregard all conflicting evidence that supports it.[FN119]

FN117. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

234 (Tex.2004); *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988); *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex.1965); *Triangle Motors v. Richmond,* 152 Tex. 354, 258 S.W.2d 60, 61 (1953); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (1952); *Anglin v. Cisco Mortgage Loan Co.,* 135 Tex. 188, 141 S.W.2d 935, 938 (1940).

FN118. *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996); *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex.1984); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753 (Tex.1970); *Dunagan v. Bushey,* 152 Tex. 630, 263 S.W.2d 148, 153 (1953); *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 258 (1951); *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121, 122 (1950); *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 61 (1941); *Chicago, R.I. & G. Ry. Co. v. Carter,* 261 S.W. 135, 135 (Tex.Com.App.1924, judgm't adopted); *Charles v. El Paso Elec. Ry. Co.,* 254 S.W. 1094, 1094–95 (Tex.Com.App.1923, holding approved, judgm't adopted).

FN119. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 483 (Tex.1984); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983); *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Henderson v.*

*Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976); *Jones v. Nafco Oil & Gas, Inc.,* 380 S.W.2d 570, 574 (Tex.1964).

By contrast, cases concerning judgments non obstante veredicto most often utilize the inclusive scope of review. Beginning with the 1931 amendment authorizing trial judges to grant them,[FN120] we have generally reviewed such orders by considering all the evidence in a light favorable to the **\*824** verdict that was set aside.[FN121] In later years we have sometimes adopted the exclusive standard,[FN122] but our opinions doing so usually cite to general no-evidence cases in which no judgment n.o.v. was involved.[FN123]

FN120. Act of April 25, 1931, 42d Leg., R.S., ch. 77, § 1, 1931 Tex. Gen. Laws 119; *Myers v. Crenshaw,* 134 Tex. 500, 137 S.W.2d 7, 13 (Tex.1940); *Hines v. Parks,* 128 Tex. 289, 96 S.W.2d 970, 971 (Tex.1936). *Cf. Deal v. Craven,* 277 S.W. 1046, 1047 (Tex.Com.App.1925, judgm't adopted) ("It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue.").

FN121. *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998) ("[W]e consider the evidence in the light most favorable to the verdict and reasonable inferences that tend to support it."); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983) ("In acting on the motion [for judgment notwithstanding the verdict], *all* testimony must be viewed in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor.") (emphasis added); *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982) (same); *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex.1974) (same); *Leyva*

*v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 550 (1962) (same); *Houston Fire & Cas. Ins. Co. v. Walker,* 152 Tex. 503, 260 S.W.2d 600, 603–04 (1953) (affirming trial court's implied disregard of one jury answer based on "consideration of the transcript as a whole"); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952) ("[W]e must consider *all the testimony in the record* from the standpoint most favorable to the plaintiff.") (emphasis added); *Neyland v. Brown,* 141 Tex. 253, 170 S.W.2d 207, 211 (Tex.1943) (considering judgment non obstante veredicto "in the light of the record as a whole"); *Le Master v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224, 225 (1942) ("[W]e must view LeMaster's testimony, *as well as all other testimony in the record,* from a standpoint most favorable to him.") (emphasis added); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941) ("[W]e must regard the evidence contained in this record in its most favorable light for McAfee ... because of the instructed verdict and judgment non obstante veredicto."); *see also Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424–29 (Tex.2004) (upholding judgment non obstante veredicto based on conclusive evidence contrary to verdict).

FN122. *See Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (per curiam); *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003) (per curiam); *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990) (per curiam); *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Williams v. Bennett,* 610 S.W.2d 144, 145 (Tex.1980); *Freeman v. Tex. Comp. Ins. Co.,* 603 S.W.2d 186, 191 (Tex.1980); *Dodd v. Tex. Farm Prods. Co.,* 576 S.W.2d 812, 814–15 (Tex.1979); *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex.1978); *Miller v. Bock Laundry Mach. Co.,* 568 S.W.2d 648, 650 (Tex.1977); *Sobel v. Jenkins,* 477 S.W.2d 863, 865 (Tex.1972); *C. & R. Transp., Inc. v. Campbell,* 406 S.W.2d 191, 193 (Tex.1966).

FN123. *See Tiller,* 121 S.W.3d at 713 (citing *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001)); *Miller,* 102 S.W.3d at 709 (same); *Best,* 786 S.W.2d at 671 (citing *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985)); *Tomlinson,* 677 S.W.2d at 492 (citing *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981)); *Campbell,* 573 S.W.2d at 497 (citing *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263, 265 (Tex.1974)); *Campbell,* 406 S.W.2d at 193 (citing *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 697–98 (1914)).

The one exception in which both standards do not expressly appear is in the scope of review for summary judgments. Here, there is only one standard—a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.[FN124] Reviewing courts do *not* disregard the evidence supporting the motion;**825** if they did, all summary judgments would be reversed.

FN124. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex.1990); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex.1984).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

In practice, however, a different scope of review applies when a summary judgment motion is filed without supporting evidence.[FN125] In such cases, evidence supporting the motion is effectively disregarded because there is none; under the rule, it is not allowed. Thus, although a reviewing court must consider all the summary judgment evidence on file, in some cases that review will effectively be restricted to the evidence contrary to the motion.

FN125. *See* TEX.R. CIV. P. 166a(i).

The standards for taking any case from the jury should be the same, no matter what motion is used. If only one standard were proper, we would not expect both to appear in cases reviewing directed verdicts, judgments notwithstanding the verdict, and summary judgments. But both do.

**C. Federal Courts: The Standards Are The Same**

The federal courts have had a similar split of authority between the inclusive and exclusive standards for scope of review. But no longer—the United States Supreme Court recently concluded in *Reeves v. Sanderson Plumbing Products, Inc.* that the two tests are the same.[FN126]

FN126. 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Under Rule 50 of the federal rules of procedure, a court should render judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[FN127] In deciding whether all or only part of the evidence should be considered, the Supreme Court stated:

FN127. FED.R.CIV.P. 50(a)(1).

The Courts of Appeals have articulated differing formulations as to what evidence a court is to consider in ruling on a Rule 50 motion. Some decisions have stated that review is limited to that evidence favorable to the nonmoving party, while most have held that review extends to the entire record, drawing all reasonable inferences in favor of the nonmovant.

On closer examination, this conflict seems more semantic than real. Those decisions holding that review under Rule 50 should be limited to evidence favorable to the nonmovant appear to have their genesis in *Wilkerson v. McCarthy* [FN128]. In *Wilkerson,* we stated that "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of" the nonmoving party.[FN129] But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should *give credence,* not the evidence that the court should *review.* In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole." And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a **\*826** matter of law, the court should review all of the evidence in the record.[FN130]

FN128. 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949).

FN129. *Id.* at 57, 69 S.Ct. 413.

FN130. *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097 (citations omitted).

We address the Supreme Court's conclusion as to the most appropriate standard below; the relevant point here is its conclusion that differences between the inclusive and exclusive standards are more semantic than real.

**D. Objections: The Standards Are Not The Same**

While we have used the two standards for the scope of review interchangeably for many years in many different contexts, several arguments suggest they are not the same.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

First, the courts of appeals often use the two standards in illustrations of the difference between legal and factual sufficiency, with the exclusive standard tied to the former and the inclusive standard to the latter:

When [reviewing] legal sufficiency, we consider *only* the evidence and inferences that tend to support the award of damages and disregard all evidence and inferences to the contrary.... When we review factual sufficiency, we consider and weigh *all* of the evidence and will set aside the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.[FN131]

> FN131. *Carter v. Steverson & Co.,* 106 S.W.3d 161, 166 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (emphasis added) (citation omitted); *accord Long v. Long,* 144 S.W.3d 64, 67 (Tex.App.-El Paso 2004, no pet.); *Gore v. Scotland Golf, Inc.,* 136 S.W.3d 26, 29 (Tex.App.-San Antonio 2003, pet. denied); *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 113 n. 3 (Tex.App.-Beaumont 2001, pet. denied); *Molina v. Moore,* 33 S.W.3d 323, 329 (Tex.App.-Amarillo 2000, no pet.); *Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 470 n. 3 (Tex.App.-Austin 2000, pet. denied); *see also In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam) (holding court of appeals erred in failing to distinguish between legal and factual sufficiency review by not weighing all the evidence when conducting the latter).

But there have always been exceptions to this distinction.[FN132] As demonstrated in Parts II and III above, it is generally true that the *result* of legal-sufficiency review is to disregard contrary evidence, but there are exceptions when a reviewing court cannot. It is not surprising that in drawing the general distinction between legal and factual sufficiency, courts have not complicated that distinction by listing the several exceptions in which the scope of review—though not the standard of review—may overlap.

> FN132. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981) (noting that review of gross negligence finding by considering all the evidence appeared to but did not conflict with traditional no-evidence test).

Second, it has been argued that the exclusive standard "is an important prophylactic" against invasion of the jury's province, as appellate judges are less likely to consider contrary evidence when they should not if the exclusive standard is used.[FN133] But if that is true, the opposite should also be the case—appellate courts are less likely to consider contrary evidence *when they must* (as shown in Part II) if the exclusive standard is used. No matter which standard is used, appellate courts must take care not to consider or disregard too little or too much.

> FN133. Dorsaneo, *supra* note 10, at 1503; *see also* Hardberger, *supra* note 10, at 17 (arguing exclusive standard is "designed to afford high deference to jury verdicts").

**\*827** Conversely, several factors appear to favor application of the inclusive standard. First, when we have said "we must look only at that evidence which tends to support the judgment,"[FN134] we could not have been speaking literally; no glasses filter evidence, and judges cannot abandon such judgments to law clerks or litigants. It is often hard to say whether evidence does or does not support a verdict—the same facts may support different conclusions,[FN135] or may support one part of a verdict but not another.[FN136] Nor can evidence supporting a verdict be identified by which party offered it—parties depend on admissions and cross-examination during their opponent's case, and min-

imize damaging evidence by presenting it during their own. As a practical matter, a court cannot begin to say what evidence supports a verdict without reviewing it all.

> FN134. *State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994).

> FN135. *See, e.g., CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 102 (Tex.2000) (noting plaintiff argued defendant's frequent inspections of stairs showed knowledge of inherent danger, while court held it showed the opposite as inspections found nothing); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998) (affirming bad-faith verdict after noting insurer's reasons for denial were contradictory).

> FN136. *See, e.g., Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993) (noting evidence of single previous minor stumble supported negligence finding but not gross negligence).

Second, an appellate court that begins by disregarding one party's evidence may strike many citizens as extending something less than justice for all. Concerns about open government and open courts suggest an appellate process that considers all the evidence, though deferring to the jury's verdict. While there is some dispute whether Lady Justice should wear a blindfold,[FN137] the metaphor was surely never intended to suggest that justice disregards the facts.

> FN137. *See* Judith Resnik, *Managerial Judges,* 96 HARV. L.R.. 374, 382–83 (1982) (noting that images of justice appeared blindfolded only within the last four hundred years).

In sum, the exclusive standard is helpful in recognizing the distinctive roles of judge and jury, intermediate and supreme court. By contrast, the in-clusive standard is helpful in recognizing what courts actually do, and must be seen to do. Both are important; we should avoid choosing between them if we can.

**E. Conclusion: The Standards Are The Same**

As both the inclusive and exclusive standards for the scope of legal-sufficiency review have a long history in Texas, as both have been used in other contexts to review matter-of-law motions, as the federal courts have decided the differences between the two are more semantic than real, and as both—properly applied—must arrive at the same result, we see no compelling reason to choose among them.

[50][51] The key qualifier, of course, is "properly applied." The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

While judges and lawyers often disagree about legal sufficiency in particular cases, **\*828** the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about. This is not a new problem; Justice Calvert noted it almost fifty years ago:

> The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence. The application of the rule can lead to strange results. It is theoretically possible, and sometimes not far from actual fact, that five members of the Su-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

preme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three justices of the Court of Civil Appeals who overruled a "no evidence" point of error and four dissenting justices of the Supreme Court are not men [FN138] of "reasonable minds." [FN139]

> FN138. Justice Calvert's use of the masculine in 1960 may perhaps be forgiven, for although Hattie Hennenberg, Hortense Ward, and Ruth Brazzil served temporarily on this Court in 1925, and Sarah T. Hughes was appointed as a state district judge ten years later, it was not until 1954 that the Texas Constitution was amended to allow women to serve as jurors, and not until 1973 that Mary Lou Robinson became the first women to serve as a state appellate judge. See James T. "Jim" Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas,* 46 S. TEX. L.REV. 33, 75 (2004); Robert L. Dabney, Jr. *We Were There,* HOUSTON B.J. Nov.-Dec.1999, at 42, 44.

> FN139. Calvert, *supra* note 12, at 364.

It is not hubris that occasionally requires an appellate court to find a jury verdict has no reasonable evidentiary basis. As Justice Frankfurter stated long ago:

Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree whether proof in a case is sufficient to demand submission to the jury. The fact that [one] thinks there was enough to leave the case to the jury does not indicate that the other [is] unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge. [FN140]

> FN140. *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring).

## V. Application to the Facts

It remains to apply the scope of review to the facts presented.

[52] A majority of the court of appeals affirmed the verdict for the Wilsons, finding legally sufficient evidence that the City knew increased flooding on the Wilsons' property was substantially certain to occur. [FN141] The majority pointed to the following proof. First, the Wilsons' expert testified that the revised plan was certain to **\*829** create flooding. [FN142] Second, as the City admittedly knew that development would increase runoff and the Sebastian ditch would channel it toward the Wilsons, so it knew "with absolute certainty" that flooding would be the result. [FN143] Third, the City "did not explain" why the Master Plan required a drainage ditch across the Wilsons' property but the revised plan did not, thus allowing jurors to infer that the City knew this omission would cause flooding. [FN144]

> FN141. 86 S.W.3d 693, 709.

> FN142. *Id.* at 703, 705.

> FN143. *Id.* at 705.

> FN144. *Id.* at 704–05.

[53] Of course, the City *did explain* why it approved the new plan—because three sets of engin-

eers said the omitted ditch was unnecessary—but the court felt compelled by the scope of review to disregard that evidence.

For several of the reasons stated earlier, we believe the court of appeals did not properly apply the scope of review. The critical question in this case was the City's state of mind—the Wilsons had to prove the City *knew* (not should have known) that flooding was substantially certain. A reviewing court cannot evaluate what the City knew by disregarding most of what it was told.

[54] Moreover, when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so. FN145 Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

> FN145. *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *see also State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding reliance on expert report did not foreclose bad-faith claim because claimant "presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual.").

None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that *the City* knew it was inevitable. The Wilsons'

expert gave no opinion on the latter point.

Second, ending a ditch at a neighbor's property line may be evidence that a defendant was substantially certain of the result in some cases, but not in the context of this one. City witnesses admitted knowing development would increase runoff at the head of this drainage system, but not flooding at its foot. Calculating the effect of detention ponds and absorption in a grassy drainage ditch forty-five feet wide and over two hundred yards long required hydrological formulas, computer models, and mathematical calculations. The omission of the ditch across the Wilsons' property obviously raised concerns that the City investigated, but was no evidence that the City knew the advice it received in response was wrong.

The Wilsons also point to a letter Sebastian's attorney wrote the City demanding indemnity in case the new ditch flooded the Wilsons. But attorneys must protect a client from potential liability whether it is **\*830** real or imagined—and justly so. In the letter, the attorney never purports to be an expert in hydrology, or cite the opinions of anyone who was. This letter may have required the City to investigate, but again is no evidence it knew the advice it received was wrong. FN146

> FN146. *Cf. Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 140 (Tex.2004) (holding complaint letters may require manufacturer to investigate, but are not evidence complaints are true).

Our concurring colleagues believe reasonable jurors could nevertheless disregard what all the engineers certified because the City had a financial incentive to believe them rather than pay the Wilsons. Of course, defendants have a financial incentive to avoid paying damages in every case; if that incentive alone is some evidence of liability, then plaintiffs create enough evidence to go to the jury every time they file suit.

But more important, this ignores what the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Wilsons had to prove—not that the City *might* have disbelieved the engineers' reports, but that it *did.* This requires evidence of "objective indicia of intent" showing the City knew identifiable harm was occurring or substantially certain to result.[FN147] Jurors' doubts about the engineers' reports or the City's motives could not supply them with objective indicia that the City knew flooding would occur. Constitutional concerns about the roles of judge and jury do not allow either to make such evidence up.

> FN147. *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 555 (Tex.2004) (emphasis added).

We agree with the court of appeals that the Wilsons presented some evidence that the City damaged their property, and that in drawing up and approving drainage plans it was acting for a public purpose. The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties. While the City certainly knew that fact after the flooding started, the Wilsons never pleaded or submitted to the jury any takings theory other than the City's initial approval.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we hold there was no evidence the City's approval of the revised drainage plan was an intentional taking.

Accordingly, we reverse the court of appeals' judgment against the City under article I, section 17 of the Texas Constitution. Because the court of appeals declined to address the jury's alternate verdict for the Wilsons on a claim under the Texas Water Code, we remand the case to that court to determine that issue.

Justice O'NEILL filed a concurring opinion in which Justice MEDINA joined.
Justice JOHNSON did not participate in the decision.

Justice O'NEILL, joined by Justice MEDINA, concurring.

The Court does an excellent job of explaining the appropriate scope of no-evidence review: the reviewing court "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." 168 S.W.3d at 807. I agree with this standard and join Parts I through IV of the Court's opinion. But I cannot join Part V, because the Court misapplies the standard that it so carefully **\*831** articulates by crediting evidence the jury could reasonably disregard.

The City of Keller's Master Drainage Plan required it in part to condemn a 2.8–acre drainage easement on the Wilson property for construction of an earthen channel forty-five feet wide and five feet deep that would funnel water from the adjoining Sebastian property over the Wilson property into the Little Bear Creek Watershed. The City chose not to proceed with this portion of the plan, though, claiming reliance on engineers' assurances that the developers' installation of retention ponds on neighboring land could prevent flooding. The drainage channel that was actually built ended at the edge of the Sebastian property and funneled water directly onto the Wilsons' land, destroying eight acres of farmland worth almost $300,000. The Court holds that the jury was required to believe the City's testimony that it relied on the engineers' assurances and thus did not know flooding was substantially certain to occur, stating that when a case requires expert testimony "jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so." 168 S.W.3d at 829. Even if this were an appropriate review standard—which it hasn't been until today—I believe the jury had a reasonable basis upon which to disregard the City's professed reliance; the City had a financial incentive to disclaim knowledge of the flooding, and the Wilsons presented some evidence that the City had independent knowledge flooding was substantially

certain to occur. In my view, the jury was the proper body to weigh the witnesses' credibility and resolve these disputed fact issues. I nevertheless agree that the City cannot be liable for a taking in this case because I believe that a city's mere act of approving a private development plan cannot constitute a taking for public use. Accordingly, I concur in the Court's judgment but not its reasoning.

# I

Questions of intent are generally proved only by circumstantial evidence; as the court of appeals in this case aptly noted, "defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions," and therefore the jury must be "free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent." 86 S.W.3d 693, 704. I agree with the Court that the jury's ability to disbelieve the City's protestations is not itself "evidence of liability." 168 S.W.3d at 830. Instead, the jury's ability to weigh the witnesses' credibility means that the City's testimony did not conclusively establish its lack of liability. Because liability is not conclusively negated, we must examine the record to see if there is legally sufficient evidence from which the jury could infer that the City knew flooding was substantially certain to occur. I would hold that the evidence of intent that was presented in this case allowed the jury to draw such an inference.

At trial, the Wilsons presented evidence that the City had independent sources of knowledge that flooding was substantially certain to occur. First, they demonstrated that the developers' plan itself was flawed. Rather than incorporate a drainage ditch running across the Wilson property, as the City's Master Plan required, the developers' plan ended the drainage ditch abruptly at the edge of the Wilson property. The Wilsons' expert testified that the plan's implementation would necessarily "increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per

second." **\*832**86 S.W.3d at 703. Second, the City was aware that water flowed across the Wilson property before the development commenced, and, as the court of appeals pointed out, the City's Director of Public Works admitted that the City knew the development would increase the water's flow and velocity; specifically, he testified that "the City knew the upstream water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel" that ended at the Wilson property's edge. *Id.* at 705. Finally, there was evidence that the City received a letter warning that the developers' plan would subject the Wilson property to flooding.

While I believe there is some evidence that the City knew flooding was substantially certain to occur, there is also some evidence that it did not. City officials testified that they relied on the representations of engineers who assured them retention ponds could substitute for a drainage easement and the Wilson property would not be damaged. If the jury accepted this evidence as true, I agree that the intent element would be negated, which would preclude the City's takings liability. But I do not agree that the jury was bound to accept the City's testimony as true. The Court itself notes that jurors "may choose to believe one witness and disbelieve another," and that "[c]ourts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. This statement mirrors our prior jurisprudence, which has long provided that a jury "has several alternatives available when presented with conflicting evidence" because it "may believe one witness and disbelieve others," "may resolve inconsistencies in the testimony of any witness," and "may accept lay testimony over that of experts." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citations omitted).

As the Court itself states, jurors are required to credit undisputed testimony only when it is "clear,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." 168 S.W.3d at 820. The City's testimony does not meet this standard. The City Manager did testify that the City "would not have approved the developments unless [it was] assured that the developments did not increase the velocity of water or the flow of water" onto the neighboring property. 86 S.W.3d at 706. But the Wilsons disputed whether the City's protestations were credible, pointing out that the City had a powerful incentive to profess a lack of knowledge through reliance on the engineers' assurances because it would then avoid the considerable expense of compensating the Wilsons for the property that would otherwise have been condemned under the Master Drainage Plan. *See id.* at 705.

Moreover, the Court's conclusion that juries cannot disregard a party's reliance on expert opinions is not consistent with our jurisprudence. The Court cites two cases for this proposition, but neither supports the Court's analysis; instead, both cases support the conclusion that the jury, as the finder of fact, should appropriately resolve factual disputes regarding a party's reliance on hired experts. *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448–50 (Tex.1997).

In *Castañeda,* a bad-faith insurance case, there was no question that the insurer had relied on an expert's assurances and thus no dispute about whether the **\*833** jury could have disregarded that evidence. *Castañeda,* 988 S.W.2d at 194–95. In that case, we performed a traditional legal sufficiency analysis and concluded there was no evidence that the defendant acted in bad faith. *Id.* at 194. We did state that reliance on an expert's opinion will not preclude a finding of bad faith if the expert's opinion was "unreliable and the insurer knew or should have known that to be the case." *Id.* However, we did not hold that the jury must credit a party's testimony that it relied on an expert.

We reiterated this point in *Nicolau,* another

bad-faith insurance case. There, the Court noted "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law," and again concluded that purported "reliance upon an expert's report, standing alone, will not necessarily shield" the defendant from liability. *Nicolau,* 951 S.W.2d at 448. The Court conceded that "[w]ere we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith," but concluded that the "determination is not ours to make" because "the Constitution allocates that task to the jury and prohibits us from reweighing the evidence." *Id.* at 450 (citing TEX. CONST. art. I, § 15, art. V, §§ 6, 10).

The same is true in this case. The jury was not required to believe that the City did not know flooding was substantially certain to occur because it relied on assurances to the contrary; as a reviewing Court, we should "assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. Such credibility determinations are uniquely suited and constitutionally committed to the fact finder. *See* TEX. CONST. art. I, § 15, art. V, § 6; *see also Nicolau,* 951 S.W.2d at 450.

## II

Although I disagree with the Court's conclusion that the jury was required to credit the City's testimony, I agree with its judgment in the City's favor because, in my view, the City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking. TEX. CONST. art. I, § 17. The City did not appropriate or even regulate the use of the Wilsons' land, nor did it design the drainage plan for the proposed subdivisions. Instead, the City merely approved subdivision plans designed by private developers, and that design included inadequate drainage capabilities. The City argues, and I agree, that its mere approval of private plans did not transfer responsibility for the content of those plans from the developers to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

the City. Municipalities review subdivision plats "to ensure that subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex.1985); *see* TEX. LOC. GOV'T CODE § 212.002. Such a review is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality. *See, e.g., City of Round Rock,* 687 S.W.2d at 302; *see also Cootey v. Sun Inv., Inc.,* 68 Haw. 480, 718 P.2d 1086, 1091 (1986) (holding that "[t]he permit process by which the County approves or disapproves the development of a proposed subdivision reflects an effort by government to require the developer to meet his responsibilities under the subdivision rules, regulations, and laws," and that "the primary responsibility of providing an adequate and safe development rests with ... the developer, and not with the County").

Because the primary responsibility for a development's design rests with the developer,**\*834** and because the plat-approval process does not transfer such responsibility to the municipality, mere plat approval cannot be a basis upon which to predicate takings liability. We have held that, to be liable for a taking, a governmental entity must "perform certain acts in the exercise of its lawful authority ... which resulted in the taking or damaging of plaintiffs' property, and which acts were the *proximate cause* of the taking or damaging of such property." *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941) (emphasis added). In this case, flooding resulted from the developers' defective drainage design, not from the City's approval of the plat; thus, the City's approval was not the proximate cause of the damage to the Wilson property.

Other courts, faced with similar facts, have also concluded that a governmental entity cannot be liable for a taking when its only action is to approve a private development plan. *See Phillips v. King County,* 136 Wash.2d 946, 968 P.2d 871, 879 (1998); *see also Pepper v. J.J. Welcome Constr.*

*Co.,* 73 Wash.App. 523, 871 P.2d 601, 606 (1994). In *Phillips,* the Washington Supreme Court observed that there is no public aspect to a private development and concluded that "[i]f the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties." *Phillips,* 968 P.2d at 878. The court in *Pepper* similarly examined an inverse condemnation claim based upon a county's approval of private developments with defective drainage plans; it, too, concluded that the county's approval did not cause the resultant flooding and did not result in an unconstitutional taking. *Pepper,* 871 P.2d at 606. The court noted that the flooding was "not the result of the County appropriating or regulating their use of the land," and held that "[t]he fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project." *Id.* The court concluded that because "land use regulation of [the plaintiffs'] property did not cause the damages, no inverse condemnation was involved." *Id.* I am persuaded by the reasoning of the courts in *Phillips* and *Pepper,* and would similarly conclude that the City's plat approval in this case did not amount to an unconstitutional taking as a matter of law.

The court of appeals in this case advanced an alternative reason for affirming the trial court's judgment, suggesting that even if the City could not be liable for merely approving a subdivision plat, it could nevertheless be held liable for failing to condemn a drainage easement across the Wilson property. 86 S.W.3d at 707. The court of appeals stated that "the City chose not to condemn any of the Wilson property," but instead "allow[ed] the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property." *Id.* As noted above, however, it was the developers' plan—not the City's actions—that allowed the water to flood the Wilson property. Because the City's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848
**(Cite as: 168 S.W.3d 802)**

action did not cause the flooding, I disagree that the City's failure to condemn an easement is relevant to takings liability. If the City were responsible for the flooding but chose not to condemn the property, it might be subject to inverse-condemnation liability. *See Tarrant County Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 554 (Tex.2004) ("When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation."). However, if a governmental entity's actions are not the **\*835** "proximate cause of the taking or damaging" of the property, then the entity cannot be liable for a taking. *Hale,* 146 S.W.2d at 736. Accordingly, the entity need not condemn property merely because a private entity is causing damage. This rule does not leave owners of flooded property without a remedy; when a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage. *See* TEX. WATER CODE § 11.086(a), (b) (providing that "[n]o person may divert or impound the natural flow of surface waters in this state ... in a manner that damages the property of another by the overflow of the water diverted or impounded" and that "[a] person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow"). Because the developers' design of the plat—not the City's approval—caused the flooding damage in this case, I would hold that the City cannot be held liable for an unconstitutional taking under Article I, Section 17 of the Texas Constitution.

### III

Because I believe the Court fails to give due regard to the jury's right to make credibility determinations, I cannot join Part V of the Court's opinion. But because I conclude that the City's mere act of approving a private development plan did not cause the Wilson property to be "taken, damaged or destroyed for or applied to public use," TEX. CONST. art. I, § 17, I agree that the City cannot be held liable for a taking in this case. Accordingly, I concur

in the Court's judgment.

Tex.,2005.
City of Keller v. Wilson
168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 237, 44 Tex. Sup. Ct. J. 664
**(Cite as: 46 S.W.3d 237)**



Supreme Court of Texas.
The DOW CHEMICAL COMPANY and Joseph
Hegyesi, Petitioners,
v.
Renee K. FRANCIS, Respondent.

No. 00–0299.
April 26, 2001.

Former employee sued employer and co-worker, alleging discrimination, fraud, constructive discharge, and retaliation. After granting summary judgment against employee on her fraud claims and dismissing co-worker from the case, the 281st District Court, Harris County, entered a take-nothing judgment on a jury verdict against employee. Employee appealed. The Houston Court of Appeals, First District, reversed and remanded. Employer and co-worker filed petition for review. The Supreme Court held that: (1) trial judge's comments toward employee's counsel were insufficient to support a finding of judicial bias or misconduct; (2) court of appeals did not conduct a proper "matter of law" or factual sufficiency review on retaliation claim; and (3) failure of court of appeals to consider, as an alternative ground for summary judgment, claims of employer and co-worker that former employee failed to produce evidence of damages as to her fraudulent-inducement claim was error.

Reversed and remanded.

West Headnotes

**[1] Trial 388 ⟋29(1)**

388 Trial
    388III Course and Conduct of Trial in General
        388k29 Remarks of Judge
            388k29(1) k. In general. Most Cited Cases
Trial court has the authority to express itself in exercising its broad discretion over the conduct of a trial.

**[2] Trial 388 ⟋18.9**

388 Trial
    388III Course and Conduct of Trial in General
        388k18.9 k. Time limitations. Most Cited Cases
    (Formerly 388k18)
Trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time.

**[3] Trial 388 ⟋29(1)**

388 Trial
    388III Course and Conduct of Trial in General
        388k29 Remarks of Judge
            388k29(1) k. In general. Most Cited Cases
Trial judge's comments toward former employee's counsel were made as judge exercised her broad discretion to maintain control and promote expedition and, as such, were insufficient to support a finding of judicial bias or misconduct.

**[4] Appeal and Error 30 ⟋207**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(B) Objections and Motions, and Rulings Thereon
            30k207 k. Arguments and conduct of counsel. Most Cited Cases

**Appeal and Error 30 ⟋216(1)**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(B) Objections and Motions, and Rulings Thereon
            30k214 Instructions
                30k216 Requests and Failure to Give Instructions

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 237, 44 Tex. Sup. Ct. J. 664
**(Cite as: 46 S.W.3d 237)**

30k216(1) k. In general. Most Cited Cases

Trial court's alleged objectionable conduct toward former employee's counsel was presumptively curable by instruction and, therefore, employee failed to preserve for appeal her bias complaint by not objecting or requesting a jury instruction at trial. Rules App.Proc., Rule 44.1(a)(1).

**[5] Appeal and Error 30 ⚖930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

**Labor and Employment 231H ⚖861**

231H Labor and Employment
   231HVIII Adverse Employment Action
      231HVIII(B) Actions
         231Hk859 Evidence
            231Hk861 k. Presumptions and burden of proof. Most Cited Cases
   (Formerly 255k40(1) Master and Servant)

Former employee had the burden of proof on her retaliation claim and, thus, in considering only the evidence favorable to employee, the Court of Appeals did not conduct a proper "matter of law" review. V.T.C.A., Labor Code § 451.002(c).

**[6] Appeal and Error 30 ⚖1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(1) k. In general. Most Cited Cases

When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue.

**[7] Appeal and Error 30 ⚖930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k930 Verdict
            30k930(1) k. In general. Most Cited Cases

**Appeal and Error 30 ⚖989**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)1 In General
            30k988 Extent of Review
               30k989 k. In general. Most Cited Cases

In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary; if there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law.

**[8] Appeal and Error 30 ⚖1001(1)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(1) k. In general. Most Cited Cases

Point of error asserted by a party attacking the legal sufficiency of an adverse finding on an issue on which she has the burden of proof should be sustained only if the contrary proposition is conclus-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ively established.

**[9] Appeal and Error 30 ☞930(1)**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
        30k930 Verdict
          30k930(1) k. In general. Most Cited Cases

Court of Appeals did not conduct a proper factual-sufficiency review when it improperly considered only the evidence favorable to former employee's retaliation claim and did not review the evidence supporting the jury verdict. V.T.C.A., Labor Code § 451.002(c).

**[10] Appeal and Error 30 ☞1003(5)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)2 Verdicts
          30k1003 Against Weight of Evidence
            30k1003(5) k. Great or overwhelming weight or preponderance. Most Cited Cases

When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.

**[11] Appeal and Error 30 ☞989**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)1 In General
          30k988 Extent of Review
            30k989 k. In general. Most Cited Cases

**Appeal and Error 30 ☞1003(6)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
        30XVI(I)2 Verdicts
          30k1003 Against Weight of Evidence
            30k1003(6) k. Clear or palpable weight or preponderance. Most Cited Cases

**Appeal and Error 30 ☞1182**

30 Appeal and Error
   30XVII Determination and Disposition of Cause
      30XVII(E) Rendition, Form, and Entry of Judgment
        30k1182 k. Form and requisites. Most Cited Cases

Court of Appeals, in reviewing the factual sufficiency of an adverse finding on which the appellant has the burden of proof, must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust; in doing so, Court of Appeals must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.

**[12] Appeal and Error 30 ☞856(1)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
        30k851 Theory and Grounds of Decision of Lower Court
          30k856 Grounds for Sustaining Decision Not Considered
            30k856(1) k. In general. Most Cited Cases

Court of Appeals should have considered, as an alternative ground for summary judgment, claims of employer and co-worker that former employee failed to produce evidence of damages as to her fraudulent-inducement claim and its failure to do so was error. Vernon's Ann.Texas Rules Civ.Proc.,

46 S.W.3d 237, 44 Tex. Sup. Ct. J. 664
**(Cite as: 46 S.W.3d 237)**

Rule 166a(i).

**[13] Fraud 184 🔑3**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k2 Elements of Actual Fraud
         184k3 k. In general. Most Cited Cases

Fraud cause of action requires: (1) a material misrepresentation; (2) that was either known to be false when made or was asserted without knowledge of its truth; (3) which was intended to be acted upon; (4) which was relied upon; and (5) which caused injury.

**[14] Appeal and Error 30 🔑852**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k851 Theory and Grounds of Decision of Lower Court
            30k852 k. Scope and theory of case. Most Cited Cases

When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious.

**\*238** Kevin Wayne Cole, Wickliff & Hall, Austin, Barbara L. Johnson, Anthony J. Sadberry, Wickliff & Hall, Houston, Ruben D. Campos, Wickliff & Hall, San Antonio, Bob E. Shannon, Joseph R. Knight, Baker & Botts, Austin, for Petitioners.

Barbara J. Gardner, Barbara Gardner & Associates, Eliot P. Tucker, Mandel & Wright, David W. Holman, The Holman Law Firm, Houston, for Respondent.

PER CURIAM.

Renee Francis, a former employee of The Dow Chemical Company, sued Dow and its employee, Joseph Hegyesi, alleging discrimination, fraud, constructive discharge, and retaliation. The trial court granted summary judgment for Dow and Hegyesi on Francis' fraud claims and dismissed Hegyesi from the case. The remaining claims against Dow were tried to a jury. After a two-week trial, the jury rejected Francis' discrimination and constructive-discharge claims. The jury found for Francis on her retaliation claim **\*239** but awarded zero damages. Based on these findings, the trial court rendered a take-nothing judgment against Francis. Francis appealed. The court of appeals reversed both the take-nothing judgment for Dow and the summary judgment for Dow and Hegyesi. 46 S.W.3d 264. In doing so, the court of appeals concluded, among other things, that the cumulative effect of the trial court's abuse of discretion with regard to its evidentiary rulings and its bias against Francis resulted in the rendition of an improper judgment. 46 S.W.3d at 281. We conclude that the court of appeals erred, reverse its judgment, and remand this cause to that court for further proceedings consistent with this opinion.

In their petition for review, Dow and Hegyesi argue that the court of appeals erred in: (1) holding that the trial judge's bias resulted in an improper judgment; (2) sustaining Francis' evidentiary complaints; (3) applying incorrect legal and factual-sufficiency standards in reviewing the jury's zero damages verdict on Francis' retaliation claim; and (4) reversing the summary judgment on Francis' fraud claim. We begin with the court of appeals' bias holding.

Without citing any particular examples, the court of appeals concluded that:

Here, the record reveals that some of the trial court's comments were not so much directed toward Francis, her attorney, or the merits of her case, as they were to the trial court's desire to expedite the proceedings. However, there are many instances of conduct by the trial court that we do not condone and which cause us concern over whether there was prejudice towards Francis.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The cumulative effect of the trial court's abuse of its discretion with regard to its evidentiary rulings and its bias against the appellant resulted in the rendition of an improper judgment and constitutes reversible error.

46 S.W.3d at 280. Dow first complains that as a matter of law, the trial judge's comments were insufficient to support a finding of judicial bias or misconduct, and that the court of appeals erred in not describing the conduct it determined to be improper. Second, Dow maintains that the trial court's objectionable conduct was presumptively curable by instruction, and therefore, Francis failed to preserve her bias complaint by not objecting or requesting a jury instruction at trial. Third, Dow argues that the court of appeals failed to analyze how the alleged judicial misconduct probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1.

Francis responds with seven examples of alleged judicial bias. First, Francis claims that the trial judge assisted Dow's counsel during voir dire by commenting, "Ms. Johnson [Dow's counsel], there were a couple of other hands on your question about labor union [sic]." Second, Francis cites the following exchange as an example of the judge encouraging Dow's counsel to object:

Counsel: "Objection, Your Honor. Remote as to time. Vague."

Judge: "Go ahead."

Counsel: "Not relevant."

Judge: "Sustained."

Third, Francis contends that the judge frequently added additional bases to Dow's objections. Fourth, Francis asserts that the judge twice instructed Francis' counsel to "move on" "so that we can get this case to the jury." Fifth, Francis claims that the judge frequently reprimanded Francis' counsel in a condescending manner; as an example, Francis cites this response by the judge to an objection:

"You can just say compound, and I can listen to the question." **\*240** Sixth, Francis complains that the judge did not allow Francis' counsel to read from documents already admitted into evidence. For example, at one point, the judge said, "I instructed you not to read from the document. Would you please just direct questions to the witness? As I said, the document is in evidence and can be reviewed by the jury; and continuing to read the document at this late hour only prolongs the time we are here." And at another point in the trial, the judge again reminded Francis' counsel: "But I once again caution you that these documents are in evidence. So, rather than reviewing the documents with the jury, ask the question of the witness; and let's focus specifically on information you need to get from this witness and not information from the document that the jury has seen several times already." Francis argues that these comments were intended to prevent the impeachment of defense witnesses.

As a seventh example of alleged judicial bias, Francis describes an exchange that took place near the end of the trial, out of the jury's presence. The judge criticized Francis' counsel for calling a Dow executive to testify when counsel had not indicated his intention to do so the day before. Francis' attorney explained that he had developed his strategy just the evening before and had not made any misrepresentations to the court. The judge then apologized for her comment: "Okay. Well, I apologize. That was out of line. I shouldn't have said that. But honestly, I'm about to my limit with the conduct of how this trial has proceeded and—you know, I'm a patient person. That was out of line, and I do apologize." Francis argues the judge's improper comments spanned the two-week trial, grew increasingly caustic in nature, and were incurable by instruction. We disagree with Francis.

First, we consider whether the trial judge's comments constituted bias as a matter of law. The United States Supreme Court, when presented with similar allegations of judicial bias, has determined that "judicial rulings alone almost never constitute

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 237, 44 Tex. Sup. Ct. J. 664
**(Cite as: 46 S.W.3d 237)**

a valid basis for a bias or partiality motion," and opinions the judge forms during a trial do not necessitate recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see also, e.g., Matassarin v. Lynch,* 174 F.3d 549, 571 (5th Cir.1999); *Hollywood Fantasy Corp. v. Gabor,* 151 F.3d 203, 216 n. 6 (5th Cir.1998); *United States v. Landerman,* 109 F.3d 1053, 1066 (5th Cir.1997). Further, "[n]ot establishing bias or partiality ... are expressions of impatience, dissatisfaction, annoyance, and even anger.... A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky,* 510 U.S. at 555–56, 114 S.Ct. 1147. In short, a trial court has the inherent power to control the disposition of cases "with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

[1][2] Similarly, Texas courts have held that "the discretion vested in the trial court over the conduct of a trial is great." *Schroeder v. Brandon,* 141 Tex. 319, 172 S.W.2d 488, 491 (1943); *see Metzger v. Sebek,* 892 S.W.2d 20, 38 (Tex.App.—Houston [1st Dist.] 1994, writ denied). A trial court has the authority to express itself in **\*241** exercising this broad discretion. *Bott v. Bott,* 962 S.W.2d 626, 631 (Tex.App.—Houston [14th Dist.] 1997, no writ). Further, a trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Hoggett v. Brown,* 971 S.W.2d 472, 495 (Tex.App.—Houston [14th Dist.] 1997, no pet.); *Great Global Assurance Co. v. Keltex Props., Inc.,* 904 S.W.2d 771, 777 (Tex.App.—Corpus Christi 1995, no writ).

[3] We apply these principles to this case, and after carefully examining the judge's allegedly improper comments in the context of the entire record, we conclude there is no evidence of judicial bias. The record indicates that the judge exercised her broad discretion to "maintain control and promote expedition." *Hoggett,* 971 S.W.2d at 495. Thus, the court of appeals erred in concluding that the trial judge's conduct exhibited bias.

[4] The court of appeals also erred in excusing Francis' failure to preserve her complaint. In *State v. Wilemon,* 393 S.W.2d 816 (Tex.1965), this Court held that objection to a trial court's alleged improper conduct or comment must be made when it occurs if a party is to preserve error for appellate review, unless the conduct or comment cannot be rendered harmless by proper instruction. *Id.* at 818. Neither Francis nor the court of appeals explain how any comments made by the trial judge were incurable or would excuse Francis' failure to preserve error. For this additional reason, the court of appeals erred in sustaining Francis' allegations of judicial bias.

The second issue is whether the court of appeals erred in sustaining five of Francis' evidentiary complaints. Dow argues that the court of appeals did not analyze how the alleged evidentiary errors caused the trial court to render an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1). Francis responds that the court of appeals correctly determined that the evidentiary errors were harmful. We agree with Dow. Without deciding whether the court of appeals erred in its substantive analysis of the evidentiary rulings, we conclude that the court of appeals erred in not conducting a harm analysis for the evidentiary rulings it reversed. *See* TEX.R. EVID. 103(a).

In its third issue, Dow contends that the court of appeals erred by applying incorrect legal and factual-sufficiency standards in reviewing the jury's zero-damages verdict on Francis' retaliation claim. Francis responds that the evidence was legally and factually insufficient to support the jury verdict.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Again, we agree with Dow and review the legal and factual-sufficiency standards in turn.

[5][6][7][8] When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); Hall, *Standards of Review in Texas, 29 ST. MARY'S L.J. 351, 481–82* (1998). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Sterner,* 767 S.W.2d at 690; Hall, *supra,* at 482. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; Hall, *supra,* at 482. The point of error should be sustained only if the contrary proposition is conclusively established. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); **\*242** Hall, *supra,* at 482. Here, Francis had the burden of proof on her retaliation claim. *See* TEX. LAB.CODE § 451.002(c). Thus, in considering only the evidence favorable to Francis, the court of appeals did not conduct a proper "matter of law" review.

[9][10][11] When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Croucher,* 660 S.W.2d at 58; Hall, *supra,* at 485. The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); Hall, *supra,* at 484. In doing so, the court of appeals must "detail the evidence relevant to the issue" and "state in what regard the contrary

evidence greatly outweighs the evidence in support of the verdict." *Pool,* 715 S.W.2d at 635. Here, the court of appeals improperly considered only the evidence favorable to Francis' retaliation claim and did not review the evidence supporting the jury verdict. Thus, we conclude that the court of appeals did not conduct a proper factual-sufficiency review.

[12] Finally, Dow and Hegyesi argue that the court of appeals erred in reversing and remanding the summary judgment on Francis' fraudulent-inducement claim. Although Dow and Hegyesi do not challenge the court of appeals' determination that Francis raised a fact issue about misrepresentation, they do argue that they were entitled to summary judgment as a matter of law based on Francis' failure to produce evidence of damages. Thus, Dow and Hegyesi contend, the court of appeals should have considered the damages issue as an alternative ground for summary judgment. Francis responds that the court of appeals correctly determined that fact issues precluded summary judgment for Dow and Hegyesi. We agree with Dow and Hegyesi.

[13][14] A fraud cause of action requires: (1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury. *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). The trial court rendered summary judgment on the fraud claim without specifying the grounds. Because Dow and Hegyesi filed a no-evidence summary-judgment motion challenging each of these elements, if Francis failed to raise a "genuine issue of material fact" about any of these elements, the summary judgment for Dow and Hegyesi should stand. TEX.R. CIV. P. 166a(i). Here, the court of appeals reversed the summary judgment after determining that Francis raised a fact issue concerning a material misrepresentation, but failed to consider Dow and Hegyesi's alternative ground for summary judgment—that Francis presented no evidence of damages. "When

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

46 S.W.3d 237, 44 Tex. Sup. Ct. J. 664
**(Cite as: 46 S.W.3d 237)**

a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious." *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). We therefore conclude that the court of appeals erred in not considering this alternative ground.

Accordingly, without hearing oral argument, we grant Dow and Hegyesi's petition for review, reverse the court of appeals' judgment, and remand the case to the court of appeals for further proceedings**\*243** consistent with this opinion. *See* TEX.R.APP. P. 59.1.

Tex.,2001.
Dow Chemical Co. v. Francis
46 S.W.3d 237, 44 Tex. Sup. Ct. J. 664

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093
**(Cite as: 118 S.W.3d 742)**



Supreme Court of Texas.
KING RANCH, INC., et al.
v.
William Warren CHAPMAN, III, et al.

No. 01–0430.
Argued April 2, 2003.
Decided Aug. 28, 2003.
Rehearing Denied Nov. 21, 2003.

Heirs and devisees of former non-possessory co-tenant in 15,449.4-acre tract of land sought bill of review as a direct attack to set aside a 120-year-old consent judgment, or, in the alternative, they asserted a trespass to try title claim, seeking to recover their title and possession to an undivided one-half interest in the property. The 28th District Court, Nueces County, Nanette Hasette, J., granted defendants' motion for no-evidence summary judgment. Plaintiffs appealed. The Corpus Christi-Edinburg Court of Appeals, 41 S.W.3d 693, reversed and remanded. Defendants filed petition for review. The Supreme Court, Jefferson, J., held that: (1) heirs failed to produce evidence of extrinsic fraud, as was required for bill of review to set aside consent judgment; (2) consent judgment was a notorious act of ouster, repudiating any claim of title by heirs, which occurred not later than the date the court entered judgment, for purposes of adverse possession statutes; and (3) defendants established as a matter of law that they cultivated, used, and enjoyed tract for over a hundred years.

Reversed and judgment rendered.

West Headnotes

**[1] Motions 267 ⚷39**

267 Motions
    267k39 k. Reargument or Rehearing. Most Cited Cases
    Supreme Court would not revisit issues related to its denials of motion to strike and petition for writ of mandamus, in which heirs and devisees of former non-possessory co-tenant in 15,449.4-acre tract of land sought to disqualify attorney representing current possessors of land, where heirs and devisees did not file a motion for rehearing or any other document seeking review of rulings until more than five months after the orders had been issued.

**[2] Appeal and Error 30 ⚷934(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k934 Judgment
                30k934(1) k. In General. Most Cited Cases
    On review of a no-evidence motion for summary judgment, the Supreme Court considers the evidence in the light most favorable to the non-movant.

**[3] Appeal and Error 30 ⚷863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k862 Extent of Review Dependent on Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases

**Appeal and Error 30 ⚷866(3)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k862 Extent of Review Dependent on Nature of Decision Appealed from
                30k866 On Appeal from Decision on Motion for Dismissal or Nonsuit or Direction of Verdict

118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093
**(Cite as: 118 S.W.3d 742)**

30k866(3) k. Appeal from Ruling on Motion to Direct Verdict. Most Cited Cases

**Judgment 228 ☞178**

228 Judgment
   228V On Motion or Summary Proceeding
      228k178 k. Nature of Summary Judgment.
Most Cited Cases

A no-evidence summary judgment is essentially a pretrial directed verdict, and the Supreme Court applies the same legal sufficiency standard in reviewing a no-evidence summary judgment as it applies in reviewing a directed verdict.

**[4] Judgment 228 ☞185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(5) k. Weight and Sufficiency.
Most Cited Cases

A no evidence summary judgment point will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.

**[5] Judgment 228 ☞185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(5) k. Weight and Sufficiency.
Most Cited Cases

A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

**[6] Judgment 228 ☞185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(5) k. Weight and Sufficiency.
Most Cited Cases

Less than a scintilla of evidence exists, for purposes of a no-evidence summary judgment motion, when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

**[7] Judgment 228 ☞185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(5) k. Weight and Sufficiency.
Most Cited Cases

More than a scintilla of evidence exists, for purposes of a no-evidence summary judgment motion, when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

**[8] Judgment 228 ☞335(1)**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court
      228k335 Actions and Other Proceedings to Review Judgment
         228k335(1) k. In General. Most Cited Cases

A "bill of review" is an equitable proceeding to set aside a judgment that is not void on the face of the record but is no longer appealable or subject to a motion for new trial.

**[9] Judgment 228 ☞335(1)**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093
**(Cite as: 118 S.W.3d 742)**

228k335 Actions and Other Proceedings to Review Judgment

228k335(1) k. In General. Most Cited Cases

**Judgment 228 ☞335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

A bill of review is proper where a party has exercised due diligence to prosecute all adequate legal remedies against a former judgment, and at the time the bill of review is filed, there remains no such adequate legal remedy still available because, through no fault of the bill's proponent, fraud, accident, or mistake precludes presentation of a meritorious claim or defense.

**[10] Judgment 228 ☞335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

The grounds upon which a bill of review can be obtained are narrow because the procedure conflicts with the fundamental policy that judgments must become final at some point.

**[11] Judgment 228 ☞335(3)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(3) k. Pleading and Evidence. Most Cited Cases

A bill of review petitioner must ordinarily plead and prove: (1) a meritorious defense to the cause of action alleged to support the judgment; (2) that the petitioner was prevented from making by the fraud, accident, or wrongful act of his or her opponent; and (3) the petitioner was not negligent.

**[12] Judgment 228 ☞335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

Fraud in relation to attacks on final judgments is either extrinsic or intrinsic, but only extrinsic fraud will support a bill of review.

**[13] Judgment 228 ☞335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

"Extrinsic fraud," which will support a bill of review, is fraud that denied a party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted; by contrast, "intrinsic fraud" relates to the merits of the issues that were presented and presumably were or should have been settled in the former action, including such matters as fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering the judgment assailed.

**[14] Judgment 228 ☞335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093
**(Cite as: 118 S.W.3d 742)**

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

Intrinsic fraud will not support a bill of review, because each party must guard against adverse findings on issues directly presented.

**[15] Judgment 228 ⟨⟩335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

Issues underlying the judgment attacked by a bill of review are intrinsic and thus have no probative value on the fraud necessary to a bill of review.

**[16] Judgment 228 ⟨⟩335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

Allegations of fraud or negligence on the part of a party's attorney are insufficient to support a bill of review.

**[17] Judgment 228 ⟨⟩335(2)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(2) k. Grounds for Review. Most Cited Cases

**Judgment 228 ⟨⟩335(3)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(3) k. Pleading and Evidence. Most Cited Cases

A bill of review petitioner who alleges that the wrongful act of his or her attorney caused an adverse judgment is not excused from the necessity of pleading and proving his or her opponent's extrinsic fraud.

**[18] Judgment 228 ⟨⟩335(3)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(3) k. Pleading and Evidence. Most Cited Cases

Heirs and devisees of former non-possessory co-tenant in 15,449.4-acre tract of land failed to produce evidence of dealings between other co-tenant and attorney who represented co-executor of non-possessory owner's estate which would support an inference that other co-tenant engaged in extrinsic fraud, as was required for bill of review to set aside 120-year-old consent judgment by which co-executor relinquished non-possessory owner's interest in tract; simultaneous representation in unrelated matters, fictionalized conversation between other co-tenant and attorney, and historian's opinion questioning attorney's actions did not evidence fraudulent conspiracy between other co-tenant and attorney.

**[19] Judgment 228 ⟨⟩335(3)**

228 Judgment

228VIII Amendment, Correction, and Review in Same Court

228k335 Actions and Other Proceedings to Review Judgment

228k335(3) k. Pleading and Evidence. Most Cited Cases

118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093
**(Cite as: 118 S.W.3d 742)**

Co-tenant's admission that he and former non-possessory co-tenant jointly bought property and jointly took a deed rendered harmless absence of actual deed, such that deed and circumstances of its late recording did not provide evidence of co-tenant's alleged extrinsic fraud, as was required for bill of review to set aside 120-year-old consent judgment by which co-executor relinquished non-possessory owner's interest in 15,449.4-acre tract of land. 5th Cong., R.S. § 21, 1841 Repub. Tex. Laws 163, 169.

**[20] Judgment 228 ⟷335(3)**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court
      228k335 Actions and Other Proceedings to Review Judgment
         228k335(3) k. Pleading and Evidence. Most Cited Cases

Fact of settlement which produced consent judgment by which co-executor of non-possessory co-tenant's estate relinquished non-possessory owner's interest in tract of land established only that both sides wanted to compromise and did not tend to establish a conspiracy that provided some evidence of extrinsic fraud by other co-tenant, for purposes of bill of review to set aside 120-year-old consent judgment; settlement awarded estate over three times what co-tenants had agreed to pay for one-half interest in property 30 years earlier and title to 240 acres of property, and heirs were litigating via long distance.

**[21] Judgment 228 ⟷335(2)**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court
      228k335 Actions and Other Proceedings to Review Judgment
         228k335(2) k. Grounds for Review. Most Cited Cases

Account book of former non-possessory co-tenant in 15,449.4-acre tract of land, which was cited as some evidence that co-tenant in fact paid other co-tenant for his share of land, was intrinsic to consent judgment in case disputing ownership and, thus, did not provide basis for bill of review to challenge consent judgment by which co-executor of non-possessory owner's estate relinquished non-possessory owner's interest in tract.

**[22] Judgment 228 ⟷335(3)**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court
      228k335 Actions and Other Proceedings to Review Judgment
         228k335(3) k. Pleading and Evidence. Most Cited Cases

In light of presumption in favor of ancient judgments, particularly those involving land titles, conspiracy theories, which were unsupported by evidence, could not be used to upend 120-year-old consent judgment quieting title to 15,449.4-acre tract of land.

**[23] Judgment 228 ⟷335(2)**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court
      228k335 Actions and Other Proceedings to Review Judgment
         228k335(2) k. Grounds for Review. Most Cited Cases

Even if co-executor of non-possessory owner's estate was required by statute to apply for or obtain probate court authority to settle litigation regarding ownership of land, the absence of evidence that he did so did not impart a sinister motive, so as to support bill of review to set aside 120-year-old consent judgment.

**[24] Descent and Distribution 124 ⟷74**

124 Descent and Distribution
   124III Rights and Liabilities of Heirs and Distributees

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

124III(A) Nature and Establishment of Rights in General

124k73 Title of Heirs or Distributees

124k74 k. In General. Most Cited Cases

Presumptions must be indulged in favor of probate proceedings, especially when they are ancient, and titles have been acquired and transmitted under them.

**[25] Judgment 228 ⚷185(5)**

228 Judgment

228V On Motion or Summary Proceeding

228k182 Motion or Other Application

228k185 Evidence in General

228k185(5) k. Weight and Sufficiency. Most Cited Cases

While anything more than a scintilla of evidence is legally sufficient to survive a no-evidence summary judgment motion, some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.

**[26] Trespass to Try Title 387 ⚷1**

387 Trespass to Try Title

387I Right of Action and Defenses

387k1 k. Nature and Scope of Remedy. Most Cited Cases

A trespass to try title action is a procedure by which rival claims to title or right of possession may be adjudicated.

**[27] Tenancy in Common 373 ⚷15(2)**

373 Tenancy in Common

373II Mutual Rights, Duties, and Liabilities of Cotenants

373k15 Adverse Possession

373k15(2) k. Necessity of Actual Ouster or Notice of Adverse Claim. Most Cited Cases

A co-tenant may not adversely possess against another co-tenant unless it clearly appears he has repudiated the title of his co-tenant and is holding adversely to it.

**[28] Tenancy in Common 373 ⚷15(11)**

373 Tenancy in Common

373II Mutual Rights, Duties, and Liabilities of Cotenants

373k15 Adverse Possession

373k15(11) k. Questions for Jury. Most Cited Cases

While repudiation of a non-possessory co-tenant's title is often a fact question, in an adverse possession action, when the pertinent facts are undisputed, repudiation may be established as a matter of law.

**[29] Tenancy in Common 373 ⚷15(2)**

373 Tenancy in Common

373II Mutual Rights, Duties, and Liabilities of Cotenants

373k15 Adverse Possession

373k15(2) k. Necessity of Actual Ouster or Notice of Adverse Claim. Most Cited Cases

Even if co-executor of non-possessory co-tenant's estate had not admitted repudiation in her pleadings, consent judgment itself was a notorious act of ouster, repudiating any claim of title by co-tenant or her heirs, which occurred not later than the date the court entered judgment, for purposes of adverse possession statutes. V.T.C.A., Civil Practice & Remedies Code §§ 16.026–16.028.

**[30] Tenancy in Common 373 ⚷15(1)**

373 Tenancy in Common

373II Mutual Rights, Duties, and Liabilities of Cotenants

373k15 Adverse Possession

373k15(1) k. In General. Most Cited Cases

**Tenancy in Common 373 ⚷15(4)**

373 Tenancy in Common

373II Mutual Rights, Duties, and Liabilities of Cotenants

373k15 Adverse Possession

373k15(4) k. Duration and Continuity of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Possession. Most Cited Cases

Current possessors of 15,449.4-acre tract of land established as a matter of law that they cultivated, used, and enjoyed tract for over a hundred years, as was required to prove adverse possession as a matter of law and defeat trespass to try title claim of heirs and devisees of former non-possessory co-tenant in tract.

**\*745** Howard P. Newton, San Antonio, James H. Robichaux, Corpus Christi, Matthews & Branscomb, P.C., Mary Taylor Henderson, Office of the Attorney General, Leon Vadim Komkov, Baskin Bennett & Komkov, Carroll G. Martin, Scott Douglass & McConnico, Austin, Keith R. Verges, Mark T. Davenport, Figari Davenport & Graves, LLP, Dallas, Robert R. Sykes, The Law Office of Robert R. Sykes, Midland, J.W. Cooper, Jr., Cooper & Cooper, J.A. (Tony) Canales, Canales & Simonson, P.C., Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, J. Scott Carothers, Andrews & Kurth, Gerri M. Fore, Exxon Company, U.S.A., John B. Thomas, Laura B. Rowe, Hicks Thomas & Lilienstern, LLP, Jess H. Hall, Jr., Stacy Lee Williams, Roland Garcia, Jr., Locke Liddell & Sapp LLP, Karen L. Chisholm, Zummo & Mitchell, L.L.P., Houston, Rick Foster, Porter Rogers Dahlman & Gordon, San Antonio, Mike A. Hatchell, Molly H. Hatchell, Hatchell P.C., Tyler, Edward J. Schroeder, The Law Office of Edward J. Schroeder, San Antonio, for petitioners.

John Blaise Gsanger, William R. Edwards, The Edwards Law Firm, L.L.P., Craig S. Smith, Law Office of Craig S. Smith, Michael G. Terry, Hartline Dacus Barger Dreyer & Kern, LLP, Donald B. Edwards, The Law Office of Donald B. Edwards, Corpus Christi, for respondent.

Justice JEFFERSON delivered the opinion of the Court.

Various heirs of Major William Warren Chapman and his wife, Helen Chapman, seek title to an undivided one-half interest **\*746** in 15,449.4 acres of property, much of it contained within the storied King Ranch in South Texas. The Chapman heirs allege that, in the late 1800s, their forebears' lawyer conspired with Captain Richard King to deprive the Chapman heirs of rightful title to the property. Seeking to avoid an 1883 agreed judgment, they have filed a bill of review and a trespass to try title action. For the reasons set forth below, we reject their claims.

## I
### Factual Background
#### A. The Property

Roughly one hundred fifty years ago, the State of Texas issued a patent to the heirs of Juan Mendiola, conveying to them three-and-one-half leagues of land totaling 15,449.4 acres located in Nueces County. These lands were known as the Rincon de Santa Gertrudis. Today, the Rincon includes portions of the King Ranch, the City of Kingsville, and the Kingsville Naval Air Station.

In 1853, the Mendiola heirs transferred their interest in the Rincon to Captain Richard King. Later that year, King conveyed a one-half interest to Gideon Lewis. Three years later, in 1856, King conveyed half of his remaining half interest (*i.e.* a one-fourth interest) to Major William Warren Chapman, who is the Chapman heirs' ancestor and the source of the title they claim. Lewis died later that year. Hamilton Bee, his administrator, sold the Lewis interest in the Rincon back to King and Chapman jointly for $1,575, for which King gave his individual promissory note. Bee executed a deed accordingly (the "Lewis deed"). At that point, King and Chapman each owned a one-half undivided interest in the property, although the Lewis deed was not recorded until 1904.

#### B. Cause No. 1279

Major Chapman died testate in 1859, leaving his estate to his wife Helen. Twenty years later, in 1879, she sued King in trespass to try title. The suit, filed in the 25th district court of Nueces County, Texas and bearing Cause No. 1279, sought an undivided one-half interest in the Rincon as well as title

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to a separate 240 acre property. Helen Chapman alleged that King, her co-tenant, had ejected her from the Rincon on January 1, 1877. Mrs. Chapman was represented by two law firms: M. Campbell & Givens and Lackey & Stayton. [FN1] By 1881, attorney Robert Kleberg had joined the Lackey & Stayton firm and participated in the representation of Mrs. Chapman.

> [FN1.] In 1881, then Governor Oran Roberts appointed J.W. Stayton associate justice of this Court. Seven years later, Governor Lawrence Sullivan Ross promoted Stayton to Chief Justice of this Court.

King, represented by F.E. Macmanus and Pat. O'Doeharty, answered the suit and admitted that the Lewis estate had conveyed Lewis's interest in the Rincon to King and Chapman jointly. King asserted, however, that he acquired title by reason of his exclusive, adverse possession of the Rincon from as early as 1857 and that Major Chapman did not pay for his interest under either the deed between King and Chapman or the Lewis deed. King asserted that Major Chapman verbally and, later, in a letter, surrendered his interest under both deeds to King in forgiveness of his debt for the purchase price, but that the letter was lost when the Union raided the King Ranch during the Civil War. King alleged that he paid the Lewis estate for Chapman's interest, took exclusive possession of the Rincon, took various actions to confirm his title, and "cultivated, used and enjoyed" the land for the three, **\*747** five, ten, and twenty-year statutory periods under the adverse possession statutes then in effect. *See* Act approved Feb. 5, 1841, 5th Cong., R.S., §§ 15–17, 1841 Repub. Tex. Laws 163, 167–68, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 627, 631–32 (Austin, Gammel Book Co. 1898).

Helen, who by this time had moved to South Carolina, died in 1881 before the lawsuit concluded. She left her two children a life estate in her interest in the Rincon, and the remainder interest to her five grandchildren. Her will was probated in both South Carolina and Texas by John Rankin, a co-executor appointed by Mrs. Chapman. [FN2] Rankin was substituted as plaintiff in Cause No. 1279, but none of the heirs was named in or made a party to the case.

> [FN2.] The other co-executor, Ellery Brayton, was married to Helen Chapman's daughter.

On April 7, 1883, four years after suit was filed and twenty-four years after Major Chapman's death, the parties settled Cause No. 1279, and the trial court rendered judgment accordingly. The April 7, 1883 judgment recited:

> [The Chapman Estate] is entitled to recover one half of the land sued for by the plaintiff ... but that in consideration of the moneyed judgment herein after set out and rendered in favor of the plaintiff and against the defendant Richard King—it is now here, by consent of all the parties hereto,—ordered adjudged and decreed by the Court—that all right title and interest of the said estate of Helen B. Chapman deceased in and to said grant originally made to Juan Mindeola [sic] be vested in Richard King the defendant herein, and that he be quieted in his possession of the said tract of land described in plaintiff's petition.... And it is now here further ordered adjudged and decreed that plaintiff do now have and recover from the defendant Richard King the sum of Five Thousand Eight Hundred and Eleven Dollars and Seventy Five Cents, $5,811.75 to be paid in four installments of one fourth (1/4) of said aggregate sum each said payments to be made respectively at the expiration of Six (6) months, Twelve (12) months, Eighteen (18) months and Twenty Four (24) months from this date on said aggregate sum at the rate of Ten (10) per centum until paid and should any default be made on the payments of said installments and the interest thereon accrued if any there be, then execution shall at once issue for the entire sum remaining unpaid of said whole amount, and it is further ordered that the defendant herein pay all

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093
**(Cite as: 118 S.W.3d 742)**

costs in this behalf expended for which execution may issue.

The judgment also awarded the Chapman estate title to the 240 acre property. There was no appeal.

Sixteen days after the case settled, Kleberg wrote to Ellery Brayton, explaining the agreed judgment:

That the suit of Helen B. Chapman v. Richard King was disposed of at the last term of our district court which has just closed. John Rankin Executor was made party plaintiff in the suit and judgment was rendered by consent of parties as follows, it was considered by the court that half of the land sued for which was the half of 3 1/2 leagues could be recovered by the plaintiff which would be 3874 1/2 acres—also a tract of 240 acres and in consideration of a moneyed judgment for $5,811.75 against the Defendant Richard King—the title was vested to him to the 3874 1/2 acres, and the title to the 240 acres was recovered in favor of the Estate of Helen B. Chapman thus **\*748** giving Judgment in favor of the Estate for $5,811.75....

Helen Chapman's son, William B. Chapman, was dissatisfied. In a May 21, 1883 letter to Brayton, Chapman wrote:

I was opposed to allowing King to take judgment for the property. We only get paid for this one part (?) of it (1/4). For the other part, it is thought that my father paid nothing. It is equally presumptive that neither did King.... I don't see why we could not have secured our title ... if anyone had taken any interest in the matter. I don't think anyone ever attempted to exercise (?) any evidence from [the administrator of the Lewis Estate]. FN3

FN3. The parties provided transcriptions of some of the ancient, handwritten exhibits in this case. The question marks presumably were inserted by the transcriptionist.

The parties do not dispute the accuracy of the transcriptions.

**C. King and Kleberg**

While Cause No. 1279 was pending, Kleberg's law firm represented King in unrelated matters. In a July 24, 1881 letter to his parents, Robert Kleberg wrote that "[King] asked us to attend to his legal business for him." The Lackey Stayton & Kleberg firm represented King in *Sobrinos v. Chamberlain, 76 Tex. 624, 13 S.W. 634 (1890)*, and *Domingue Rotge v. Richard King.* The *Sobrinos* case, filed in September 1881, involved a claim against the administrator of the estate of Hiram Chamberlain by a creditor of the estate. The creditor, Jose Sobrinos, alleged that the administrator of the estate, Bland Chamberlain, inappropriately paid certain claims made by King, who was a co-defendant. On March 17, 1882, Lackey Stayton & Kleberg made its first appearance in the case, filing an answer on King's behalf. *Rotge v. King,* filed in August 1881, involved a dispute over ownership of cattle. Lackey, Stayton & Kleberg filed an answer on behalf of King in the *Rotge* case in March 1882. The parties do not contend that the subject matter of these two cases related in any way to Cause No. 1279.

In 1885, two years after entry of the consent judgment in Cause No. 1279, Richard King died testate. He left his properties to his wife, Henrietta King. Kleberg became the manager of the King Ranch and, the following year, married Alice King, Richard and Henrietta's daughter. In 1904, Kleberg's nephew recorded the Lewis deed.

**D. THE KING RANCH, by Tom Lea (Little, Brown 1957).**

In 1951, the King Ranch commissioned artist and author Tom Lea to prepare an illustrated history of the Ranch to commemorate the centennial of the Ranch's founding in 1853. The resulting two-volume work, entitled *The King Ranch,* contains Lea's fictional account of a conversation in 1881 between Robert Kleberg and Richard King in which King retained Kleberg's legal services for $5000 a year:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Before Kleberg dropped off to sleep, he heard a knock.

He got up, lit a lamp and went to the door. It swung open to reveal the impressive figure of Captain Richard King with his black hat and black beard, his black boots, his watch chain glinting yellow in the lamplight.

Standing uncomfortably self-conscious in his night shirt, the young lawyer said, "Come in, Captain King."

He came in and closed the door.

"Kleberg."

"Yes, Captain King."

"I'm looking for a good lawyer. How would a retainer of five thousand a year suit you?"

**\*749** Robert Kleberg gulped. "Why—when would that start, sir?"

"Now."

Robert Kleberg gulped again.

"Right now," the captain said. "We will drive out to the Santa Gertrudis."

LEA, THE KING RANCH 340 (Little, Brown 1957).

### E. Caller–Times Article.

On August 23, 1992, the *Corpus Christi Caller–Times* published an article entitled *King and Kleberg Fought Widow for her Half Share of King Ranch.* The article, written by Ron George, contained the following quote attributed to Bruce Cheeseman, a King Ranch archivist and historian: "Clearly, Kleberg was looking after the interest of his in-state client versus the interests of his out-of-state client."

## II
### The Chapman Heirs' Claims

In 1995, twenty plaintiffs, self-described as the heirs or devisees of the Chapmans, sued some two hundred eight parties, who are alleged to own interests in the Rincon. The Chapman heirs sought a bill of review to set aside the 1883 judgment and asserted an alternative trespass to try title action to regain possession as cotenants. They alleged a conspiracy between King and Kleberg, claiming that the two "connived ... to advance the interests of Richard King at the expense of the Estate of Helen Chapman." The Chapman heirs also alleged, based on their status as cotenants, that "all oil and gas leases ... made after entry of the consent or agreed judgment [in Cause No. 1279] ... are now here ratified by the said Plaintiffs, entitling Plaintiffs to receive from the present lessee or lessees their proportionate share of all bonuses, delay rentals, royalties, and any other profits due to Plaintiffs...."

King Ranch, joined by most of the other defendants, answered and moved for summary judgment under Rule 166a(c) and (i), TEX.R. CIV. P. [FN4] The motions asserted that (1) there was no evidence of King's extrinsic fraud or the Chapman heirs' freedom from negligence, two elements essential to the Chapman heirs' bill of review, (2) the action was barred by limitations, (3) the 1883 judgment bound all parties and barred the trespass to try title claim, and (4) King Ranch proved title to the property by adverse possession. The trial court granted the motions. [FN5]

> FN4. For ease of reference, the petitioners are referred to collectively as "King Ranch."
>
> FN5. The Chapman heirs assert that, after granting King Ranch's summary judgment motion, a subsequent order granting summary judgment to other defendants effectively "ungranted" the first motion, because the second order contained a "Mother Hubbard" clause. We reject this contention. There is no indication that the trial court intended to set aside the first order, *Lehmann v. Har–Con Corp.,* 39 S.W.3d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

191, 205 (Tex.2001), and a later judgment does not automatically set aside an earlier interlocutory judgment, *Webb v. Jorns,* 488 S.W.2d 407, 409 (Tex.1972).

The court of appeals reversed and remanded, holding (1) there was evidence of extrinsic fraud in the 1883 judgment, (2) the same evidence "avoided the four year statute of limitations for bills of review" and "raise[d] a genuine issue of material fact as to [the Chapmans'] trespass to try title action," and (3) King Ranch's adverse possession claim failed because King Ranch did not establish a repudiation of Mrs. Chapman's title as a matter of law. 41 S.W.3d 693, 704–07.

We granted the petitions for review. 46 Tex. Sup.Ct. J. 394 (Jan. 16, 2003).

### III
### Attorney Disqualification

Before turning to the issues raised in the petitions for review, we address a preliminary**\*750** matter. After King Ranch filed its petitions for review, but before they were granted, the Chapman heirs filed several emergency motions asking us to strike King Ranch's petitions for review and remand the case for discovery on whether one of King Ranch's attorneys, Russell McMains, should be disqualified. The Chapman heirs alleged that family member Edward C. Coker revealed privileged information to McMains in the course of a conversation discussing a possible appeal of the trial court's judgment. We abated the petitions and granted the motion to remand on the disqualification issue and directed the trial court to issue findings of fact and conclusions of law. On remand, the trial court scheduled a disqualification hearing.

In response to the Chapman heirs' objections to testimony from McMains allegedly implicating the attorney-client privilege, the trial court ordered that only the Chapman heirs' counsel be present during an in camera examination of McMains. Although it denied the heirs' request to cross-examine McMains during the in camera proceeding, the trial court per-mitted them to submit written questions to McMains in camera and allowed all parties to examine McMains in open court on matters for which asserted privileges were not at issue. The Chapman heirs petitioned us for a writ of mandamus to prevent the in camera examination from going forward or to permit them to cross-examine McMains during that examination. We denied the petition. 45 Tex. Sup.Ct. J. 227 (Dec. 17, 2001).

[1] The trial court found that Coker's testimony was not credible, that he never established an attorney-client relationship with McMains, and that he had not disclosed confidential information to McMains. The court concluded that there was no valid ground to strike the petitions because the Chapman heirs did not meet their burden to establish that McMains was disqualified from representing King Ranch. Based on those findings, we lifted the abatement order and denied the motion to strike. Five months later, in response to the petitions for review, the Chapman heirs complained that the trial court erred in conducting the in camera inspection and that the court reporter failed to transcribe the in camera hearing. The heirs now claim they are entitled to a second disqualification hearing because they are unable to review a transcript of the in camera examination. We note, however, that the Chapman heirs' counsel attended the in camera examination, and the heirs do not contend that evidence presented at the hearing supports their disqualification claim. In any event, their challenges come too late. We ruled on these issues when we denied both the motion to strike and the petition for writ of mandamus. The Chapman heirs did not file a motion for rehearing or any other document seeking review of our rulings until more than five months after we issued them. We decline to revisit those issues.

### IV
### Standard of Review of No Evidence Motions for Summary Judgment

[2][3] Because King Ranch's summary judgment motion was, in part, a no-evidence motion, we

consider the evidence in the light most favorable to the non-movant. *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 208 (Tex.2002). A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing**\*751** a directed verdict. *See, e.g., Valero Mktg. & Supply Co. v. Kalama Int'l,* 51 S.W.3d 345, 350 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *Blackburn v. Columbia Med. Ctr. Of Arlington Subsidiary,* 58 S.W.3d 263, 270 (Tex.App.-Fort Worth 2001, pet. denied); *Mansfield v. C.F. Bent Tree Apartment, L.P.,* 37 S.W.3d 145, 149 (Tex.App.-Austin 2001, no pet.); *Espalin v. Children's Med. Ctr.,* 27 S.W.3d 675, 683 (Tex.App.-Dallas 2000, no pet.); *Barraza v. Eureka Co.,* 25 S.W.3d 225, 231 (Tex.App.-El Paso 2000, pet. denied); *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied).

[4][5][6][7] Accordingly, we review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). "A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Id.* (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). Thus, a no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i) ; *Wal–Mart,* 92 S.W.3d at 506. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact.

*Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983) . More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms.,* 953 S.W.2d at 711 .

With this standard in mind, we turn to the claims made and the evidence adduced in this case.

## V
### Bill of Review

As outlined above, this is not the first time that Major Chapman's heirs have sued for title to the Rincon. The 1883 judgment in Cause No. 1279 adjudicated the claim over one hundred years ago. To succeed on their current claim to the Rincon, the Chapman heirs must somehow avoid the 1883 judgment quieting title in Richard King. The first claim they allege is a bill of review.

[8][9][10][11] A bill of review is an equitable proceeding to set aside a judgment that is not void on the face of the record but is no longer appealable or subject to a motion for new trial. *Baker v. Goldsmith,* 582 S.W.2d 404, 406 (Tex.1979); *Schwartz v. Jefferson,* 520 S.W.2d 881, 889 (Tex.1975). A bill of review is proper where a party has exercised due diligence to prosecute all adequate legal remedies against a former judgment, and at the time the bill of review is filed, there remains no such adequate legal remedy still available because, through no fault of the bill's proponent, fraud, accident, or mistake precludes presentation of a meritorious claim or defense. *Baker,* 582 S.W.2d at 408. The grounds upon which a bill of review can be obtained are narrow because the procedure conflicts with the fundamental policy that judgments must become final at some point. *Alexander v. Hagedorn,* 148 Tex. 565, 226 S.W.2d 996, 998 (1950); *Crouch v. McGaw,* 134 Tex. 633, 138 S.W.2d 94, 96 (1940) (noting that a bill of review requires "something more than injustice"). Thus, a **\*752** bill of review petitioner must ordinarily plead and prove (1) a meritorious defense to the cause of action alleged to support the judgment, (2) that the

petitioner was prevented from making by the fraud, accident or wrongful act of his or her opponent, and (3) the petitioner was not negligent. *Alexander,* 226 S.W.2d at 998.

King Ranch's summary judgment motion asserted that there was no evidence of Richard King's alleged extrinsic fraud or the Chapman heirs' lack of negligence, two essential elements of the bill of review. Because the Chapman heirs would bear the burden of proof on a bill of review at trial, they were required to raise a fact issue on each of these elements. TEX.R. CIV. P. 166a(i).

## A. Extrinsic Fraud.

[12][13][14][15] Fraud in relation to attacks on final judgments is either extrinsic or intrinsic. Only extrinsic fraud will support a bill of review. *Tice v. City of Pasadena,* 767 S.W.2d 700, 702 (Tex.1989). Extrinsic fraud is fraud that denied a party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted. *Id.* Intrinsic fraud, by contrast, relates to the merits of the issues that were presented and presumably were or should have been settled in the former action. *Id.* Within that term are included such matters as fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering the judgment assailed. *Id.* Such fraud will not support a bill of review, because each party must guard against adverse findings on issues directly presented. *Id.; Alexander,* 226 S.W.2d at 998. Issues underlying the judgment attacked by a bill of review are intrinsic and thus have no probative value on the fraud necessary to a bill of review. *Tice,* 767 S.W.2d at 702.

[16][17] Similarly, allegations of fraud or negligence on the part of a party's attorney are insufficient to support a bill of review. *Transworld Fin. Servs. Corp. v. Briscoe,* 722 S.W.2d 407, 408 (Tex.1987); *Gracey v. West,* 422 S.W.2d 913, 918–19 (Tex.1968). Thus, a bill of review petitioner who alleges that the wrongful act of his or her attorney caused an adverse judgment is not excused from the necessity of pleading and proving his or

her opponent's extrinsic fraud. *Transworld,* 722 S.W.2d at 408.

## B. Kleberg's representation of King

[18] The court of appeals held that the Chapman heirs "produced more than a scintilla of probative evidence to raise a genuine issue of material fact of extrinsic fraud." 41 S.W.3d at 705. In so holding, the court of appeals relied on several categories of evidence it found indicative of King's extrinsic fraud. The first such category involved Kleberg's representation of King in the late 1800s. Within that category, the court of appeals cited several pieces of evidence: an 1881 letter from Kleberg to his parents, Kleberg's representation of King in March 1881 in the *Sobrinos v. Chamberlain* case, the fictional conversation in Tom Lea's two-volume book, and the Cheeseman quote. We address each item in turn.

As set forth above, the 1881 letter from Kleberg to his parents states that King "asked us to attend to his legal business for him." The record confirms that Kleberg's firm represented King in two pieces of litigation unrelated to Cause No. 1279: *Rotge v. King* and *Sobrinos v. Chamberlain.* But simultaneous representation in unrelated matters is not evidence of a fraudulent conspiracy between Kleberg and King. Such dual representation is permissible under today's ethical rules and was not prohibited in the 1880s. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(b), **\*753** cmt. 11 (noting that "there are circumstances in which a lawyer may act as advocate against a client, for a lawyer is free to do so unless this Rule ... would be violated"); *Laybourne v. Bray & Shifflett,* 190 S.W. 1159, 1162 (Tex.Civ.App.-Amarillo 1916, no writ) (The "rule prohibiting an attorney once retained by a client from acting for the opposing party applies only in the case of conflicting interest").

The Chapman heirs allege that King paid Kleberg a $5,000 retainer during the pendency of Cause No. 1279 but rely solely on Tom Lea's fanciful account of a conversation between Kleberg and King to support the claim. Lea testified that he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

could not swear to the accuracy of the Kleberg/ King conversation. Even if accurate, however, that conversation would not be evidence of extrinsic fraud because the fact that Kleberg may have simultaneously represented King and Chapman in unrelated cases was neither unethical nor fraudulent.

Finally, the Cheeseman quote provides no evidence of extrinsic fraud. Cheeseman denied making this statement to the reporter, but on review of a summary judgment, we assume the quote is accurate. *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). Even if accurate, Cheeseman's statement says nothing about King's actions or intent and cannot support an inference that King committed extrinsic fraud. Instead, it is a historian's opinion—given over one hundred years after the transaction at issue—questioning Kleberg's actions. Kleberg's actions, even if fraudulent, will not support a bill of review. *Transworld,* 722 S.W.2d at 408. In sum, none of the evidence of King and Kleberg's dealings supports an inference that King engaged in extrinsic fraud, because it does not provide "proof of some deception practiced by [King], collateral to the issues in the case, which prevent[ed] the petitioner from fully presenting" claims or defenses in the underlying action. *Bakali v. Bakali,* 830 S.W.2d 251, 255 (Tex.App.-Dallas 1992, no writ).

## C. The Lewis deed

[19] The court of appeals next focused on the Lewis deed as evidence of the alleged extrinsic fraud. The court observed that the deed, executed in 1856, was later found in the possession of King and recorded by Kleberg's nephew in 1904. 41 S.W.3d at 704. The court then concluded that "without the deed as the necessary proof of title, King's allegations that Chapman wanted out of the land purchase and had not paid his share had the potential of bearing more weight before the court in cause no. 1279." *Id.* We disagree. In Cause No. 1279, King swore to both the existence and the contents of the Lewis deed. Moreover, under the recording statute, the unrecorded deed was valid and binding on the

parties thereto and their heirs. Act approved Feb. 5, 1841, 5th Cong., R.S. § 21, 1841 Repub. Tex. Laws 163, 169, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 627, 633 (Austin, Gammel Book Co. 1898). As Justice Dorsey correctly noted, King's admission rendered harmless the absence of the actual deed. 41 S.W.3d at 709–10 (Dorsey, J., dissenting). Although the trial court subpoenaed the deed for trial, the case was settled and never tried. We cannot surmise that King would have been unable to produce the deed at trial. The Lewis deed and the circumstances of its recording do not provide evidence of King's alleged extrinsic fraud.

## D. The Powers Letter

[20] As further evidence of King's extrinsic fraud, the court of appeals points to a November 3, 1880 letter from Stephen Powers of the Powers & Wells law firm, in **\*754** which he advised Richard King to compromise Cause No. 1279 because "I don't see how you are to get over Mrs. Chapman's title to the Santa Gertrudis interest." [FN6] 41 S.W.3d at 705. The court held that this statement "conflict[ed] with Kleberg's claim of inability to prove [Chapman's] title" under the Lewis deed. *Id.* Kleberg, however, did not make such a claim in the April 23, 1883 letter to Brayton to which the court of appeals refers. Instead, that letter accurately recounts the terms of the settlement as evidenced by the consent judgment (*i.e.* that "half of the land sued for" was "considered" as recovered by the estate). It does not identify which half was recovered, nor does it reveal Kleberg's thoughts on the matter. In any event, the decision to settle cannot support an inference that King committed extrinsic fraud. The fact of settlement establishes only that both sides wanted to compromise. By going to trial, the Chapman estate could have lost all. Settlement—particularly a settlement like this one, that awarded the Chapman estate $5,811.75 (over three times what King and Chapman agreed to pay for Lewis's one-half interest in the Rincon thirty years earlier) and title to 240 acres of property—may have been the most prudent course. As Justice

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Dorsey aptly noted, at the time of the consent judgment, both William and Helen Chapman were dead, and the heirs were litigating via long distance. 41 S.W.3d at 710. We would be remiss in concluding that, under the circumstances of that litigation, this settlement tended to establish a conspiracy between King and Kleberg that provided some evidence of King's extrinsic fraud.

> FN6. Neither Powers nor his firm entered an appearance on King's behalf in Cause No. 1279.

**E. Payment for the Rincon**

[21] The court of appeals also focused on whether Chapman paid King for the Rincon as evidentiary support of King's alleged extrinsic fraud, holding that notations in William Chapman's account book provided some evidence that Chapman in fact paid King for his share of the land. 41 S.W.3d at 704. But the very question in Cause No. 1279, put in issue by King's sworn answer, was Chapman's alleged nonpayment. In that case, King's wife filed interrogatory answers stating that she and King received "not one cent" from Chapman, and Helen Chapman's interrogatory answers stated that she had no knowledge of King paying any money for the Rincon on behalf of her husband. The parties disagreed on this point, and they settled the matter with the 1883 Judgment. Thus, Chapman's account book—which, in any event, has been continuously in the Chapman family's possession for over 100 years—goes to payment for the Rincon, a point squarely at issue in Cause No. 1279 and therefore intrinsic to the judgment in that case.[FN7]

> FN7. We note, too, that the record is devoid of evidence to support the court of appeals' statement that the account book, produced by the Chapmans in this litigation, had not been produced in Cause No. 1279.

**F. Probate Court Approval**

[22][23][24] Finally, as evidence of Richard King's alleged extrinsic fraud, the court of appeals relied on the absence of evidence that Rankin, co-executor of Helen Chapman's estate, applied for or obtained probate court authority to settle Cause No. 1279. 41 S.W.3d at 704. Even if Rankin was required to do so by statute, the absence of evidence that he did does not impart a sinister motive. We cannot infer from the absence of evidence in a century-old probate court record that King caused Rankin to act without court authority, or that King induced Kleberg to cause Rankin**\*755** to act without authority. The probate court record appears incomplete; for example, there is nothing indicating that the estate was closed or its assets distributed. In such cases, we apply a presumption, in the absence of evidence, in favor of the judgment. *Baker v. Coe,* 20 Tex. 429, 436–37 (Tex.1857) (public policy disfavors annulling titles even if the "records did not show a compliance with all the requirements of the law in respect to the disposition of the estates of deceased persons"). "Presumptions must be indulged in favor of such proceedings, especially when they are ancient, and titles have been acquired and transmitted under them, or it would indeed be true that time, instead of healing, as it should, the defects of these titles, would gradually undermine, and eventually destroy them." *Id.* at 437. Accordingly, the absence of evidence of probate court approval will not support an inference that King committed extrinsic fraud.

[25] Instead, we conclude that "[t]ime, which buries in obscurity all human transactions, has achieved its accustomed effects upon this." *Prevost v. Gratz,* 19 U.S. (6 Wheat.) 481, 495, 5 L.Ed. 311 (1821). In this case, the Chapman heirs have cobbled together a series of interesting historical tidbits and Texas folklore in an effort to regain title to one-half of the Rincon—an interest they claim is worth a substantial sum. Viewed separately, each of these tidbits fails to provide evidence of King's extrinsic fraud, and aggregated, they fare no better. While anything more than a scintilla of evidence is legally sufficient to survive a no-evidence summary judgment motion, "some suspicion linked to other suspicion produces only more suspicion, which is

not the same as some evidence." *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."). The Chapman heirs' extrinsic fraud claims are supported, in large part, by the absence of evidence—the dearth of complete records one hundred twelve years after judgment was entered, and the unavailability of any living witness to testify to the events at issue. The heirs urge us to second guess, with benefit of hindsight, the wisdom of settling ancient litigation. We decline to do so. As we recognized in 1857, we must apply a presumption in favor of ancient judgments, particularly those involving land titles, lest the passage of time destroy them. *Baker,* 20 Tex. at 437. We cannot conclude that conspiracy theories—fascinating but unsupported by evidence—may be used to upend a one hundred twenty year old judgment quieting title to the property. Because the Chapman heirs failed to produce even a scintilla of evidence of Richard King's alleged extrinsic fraud, their bill of review fails.[FN8]

> FN8. Because the Chapman heirs failed to produce evidence of extrinsic fraud, we need not decide whether there was any evidence of the Chapman heirs' lack of negligence.

## VI
### Trespass to Try Title

[26] The Chapman heirs also filed an alternative trespass to try title action, a procedure by which rival claims to title or right of possession may be adjudicated. *Yoast v. Yoast,* 649 S.W.2d 289, 292 (Tex.1983). In 1879, Helen Chapman alleged just such a claim in Cause No. 1279. To avoid its effect, the Chapman heirs claim that the judgment is not binding on them because Texas law required Helen Chapman's heirs to be joined as parties in **\*756** Cause 1279, and nothing in the record demonstrates such joinder. On this point, King Ranch moved for summary judgment on two separate grounds: (1) the judgment was valid without joinder of the minor heirs in Cause No. 1279, and (2) even if the judgment were void due to the non-joinder, King Ranch adversely possessed the property for a sufficient time to acquire title. Without discussing this point, the court of appeals held that the evidence in the record supporting a bill of review also raised a fact issue as to whether the 1883 judgment is void. 41 S.W.3d at 706. In addition, the court of appeals rejected the adverse possession claim, holding that repudiation was a fact issue. *Id.* at 707. We need not decide whether the minor heirs were necessary parties to Cause No. 1279, because we hold that King Ranch established adverse possession as a matter of law.

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM.CODE § 16.021(1). King Ranch moved for summary judgment on the ten year and the two twenty-five year adverse possession statutes. *See* TEX. CIV. PRAC. & REM.CODE § 16.026 –.028. The first of those twenty-five year prescriptions provides:

> A person, regardless of whether the person is or has been under a legal disability, must bring suit not later than 25 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses or enjoys the property.

> *Id.* § 16.027.

[27][28] The court of appeals correctly noted that a co-tenant may not adversely possess against another co-tenant unless it clearly appears he has repudiated the title of his co-tenant and is holding adversely to it, *Todd v. Bruner,* 365 S.W.2d 155, 156 (Tex.1963), but it also held that whether there has been a repudiation of a non-possessory co-tenant's title is a question of fact. 41 S.W.3d at 707.

While we agree that repudiation is often a fact question, when the pertinent facts are undisputed, repudiation may be established as a matter of law. *See Thedford v. Union Oil Co. of Cal.,* 3 S.W.3d 609, 613–14 (Tex.App.-Dallas 1999, pet. denied).

In *Republic Production Co. v. Lee,* 132 Tex. 254, 121 S.W.2d 973, 977 (1938), we considered the circumstances under which repudiation may be established between cotenants:

It is a rule of wide application that if two or more tenants in common of a tract of land enter into a partition of same, and set apart the whole to the exclusion of a non-participating cotenant, such act of partition, when followed by adverse possession, even if wholly void as against the excluded cotenant, constitutes a complete and unequivocal repudiation of the cotenancy relationship. It is also well settled that such a partition, even though there be no sufficient record thereof as will give notice to the excluded cotenant, may be proven as an act manifesting an intention on the part of the participating cotenant to oust the other cotenant or repudiate the tenancy relationship with him.

In *Cryer v. Andrews,* 11 Tex. 170, 180 (Tex.1853), we faced a similar issue. In that case, a brother died intestate, survived by his siblings and their descendants. Several of those siblings initiated a partition action to quiet title to a piece of property owned by their brother before his death. Mildred Cryer, a sister who was also an heir, was not made a party to the partition action and was not awarded title **\*757** to any portion of the property. In 1839, the probate court divided the property among the other heirs. Eight years later, Mildred sued for her portion of the land. Her siblings plead adverse possession.

We recognized that the partition judgment was binding only on those parties who were before the court. We also held, however, that

inasmuch as this partition was a notorious act of ouster, the other parties claiming the whole of the land, to the exclusion of the plaintiff, it would, on general principles, as against a citizen not laboring under a disability, operate as the commencement of prescription in favor of all who held adversely, under such decree; and possession under it, accompanied with the circumstances enumerated in the statute, would ripen into a bar against a joint owner thus disseized.

*Id.* at 181; *see also McCook v. Amarada Petroleum Corp.,* 93 S.W.2d 482, 484 (Tex.Civ.App.-Texarkana 1936, writ dism'd).

[29] In Cause No. 1279, Helen Chapman judicially admitted repudiation, alleging in her original petition "[t]hat on the first day of January A.D. 1877 the Said Richard King entered upon said premises and ejected ... petitioner therefrom." Even if she had not admitted repudiation in her pleadings, the judgment in Cause No. 1279 itselfwas a "notorious act of ouster," repudiating any claim of title by Helen Chapman or her heirs by providing that "it is now here, by consent of the parties hereto, ordered, adjudged and decreed by the court, that all the right title and interest in the said grant originally made to Juan Mindeola [sic] be vested in Richard King, the defendant here, and that he be quieted in his possession of the said tract of land described in plaintiff's petition." *See Cryer,* 11 Tex. at 181. If—as the Chapman heirs contend—that judgment was a nullity as to them, the statute continued to run against the heirs notwithstanding their minority. TEX. CIV. PRAC. & REM.CODE § 16.027; *see also Moody's Heirs v. Moeller,* 72 Tex. 635, 10 S.W. 727, 728 (1889) (holding that prescriptive period continued against heirs seeking title "notwithstanding any disability of coverture or minority"). As a matter of law, repudiation occurred not later than April 7, 1883, the date the court entered judgment in Cause No. 1279.

[30] King Ranch also produced summary judgment evidence on the remaining elements of adverse possession, establishing as a matter of law that it has cultivated, used, and enjoyed the Rincon

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

for over a hundred years. By holding that a fact issue existed as to whether King Ranch has adversely possessed property it has used openly, notoriously, and exclusively for over one hundred years, despite the undisputed facts of record, the court of appeals ignored our precedent and frustrated the policy behind our adverse possession statutes. *Republic Nat. Bank of Dallas v. Stetson,* 390 S.W.2d 257, 262 (Tex.1965) ( "The policy behind statutes which permit adverse possession is the settlement and repose of titles."); *Wilson v. Daggett,* 88 Tex. 375, 31 S.W. 618, 619 (1895). Without such laws, "time, instead of lending a helping hand to cure apparent defects and remove opposing claims, will only be the means and afford a ready opportunity of rendering [titles] less secure against mistakes, frauds, and perjuries. The older the title the less secure it becomes against such attacks." *Howard v. Colquhoun,* 28 Tex. 134, 145 (1866). We hold that King Ranch satisfied the requirements of the statute and proved adverse possession of the Rincon as a matter of **\*758** law.[FN9]

> FN9. Because King Ranch, Inc. established adverse possession as a matter of law, the lessors of the minerals underlying the entire King Ranch, were also entitled to summary judgment on the Chapman heirs' trespass to try title claim, because the Chapman heirs' purported ratification of any mineral lease was without effect.

### VII
### Conclusion

[T]o permit multiple actions leaves an undesirable uncertainty in the economic affairs of those subject to them. Thus, the social interest in preserving free marketability of property, recognized in recording and registration acts and in statutes of limitations, can be undermined by allowing repeated litigation of the same title on various grounds existing at the time the first action is brought. It is also unjust to a party who may have made improvements on land in reliance on the first judgment; or worse, it may discourage him from improving his land in the first place. *Developments in the Law—Res Judicata,* 65 HARV. L.REV.. 818, 827–28 (March 1952). This case demonstrates the wisdom in protecting the stability of final judgments. Richard King and William Chapman, along with every witness with personal knowledge of the events at issue, have long since expired. The paper trail of evidence, though surprisingly detailed, cannot turn speculation about King's motives into evidence of his fraud. Assuming we had the ability, more than a century later, to ferret from history facts supporting the Chapman heirs' claim, we must nevertheless presume that, absent extrinsic fraud, the 1883 judgment settled the dispute, once and for all. Even if not settled by judgment, the King Ranch's continued dominion over the Rincon, in a manner obviously hostile to the heirs' claims, establishes adverse possession conclusively.

Accordingly, we reverse the court of appeals' judgment and render judgment that the Chapman heirs take nothing.

Justice ENOCH and Justice O'NEILL did not participate in the decision.

Tex.,2003.
King Ranch, Inc. v. Chapman
118 S.W.3d 742, 46 Tex. Sup. Ct. J. 1093

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

286 S.W.2d 190
**(Cite as: 286 S.W.2d 190)**



C

Court of Civil Appeals of Texas, San Antonio.
Benjamin D. LUCAS, Appellant,
v.
J. H. MORRISON, Appellee.

No. 12941.
Jan 11, 1956.

Action to recover damages for trespass upon plaintiff's land and wrongful destruction of a tree growing thereon. The County Court at Law No. 2, Bexar County, Charles W. Grace, J., rendered judgment on a verdict in favor of plaintiff, and defendant appealed. The Court of Civil Appeals, W. O. Murray, C. J., held that award of $100 as nominal damages for trespasses upon plaintiff's land, all committed during one afternoon, was excessive and should be reduced.

Judgment amended in accordance with opinion and, as amended, affirmed.

West Headnotes

**[1] Woods and Forests 411 ⬥1**

411 Woods and Forests
411k1 k. Nature of Property. Most Cited Cases
Trees growing upon land are a part of the realty unless they have a market value when severed from the land.

**[2] Damages 115 ⬥112**

115 Damages
115VI Measure of Damages
115VI(B) Injuries to Property
115k107 Injuries to Real Property
115k112 k. Growing Crops, Grass, Shrubbery, or Trees. Most Cited Cases
Ordinarily, the measure of damages for wrongful destruction of growing trees which have no market value when severed from the land, is the differ-ence between value of the land immediately before such trees were destroyed and value of such land immediately after their destruction.

**[3] Trespass 386 ⬥52**

386 Trespass
386II Actions
386II(D) Damages
386k52 k. Cutting and Removal of Trees. Most Cited Cases
Where growing tree, wrongfully destroyed, though it had no market value when severed from the land, was valuable to landowner as providing the only shade for his dairy cattle, but such value was so small in proportion to value of land as a whole that destruction of tree did not affect market value of the land, under exception to general rule of measure of damages, wrongdoer responsible for destruction of such tree was liable to landowner for intrinsic value of tree.

**[4] Trespass 386 ⬥57**

386 Trespass
386II Actions
386II(D) Damages
386k57 k. Amount Awarded. Most Cited Cases
In suit for wrongful destruction of tree which had no market value when severed from the land but afforded the only shade for plaintiff's dairy cattle, finding that intrinsic value of tree was $50 was supported by the evidence, though plaintiff did not testify as to such value in dollars and cents.

**[5] Damages 115 ⬥8**

115 Damages
115II Nominal Damages
115k8 k. Nature and Theory of Award. Most Cited Cases

**Damages 115 ⬥14**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

286 S.W.2d 190
**(Cite as: 286 S.W.2d 190)**

115 Damages
    115II Nominal Damages
           115k14 k. Amount of Nominal Damages.
Most Cited Cases

    "Nominal damages" are damages in name only and should be awarded in some trivial amount, usually $1.

**[6] Trespass 386 &#128273;58**

386 Trespass
    386II Actions
      386II(D) Damages
           386k58 k. Inadequate and Excessive Damages. Most Cited Cases

    Award of $100 as nominal damages for 20 different trespasses upon plaintiff's land, all committed during one afternoon in connection with moving a school house, was excessive and should be reduced to $20.

**\*191** Rice, Waitz & Rice, San Antonio, for appellant.

Moursund, Ball, Bergstrom & Barrow, San Antonio, for appellee.

W. O. MURRAY, Chief Justice.

    This is an appeal from a judgment of the County Court at Law No. 2 of Bexar County, based upon a jury verdict allowing plaintiff, J. H. Morrison, a recovery against defendant, Benjamin D. Lucas, of $50 as the intrinsic value of a hackberry shade tree and a recovery of $100 as nominal damages for wrongful trespass of defendant upon the land of plaintiff. Benjamin D. Lucas has prosecuted this appeal.

    Appellant's first four points present the contention that the court erred in permitting a recovery of $50 for the hackberry tree, because the wrong measure of damages was applied, and because there was no evidence to support the finding of the jury to the effect that the intrinsic value of the tree was $50.

    [1][2] We overrule these contentions. It is quite true that trees growing upon land are a part of the realty, unless they have a market value when detached from the land, and ordinarily the measure of damages for the wrongful destruction of such trees is the difference in the value of the land immediately before the trees were destroyed and immediately after their destruction. Hooper v. Smith, Tex.Civ.App., 53 S.W. 65; Galveston, H. & S. A. Ry. Co. v. Warnecke, 43 Tex.Civ.App. 83, 95 S.W. 600; Hidalgo County Water Control & Improvement Dist. No. 1 v. Gannaway, Tex.Civ.App., 13 S.W.2d 204.

    It was stipulated in this case that the hackberry tree had no market value when severed from the land. The evidence shows that the market value of the land was the same before and after the destruction of the hackberry tree. So, if this measure of damages be followed, it is apparent that appellee would not receive anything for the wrongful destruction of his valuable shade tree.

    [3] Appellee testified that the hackberry tree was the only shade in the enclosure in which he kept his milk cows, that milk cows need shade and fall off in their production when they do not have shade, and that forty cows could stand in the shade of this tree. A picture of the tree before it was cut down is in the statement of facts. H. R. Hohenberger, a witness for appellant, admitted that shade is valuable to dairy cattle to a certain extent. No doubt this one hackberry tree is of small value when compared with the value of the entire tract of land, and of such small value that its destruction would not affect the market value of the entire land. On the other hand, should appellant be permitted to wrongfully enter upon the farm of appellee and cut down a shade tree which was of value to him and not be required to pay any damages because its value in proportion to the value of the entire farm was of such insignificance as not to affect the market value of the land? We think not. Here an exception should be made to the general rule of measure of damages with regard to de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

286 S.W.2d 190
**(Cite as: 286 S.W.2d 190)**

struction of growing trees and appellee should be permitted to recover the intrinsic value of his shade tree. Stephenville, N. & S. T. R. Co. v. Baker, Tex.Civ.App., 203 S.W. 385; Shell Pipe Line Corporation v. Svrcek, Tex.Civ.App., 37 S.W.2d 297.

[4] It is true that appellee did not testify as to the intrinsic value of the shade tree, in dollars and cents, and it is further apparent that had he done so it would have been only an estimate. This the jury could do as well as appellee. Appellee alleged the tree was worth $100, the jury allowed $50. There is no contention that the value allowed by the jury was excessive in amount. The evidence was sufficient to support the finding of the jury as to the value of the tree.

[5][6] Appellant next contends that the court erred in allowing nominal damages in the sum of $100. We are of the opinion that $100 is substantial damages and not merely nominal damages. Nominal damages is damages in name only. It should **\*192** be in some trivial amount and is usually in the sum of $1. Appellee points out the fact that the evidence would justify the conclusion that appellant and his men committed as least twenty different trespasses upon appellee's land and that only $5 per trespass would not be excessive nominal damages. We cannot agree. Whatever trespasses were committed occurred in one afternoon in connection with the moving of a school house. Conceding that there were twenty separate trespasses committed, the nominal damages should not have been more than $1 per trespass and not exceeding $20 for all of the trespasses.

The judgment will be amended so as to allow $20.00 as nominal damages and a total recovery of $70 for both the value of the hackberry tree and nominal damages, and as thus amended the judgment is affirmed. The costs of this appeal are taxed one-half against appellant and one-half against appellee.

Tex.Civ.App. 1956
Lucas v. Morrison

286 S.W.2d 190

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

▷

Supreme Court of Texas.
MERRELL DOW PHARMACEUTICALS, INC.,
Petitioner,
v.
Ernest HAVNER and Marilyn Havner on Behalf of
their minor child Kelly HAVNER, Respondents.

No. 95–1036.
Argued March 19, 1996.
Decided July 9, 1997.
Order Overruling Rehearing Nov. 13, 1997.

Parents of child who suffered from limb reduction birth defect brought products liability action against manufacturer of prescription drug (Bendectin) ingested by mother during pregnancy. The 214th District Court, Nueces County, Mike Westergren, J., entered judgment on jury verdict awarding actual and exemplary damages to plaintiffs, and manufacturer appealed. After panel initially reversed and rendered judgment, rehearing en banc was granted, and on rehearing, the Corpus Christi Court of Appeals, 907 S.W.2d 535, affirmed as to actual damages, and reversed and rendered as to punitive damages. Application for writ of error was granted, and the Supreme Court, Owen, J., held that: (1) properly designed and executed epidemiological studies indicating that exposure more than doubled risk of injury may be part of evidence supporting finding of causation in toxic tort case; but (2) other factors must be considered, and plaintiff must in addition offer evidence excluding other possible causes of disease with reasonable certainty; and (3) evidence was legally insufficient to establish that child's defect was caused by exposure to drug..

Court of Appeals reversed, and judgment rendered for defendant.

Gonzalez, J., concurred and filed opinion.

Spector, J., concurred and filed opinion.

West Headnotes

**[1] Appeal and Error 30 ⟜930(3)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k930 Verdict
                30k930(3) k. Interrogatories and special verdicts. Most Cited Cases
    In determining whether there is no evidence of probative force to support jury's finding, all record evidence must be considered in light most favorable to party in whose favor verdict has been rendered, and every reasonable inference deducible from evidence is to be indulged in that party's favor.

**[2] Appeal and Error 30 ⟜1001(3)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1001 Sufficiency of Evidence in Support
                    30k1001(3) k. Total failure of proof. Most Cited Cases
    No evidence point of error will be sustained when (1) there is complete absence of evidence of a vital fact, (2) court is barred by rules of law or of evidence from giving weight to only evidence offered to prove a vital fact, (3) evidence offered to prove a vital fact is no more than a mere scintilla, or (4) evidence conclusively establishes the opposite of the vital fact.

**[3] Appeal and Error 30 ⟜1001(3)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1001 Sufficiency of Evidence in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

Support

30k1001(3) k. Total failure of proof. Most Cited Cases

"More than a scintilla" of evidence exists to support jury finding, and no evidence point of error will be denied, when evidence supporting finding, as a whole, rises to level that would enable reasonable and fair-minded people to differ in their conclusions.

**[4] Appeal and Error 30 ⚷842(7)**

30 Appeal and Error
   30XVI Review
       30XVI(A) Scope, Standards, and Extent, in General
          30k838 Questions Considered
          30k842 Review Dependent on Whether Questions Are of Law or of Fact
          30k842(7) k. Review of evidence. Most Cited Cases

Expert's bare opinion testimony will not suffice to support factual finding, and substance of testimony must be considered in reviewing legal sufficiency of evidence.

**Evidence 157 ⚷570**

157 Evidence
   157XII Opinion Evidence
       157XII(F) Effect of Opinion Evidence
          157k569 Testimony of Experts
          157k570 k. In general. Most Cited Cases

Expert's bare opinion testimony will not suffice to support factual finding, and substance of testimony must be considered in reviewing legal sufficiency of evidence.

**[5] Evidence 157 ⚷546**

157 Evidence
   157XII Opinion Evidence
       157XII(C) Competency of Experts
          157k546 k. Determination of question of competency. Most Cited Cases

Testimony of expert is generally opinion testimony, and whether such testimony rises to level of evidence is determined under Rules of Evidence.

**[6] Evidence 157 ⚷546**

157 Evidence
   157XII Opinion Evidence
       157XII(C) Competency of Experts
          157k546 k. Determination of question of competency. Most Cited Cases

While rule governing admission of expert testimony deals with admissibility of evidence, it offers substantive guidelines in determining if expert testimony is some evidence of probative value. Rules of Civ.Evid., Rule 702.

**[7] Evidence 157 ⚷555.2**

157 Evidence
   157XII Opinion Evidence
       157XII(D) Examination of Experts
          157k555 Basis of Opinion
          157k555.2 k. Necessity and sufficiency. Most Cited Cases

Factors that should be considered in looking beyond bare opinion of expert witness to determining whether expert's scientific testimony is of some probative value include (1) extent to which theory has been or can be tested, (2) extent to which technique relies upon subjective interpretation of expert, (3) whether theory has been subjected to peer review and publication, (4) technique's potential rate of error, (5) whether underlying theory or technique has been generally accepted as valid by relevant scientific community, and (6) nonjudicial uses that have been made of theory or technique. Rules of Civ.Evid., Rule 702.

**[8] Evidence 157 ⚷555.2**

157 Evidence
   157XII Opinion Evidence
       157XII(D) Examination of Experts
          157k555 Basis of Opinion
          157k555.2 k. Necessity and sufficiency. Most Cited Cases

If foundational data underlying scientific opinion testimony are unreliable, expert will not be permitted to base opinion on that data, because any opinion drawn from that data is likewise unreliable. Rules of Civ.Evid., Rule 702.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

**[9] Evidence 157 ⚷═►555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and sufficiency. Most Cited Cases

    Expert's scientific testimony is unreliable, even when underlying data are sound, if expert draws conclusions from that data based on flawed methodology. Rules of Civ.Evid., Rule 702.

**[10] Evidence 157 ⚷═►555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and sufficiency. Most Cited Cases

    Flaw in expert witness' reasoning from data may render reliance on scientific study unreasonable, and render the inferences drawn therefrom dubious; under that circumstance, expert's scientific testimony is unreliable and, legally, no evidence. Rules of Civ.Evid., Rule 702.

**[11] Evidence 157 ⚷═►150**

157 Evidence
    157IV Admissibility in General
        157IV(E) Competency
            157k150 k. Results of experiments. Most Cited Cases

    Properly designed and executed epidemiological studies may be part of evidence supporting finding of causation in toxic tort case.

**[12] Evidence 157 ⚷═►150**

157 Evidence
    157IV Admissibility in General
        157IV(E) Competency
            157k150 k. Results of experiments. Most Cited Cases

**Products Liability 313A ⚷═►147**

313A Products Liability
    313AII Elements and Concepts
        313Ak146 Proximate Cause
            313Ak147 k. In general. Most Cited Cases
    (Formerly 313Ak15)

**Products Liability 313A ⚷═►409**

313A Products Liability
    313AIV Actions
        313AIV(D) Questions of Law or Fact
            313Ak408 Proximate Cause
                313Ak409 k. In general. Most Cited Cases
    (Formerly 313Ak87.1)

    Epidemiological studies indicating that exposure to a substance more than doubled risk of injury may be part of evidence supporting causation in toxic tort case; however, other factors must be considered, and to raise fact issue on causation, and thus to survive legal sufficiency review, plaintiff must show that he or she is similar to those in studies, including proof of exposure to same substance, that exposure or dose levels were comparable to or greater than those in studies, that exposure occurred before injury, and that timing of onset of injury was consistent with that experienced by those in study, and also must offer evidence excluding other possible causes of disease with reasonable certainty.

**[13] Products Liability 313A ⚷═►225**

313A Products Liability
    313AIII Particular Products
        313Ak223 Health Care and Medical Products
            313Ak225 k. Drugs in general. Most Cited Cases
    (Formerly 313Ak83, 138k21 Drugs and Narcotics)

**Products Liability 313A ⚷═►390**

313A Products Liability
    313AIV Actions
        313AIV(C) Evidence

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

313AIV(C)4 Weight and Sufficiency of Evidence

313Ak389 Proximate Cause

313Ak390 k. In general. Most Cited Cases

(Formerly 313Ak83, 138k21 Drugs and Narcotics)

Evidence was legally insufficient to establish that child's limb reduction birth defect was caused by mother's in vitro ingestion of morning sickness drug (Bendectin); isolated epidemiological study finding statistically significant association between exposure to drug and limb reduction defect was not scientifically reliable, in vivo and in vitro animal studies could not support conclusion of causation in humans, and testimony of physician that drug had caused defect, which was based in part on testimony of other experts, was opinion rather than science.

**[14] Evidence 157 ☜555.2**

157 Evidence

157XII Opinion Evidence

157XII(D) Examination of Experts

157k555 Basis of Opinion

157k555.2 k. Necessity and sufficiency. Most Cited Cases

Publication and other peer review is significant indicia of reliability of scientific evidence when expert's testimony is in area in which peer review or publication would not be uncommon, and while publication is not prerequisite for scientific reliability in every case, courts must be especially skeptical of scientific evidence that has not been published or subjected to peer review. Rules of Civ.Evid., Rule 702.

**[15] Evidence 157 ☜150**

157 Evidence

157IV Admissibility in General

157IV(E) Competency

157k150 k. Results of experiments. Most Cited Cases

**Products Liability 313A ☜390**

313A Products Liability

313AIV Actions

313AIV(C) Evidence

313AIV(C)4 Weight and Sufficiency of Evidence

313Ak389 Proximate Cause

313Ak390 k. In general. Most Cited Cases

(Formerly 313Ak82.1)

Particularly where direct experimentation has not been conducted, it is important that any conclusions about causation in toxic tort case be reached only after association is observed in epidemiological studies among different groups and association continues to hold when effects of other variables are taken into account.

**[16] Evidence 157 ☜596(1)**

157 Evidence

157XIV Weight and Sufficiency

157k596 Degree of Proof in General

157k596(1) k. In general. Most Cited Cases

**Products Liability 313A ☜381**

313A Products Liability

313AIV Actions

313AIV(C) Evidence

313AIV(C)4 Weight and Sufficiency of Evidence

313Ak381 k. Standard of proof, in general. Most Cited Cases

(Formerly 313Ak82.1)

Legal system requires that claimants prove their cases by a preponderance of the evidence, and in keeping with that proposition, law should not be hasty to impose liability in toxic tort cases when scientifically reliable evidence is unavailable.

**[17] Products Liability 313A ☜390**

313A Products Liability

313AIV Actions

313AIV(C) Evidence

313AIV(C)4 Weight and Sufficiency of Evidence

313Ak389 Proximate Cause

313Ak390 k. In general. Most Cited Cases

(Formerly 313Ak82.1)

Testimony to the effect that substance "could" or "can" cause disease or disorder is not evidence that in reasonable probability it does, as is required to support recovery in toxic tort case.

**\*708** John L. Hill, Austin, Russell W. Miller, Dallas, James E. Essig, Kamela Bridges, Houston, Robert L. Dickson, Hall R. Marston, George E. Berry, Santa Monica, CA, Gene M. Williams, Beaumont, Rob L. Wiley, Steven Goode, Austin, for Petitioner.

Guy H. Allison, Kevin W. Grillo, Corpus Christi, Barry J. Nace, Washington, DC, Roberrt C. Hilliard, Corpus Christi, Rebecca E. Hamilton, Rockwall, John T. Flood, Corpus Christi, for Respondents.

OWEN, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, CORNYN, ENOCH and ABBOTT, Justices, join.

The issue in this case is whether there is any evidence that the drug Bendectin caused Kelly Havner to be born with a birth defect. We hold that the evidence offered is legally insufficient to establish causation. Accordingly, we reverse the judgment of the court of appeals. 907 S.W.2d 535.

## I

Kelly Havner was born with a limb reduction birth defect. The fingers on her right hand were not formed. Kelly's mother had taken the prescription drug Bendectin in 1981 during her pregnancy to relieve nausea and other symptoms associated with morning sickness. Bendectin was formulated by Merrell Dow and its predecessors and marketed in the United States from 1957 to 1983. It was sold in other countries as well, but was called Debendox in the British Commonwealth, Ireland, and Australia and Lenotan in West Germany. The Bendectin Marilyn Havner ingested had two components: doxylamine succinate, which is an antihistamine, and pyridoxine hydrochloride, which is vitamin B–6. Prior to 1977, Bendectin had contained a third component, dicylomine hydrochloride, which is an anticholergenic. Approximately thirty million women took Bendectin in either the two- or three-ingredient form.

More than twenty years ago, questions were raised about Bendectin and its possible association with birth defects. The FDA investigated the concerns, but failed to conclude that Bendectin increased the risk of birth defects. More than thirty studies on Bendectin and birth defects have been conducted and published in peer-reviewed scientific and medical journals since questions were first raised. None of these studies concludes that children of women who took Bendectin during pregnancy had an increased risk of limb reduction birth defects. Some of these studies affirmatively conclude that there is no association between Bendectin and birth defects and that Bendectin is a safe drug. Although FDA approval of Bendectin has never been revoked, Merrell Dow withdrew the drug from the market in 1983, a little over a year after Kelly Havner was born.

The Havners' suit is based on theories of negligence, defective design, and defective marketing. It is one of thousands brought against Merrell Dow and its predecessors for the manufacture and distribution of Bendectin. In virtually all the Bendectin litigation, the central issue has been the scientific reliability of the expert testimony offered to establish causation. Merrell Dow challenged the Havners' causation evidence at several junctures in these proceedings. It filed a motion for summary judgment, contending that there is no scientifically reliable evidence that Bendectin causes limb reduction birth defects or that it caused Kelly Havner's birth defect. Before denying the motion, the trial court held a hearing at which the scientific**\*709** reliabil-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ity of the Havners' summary judgment evidence was extensively aired.

Just before trial, the scientific reliability of the Havners' evidence was again raised by Merrell Dow in motions in limine that sought to exclude the testimony of certain of the Havners' experts and other causation evidence. One of these motions requested that testimony about causation be excluded until a prima facie case had been established that there was a statistically significant elevated risk that a child would be born with limb reduction birth defects if the child's mother ingested Bendectin. Another motion sought to preclude the Havners' witnesses from relying on *in vitro* and *in vivo* animal studies. Other motions sought to exclude entirely the testimony of three of the Havners' causation witnesses. The issues were fully briefed, and after a lengthy hearing, the trial court denied each of the motions.

A bifurcated jury trial ensued. In the liability phase, the Havners called five experts on the causation question. Merrell Dow objected to the admission of some, but not all, of this evidence. Merrell Dow also unsuccessfully moved for a directed verdict on the issue of causation at the close of the Havners' evidence. As can be seen from the record, the question of scientific reliability was raised repeatedly.

At the conclusion of the liability phase, the jury found in favor of the Havners and awarded $3.75 million. In the punitive damages stage, the jury awarded $30 million, but that amount was reduced by the trial court to $15 million pursuant to former TEX. CIV. PRAC. & REM.CODE § 41.007. Merrell Dow appealed.

The panel of the court of appeals that originally heard the case reversed and rendered judgment that the Havners take nothing, holding that the evidence of causation was legally insufficient. 907 S.W.2d at 548. The panel concluded that "[t]he Havners have failed to bring forward anything more than suspicion on the essential element of causation." *Id.* On rehearing en banc, a divided court disagreed. It affirmed the trial court's award of actual damages, but reversed and rendered the award of punitive damages. *Id.* at 564. We granted Merrell Dow's application for writ of error.

Merrell Dow challenges the legal sufficiency of the Havners' causation evidence and the admissibility of some of that evidence and further contends that its due process rights under the United States Constitution and its due course rights under the Texas Constitution were denied. Because of our disposition of this case, we reach only the no evidence point of error.

II

All the expert witnesses on causation have appeared in other cases in which Bendectin was claimed to have caused limb reduction birth defects. The Sixth Circuit commented that the Bendectin suits are "variations on a theme, somewhat like an orchestra which travels to different music halls, substituting musicians from time to time but playing essentially the same repertoire." *Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1351 (6th Cir.1992).

The federal courts have dealt extensively with Bendectin litigation. To date, no plaintiff has ultimately prevailed in federal court. The evidence in those cases has been similar to that offered by the Havners. The federal decisions have discussed the substance of the evidence in detail, and often the testimony under scrutiny included that of Drs. Palmer, Newman, Glasser, Gross, and Swan, the Havners' witnesses. These decisions are not binding on our Court, but they do provide extensive consideration of the scientific reliability of the causation evidence.

Some federal courts have concluded that the expert evidence of causation is legally insufficient. *See Elkins v. Richardson–Merrell, Inc.,* 8 F.3d 1068 (6th Cir.1993); *Turpin,* 959 F.2d 1349; *Brock v. Merrell Dow Pharms., Inc.,* 874 F.2d 307 (5th Cir.), *modified on reh'g,* 884 F.2d 166 (5th Cir.1989);

*Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823 (D.C.Cir.1988); *LeBlanc v. Merrell Dow Pharms., Inc.,* 932 F.Supp. 782 (E.D.La.1996); *Hull v. Merrell Dow Pharms., Inc.,* 700 F.Supp. 28 (S.D.Fla.1988); *Monahan v. Merrell–National Labs.,* No. 83–3108–WD, 1987 WL 90269 (D.Mass. Dec.18, 1987).

**\*710** Other federal courts have found the expert evidence to be inadmissible. *See Raynor v. Merrell Pharms., Inc.,* 104 F.3d 1371 (D.C.Cir.1997); *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311 (9th Cir.) (on remand), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); *Ealy v. Richardson–Merrell, Inc.,* 897 F.2d 1159 (D.C.Cir.1990); *Lynch v. Merrell–National Labs.,* 830 F.2d 1190 (1st Cir.1987); *DeLuca v. Merrell Dow Pharms., Inc.,* 791 F.Supp. 1042 (D.N.J.1992), *aff'd,* 6 F.3d 778 (3d Cir.1993); *Lee v. Richardson–Merrell, Inc.,* 772 F.Supp. 1027 (W.D.Tenn.1991), *aff'd,* 961 F.2d 1577 (6th Cir.1992); *Cadarian v. Merrell Dow Pharms., Inc.,* 745 F.Supp. 409 (E.D.Mich.1989); *Ambrosini v. Richardson–Merrell, Inc.,* No. 86–278, 1989 WL 298429 (D.D.C. June 30, 1989), *aff'd,* 946 F.2d 1563 (D.C.Cir.1991); *Will v. Richardson–Merrell, Inc.,* 647 F.Supp. 544 (S.D.Ga.1986).

One federal circuit court initially found the expert testimony admissible and reversed a summary judgment for Merrell Dow. *DeLuca v. Merrell Dow Pharms., Inc.,* 911 F.2d 941, 952–59 (3d Cir.1990). However, on remand the trial court once again found the evidence inadmissible and, after entering extensive findings of fact and conclusions of law, granted summary judgment for Merrell Dow. The Third Circuit affirmed that judgment with an unpublished opinion. *DeLuca v. Merrell Dow Pharms., Inc.,* 791 F.Supp. 1042 (D.N.J.1992), *aff'd,* 6 F.3d 778 (3d Cir.1993).

A few federal district courts have denied summary judgment for Merrell Dow on the basis that the evidence raised a fact question. *Longmore v. Merrell Dow Pharms., Inc.,* 737 F.Supp. 1117 (D.Idaho 1990); *In re Bendectin Prods. Liab. Litig.,*

732 F.Supp. 744 (E.D.Mich.1990); *Hagen v. Richardson–Merrell, Inc.,* 697 F.Supp. 334 (N.D.Ill.1988); *see also Lanzilotti v. Merrell Dow Pharms., Inc.,* No. 82–0183, 1986 WL 7832 (E.D.Pa. July 10, 1986) (denying motion for directed verdict).

Decisions in which Merrell Dow obtained a jury verdict in its favor include *Wilson v. Merrell Dow Pharmaceuticals, Inc.,* 893 F.2d 1149 (10th Cir.1990), and *In re Bendectin Litigation,* 857 F.2d 290 (6th Cir.1988).

However, a state trial court recently entered judgment on a jury verdict against Merrell Dow that included a finding of fraud. In a written opinion, the court was highly critical of the evidence offered by Merrell Dow, concluding that there was ample evidence Merrell Dow had made misrepresentations to the FDA, including misrepresentations about its animal studies on Bendectin. *Blum v. Merrell Dow Pharm., Inc.,* No. 1027 (Pa.Ct.C.P. Dec. 13, 1996) (appeal pending).

At least one state court has granted summary disposition for Merrell Dow on the basis that the expert testimony of Drs. Newman, Palmer, and Swan was inadmissible. *DePyper v. Navarro,* No. 83–303467–NM, 1995 WL 788828 (Mich.Cir.Ct. Nov.27, 1995) (holding plaintiffs' experts' testimony inadmissible under the *Davis/Frye* rule and rendering judgment for Merrell Dow).

The only appellate decision we have found, state or federal, that has upheld a verdict in favor of a plaintiff in a Bendectin case is from the court of appeals for the District of Columbia in *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100 (D.C.1986) (reversing judgment notwithstanding the verdict and remanding for reinstatement of compensatory damages and determination of punitive damages). However, the subsequent history of that case is somewhat extraordinary. Upon remand to the trial court, instead of following the court of appeals' directive, the trial court granted Merrell Dow's motion for new trial and vacated the judg-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment. Another appeal ensued, and the case was re-manded with instructions that a judgment be entered on the verdict. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 563 A.2d 330, 331, 338 (D.C.1989). Judgment was entered. Yet another appeal was taken, but the appeal was dismissed for lack of finality because the question of punitive damages remained to be tried. *Merrell Dow Pharms., Inc. v. Oxendine,* 593 A.2d 1023 (D.C.1991). Following remand, judgment was entered, but Merrell Dow sought relief from the judgment in light of post-trial developments includ-ing epidemiological studies that were not com-pleted at the time of trial. Merrell Dow also relied on appellate decisions decided on the heels of the first appellate**\*711** decision in *Oxendine* that had concluded that there was no scientifically reliable evidence of causation in the Bendectin cases. The trial court declined to set aside the judgment. *Mer-rell Dow Pharms., Inc. v. Oxendine,* 649 A.2d 825, 827 (D.C.1994). The fourth appeal ensued, and the appellate court remanded the case to the trial court for a determination of whether Merrell Dow could demonstrate "that the newly discovered evidence 'would probably produce a different verdict if a new trial were granted.' " *Id.* at 832. On remand, the trial court extensively reviewed the evidence, including the testimony or affidavits of Drs. New-man, Swan, Palmer, Gross, and Glasser, and gran-ted relief from the verdict, rendering judgment for Merrell Dow. *Oxendine v. Merrell Dow Pharms., Inc.,* No. 82–1245, 1996 WL 680992 (D.C.Super.Ct. Oct. 24, 1996) (appeal pending).

Thus, we are not the first court to wrestle with the issues presented by the Bendectin litigation.

### III

As in most of the Bendectin cases, the central issue before us is not whether the plaintiffs' wit-nesses possessed adequate credentials, skills, or ex-perience to testify about causation. The only wit-ness whose qualifications have been challenged is Dr. Palmer, whose experience in identifying the cause of birth defects is questioned by Merrell

Dow. *Cf. United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30–31 (Tex.1997); *Broders v. Heise,* 924 S.W.2d 148, 151–54 (Tex.1996). Indeed, the Havners' causation witnesses, including Dr. Palmer, testified in a case that reached the United States Su-preme Court, and that Court deemed their creden-tials "impressive." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 583 & n. 2, 113 S.Ct. 2786, 2792 & n. 2, 125 L.Ed.2d 469 (1993). The is-sue before us, as in most of the previously cited Bendectin cases, is whether the Havners' evidence is scientifically reliable and thus some evidence to support the judgment in their favor.

[1][2][3] In determining whether there is no evidence of probative force to support a jury's find-ing, all the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be in-dulged in that party's favor. *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970). A no evidence point will be sustained when (a) there is a complete ab-sence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. Robert W. Calvert, " *No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, " 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.' " *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995) (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)).

[4] Several of the Havners' experts testified that Bendectin can cause limb reduction birth defects. Dr. Palmer testified that, to a reasonable degree of medical certainty, Kelly Havner's birth defect was caused by the Bendectin her mother ingested during

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

pregnancy. We have held, however, that an expert's bare opinion will not suffice. *See Burroughs Wellcome,* 907 S.W.2d at 499–500; *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 202–04 (Tex.1980). The substance of the testimony must be considered. *Burroughs Wellcome,* 907 S.W.2d at 499–500; *Schaefer,* 612 S.W.2d at 202.

In *Schaefer,* a workers' compensation case, the plaintiff suffered from atypical tuberculosis, some strains of which were carried by fowl. An expert testified that based on reasonable medical probability, the plaintiff's disease resulted from his employment as a plumber in which he was exposed to soil contaminated with the feces of birds. *Schaefer,* 612 S.W.2d at 202. Nevertheless, this Court looked at the testimony in its entirety, noting that to accept the expert's opinion as some evidence "simply because he used the magic words" would effectively remove the **\*712** jurisdiction of the appellate courts to determine the legal sufficiency of the evidence in any case requiring expert testimony. *Id.* at 202–05. After considering the record in *Schaefer,* this Court held that there was no evidence of causation because despite the "magic language" used, the expert testimony was not based on reasonable medical probability but instead relied on possibility, speculation, and surmise. *Id.* at 204–05.

Other courts have likewise recognized that it is not so simply because "an expert says it is so." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 421 (5th Cir.1987). When the expert "br[ings] to court little more than his credentials and a subjective opinion," this is not evidence that would support a judgment. *Id.* at 421–22. The Fifth Circuit in *Viterbo* affirmed a summary judgment and the exclusion of expert testimony that was unreliable, holding that "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Id.* at 422; *see also Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.) ("[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."), *cert. denied,* 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996); *Turpin v. Merrell Dow*

*Pharms., Inc.,* 959 F.2d 1349, 1360 (6th Cir.1992) (holding evidence legally insufficient in Bendectin case when no understandable scientific basis was stated).

It could be argued that looking beyond the testimony to determine the reliability of scientific evidence is incompatible with our no evidence standard of review. If a reviewing court is to consider the evidence in the light most favorable to the verdict, the argument runs, a court should not look beyond the expert's testimony to determine if it is reliable. But such an argument is too simplistic. It reduces the no evidence standard of review to a meaningless exercise of looking to see only what words appear in the transcript of the testimony, not whether there is in fact some evidence. We have rejected such an approach. *See Schaefer,* 612 S.W.2d at 205; *see also Burroughs Wellcome,* 907 S.W.2d at 499–500.

[5][6] Justice Gonzalez, in writing for the Court, gave rather colorful examples of unreliable scientific evidence in *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995), when he said that even an expert with a degree should not be able to testify that the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system. If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no. In concluding that this testimony is scientifically unreliable and therefore no evidence, however, a court necessarily looks beyond what the expert said. Reliability is determined by looking at numerous factors including those set forth in *Robinson* and *Daubert.* The testimony of an expert is generally *opinion* testimony. Whether it rises to the level of *evidence* is determined under our rules of evidence, including Rule 702, which requires courts to determine if the opinion testimony will assist the jury in deciding a fact issue.[FN1] While Rule 702 deals with the admissibility of evidence, it offers substantive guidelines in determining if the expert

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

testimony is some evidence of probative value.

FN1. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise.

TEX.R. CIV. EVID. 702.

Similarly, to say that the expert's testimony is some evidence under our standard of review simply because the expert testified that the underlying technique or methodology supporting his or her opinion is generally accepted by the scientific community is putting the cart before the horse. As we said in *Robinson,* an expert's bald assurance of validity is not enough. 923 S.W.2d at 559 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1316 (9th Cir.) (on remand) (holding that expert's assertion of validity is not enough; there must be objective, independent validation of the expert's methodology), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)).

**\*713** The view that courts should not look beyond an averment by the expert that the data underlying his or her opinion are the type of data on which experts reasonably rely has likewise been rejected by other courts. The underlying data should be independently evaluated in determining if the opinion itself is reliable. *See, e.g., In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 747–48 (3d Cir.1994); *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 829 (D.C.Cir.1988); *In re Agent Orange Liab. Litig.,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987). In the wake of the Supreme Court's decision in *Daubert,* the Third Circuit overruled its prior holding in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 952 (3d Cir.1990), that an ex-

pert's averment that his or her testimony is based on the type of data on which experts reasonably rely is generally enough to survive a Federal Rule of Evidence 703 inquiry. *In re Paoli,* 35 F.3d at 747–48. The Third Circuit was persuaded by Judge Weinstein's opinion in *In re Agent Orange:* " 'If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.' " *Id.* at 748 (quoting *In re Agent Orange,* 611 F.Supp. at 1245). If the expert's scientific testimony is not reliable, it is not evidence. The threshold determination of reliability does not run afoul of our no evidence standard of review.

Indeed, the United States Supreme Court would agree that a determination of scientific reliability is appropriate in reviewing the legal sufficiency of evidence. While admissibility rather than sufficiency was the focus of the Supreme Court's decision in *Daubert,* that Court explained that when "wholesale exclusion" is inappropriate and the evidence is admitted, a review of its sufficiency is not foreclosed:

[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment ... and likewise to grant summary judgment.

509 U.S. at 595, 113 S.Ct. at 2798.

The Court cited two Bendectin decisions in support of this statement, *Turpin,* 959 F.2d 1349, and *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.), *modified on reh'g,* 884 F.2d 166 (5th Cir.1989). In *Turpin,* the Sixth Circuit held that the scientific evidence, viewed in the light most favorable to the plaintiffs, was not sufficient to allow a jury to find that it was more probable than not that the defendant caused the injury. *Turpin,* 959 F.2d at 1350. In *Brock,* the Fifth Circuit reversed a judgment entered on a jury verdict

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

because the evidence of causation was legally insufficient. *Brock,* 874 F.2d at 315; *see also Raynor v. Merrell Pharms. Inc.,* 104 F.3d 1371, 1376 (D.C.Cir.1997) (affirming judgment notwithstanding the verdict and noting that even if expert testimony were admissible under *Daubert,* it was "unlikely" that a jury could reasonably find it sufficient to show causation).

As already discussed, a number of other decisions in the Bendectin litigation have held that the causation evidence was legally insufficient, sometimes setting aside a jury verdict and in other cases granting summary judgment or a directed verdict. *See supra* at 709. The decision in *Richardson–Merrell* said in no uncertain terms that the trial court did not err in granting judgment notwithstanding the verdict because "[w]hether an expert's opinion has an adequate basis" is an issue "falling within the province of the court." 857 F.2d at 833.

There are many decisions outside the Bendectin litigation that have examined the reliability of scientific evidence in a review of the legal sufficiency of the evidence. *See, e.g., Conde v. Velsicol Chem. Corp.,* 24 F.3d 809, 813 (6th Cir.1994) (stating that even if evidence is admissible under *Daubert,* it can still be legally insufficient to withstand summary judgment); *Wade–Greaux v. Whitehall Labs., Inc.,* 874 F.Supp. 1441, 1485–86 (D.Vi.) (granting summary judgment in toxic tort case when evidence of causation was insufficient to sustain a jury verdict), *aff'd,* 46 F.3d 1120 (3d Cir.1994); *see also* **\*714***Vadala v. Teledyne Indus., Inc.,* 44 F.3d 36, 39 (1st Cir.1995) (noting that even if expert testimony about cause of plane crash were admitted, it would not be sufficient to permit a jury to find in plaintiffs' favor); *In re Paoli,* 35 F.3d at 750 n. 21 ("[I]f the scintilla of evidence presented is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment ... [or] to grant summary judgment."); *cf. In re Joint Eastern & Southern Dist. Asbestos Litig.,* 52 F.3d 1124, 1131–37 (2d Cir.1995) (finding

evidence of causation in asbestos case legally sufficient and reversing trial court's judgment notwithstanding the verdict); *Gruca v. Alpha Therapeutic Corp.,* 51 F.3d 638, 643 (7th Cir.1995) (holding that trial court abdicated its responsibility by refusing to rule on admissibility and by instructing a verdict for the defendant in a blood bank case; assuming admissibility of the evidence, it would be legally sufficient). *But see Joiner v. General Elec. Co.,* 78 F.3d 524, 534 (11th Cir.1996) (Birch, J., concurring) (stating that the sufficiency and weight of evidence are beyond the scope of a *Daubert* analysis), *cert. granted,* 520 U.S. 1114, 117 S.Ct. 1243, 137 L.Ed.2d 325 (1997).

[7] In *Robinson,* we set forth some of the factors that courts should consider in looking beyond the bare opinion of the expert. Those factors include:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses that have been made of the theory or technique.

*See Robinson,* 923 S.W.2d at 557. The issue in *Robinson* was admissibility of evidence, but as we have explained the same factors may be applied in a no evidence review of scientific evidence.

[8][9][10] If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

unreliable. Further, an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious. Under that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence.

We next consider some of the difficult issues surrounding proof of causation in a toxic tort case such as this.

IV

The Havners do not contend that all limb reduction birth defects are caused by Bendectin or that Bendectin always causes limb reduction birth defects even when taken at the critical time of limb development. Experts for the Havners and Merrell Dow agreed that some limb reduction defects are genetic. These experts also agreed that the cause of a large percentage of limb reduction birth defects is unknown. Given these undisputed facts, what must a plaintiff establish to raise a fact issue on whether Bendectin caused an individual's birth defect? The question of causation in cases like this one has engendered considerable debate. Courts that have addressed the issue have not always agreed, and commentators have expressed widely divergent views on the quantum and quality of evidence necessary to sustain a recovery.

Sometimes, causation in toxic tort cases is discussed in terms of general and specific causation. *See, e.g., Raynor v. Merrell Pharms., Inc.,* 104 F.3d 1371, 1376 (D.C.Cir.1997); Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Bendectin Cases,* 46 STAN. L.REV.. 1, 14 (1993). General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury. In some cases, controlled scientific experiments**715** can be carried out to determine if a substance is capable of causing a particular injury

or condition, and there will be objective criteria by which it can be determined with reasonable certainty that a particular individual's injury was caused by exposure to a given substance. However, in many toxic tort cases, direct experimentation cannot be done, and there will be no reliable evidence of specific causation.

In the absence of direct, scientifically reliable proof of causation, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury. The finder of fact is asked to infer that because the risk is demonstrably greater in the general population due to exposure to the substance, the claimant's injury was more likely than not caused by that substance. Such a theory concedes that science cannot tell us what caused a particular plaintiff's injury. It is based on a policy determination that when the incidence of a disease or injury is sufficiently elevated due to exposure to a substance, someone who was exposed to that substance and exhibits the disease or injury can raise a fact question on causation. *See generally Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1320 n. 13 (9th Cir.) (on remand), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). The Havners rely to a considerable extent on epidemiological studies for proof of general causation. Accordingly, we consider the use of epidemiological studies and the "more likely than not" burden of proof.

A

Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition. *See, e.g.,* Bert Black & David E. Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation,* 52 FORDHAM L.REV. 732, 750 (1984). However, witnesses for the Havners and commentators in this area uniformly acknowledge that epidemiological studies cannot establish that a given individual contracted a disease or condition due to exposure to a particular drug or agent. *See, e.g.,* Michael Dore, *A Comment-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*ary on the Use of Epidemiological Evidence in Demonstrating Cause–In–Fact,* 7 HARV. ENVTL. L. REVV. 429, 431–35 (1983); Steve Gold, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence,* 96 YALE L.J. 376, 380 (1986).* Dr. Glasser, a witness for the Havners, gave as an example a study designed to see if a given drug causes rashes. Even though a study may show that ten people who took the drug exhibited a rash, while rashes appeared on only three people who did not take the drug, Dr. Glasser explained that the study cannot tell us which of the exposed ten got the rash because of the drug. We know that things other than the drug cause rashes.

Recognizing that epidemiological studies cannot establish the actual cause of an individual's injury or condition, a difficult question for the courts is how a plaintiff faced with this conundrum can raise a fact issue on causation and meet the "more likely than not" burden of proof. Generally, more recent decisions have been willing to recognize that epidemiological studies showing an increased risk may support a recovery. Judge Weinstein, whose decision in the Agent Orange litigation has been widely discussed and followed, has observed that courts have been divided between the "strong" and "weak" versions of the preponderance rule. *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1261 (E.D.N.Y.1985) (citing David Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System,* 97 HARV. L.REV.. 851, 857 (1984)). The "strong" version requires a plaintiff to offer both epidemiological evidence that the probability of causation exceeds fifty percent in the exposed population and "particularistic" proof that the substance harmed the individual. The "weak" version allows verdicts to be based solely on statistical evidence. Rosenberg, *supra,* 97 HARV. L. REVV. at 857–58. Judge Weinstein concluded that the plaintiffs in *Agent Orange* were required to offer evidence that causation was "more than 50 percent probable," 611 F.Supp. at 1262, and that the plaintiffs' experts were required to "rule out the myriad other possible causes

of the veterans' afflictions," *id.* at 1263.

**\*716** Other courts have likewise found that the requirement of a more than 50% probability means that epidemiological evidence must show that the risk of an injury or condition in the exposed population was more than double the risk in the unexposed or control population. *See, e.g., Daubert,* 43 F.3d at 1320 (requiring Bendectin plaintiffs to show that mothers' ingestion of the drug more than doubled the likelihood of birth defects); *DeLuca v. Merrell Dow Pharms., Inc.,* 911 F.2d 941, 958 (3d Cir.1990) (requiring that Bendectin plaintiffs establish relative risk of limb reduction defects arising from epidemiological data of at least 2.0, which equates to more than a doubling of the risk); *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1403 (D.Or.1996) (requiring breast-implant plaintiffs to demonstrate that exposure to breast implants more than doubled the risk of their alleged injuries, which, in epidemiological terms, requires a relative risk of more than 2.0); *Manko v. United States,* 636 F.Supp. 1419, 1434 (W.D.Mo.1986) (stating that a relative risk of 2.0 in an epidemiological study means that the disease more likely than not was caused by the event), *aff'd in relevant part,* 830 F.2d 831 (8th Cir.1987); *Marder v. G.D. Searle & Co.,* 630 F.Supp. 1087, 1092 (D.Md.1986) (stating that in IUD litigation, a showing of causation by a preponderance of the evidence, in epidemiological terms, requires a relative risk of at least 2.0), *aff'd,* 814 F.2d 655 (4th Cir.1987); *Cook v. United States,* 545 F.Supp. 306, 308 (N.D.Cal.1982) (stating that in vaccine case, when relative risk is greater than 2.0, there is a greater than 50% chance that the injury was caused by the vaccine).

Some courts have reached a contrary conclusion, holding that epidemiological evidence showing something less than a doubling of the risk may support a jury's finding of causation. In *In re Joint Eastern & Southern District Asbestos Litigation,* 52 F.3d 1124, 1134 (2d Cir.1995), the Second Circuit observed that the district court cited no authority for the "bold" assertion that standardized mortality

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ratios of 1.5 are statistically insignificant and cannot be relied upon by a jury. The circuit court held that it was far preferable to instruct the jury on statistical significance and to let the jury decide whether studies over the 1.0 mark have any significance. *Id.*; *see also Allen v. United States,* 588 F.Supp. 247, 418–19 (D.Utah 1984) (explicitly rejecting the greater than 50% standard of causation in connection with statistical evidence), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir.1987); *Grassis v. Johns–Manville Corp.,* 248 N.J.Super. 446, 591 A.2d 671, 674–76 (App.Div.1991) (holding that trial court erred in precluding opinion testimony based on epidemiological studies showing relative risks of less than 2.0).

The "doubling of the risk" issue in toxic tort cases has provided fertile ground for the scholarly plow. Those who advocate that something short of a doubling of the risk is adequate to support liability or who advocate that some type of proportionate liability should be imposed include Daniel A. Farber, *Toxic Causation,* 71 MINN. L.REV. 1219, 1237–51 (1987); Gold, *supra,* 96 YALE L.J. at 395–401; Khristine L. Hall & Ellen K. Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore,* 7 HARV. ENVTL. L.REV.. 441, 445–46 (1983); Rosenberg, *supra,* 97 HARV. L.REV.. at 859–60; *see also* 2 AMERICAN LAW INST., ENTERPRISE RESPONSIBILITY FOR PERSONAL INJURY 369–75 (1991) (discussing toxic tort cases and suggesting that proportionate compensation to all with the disease or disorder should be based on the attributable fractions of causation); D.H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion,* 73 CORNELL L.REV. 54, 71–73 (1987).

On the other end of the spectrum is Michael Dore, who asserts that epidemiological studies cannot, standing alone, establish causation. *See* Dore, *A Commentary on the Use of Epidemiological Evidence, supra,* 7 HARV. ENVTL. L. REVV. at 434; *see also* Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litiga-*

*tion: The Legacy of* Agent Orange *and Bendectin Litigation,* 86 NW. U.L.REV. 643, 691 (1992) (concluding that in the absence of other information, a doubling of the risk would be inadequate to support a plaintiff's verdict, but advocating that a lower risk might be sufficient if other risk factors could be eliminated); Melissa Moore Thompson, **\*717***Causal Inference in Epidemiology: Implications for Toxic Tort Litigation,* 71 N.C. L.REV. 247, 253, 289 (1992) (arguing that a strong association requires a risk ratio greater than or equal to 8.0, although moderate association of 3.0 to 8.0 could suffice if coupled with other factors).

Some commentators have been particularly critical of attempts by the courts to meld the more than 50% probability requirement with the relative risks found in epidemiological studies in determining if the studies were admissible or were some evidence that would support an award for the claimant. But there is disagreement on how epidemiological studies should be used. Some commentators contend that the more than 50% probability requirement is too stringent, while others argue that epidemiological studies have no relation to the legal requirement of "more likely than not." *Compare* Gold, *supra,* 96 YALE L.J. at 395–97 (advocating a relaxed threshold of proof), *with* Diana B. Petitti, *Reference Guide on Epidemiology,* 36 JURIMETRICS J. 159, 167–68 (1996) (finding no support in textbooks of epidemiology or from empirical studies for the proposition that when attributable risk exceeds 50% an agent is more likely than not to be the cause of the plaintiff's disease), *and* Thompson, *supra,* 71 N.C. L.REV. at 264–65 (asserting that the use of statistical association to satisfy a more likely than not standard is "misguided"). *See also* Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context–Sensitive Science in Toxic Torts after Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 16 VA. ENVTL. L.J. 1, 37–40 (1996) (arguing that epidemiological evidence should not be excluded simply because it reveals a relative risk less than 2.0, unless there is no other supporting evidence); Kaye,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*supra,* 73 CORNELL L.REV. at 69 (arguing that it is fallacious to reason that "if the data are more probable under one hypothesis than another, then the former hypothesis is more likely to be true than the latter"); James Robins & Sander Greenland, *The Probability of Causation Under a Stochastic Model for Individual Risk,* 45 BIOMETRICS 1125, 1131 (1989) (concluding that proportional liability schemes cannot be based on epidemiological data alone).

B

[11][12] Although we recognize that there is not a precise fit between science and legal burdens of proof, we are persuaded that properly designed and executed epidemiological studies may be part of the evidence supporting causation in a toxic tort case and that there is a rational basis for relating the requirement that there be more than a "doubling of the risk" to our no evidence standard of review and to the more likely than not burden of proof. *See generally DeLuca v. Merrell Dow Pharms., Inc.,* 911 F.2d 941, 958–59 (3d Cir.1990); Black & Lilienfeld, *supra,* 52 FORDHAM L.REV. at 767; *see also Daubert,* 43 F.3d at 1321; *Cook,* 545 F.Supp. at 308.

Assume that a condition naturally occurs in six out of 1,000 people even when they are not exposed to a certain drug. If studies of people who *did* take the drug show that nine out of 1,000 contracted the disease, it is still more likely than not that causes other than the drug were responsible for any given occurrence of the disease since it occurs in six out of 1,000 individuals anyway. Six of the nine incidences would be statistically attributable to causes other than the drug, and therefore, it is not more probable that the drug caused any one incidence of disease. This would only amount to evidence that the drug *could* have caused the disease. However, if more than twelve out of 1,000 who take the drug contract the disease, then it may be *statistically* more likely than not that a given individual's disease was caused by the drug.

This is an oversimplification of statistical evid-

ence relating to general causation, as we discuss below, but it illustrates the thinking behind the doubling of the risk requirement. For another viewpoint in this same vein, see ROBERT P. CHARROW & DAVID E. BERNSTEIN, WASHINGTON LEGAL FOUNDATION, SCIENTIFIC EVIDENCE IN THE COURTROOM: ADMISSIBILITY AND STATISTICAL SIGNIFICANCE AFTER *DAUBERT* 28–34 (1994), who advocate that there is a mathematically demonstrable relationship between relative risk and the more likely than not standard. They contend that a relative risk of slightly more than 2.0 will rarely, if ever, satisfy the legal causation **\*718** standard. From a mathematical perspective, the probability of general causation changes as the level of statistical significance changes. *Id.* at 29–31. A relative risk of 2.2 may be sufficient to show more than a 50% probability at the 0.05 level (5 chances out of 100 that result occurred by chance), but not at the 0.10 level (10 chances out of 100). With calculations that we do not attempt to set out here, these commentators offer an example in which a relative risk ratio of 2.75 results in a probability of general causation of about 52% with a statistical significance of 0.05, but only about a 43% probability of general causation with a statistical significance of 0.10. *Id.* at 31–32.

We recognize, as does the federal *Reference Manual on Scientific Evidence,* that a disease or condition either is or is not caused by exposure to a suspected agent and that frequency data, such as the incidence of adverse effects in the general population when exposed, cannot indicate the actual cause of a given individual's disease or condition. *See* Linda A. Bailey et al., *Reference Guide on Epidemiology, in* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 169 (1994). But the law must balance the need to compensate those who have been injured by the wrongful actions of another with the concept deeply imbedded in our jurisprudence that a defendant cannot be found liable for an injury unless the preponderance of the evidence supports cause in fact. The use of scientifically reliable epidemiolo-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

gical studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science.

We do not hold, however, that a relative risk of more than 2.0 is a litmus test or that a single epidemiological test is legally sufficient evidence of causation. Other factors must be considered. As already noted, epidemiological studies only show an association. There may in fact be no causal relationship even if the relative risk is high. For example, studies have found that there is an association between silicone breast implants and reduced rates of breast cancer. This does not necessarily mean that breast implants caused the reduced rate of breast cancer. *See* David E. Bernstein, *The Admissibility of Scientific Evidence After* Daubert v. Merrell Dow Pharmaceuticals, Inc., 15 CARDOZO L.REV. 2139, 2167 (1994) (citing H. Berkel et al., *Breast Augmentation: A Risk Factor for Breast Cancer?,* 326 NEW ENG. J. MED.. 1649 (1992)). Likewise, even if a particular study reports a low relative risk, there may in fact be a causal relationship. The strong consensus among epidemiologists is that conclusions about causation should not be drawn, if at all, until a number of criteria have been considered. One set of criteria widely used by epidemiologists was published by Sir Austin Bradford Hill in 1965.[FN2] Another set of criteria**719** used by epidemiologists in studying disease is the Henle–Koch–Evans Postulates.[FN3] Although epidemiologists do not consider it necessary that all these criteria be met before drawing inferences about causation, they are part of sound methodology generally accepted by the current scientific community.

> FN2. The Bradford Hill criteria are summarized as follows:
>
> 1. Strength of association. "First upon my list I would put the strength of association. To take a very old example, by comparing the occupations of patients with scrotal cancer with the occupations of patients presenting with other diseases, Percival Pott could reach the correct conclusion because of the enormous increase of scrotal cancer in the chimney sweeps."
>
> 2. Consistency. "Next on my list of features to be specifically considered I would place the consistency of association. Has it been repeatedly observed by different persons, in different places, circumstances and times?"
>
> 3. Specificity. "If ... the association is limited to specific workers and to particular sites and types of disease and there is no association between the work and other modes of dying, then clearly that is a strong argument in favor of causation."
>
> 4. Temporality. "Which is the cart and which the horse?"
>
> 5. Biological gradient. "Fifthly, if the association is one which can reveal a biological gradient, or dose-response curve, then we should look most carefully for such evidence.... The clear-dose response curve admits of a simple explanation and obviously puts the case in a clearer light."
>
> 6. Plausibility. "It would be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends on the biological knowledge of the day."
>
> 7. Coherence. "The cause-and-effect interpretation of our data should not seriously conflict with the generally known facts of the natural history and biology of the disease."
>
> 8. Experiment. "Occasionally it is possible to appeal to experimental ... evidence.... Here the strongest support for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the causation hypothesis may be revealed."

9. Analogy. "In some circumstances it would be fair to judge by analogy. With the effects of thalidomide and rubella before us we would surely be ready to accept slighter but similar evidence with another drug or another viral disease in pregnancy."

Bernstein, *supra,* 15 CARDOZO L.REV. at 2167–68 (quoting Austin Bradford Hill, *The Environment and Disease: Association or Causation?,* 58 PROC. ROYAL SOC'Y MED. 295, 299 (1965)); *see also* Thompson, *supra,* 71 N.C. L.REV. at 268–74.

FN3. *See, e.g.,* Black & Lilienfeld, *supra,* 52 FORDHAM L.REV. at 762–63; Christopher L. Callahan, *Establishment of Causation in Toxic Tort Litigation,* 23 ARIZ. ST. L.J. 605, 626 (1991); Michael Dore, *A Proposed Standard For Evaluating the Use of Epidemiological Evidence in Toxic Tort and other Personal Injury Cases,* 28 HOW. L.J. 677, 691 (1985); *see also* Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 160–64.

Sound methodology also requires that the design and execution of epidemiological studies be examined. For example, bias can dramatically affect the scientific reliability of an epidemiological study. *See, e.g.,* Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 138–43; Thompson, *supra,* 71 N.C. L.REV. at 259–61. Bias can result from confounding factors, selection bias, and information bias. Thompson, *supra,* 71 N.C. L.REV. at 260. We will not undertake an extended discussion of the many ways in which bias may cause results of a study to be misleading. We note

only that epidemiological studies "are subject to many biases and therefore present formidable problems in design and execution and even greater problems in interpretation." Marcia Angell, *The Interpretation of Epidemiologic Studies,* 323 NEW ENG. J. MED.. 823, 824 (1996).

We also note that some of the literature indicates that epidemiologists consider a relative risk of less than three to indicate a weak association. *See* Thompson, *supra,* 71 N.C. L.REV. at 252 (citing Ernest L. Wynder, *Guidelines to the Epidemiology of Weak Associations,* 16 PREVENTIVE MED. 139, 139 (1987)). The executive editor of the *New England Journal of Medicine,* Marcia Angell, has stated that "[a]s a general rule of thumb, we are looking for a relative risk of three or more [before accepting a paper for publication], particularly if it is biologically implausible or if it's a brand-new finding." Gary Taubes, *Epidemiology Faces Its Limits,* SCIENCE, July 14, 1995, at 168. Similarly, Robert Temple, the director of drug evaluation at the FDA, has said that "[m]y basic rule is if the relative risk isn't at least three or four, forget it." *Id.* We hasten to point out that these statements are contained in what is more akin to the popular press, not peer-reviewed scientific journals, and the context of those statements is not altogether clear. We draw no conclusions from any of the foregoing articles other than to point out that there are a number of reasons why reliance on a relative risk of 2.0 as a bright-line boundary would not be in accordance with sound scientific methodology in some cases. Careful exploration and explication of what is reliable scientific methodology in a given context is necessary.

D

A few courts that have embraced the more-than-double-the-risk standard have indicated in dicta that in some instances, epidemiological studies with relative risks of less than 2.0 might suffice if there were other evidence of causation. *See, e.g., Daubert,* 43 F.3d at 1321 n. 16; *Hall,* 947 F.Supp. at 1398, 1404. We need not decide in this case

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

whether epidemiological evidence with a relative risk less than 2.0, coupled with other credible and reliable evidence, may be legally sufficient to support causation. We emphasize, however, that evidence of causation from whatever source must be scientifically reliable. Post hoc, speculative testimony will not suffice.

A physician, even a treating physician, or other expert who has seen a skewed data sample, such as one of a few infants who has a birth defect, is not in a position to infer causation. The scientific community would not accept as methodologically sound **\*720** a "study" by such an expert reporting that the ingestion of a particular drug by the mother caused the birth defect. Similarly, an expert's assertion that a physical examination confirmed causation should not be accepted at face value. In *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.1994), a treating physician testified that he knew what radiation-induced cataracts looked like because they are clinically describable and definable and "cannot be mistaken for anything else." *Id.* at 1106. Nevertheless, his opinion that exposure to radiation caused the plaintiff's cataracts was found to be inadmissible because it had no scientific basis. The literature on which the expert relied did not support his assertion that radiation-induced cataracts could be diagnosed by visual examination. *Id.* at 1106–07. For a good discussion of the evils of "evidence" of this nature, see Bernstein, *supra,* 15 CARDOZO L.REV. at 2148–49. Further, as we discuss in Part VI(A), an expert cannot dissect a study, picking and choosing data, or "reanalyze" the data to derive a higher relative risk if this process does not comport with sound scientific methodology.

The FDA has promulgated regulations that detail the requirements for clinical investigations of the safety and effectiveness of drugs. 21 C.F.R. § 314.126 (1996). These regulations state that "[i]solated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered." *Id.* § 314.126(e). Courts should likewise reject such evidence be-

cause it is not scientifically reliable. As Bernstein points out, physicians following scientific methodology would not examine a patient or several patients in uncontrolled settings to determine whether a particular drug has favorable effects, nor would they rely on case reports to determine whether a substance is harmful. *See* Bernstein, *supra,* 15 CARDOZO L.REV. at 2148–49; *see also* Rosenberg, *supra,* 97 HARV. L.REV.. at 870 (arguing that anecdotal or particularized evidence accomplishes no more than a false appearance of direct and actual knowledge of a causal relationship). Expert testimony that is not scientifically reliable cannot be used to shore up epidemiological studies that fail to indicate more than a doubling of the risk.

E

To raise a fact issue on causation and thus to survive legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study. *See generally* Thompson, *supra,* 71 N.C. L.REV. at 286–88. Further, if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *See generally E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 559 (Tex.1995) (finding that the failure of the expert to rule out other causes of the damage rendered his opinion little more than speculation); *Parker v. Employers Mut. Liab. Ins. Co.,* 440 S.W.2d 43, 47 (Tex.1969) (holding that a cause becomes "probable" only when "in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result").

In sum, we emphasize that courts must make a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

determination of reliability from all the evidence. Courts should allow a party, plaintiff or defendant, to present the best available evidence, assuming it passes muster under *Robinson,* and only then should a court determine from a totality of the evidence, considering all factors affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment.

Finally, we are cognizant that science is constantly reevaluating conclusions and theories and that over time, not only scientific knowledge but scientific methodology in a particular field may evolve. We have strived to make our observations and holdings in light of current, generally accepted scientific **\*721** methodology. However, courts should not foreclose the possibility that advances in science may require reevaluation of what is "good science" in future cases.

V

Certain conventions are used in conducting scientific studies, and statistics are used to evaluate the reliability of scientific endeavors and to determine what the results tell us. In this opinion, we consider some of the basic concepts currently used in scientific studies and statistical analyses and how those concepts mesh with our legal sufficiency standard of review. For an extended discussion of statistical methodology and its use in epidemiological studies, see *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 945–48 (3d Cir.1990). *See also Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1353 n. 1 (6th Cir.1992); Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 138–43, 171–78. We do not attempt to discuss all the multifaceted aspects of the scientific method and statistics, but focus on the principles that shed light on the particular facts and issues in this case.

A

One way to study populations is by a retrospective case-control or case-comparison epidemiological study. For example, this type of study identifies individuals with a disease and a suitable control group of people without the disease and then looks back to examine postulated causes of the disease. *See* Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 136–38, 172. Another type of epidemiological study is a cohort study, or incidence study, which is a prospective study that identifies groups and observes them over time to see if one group is more likely to develop disease. *Id.* at 134–36, 173.

An "odds ratio" can be calculated for a case-control study. *Id.* at 175. For example, an odds ratio could be used to show the odds that ingestion of a drug is associated with a particular disease. The odds ratio compares the odds of having the disease when exposed to the drug versus when not exposed. If the ratio is 2.67, the odds are that a person exposed to the drug is 2.67 times more likely to develop the disease under study.

Similarly, the "relative risk" that a person who took a drug will develop a particular disease can be determined in a cohort study. *Id.* at 173, 176. The relative risk is calculated by comparing the incidence of disease in the exposed population with the incidence of the disease in the control population. If the relative risk is 1.0, the risk in exposed individuals is the same as unexposed individuals. If the relative risk is greater than 1.0, the risk in exposed individuals is greater than in those not exposed. If the relative risk is less than 1.0, the risk in exposed individuals is less than in those not exposed. For the result to indicate a doubling of the risk, the relative risk must be greater than 2.0. *See id.* at 147–48.

Perhaps the most useful measure is the attributable proportion of risk, which is the statistical measure of a factor's relationship to a disease in the population. It represents the "proportion of the disease among exposed individuals that is associated with the exposure." *Id.* at 149. In other words, it reflects the percentage of the disease or injury that could be prevented by eliminating exposure to the substance. For a more detailed discussion of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

calculation and use of the attributable proportion of risk, see *id.* at 149–50; Black & Lilienfeld, *supra,* 52 FORDHAM L.REV. at 760–61. *See also* Thompson, *supra,* 71 N.C. L.REV. at 252–56.

The numeric value of an odds ratio is at least equal to the relative risk, but the odds ratio often overstates the relative risk, especially if the occurrence of the event is not rare. For an example of the difference between the mathematical calculation of the odds ratio and the relative risk, see BARBARA HAZARD MUNRO & ELLIS BATTEN PAGE, STATISTICAL METHODS FOR HEALTH CARE RESEARCH 233–35 (2d ed. 1993). In the example given by Munro and Page, the odds ratio was 3.91, while the relative risk was only 3.0 based on the same set of data. *See also* Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 149; Thompson, *supra,* 71 N.C. L.REV. at 250 n. 22.

**\*722** The relative risk may be expressed algebraically as:

$$RR = I_e \div I_c$$

where RR is the relative risk, $I_e$ is the incidence of the disease in the exposed population, and $I_c$ is the incidence of disease in the control population. A sample calculation is as follows:

· the incidence of the disease in exposed individuals ($I_e$) is 30 cases per 100 persons, or 0.3

· the incidence of the disease in the unexposed individuals ($I_c$) is 10 cases per 100 persons, or 0.1

· the relative risk is the incidence in the exposed group (0.3) divided by the incidence in the unexposed group (0.1), which equals 3.0

Using this hypothetical, can we conclude that people who are exposed are three times more likely to contract disease than those who are not? Not necessarily. The result in any given study or comparison may not be representative of the entire population. The result may have occurred by chance. The discipline of statistics has determined means of telling us how significant the results of a study may be.

B

The first step in understanding significance testing is to understand how research is often conducted. A researcher tests hypotheses and does so by testing whether the data support a particular hypothesis. The starting point is the null hypothesis, which assumes that there is no difference or no effect. If you were studying the effects of Bendectin, for example, the null hypothesis would be that it has no effect. The researcher tries to find evidence *against* the hypothesis. *See* DAVID S. MOORE & GEORGE P. MCCABE, INTRODUCTION TO THE PRACTICE OF STATISTICS 449 (2d ed. 1993); MUNRO & PAGE, *supra,* at 54. The statement that the researcher suspects may be true is stated as the alternative hypothesis. If a significant difference is found, the null hypothesis is rejected. If a significant difference is not found, the null hypothesis is accepted. MUNRO & PAGE, *supra,* at 54. This concept is important because it is the basis of the statistical test. *Id.*

A study may contain error in deciding to reject or accept a hypothesis, and this error can be one of two types. *Id.;* MOORE & MCCABE, *supra,* at 482–87. A Type I error occurs when the null hypothesis is true but has been rejected, and a Type II error occurs when the null hypothesis is false but has been accepted. MUNRO & PAGE, *supra,* at 55. An example of the two types of error given by Munro and Page is a comparison of two groups of people who have been taught statistics by different methods. *Id.* Group A scored significantly higher than Group B on a test of their knowledge of statistics. The null hypothesis is that there is no difference between the teaching methods, but because the study indicated there was a difference, the null hypothesis was rejected. Suppose, however, that Group A was composed of people with higher math ability and that in actuality the teaching method did not matter at all. The rejection of the null hypothesis is a Type I error. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

The probability of making a Type I error can be decreased by changing the level of significance, that is, the probability that the results occurred by chance. *Id.* If the level of significance had been five in one hundred (0.05), there is only a five in one hundred chance that the result occurred by chance alone. If the level of significance is one in one hundred (0.01), there is only a one in one hundred chance that the result occurred by chance alone. However, as the significance level is made more stringent (*e.g.,* from 0.05 to 0.01), it will be more difficult to find a significant result. *Id.* Altering the significance level in this manner also increases the risk of a Type II error, which is accepting a false null hypothesis. *Id.* To avoid Type II errors, the level of significance can be lowered, for example, to ten in one hundred (0.1). *Id.*

Different levels of significance may be appropriate for different types of studies depending on how much risk one is willing to accept that the conclusion reached is wrong. Again, to take examples offered by Munro and Page, assume that a test for a particular genetic defect exists and that if the defect is **\*723** diagnosed at an early stage, a child with the defect can be successfully treated. If the genetic defect is not diagnosed in time, the child's development will be severely impaired. If a child is mistakenly diagnosed as having the defect and treated, there are no harmful effects. Most would agree that it would be preferable to make a Type I error rather than a Type II error under these circumstances. *Id.* A Type II error would be failing to diagnose a child that had the genetic defect.

Contrast that hypothetical with one in which a federal study is conducted to determine whether a particular method of teaching underprivileged children increases their success in school. *Id.* The cost of implementing this teaching method in a nationwide program would be very great. A Type I error would be to conclude that the program had an effect when it did not. *Id.* The significance level for this project would probably be higher than the one used to screen for genetic defects in the other hypothetic-

al. In the genetic defects example, it is preferable to treat children even if they may not have the disease, but in the teaching method example, it is not preferable to teach children at considerable cost if it has no effect.

A confidence level can be used in epidemiological studies to establish the boundaries of the relative risk. These boundaries are known as the confidence interval. *See id.* at 59–63; *see also* David H. Kaye & David A. Freedman, *Reference Guide on Statistics, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 376–77, 396; MOORE & MCCABE, *supra,* at 432–37. The confidence interval tells us if the results of a given study are statistically significant at a particular confidence level. *See* MOORE & MCCABE, *supra,* at 432–33. A confidence interval shows a "range of values within which the results of a study sample would be likely to fall if the study were repeated numerous times." Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 173. If, based on a confidence level of 95%, a study showed a relative risk of 2.3 and had a confidence interval of 1.3 to 3.8, we would say that, if the study were repeated, it would produce a relative risk between 1.3 and 3.8 in 95% of the repetitions. However, if the interval includes the number 1.0, the study is not statistically significant or, said another way, is inconclusive. This is because the confidence interval includes relative risk values that are both less than and greater than the null hypothesis (1.0), leaving the researcher with results that suggest both that the null hypothesis should be accepted and that it should be rejected. *See, e.g., Turpin,* 959 F.2d at 1353 n. 1; *Brock v. Merrell Dow Pharms., Inc.,* 874 F.2d 307, 312 (5th Cir.), *as modified on reh'g,* 884 F.2d 166 (5th Cir.1989); Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 173. This concept was explained to the jury in this case by Dr. Glasser, one of the Havners' witnesses. Thus, a study may produce a relative risk of 2.3, meaning the risk is 2.3 times greater based on the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

data, but at a confidence level of 95%, the confidence interval has boundaries of 0.8 and 3.2. The results are therefore insignificant at the 95% level. If the researcher is willing to accept a greater risk of error and lowers the confidence level to 90%, the results may be statistically significant at that lower level because the range does not include the number 1.0. *See generally* Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 151–55. "[T]he narrower the confidence interval, the greater the confidence in the relative risk estimate found in the study." *Id.* at 173.

The generally accepted significance level or confidence level in epidemiological studies is 95%, meaning that if the study were repeated numerous times, the confidence interval would indicate the range of relative risk values that would result 95% of the time. *See DeLuca v. Merrell Dow Pharms., Inc.,* 791 F.Supp. 1042, 1046 (D.N.J.1992), *aff'd,* 6 F.3d 778 (3d Cir.1993); Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 153; Dore, *A Proposed Standard, supra* note 3, 28 HOW. L.J. at 693; Thompson, *supra,* 71 N.C. L.REV. at 256. Virtually all the published, peer-reviewed studies on Bendectin have **\*724** a confidence level of at least 95%. Although one of the Havners' witnesses, Dr. Swan, advocated the use of a 90% confidence level (10 in 100 chance of error), she and other of the Havners' witnesses conceded that 95% is the generally accepted level.

Another of the Havners' witnesses, Dr. Glasser, explained that in any scientific application, the confidence interval is kept very high. He testified that you "don't ever see [confidence intervals of 50% or 60%] in a scientific study because that means we're going to miss it a lot of times and [scientists] are not willing to take that risk." One commentator advocates that the confidence level for admissibility of epidemiological studies should be higher than the generally accepted 95% and should be 99%. *See* Dore, *A Proposed Standard, supra* note 3, 28

HOW. L.J. at 693–95. *But cf. DeLuca,* 911 F.2d at 948 (discussing statistics expert Kenneth Rothman's view that the predominate choice of a 95% confidence level is an arbitrarily selected convention of his discipline); *Longmore v. Merrell Dow Pharms., Inc.,* 737 F.Supp. 1117, 1119–20 (D.Idaho 1990) (concluding that the scientific standard for determining causation is much stricter than the standard employed by the court and that confidence levels of 95%, 90%, or even 80% should not be required).

We think it unwise to depart from the methodology that is at present generally accepted among epidemiologists. *See generally* Bert Black, *The Supreme Court's View of Science: Has* Daubert *Exorcised the Certainty Demon?,* 15 CARDOZO L.REV. 2129, 2135 (1994) (stating that " '[a]lmost all thoughtful scientists would agree ... that [a significance level of five percent] is a reasonable general standard' " (quoting Amicus Curiae Brief of Professor Alvan R. Feinstein in Support of Respondent at 16, *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (No. 92–102))). Accordingly, we should not widen the boundaries at which courts will acknowledge a statistically significant association beyond the 95% level to 90% or lower values.

It must be reiterated that even if a statistically significant association is found, that association does not equate to causation. Although there may appear to be an increased risk associated with an activity or condition, this does not mean the relationship is causal. As the original panel of the court of appeals observed in this case, there is a demonstrable association between summertime and death by drowning, but summertime does not cause drowning. 907 S.W.2d at 544 n. 8.

There are many other factors to consider in evaluating the reliability of a scientific study including, but certainly not limited to, the sample size of the study, the power of the study, confounding variables, and whether there was selection bias. These factors are not central to a resolution of this appeal, and we do no more than acknowledge that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

determining scientific reliability can have many facets.

### VI

Armed with some of the basic principles employed by the scientific community in conducting studies, we turn to an examination of the evidence in this case measured against the *Robinson* factors. *See E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex.1995).* The evidence relied upon by the Havners' experts falls into four categories: (1) epidemiological studies; (2) *in vivo* animal studies; (3) *in vitro* animal studies; and (4) a chemical structure analysis of doxylamine succinate, the antihistamine component of Bendectin. We consider each in turn.

### A

[13] Dr. J. Howard Glasser, an associate professor at the University of Texas School of Public Health at the Texas Medical Center in Houston, is an epidemiologist with a Ph.D. in experimental statistics and a Master of Science of Bio–Statistics. He gave the jury an overview of statistics. As noted earlier, he explained that statistics are used to determine if there is a significant association between two events or occurrences, but cautioned that a statistical association is not the same thing as causation.

Glasser identified a number of epidemiological studies from which he concluded that it was more likely than not that there is an **\*725** association between Bendectin and birth defects, even though the authors of those studies did not find such an association. One study was done by Cordero and had a relative risk of 1.18 and a confidence interval of 0.65 to 2.13. However, the relative risk would need to exceed 2.0, and the confidence interval could not include 1.0, for the results to indicate more than a doubling of the risk and a statistically significant association between Bendectin and limb reduction birth defects. *See supra* Part V; *see also Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1320 (9th Cir.) (on remand) (noting that more likely than not standard requires, in terms of statistical proof, a

more than doubling of the risk), *cert denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). None of the other studies identified by Glasser showed a doubling of the risk. The McCredie study had a relative risk of 1.1 and a confidence interval of 0.8 to 1.5. The data in the Eskanzi study that considered limb reduction birth defects resulted in a relative risk of 4.18, but the confidence interval was 0.48 to 36.3, a very large interval that included 1.0. Dr. Glasser agreed that results with a confidence interval that included 1.0 or a lower number would be inconclusive and statistically insignificant.

Dr. Glasser did, however, reanalzye some data, called the Jick data, that had been included in a report to the FDA. Glasser isolated information on women who had filled two or more prescriptions of Bendectin and who were not exposed to spermicide, which resulted in a relative risk of 13.0 of limb reduction birth defects. However, the confidence level he used was 90%. Further, there is no testimony or other evidence regarding the confidence interval. The confidence interval may or may not have contained 1.0.

The Havners also point to a memorandum prepared within the FDA that was identified by Dr. Glasser. The document indicates that the relative risk of limb defects when Bendectin is given within the first three lunar months of pregnancy is 2.13. The only conclusion drawn by Dr. Glasser from this memorandum is that, taken in conjunction with the other articles he had discussed, there is an "importance of time" and an "importance of exposure with the highest relative risk coming when the exposure period one to three lunar months is counted." The memo itself was not introduced into evidence, and there is no evidence of the confidence level at which the relative risk of 2.13 was found or of the confidence interval. The confidence interval may or may not have contained 1.0.

Finally, Glasser testified about published studies on Bendectin that did show statistically significant results, but they dealt with birth defects other than limb reduction defects. These studies cannot of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

course support a finding that Bendectin causes *limb reduction defects.* Further, later studies of these other types of birth defects did not bear out an association with Bendectin.

The other expert witness for the Havners who testified about epidemiological studies was Dr. Shanna Swan. She has a doctorate in statistics and is the Chief of the Reproductive Epidemiological Program for the state of California. She also teaches epidemiology at the University of California at Berkeley.

Dr. Swan conceded that none of the published epidemiological studies found an association between Bendectin and limb reduction defects. She identified a number of these studies and confirmed that the confidence intervals in each of them included 1.0. However, Dr. Swan testified about these studies at some length and criticized the methodology. Then, relying on these same studies, she opined that Bendectin more probably than not is associated with limb reduction birth defects. Swan considered the findings of these studies in the aggregate and testified that the results fall along a curve in which the "weight of the curve" was in the direction of an increased risk. Yet, she also said that these studies were consistent with a relative risk that was between 0.7 and 1.8. That is not a doubling of the risk. It may support her opinion that it is more probable than not that there is an *association* between Bendectin and limb reduction defects, but the *magnitude* of the association she gleaned from these studies is not more than 2.0, based on her own testimony.

Dr. Swan also performed a reanalysis of data from at least two studies. One reanalysis was of raw *unpublished* data underlying **\*726** the Jick study of limb reduction birth defects, the same data about which Dr. Glasser testified. Dr. Swan derived a relative risk estimate of 2.2 for women exposed to Bendectin during the first trimester. She also testified that the relative risk for women who were exposed to Bendectin but not exposed to spermicide was 8.8 and finally, that if women who were ex-

posed to two or more Bendectin prescriptions were considered, without regard to exposure to spermicide, the relative risk was 13 with a confidence interval from 3 to 53. She did not reveal the confidence level used in obtaining these results, and there is no evidence of the confidence level in the record.

The other reanalysis by Dr. Swan was of data in the Cordero study, which was based on information collected by the Center for Disease Control in Atlanta. An abstract she prepared regarding this data was published in the *Journal for the Society of Epidemiological Research* in 1983 or 1984 and states that the original Cordero study found the odds ratio for limb reduction birth defects to be 1.2. Swan concluded, however, that when a different control group is selected, the relative risk estimates are affected. Swan's abstract stated that, "under certain assumptions," which are not identified, "the odds ratio for limb reduction defects" are "a highly significant" 2.8. There is no explanation in the abstract or in Dr. Swan's testimony of the significance level used to obtain the 2.8 result. The result may well be statistically inconclusive at a 95% confidence level. We simply do not know from this record. Without knowing the significance level or the confidence interval, there is no scientifically reliable basis for saying that the 2.8 result is an indication of anything. Further, her choice of the control group could have skewed the results. Although her abstract does not identify what control group she used, Swan testified at trial that she chose births of Downs Syndrome babies. Swan's reanalysis using Downs Syndrome babies as the control group was considered in *Lynch* and in *Richardson–Merrell,* and those courts likewise found it insufficient. *See Lynch v. Merrell–National Labs.,* 830 F.2d 1190, 1195 (1st Cir.1987), *aff'd,* 857 F.2d 823 (D.C.Cir.1988); *Richardson v. Richardson–Merrell, Inc.,* 649 F.Supp. 799, 802 n. 10 (D.D.C.1986), *aff'd,* 857 F.2d 823 (D.C.Cir.1988).

In addition to the statistical shortcomings of the Havners' epidemiological evidence, another strike against its reliability is that it has never been pub-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

lished or otherwise subjected to peer review, with the exception of Dr. Swan's abstract, which she acknowledges is not the equivalent of a published paper. Dr. Swan has published a number of papers in scientific journals, including a study that concluded Bendectin is not associated with cardiac birth defects. Although she has been testifying in Bendectin limb reduction birth defect cases for many years, Dr. Swan has never attempted to publish her opinions or conclusions about Bendectin and limb reduction defects. Similarly, studies by Dr. Glasser have been published in refereed journals, but none of his 32 to 33 publications mentions Bendectin or limb reduction birth defects.

As already discussed, there are over thirty published, peer-reviewed epidemiological studies on the relationship between Bendectin and birth defects. None of the findings offered by the Havners' five experts in this case have been published, studied, or replicated by the relevant scientific community. As Judge Kozinski has said, "the only review the plaintiffs' experts' work has received has been by judges and juries, and the only place their theories and studies have been published is in the pages of federal and state reporters." *Daubert,* 43 F.3d at 1318 (commenting on the same five witnesses called by the Havners). A related factor that should be considered is whether the study was prepared only for litigation. Has the study been used or relied upon outside the courtroom? Is the methodology recognized in the scientific community? Has the litigation spawned its own "community" that is not part of the purely scientific community? The opinions to which the Havners' witnesses testified have never been offered outside the confines of a courthouse.

[14] Publication and other peer review is a significant indicia of the reliability of scientific evidence when the expert's testimony is in an area in which peer review or publication would not be uncommon. Publication in **\*727** reputable, established scientific journals and other forms of peer review "increases the likelihood that substantive flaws in

methodology will be detected." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993). One legal commentator has suggested that the ultimate test of the integrity of an expert witness in the scientific arena is "her readiness to publish and be damned." *Daubert,* 43 F.3d at 1318 (quoting PETER W. HUBER, GALILEO'S REVENGE: JUNK SCIENCE IN THE COURTROOM 209 (1991)). Further, "the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 831 n. 55 (D.C.Cir.1988) (quoting *Perry v. United States,* 755 F.2d 888, 892 (11th Cir.1985) ).

We do not hold that publication is a prerequisite for scientific reliability in every case, but courts must be "especially skeptical" of scientific evidence that has not been published or subjected to peer review. *Brock v. Merrell Dow Pharms., Inc.,* 874 F.2d 307, 313 (5th Cir.), *as modified on reh'g,* 884 F.2d 166 (5th Cir.1989); *see also* Bert Black et al., *Science and the Law in the Wake of* Daubert: *A New Search for Scientific Knowledge,* 72 TEX. L.REV. 715, 778 (1994). Publication and peer review allow an opportunity for the relevant scientific community to comment on findings and conclusions and to attempt to replicate the reported results using different populations and different study designs.

[15] The need for the replication of results was acknowledged by the Havners' witnesses. Moreover, it must be borne in mind that the discipline of epidemiology studies associations, not "causation" per se. Particularly where, as here, direct experimentation has not been conducted, it is important that any conclusions about causation be reached only after an association is observed in studies among different groups and that the association continues to hold when the effects of other variables are taken into account. *See, e.g.,* MOORE & MCCABE, *supra,* at 202.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

As we have already observed, an isolated study finding a statistically significant association between Bendectin and limb reduction defects would not be legally sufficient evidence of causation. The Havners' witnesses conceded that when a number of studies have been done, it would not be good practice to pick out one to support a conclusion. As the federal *Reference Manual on Scientific Evidence* points out, "[m]ost researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn." Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 157. For example, Dr. Swan explained that initially, some studies showed a statistically significant association between Bendectin and the birth defect pyloric stenosis. However, subsequent, much larger studies did not bear out that association, and in fact, Swan herself has published studies that failed to find an association between Bendectin and this type of birth defect.

Accordingly, if scientific methodology is followed, a single study would not be viewed as indicating that it is "more probable than not" that an association exists. *See, e.g., Richardson v. Richardson–Merrell, Inc.,* 649 F.Supp. 799, 802 n. 10 (D.D.C.1986) (noting that no single study would be sufficient to exonerate or to implicate Bendectin with certainty and that studies become "conclusive" only in the aggregate), *aff'd,* 857 F.2d 823 (D.C.Cir.1988). In affirming the district court in *Richardson–Merrell,* the District of Columbia Circuit recognized that the plaintiffs' expert had recalculated epidemiological data and had obtained a statistically significant result. *See Richardson,* 857 F.2d at 831. The court nevertheless held this was not evidence that would support a verdict. *Id.* Courts should not embrace inferences that good science would not draw. *But cf. Lynch,* 830 F.2d at 1194 (asserting that a new study coming to a different conclusion and challenging the consensus would be admissible).

The argument is sometimes made that waiting until an association found in one study is confirmed by others will mean that early claimants will be denied a recovery. *See, e.g.,* Green, *supra,* **\*728**86 NW. U.L.REV. at 680–81; Wendy E. Wagner, *Trans–Science in Torts,* 96 YALE L.J. 428, 428–29 (1986). A related argument is that history tells us that the scientific community has been slow at times to accept valid research and its results. While these observations are true, history also tells us that valid and reliable research and theories are generally accepted quickly within the scientific community when sufficient explanation is provided and empirical data are adequate. *See* Black et al., *supra,* 72 TEX. L. REV. at 779–82 (discussing Galileo, Pasteur, DNA, and continental drift).

[16] Others have argued that liability should not be allocated only on the basis of reliable proof of fault because legal rules should have the goals of "risk spreading, deterrence, allocating costs to the cheapest cost-avoider, and encouraging socially favored activities," and because " 'consumers of American justice want people compensated.' " Rochelle Cooper Dreyfuss, *Is Science a Special Case? The Admissibility of Scientific Evidence After Daubert v. Merrell Dow,* 73 TEX. L.REV. 1779, 1795–96 (1995) (quoting Kenneth R. Feinberg, *Civil Litigation in the Twentieth–First Century: A Panel Discussion,* 59 BROOK. L.REV.. 1199, 1206 (1993)). It has been contended that "[f]or some cases that very well may mean creating a compensatory mechanism even in the absence of clear scientific proof of cause and effect" and that "[d]eferring to scientific judgments about fault only obscures the core policy questions that are addressed by the laws that the court is applying." *Id.* We expressly reject these views. Our legal system requires that claimants prove their cases by a preponderance of the evidence. In keeping with this sound proposition at the heart of our jurisprudence, the law should not be hasty to impose liability when scientifically reliable evidence is unavailable. As Judge Posner has said, "[l]aw lags science; it does not lead it." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

316, 319 (7th Cir.), *cert. denied,* 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996).

B

The Havners relied on *in vivo* animal studies to support the conclusion that Bendectin causes limb reduction birth defects in humans. This evidence was presented by Dr. Adrian Gross, a veterinarian and a veterinary pathologist who had worked at the FDA from 1964 to 1979, served as the Chief of the Toxicology Branch at the Environmental Protection Agency from 1979 to 1980, and thereafter was a Senior Science Advisor at the EPA. Dr. Gross confirmed that the FDA and EPA consider animal studies in assessing the potential human response to drugs or pesticides. He testified that what will affect an animal is likely to affect humans in the same way and that the only reason animal studies are done is to predict if the drug at issue will have an adverse effect on humans.

Dr. Gross reviewed a number of animal studies that had been conducted on Bendectin. He described studies on rabbits exposed to Bendectin in which he saw "a lot of malformed kits." Gross testified about another study of rabbits that he found statistically significant. He opined that the probability that the malformations in this study occurred by chance were six in 10,000. With respect to another animal study on rabbits, he stated that the probability that the drug was harmless was less than one per 1,000,000. He listed studies on monkeys, rats, and mice showing "highly significant deleterious harmful effects as far as birth defects are concerned." Based on these animal studies, Dr. Gross was of the opinion that Bendectin was teratogenic in humans, which means that it causes birth defects. However, he conceded that the dosage levels at which Bendectin became associated with birth defects in rats was at 100 milligrams per kilogram per day, which would be the equivalent of a daily dosage of 1200 tablets for a woman weighing 132 pounds.

The Havners assert in their briefing before this Court that the accepted technique for determining if a substance is a teratogen in humans is to look at all information, including epidemiological data, animal data, biological plausibility, and *in vitro* studies. Dr. Swan confirmed that these are the relevant sources of information in determining teratogenicity. *See also* Brent, *Comment on Comments on "Teratogen Update: Bendectin,"* **\*729** TERATOLOGY 31:429–30 (1985) (stating process for determining if a substance is a teratogen: (1) consistent, reproducible findings in human epidemiological studies; (2) development of an animal model; (3) embryo toxicity that is dose related; and (4) consistency with basic, recognized concepts of embryology and fetal development). Thus, scientific methodology would not rely on animal studies, standing alone, as conclusive evidence that a substance is a teratogen in humans. *See Raynor v. Merrell Pharms., Inc.,* 104 F.3d 1371, 1375 (D.C.Cir.1997) (noting that the only way to test whether data from nonhuman studies can be extrapolated to humans would be to conduct human experiments or to use epidemiological data); *Elkins v. Richardson–Merrell, Inc.,* 8 F.3d 1068, 1071 (6th Cir.1993) (holding that expert opinion indicating a basis of support in animal studies is admissible but is simply inadequate to permit a jury to conclude that Bendectin more probably than not causes limb defects); *Lynch,* 830 F.2d at 1194 (asserting that *in vivo* and *in vitro* animal studies singly or in combination do not have the capability of proving causation in human beings in the absence of any confirming epidemiological data); *see also Brock,* 874 F.2d at 313 (recognizing that animal studies are of very limited usefulness when confronted with questions of toxicity); *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 197 (5th Cir.1996) (quoting and following *Brock* in toxic tort case).

We further note that with respect to the *in vivo* studies about which Dr. Gross testified, their reliability as predictors of the effect of Bendectin in humans is questionable because of the dosage levels. Dr. Gross offered no explanation of how the very high dosages could be extrapolated to humans. Other courts have rejected animal studies that relied on high dosage levels as evidence of causation in hu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

mans. *See, e.g., Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349 (6th Cir.1992) (reasoning that to eliminate drugs toxic to embryos at high dosage levels would eliminate most drugs and many useful chemicals on which modern society depends heavily) (citing James Wilson, *Current Status of Teratology, in* HANDBOOK OF TERATOLOGY 60 (1977)). Gross also failed to explain why the published studies from which he extracted his data had concluded Bendectin was not harmful.

The *in vivo* studies identified in this case cannot support the jury's verdict.

Dr. Stuart Allen Newman also relied on animal studies to support his opinion that Bendectin is a teratogen in humans. Dr. Newman holds a doctorate in chemical physics and is a professor at New York Medical College. He has published over fifty articles, although none contain the opinions or conclusions to which he testified in this case.

The studies Newman reviewed were *in vitro* studies, which are based on tests conducted on cells in a test tube or petri dish. Doxylamine succinate was placed directly on the limb bud cells of animals including chickens and mice. The development of cartilage was affected. Newman acknowledged that in these studies, the researchers who had conducted them concluded only that doxylamine succinate was potentially capable of inducing genetic damage and that it should be tested on other systems. But Newman testified that if you find an effect that prevails across a number of different species, "you can be awfully sure that the same thing will prevail in humans."

[17] Newman opined that Kelly Havner's defect was due to loss of portions of the skeleton that *could* with scientific certainty have been caused by a teratogen that affected the embryo. Similarly, he testified that the findings of one study, the Hassell/ Horigan Study, indicated to him that doxylamine succinate *can* interfere with chondrogenesis, which is the process of certain cells turning into cartilage. We note that testimony to the effect that a sub-stance "could" or "can" cause a disease or disorder is not evidence that in reasonable probability it does. *See, e.g., Parker v. Employers Mut. Liab. Ins. Co.,* 440 S.W.2d 43, 47 (Tex.1969); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 785 (1949). Newman testified, however, that based on the Hassell/Horigan and other animal studies, he concluded with a reasonable degree of medical certainty that doxylamine succinate is a teratogen for cartilage development and **\*730** that doxylamine succinate is a teratogen in humans. He also testified that he had reviewed the records surrounding Marilyn Havner's pregnancy and that to a reasonable certainty, she was not exposed to any teratogen other than Bendectin.

The *in vitro* studies are similar to the cell biology data at issue in *Allen v. Pennsylvania Engineering,* 102 F.3d at 198. The fact that Bendectin may have an adverse effect on limb bud cells is "the beginning, not the end of the scientific inquiry and proves nothing about causation without other scientific evidence." *Id.; see also Richardson,* 857 F.2d at 830 ("Positive results from *in vitro* studies may provide a clue signaling the need for further research, but alone do not provide a satisfactory basis for opining about causation in the human context."); Bailey et al., *Reference Guide on Epidemiology, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra,* at 130–31 (noting that the problem with *in vitro* studies is extrapolating the findings "from tissues in laboratories to whole human beings").

Logical support for Dr. Newman's opinions was also lacking. A number of substances, such as vitamin C, have been shown to damage animal cells when placed directly on tissue. Dr. Newman offered no explanation of how he made the logical leap from the *in vitro* studies on animal tissue to his conclusion that Bendectin causes birth defects in humans. Dr. Newman's testimony is not evidence of causation.

D

Of the five witnesses who testified on the ques-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion of causation, the only witness who opined that Bendectin was the cause of Kelly Havner's birth defect, as opposed to birth defects in general, was Dr. John Davis Palmer. Dr. Palmer is a licensed medical doctor and holds a doctorate in pharmacology. He is a professor at the University of Arizona College of Medicine and the acting head of its Pharmacology Department. His opinion was based in part on the testimony of the Havners' other witnesses.

Dr. Palmer testified that there is a critical period during gestation when the limbs of a fetus are forming. Marilyn Havner took Bendectin somewhere between the 32nd and 42nd day of gestation, depending on how the date of conception is calculated, which was within the period for the development of Kelly Havner's hand and arm. Palmer explained that the molecular structure of doxylamine succinate, one of the two components of Bendectin, permits it to cross the placenta from the mother's body and reach the fetus. Based on this fact and on *in vitro* animal studies, intact animal studies, and epidemiological information, he concluded that doxylamine succinate is a teratogen in humans. Relying on this same information and on information concerning Kelly Havner, including the date her mother ingested Bendectin, Dr. Palmer concluded that to a reasonable degree of medical certainty, Bendectin caused the birth defect seen in Kelly Havner's hand.

However, Dr. Palmer's testimony is based on epidemiological studies that conclude just the opposite. To the extent that he relied on the opinions of Drs. Swan, Glasser, Newman, or Gross, there is no scientifically reliable evidence to support their opinions, as we have seen. Palmer identified no other study or body of knowledge that would support his opinion, other than the chemical structure of doxylamine succinate and a study done on antihistamines, not Bendectin. The Sixth Circuit captured the essence of Dr. Palmer's testimony when it said, "no understandable scientific basis is stated. Personal opinion, not science, is testifying here." *Turpin,* 959 F.2d at 1360. That court further ob-

served that Dr. Palmer's conclusions so overstated their predicate that it could not legitimately form the basis for a jury verdict. *Id.* We agree with that observation based on the record in this case.

\* \* \* \* \* \*

There is no scientifically reliable evidence to support the verdict in this case. Accordingly, we reverse the judgment of the court of appeals in part and render judgment for Merrell Dow.

BAKER, J., not sitting.
**\*731** GONZALEZ, Justice, concurring.

I join the Court's opinion and judgment. I write separately to reiterate that the guidelines we established in *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995), are not limited to expert testimony based on a novel scientific theory.

In *Robinson,* we held that Texas Rule of Evidence 702 requires the proponent of scientific expert testimony to show that the testimony is both relevant and reliable. *Robinson,* 923 S.W.2d at 556. In doing so, we followed the lead of the United States Supreme Court and the Texas Court of Criminal Appeals and adopted a list of non-exclusive factors for determining whether such testimony is admissible.[FN1] *See id.* at 554–57 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992)). Here, the Court applies the *Robinson* criteria to Merrell Dow's legal sufficiency challenge and concludes that the Havners' expert testimony is no evidence of causation. 953 S.W.2d 706. I agree with this approach. But I am concerned that some litigants may misread *Robinson* to apply only to novel scientific evidence because of my later writings applying it to "junk science" cases. *See S.V. v. R.V.,* 933 S.W.2d 1, 26 (Tex.1996) (Gonzalez, J., concurring); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 500 (Tex.1995) (Gonzalez, J., concurring).

FN1. These factors are:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of that theory or technique.

*E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995) (citation and footnote omitted).

Recently, the Court of Criminal Appeals addressed a similar attack on *Kelly,* that court's equivalent of *Robinson.* In rejecting this argument, the court stated:

Nowhere in *Kelly* did we limit the two-pronged standard to novel scientific evidence. The [United States] Supreme Court in *Daubert* directly addressed the issue in a footnote, stating "[a]lthough the *Frye* decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specifically or exclusively to unconventional evidence." *Daubert,* 509 U.S. at 593 n. 11, 113 S.Ct. at 2796 n. 11. The Supreme Court noted that "under the Rules, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. at 2795 (emphasis added). We likewise see no value in having a different standard of admissibility for novel scientific evidence. The problems presented in determining whether or not a particular type of evidence would be con-

sidered "novel" are daunting enough to reject application of a dual standard. Moreover, we observe that the factors and criteria set forth in *Kelly* as bearing upon the reliability of proffered scientific evidence are adequate measure for assuring that "novel" scientific evidence which is "junk science" is excluded. These factors "address the soundness of the underlying scientific theory and technique." *Jordan v. State,* 928 S.W.2d 550, 554 (Tex.Crim.App.1996)....

*Hartman v. State,* 946 S.W.2d 60, 63 (Tex.Crim.App.1997). This analysis applies equally to *Robinson.* As I have said before, we intended *Robinson* to "provide the exclusive standard for evaluating the reliability of expert testimony about anything characterized as science." *S.V. v. R.V.,* 933 S.W.2d at 42 (Gonzalez, J., concurring on rehearing). We did not intend to free from *Robinson* 's grasp what might be considered routine science.

The Havners attempted to prove causation primarily through expert testimony based on epidemiological and animal studies. These foundations are by no means novel. By applying the *Robinson* factors to Merrell Dow's no-evidence challenge, the Court implicitly holds that *Robinson* applies to scientific expert testimony across the board. The trial **\*732** court must only determine whether the evidence is relevant and reliable. *See Robinson,* 923 S.W.2d at 556. It need not decide whether the evidence is also novel.

SPECTOR, Justice, concurring.

The Court today fails to heed its own warning that "the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." 953 S.W.2d at 727 (internal citations omitted). I agree that the Havners' expert witness testimony is not legally sufficient evidence of causation. However, as a judge, and not a scientist, I am uncomfortable with the majority's ambitious scientific analysis and its unnecessarily expansive application of the *Daubert* standard. The majority's opinion, replete with *dicta,* gives courts no practical

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846
**(Cite as: 953 S.W.2d 706)**

guidance outside the context of Bendectin litigation. Accordingly, I concur only in the judgment of the Court.

ON MOTION FOR REHEARING
**ORDER**

The motion for rehearing filed on behalf of the Havners is overruled. However, the tenor of that motion requires that we address the conduct of Respondents' counsel.

This is not the first time in this case that the Havners' counsel have engaged in less than exemplary conduct. Following the decision of the original panel of the court of appeals, which had reversed the judgment of the trial court and rendered judgment that the Havners take nothing, Robert C. Hilliard filed two briefs with the court of appeals which that court, sitting en banc, found to be "insulting, disrespectful, and unprofessional." *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 907 S.W.2d 565, 566 (Tex.App.—Corpus Christi 1994) (en banc) (per curiam). The court of appeals further concluded that the briefs "evidence[d] a violation of the Texas Disciplinary Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness, or fitness." *Id.* The court of appeals accordingly forwarded copies of those briefs to the Office of General Counsel of the State Bar of Texas pursuant to Texas Code of Judicial Conduct, Canon 3(D)(2). *Id.*

In assessing the appropriate response to the motion for rehearing that has now been filed by Hilliard and his co-counsel in this Court, we agree with another of our courts of appeals who recently found it necessary to address attacks on the integrity of that court:

A distinction must be drawn between respectful advocacy and judicial denigration. Although the former is entitled to a protected voice, the latter can only be condoned at the expense of the public's confidence in the judicial process. Even were this court willing to tolerate the personal insult levied by [counsel], we are obligated to maintain the respect due this Court and the legal system we took an oath to serve.

*In re Maloney,* 949 S.W.2d 385, 388 (Tex.App.—San Antonio 1997, no writ) (en banc) (per curiam); *see also Johnson v. Johnson,* 948 S.W.2d 835, 840–41 (Tex.App.—San Antonio 1997, writ requested) [FN1] (sanctioning counsel for disparaging remarks about the trial court and forwarding the court of appeals' opinion to the Office of General Counsel, concluding that a substantial question had been raised about counsel's honesty, trustworthiness, or fitness as a lawyer).

> FN1. An application for writ of error is pending in this Court, and we express no opinion on the merits of that appeal.

Courts possess inherent power to discipline an attorney's behavior. " 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence.' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (further observing that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it) (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 227 (1821) ); *see also Public Util. Comm'n v. Cofer,* 754 S.W.2d 121, 124 (Tex.1988); *Johnson,* 948 S.W.2d at 840–41.

The Disciplinary Rules governing the conduct of a lawyer provide:

**\*733** A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 4, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. A (Vernon Supp.1997) (TEX. STATE BAR R. art. X, § 9).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rule 8.02(a) of the Disciplinary Rules specifically states:

A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory official or public legal officer, or of a candidate for election or appointment to judicial or legal office.

*Id.* Rule 8.02(a).

The Legislature has also provided a mechanism for courts to sanction counsel who file pleadings presented for an improper purpose or to harass. TEX. CIV. PRAC. & REM.CODE §§ 10.001 — 10.005. In addition, one of the lawyers for the Havners, Barry Nace, is a non-resident attorney. His appearance in Texas courts is subject to the Rules Governing Admission to the Bar, including Rule XIX.

The specific portions of the "Respondents' Motion for Rehearing" filed in this Court that raise particular concerns are the "Statement of the Case for Rehearing" (pages 1–5), the "Brief of the Argument" (pages 8, 14, and 16), and the "Prayer for Relief" (pages 19–20). Counsel for Respondents Robert C. Hilliard of the firm of Hilliard & Muñoz, Barry J. Nace of the firm of Paulson, Nace, Norwind & Sellinger, and Rebecca E. Hamilton of the firm of White, White & Hamilton, P.C., are hereby afforded the opportunity to respond as to why the Court should not

1) refer each of them to the appropriate disciplinary authorities;

2) prohibit attorney Nace from practicing in Texas courts; and

3) impose monetary penalties as sanctions.

Any response must be filed in this Court by 5:00 p.m., Monday, November 24, 1997.

Done at the City of Austin, this 13th day of

November, 1997.

BAKER, J., not sitting.

Tex.,1997.
Merrell Dow Pharmaceuticals, Inc. v. Havner
953 S.W.2d 706, Prod.Liab.Rep. (CCH) P 15,015, 40 Tex. Sup. Ct. J. 846

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



772 S.W.2d 442, 8 UCC Rep.Serv.2d 991
**(Cite as: 772 S.W.2d 442)**

▷

Supreme Court of Texas.
PLAS–TEX, INC. et al., Petitioners,
v.
U.S. STEEL CORPORATION, Respondent.

No. C–7728.
April 19, 1989.
Rehearing Denied May 17, 1989.

Buyer of resins used in manufacture of fiberglass swimming pools brought action against resin manufacturer and seller to recover for breach of warranty and violation of Deceptive Trade Practices Act. The 14th District Court, Dallas County, John McClellan Marshall, J., entered judgment in favor of buyer against manufacturer and take-nothing judgment for buyer against seller. Manufacturer appealed. The Dallas Court of Appeals, Fifth Supreme Judicial District, 751 S.W.2d 628, reversed and remanded. On appeal, the Supreme Court, Cook, J., held that: (1) proof of defect in goods was required in implied warranty of merchantability case; (2) seller was not entitled to indemnity for attorney's fees under Deceptive Trade Practices Act as finding of manufacturer's liability had been reversed on appeal; and (3) unappealed-from take-nothing judgment against seller was final as to that issue, and remand for new trial of entire case was thus improper.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Sales 343 ⬿371**

343 Sales
  343VII Remedies of Seller
    343VII(F) Actions for Damages
      343k371 k. Conditions Precedent. Most Cited Cases
Proof of defect in goods is required in action for breach of implied warranty of merchantability. V.T.C.A., Bus. & C. § 2.314(b)(3).

**[2] Sales 343 ⬿272**

343 Sales
  343VI Warranties
    343k265 Implied Warranty of Quality, Fitness, or Condition
      343k272 k. Merchantability. Most Cited Cases
In context of implied warranty of merchantability case, word "defect" means condition of goods that renders them unfit for ordinary purposes for which they are used because of lack of something necessary for adequacy. V.T.C.A., Bus. & C. § 2.314(b)(3).

**[3] Sales 343 ⬿441(3)**

343 Sales
  343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
      343k438 Evidence
        343k441 Weight and Sufficiency
          343k441(3) k. Breach of Warranty. Most Cited Cases
Plaintiff in implied warranty of merchantability case does not have to use direct or expert opinion evidence to show that goods were defective at time they left manufacturer's or seller's possession and can instead meet burden by using circumstantial evidence. V.T.C.A., Bus. & C. § 2.314(b)(3).

**[4] Appeal and Error 30 ⬿989**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)1 In General
        30k988 Extent of Review
          30k989 k. In General. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

772 S.W.2d 442, 8 UCC Rep.Serv.2d 991
**(Cite as: 772 S.W.2d 442)**

In factual sufficiency review, appellate court is to consider all evidence in record, including any evidence contrary to judgment.

**[5] Indemnity 208 ☞72**

208 Indemnity
    208III Indemnification by Operation of Law
        208k63 Particular Cases and Issues
            208k72 k. Successive Sellers; Products Liability. Most Cited Cases
    (Formerly 208k13.5)

Seller was not entitled to indemnity from manufacturer for attorney's fees in buyer's action under Deceptive Trade Practices Act where trial court's finding of manufacturer's liability was reversed on appeal. V.T.C.A., Bus. & C. § 17.555.

**[6] Appeal and Error 30 ☞1173(2)**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(D) Reversal
            30k1173 Reversal as to One or More Coparties
            30k1173(2) k. Reversal as to Parties Not Appealing. Most Cited Cases

General rule that, when one party appeals from judgment then reversal as to that party will not justify reversal as to other nonappealing parties, does not apply when rights of appealing and nonappealing parties are so interwoven or dependent on each other as to require reversal of entire judgment.

**[7] Appeal and Error 30 ☞1173(2)**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(D) Reversal
            30k1173 Reversal as to One or More Coparties
            30k1173(2) k. Reversal as to Parties Not Appealing. Most Cited Cases

Take-nothing judgment against seller that was not appealed by buyer was final, and remand of entire case against seller and manufacturer on reversal

of judgment against manufacturer was thus improper.

**\*442** Roger D. Higgins and Robert A. Michael, Thompson, Coe, Cousins & Irons, Dallas, for petitioner.

Larry Hallman & Joann N. Wilkins, Burford & Ryburn, Judy Norris and Frank Finn, Thompson & Knight, Dallas, for respondent.

**\*443** COOK, Justice.

This is a breach of implied warranty of merchantability case that was brought by Fiberex, Inc. against U.S. Steel Corporation and Plas–Tex, Inc. The court of appeals reversed the judgment of the trial court and remanded the cause for a new trial after concluding that the evidence was factually insufficient to support jury findings of a breach of warranty and causation against U.S. Steel. 751 S.W.2d 628 (Tex.App.1988). We modify the judgment of the court of appeals and remand the cause to the trial court for a new trial.

Fiberex is a manufacturer of fiberglass swimming pools. During 1980 and 1981 Fiberex purchased polyester resins used in the manufacture of these pools from Plas–Tex, a resin distributor. Most of the resins purchased by Fiberex in 1980 and 1981 were manufactured by U.S. Steel. Beginning in the latter part of 1980 some of the pools manufactured by Fiberex began delaminating.[FN1] By the spring of 1981 approximately thirty-four pools had delaminated. Fiberex kept no records as to which types of resins were used in the manufacture of the pools that delaminated.

    FN1. Delamination is the separation of layers of fiberglass caused by the failure of the layers of fiberglass to bond together.

Fiberex then brought suit against U.S. Steel and Plas–Tex, claiming that the resins manufactured by U.S. Steel and sold by Plas–Tex caused the delamination in the swimming pools Fiberex built using these resins. Plas–Tex asserted a cross-claim

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

772 S.W.2d 442, 8 UCC Rep.Serv.2d 991
**(Cite as: 772 S.W.2d 442)**

against U.S. Steel for indemnity. The trial court rendered judgment in favor of Fiberex against U.S. Steel, holding it liable for breach of implied warranty of merchantability and for violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA), Tex.Bus. & Com.Code Ann. §§ 17.41–.63 (Vernon 1987). With regard to Plas–Tex, the trial court rendered judgment that Fiberex take nothing. The trial court also rendered judgment that U.S. Steel indemnify Plas–Tex for its attorney's fees.

U.S. Steel appealed and the court of appeals reversed the judgment of the trial court and remanded the entire cause for a new trial. Fiberex and Plas–Tex each filed an application for writ of error. Fiberex contends that the court of appeals erred in requiring proof of a defect in the goods in an implied warranty of merchantability claim and also erred in its factual sufficiency analysis. Plas–Tex contends that the court of appeals erred in reversing its award of indemnity for attorney's fees and in remanding the entire cause for a new trial.

## I.

[1] Fiberex argues that the court of appeals erred in holding that goods must be defective before recovery will be allowed under an implied warranty of merchantability theory. Tex.Bus. & Com.Code Ann. § 2.314(b)(3) (Tex.U.C.C.) (Vernon 1968) ("Goods to be merchantable must be at least such as are fit for the ordinary purposes for which such goods are used."). Fiberex contends that it need not show a defect in the goods, but instead it need only show that the goods were not merchantable, *i.e.*, not fit for the ordinary purposes for which the goods are used.

The majority of the courts of appeals that have considered this issue have concluded that proof of a defect is required. *Fitzgerald v. Caterpillar Tractor Co.*, 683 S.W.2d 162, 163–64 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.); *Ford Motor Co. v. Tidwell*, 563 S.W.2d 831, 835 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.); *see also Clark v. DeLaval Separator Corp.*, 639 F.2d 1320, 1326

(5th Cir. Unit A Mar.1981) (applying Texas law). *But see Bernard v. Dresser Indus.*, 691 S.W.2d 734, 738 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.) (no proof of defect required).[FN2] The overwhelming**444** majority of jurisdictions also requires proof of a defect.[FN3] We likewise hold that proof of a defect is required in an action for breach of implied warranty of merchantability under section 2.314(b)(3).[FN4]

> FN2. Fiberex also argues that *Conann Constructors, Inc. v. Muller*, 618 S.W.2d 564 (Tex.Civ.App.—Austin 1981, writ ref'd n.r.e.), supports its position that proof of a defect is not required in an implied warranty of merchantability case. However, *Conann* is based on implied warranty of fitness for a particular purpose, 618 S.W.2d 566–67; *see* Tex.Bus. & Com.Code Ann. § 2.315 (Tex.U.C.C.) (Vernon 1968), and is thus not applicable to the instant case, *see generally* 1 J. White & R. Summers, *Uniform Commercial Code* § 9–10, at 481–82 (3d ed. 1988). In an action based on implied warranty of fitness for a particular purpose, proof of a defect is not required. *See id.* at 482 & n. 3.

> FN3. *See* R. Anderson, *Uniform Commercial Code* § 2–314:56, at 162 & n. 16 (1983); W. Hawkland, *Uniform Commercial Code Series* § 2–314:05, at 143 n. .5 (Supp.1988); *see also* B. Clark & C. Smith, *The Law of Product Warranties* ¶ 5.01[2][a][ii] (1984 & Supp.1987) ("For a product to flunk the merchantability test, it must contain an inherent defect.... If the goods contain no inherent defect, there can be no breach of the implied warranty of merchantability under Section 2–314."); W. Powers, *Texas Products Liability Law* § 2.044 (1989) ("To recover for a breach of an implied warranty of merchantability, the buyer must also prove that the goods were defective when they were sold."); G.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Wallach, *The Law of Sales Under the Uniform Commercial Code* ¶ 11.08[2] (1981) ("[T]he warranty of merchantability has been breached so long as the product failure is caused by some flaw in the goods themselves.").

FN4. The jury charge used in this cause on the implied warranty of merchantability claim was a pattern jury charge. *See* 3 State Bar of Texas, *Texas Pattern Jury Charges* PJC 71.07 (1982). The holding in this cause will require a change in PJC 71.07. Question one of PJC 71.07 should be amended to read as follows:

QUESTION 1

Was the reactor heater supplied by the ABC Company unfit for the ordinary purposes for which such heaters are used *because of a defect* ?

Answer: _____

*"Defect" means a condition of the goods that renders them unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy.*

If you have answered Question 1 "Yes," and only in that event, then answer Question 2.

With the italicized modifications, question one of PJC 71.07 accurately reflects the court's holding in this cause.

PJC 71.07 is only applicable when the implied warranty of merchantability case is being tried under a section 2.314(b)(3) breach since there are other possible tests for merchantability listed under section 2.314(b)(1)–(2), (4)–(6) of the Texas Business and Commerce Code. For example, goods are not merchant-

able if they fail to at least: pass without objection in the trade under the contract description, *id.* § 2.314(b)(2); run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved, *id.* § 2.314(b)(4); be adequately contained, packaged, and labeled as the agreement may require, *id.* § 2.314(b)(5); or conform to the promises or affirmations of fact made on the container or label, if any, *id.* § 2.314(b)(6). If any of these requirements are not met, then the goods will not be merchantable. *Id.* § 2.314(b); *see* W. Powers, *Texas Products Liability Law* § 2.043 (1989).

[2] The defect in an implied warranty of merchantability case is not the same as the defect in a strict products liability case. In the context of an implied warranty of merchantability case the word "defect" means a condition of the goods that renders them unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy. In the area of strict products liability, however, the word "defect" means a condition of the product that renders it unreasonably dangerous. *See* 3 State Bar of Texas, *Texas Pattern Jury Charges* PJC 71.01 (1982). Practitioners—as well as the courts—should exercise care to see that these terms are used precisely.

[3] A plaintiff in an implied warranty of merchantability case has the burden of proving that the goods were defective at the time they left the manufacturer's or seller's possession. He must show that the goods were unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy, *i.e.*, because of a defect. A plaintiff does not, however, have to use direct or expert opinion evidence to show that the goods had a defect; he can instead meet his burden by using circumstantial evidence. *See Ford Motor Co. v. Tidwell*, 563 S.W.2d at 835. To make a prima facie showing of a defect based solely on circumstantial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence, Fiberex must present evidence that it handled and applied the resin properly. [FN5] Evidence of proper use of the goods together **\*445** with a malfunction may be sufficient evidence of a defect.

> FN5. In a case where the plaintiff relies solely on circumstantial evidence to establish a defect, the plaintiff must present evidence of proper use of the goods to make a prima facie showing of the defect. In cases where the plaintiff relies on direct evidence—as opposed to relying solely on circumstantial evidence—to establish a defect, the plaintiff need not present evidence of proper use of the goods.

The only Texas case stating that it is not necessary to show a defect in the goods to recover under a breach of implied warranty of merchantability theory is *Bernard v. Dresser Industries,* 691 S.W.2d 734, 738 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). Even in *Dresser,* however, the court concluded that circumstantial evidence and reasonable inferences showed that the gauge in question was in fact defective, *id.* at 738, thereby making this statement dictum. The evidence in *Dresser* showed that the gauge was in the same condition as it was when it left the possession of the manufacturer and that the gauge had been properly handled and used. *Id.* at 735–38. There was no evidence that anything else caused the malfunction of the gauge. This made any explanation other than the existence of a defect unlikely. We disapprove *Dresser* to the extent it conflicts with the instant case. [FN6]

> FN6. The court of appeals distinguished *Dresser* solely because it involved personal injuries whereas the instant case only involved economic damages. 751 S.W.2d at 632 n. 3. We disagree with this reasoning that two different tests should be used in an implied warranty of merchantability claim depending on whether personal injury or economic loss is involved.

## II.

[4] Further, Fiberex argues that the court of appeals erred in applying its factual sufficiency analysis in reviewing the jury findings regarding the presence of a defect in the goods and causation because it failed to detail the evidence and state why the evidence was factually insufficient, as required by this court in *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). Fiberex contends that the court of appeals looked only to the evidence contrary to the verdict and substituted its judgment for that of the jury. We disagree.

The court of appeals correctly recognized that in its factual sufficiency review it was to consider all of the evidence in the record, including any evidence contrary to the judgment. [FN7] 751 S.W.2d at 631 (citing *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980)). The court of appeals then went on to do just that, consider both the evidence supporting and contrary to the judgment. After doing so, the court of appeals concluded that the evidence was factually insufficient to support jury findings regarding the presence of a defect in the goods and causation. 751 S.W.2d at 634, 637. The court of appeals adequately detailed the evidence and stated the reasons why the evidence was factually insufficient, thus satisfying the dictates of this court set forth in *Pool,* 715 S.W.2d at 635.

> FN7. In its opinion the court of appeals also said that "an insufficient evidence point requires only consideration of the evidence tending to support a fact...." 751 S.W.2d at 631 n. 2. This statement should be disregarded as it conflicts with previous holdings of this court requiring a review of all evidence, including evidence contrary to the judgment, in a factual sufficiency review. *E.g., Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980); *In re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

## III.

[5] In its application Plas–Tex complains that

the court of appeals erred in reversing the judgment in its favor against U.S. Steel for indemnity for attorney's fees under the DTPA. Plas–Tex contends that it is entitled to indemnity for attorney's fees under section 17.55A of the Texas Business and Commerce Code even though the judgment rendering U.S. Steel liable under the DTPA was reversed by the court of appeals.[FN8] Deceptive Trade Practices–**\*446** Consumer Protection Act—Definitions, Relief, Defenses, Legislative Intent, ch. 216, § 7, 1977 Tex.Gen.Laws 600, 604, *repealed by* Act of May 25, 1987, ch. 167, § 5.02(6), 1987 Tex.Gen.Laws 1338, 1361. We disagree.

> FN8. In 1987 section 17.55A was renumbered, without change, as section 17.555 of the Texas Business and Commerce Code. That section reads as follows:
>
> A person against whom an action has been brought under this subchapter may seek contribution or indemnity from one who, under the statute law or at common law, may have liability for the damaging event of which the consumer complains. A person seeking indemnity as provided by this section may recover all sums that he is required to pay as result of the action, his attorney's fees reasonable in relation to the amount of work performed in maintaining his action for indemnity, and his costs.
>
> Tex.Bus. & Com.Code Ann. § 17.555 (Vernon 1987).

Section 17.55A was added to the DTPA as part of the 1977 amendments. The section was added in response to *Volkswagen of America, Inc. v. Licht,* 544 S.W.2d 442, 447 (Tex.Civ.App.—El Paso 1976, no writ), in which the court of civil appeals held that the right of indemnity was not available under the DTPA. *See* Debate on Tex.S.B. 664 in Senate Hum. Res. Comm., 65th Leg. 2 (Mar. 14, 1977) (transcript available from Texas Senate Staff Services Office). The statute does not describe the nature of or set the standard for obtaining the statutory rights to contribution and indemnity. *See* W. Dorsaneo & C. Alder, *Contribution and Indemnity,* in 4 *Texas Torts and Remedies* § 102.06[2] (J. Edgar & J. Sales eds. 1989). Considering the circumstances under which the section was added and its lack of guidelines, it appears this section was intended to incorporate existing principles of contribution and indemnity law into DTPA cases. *See id.*

We considered an issue related to the one in the instant case in *Swafford v. View–Caps Water Supply Corp.,* 617 S.W.2d 674 (Tex.1981). In that case the indemnitor, View–Caps, was found to be liable to the plaintiff, but the indemnitees, Swafford and Baker, were absolved of liability. *Id.* at 675. The indemnitees sought attorney's fees under section 17.55A. *Id.* We said:

> The only question before this Court is whether Swafford and Baker are entitled to indemnity from View–Caps for their attorney fees under Section 17.55A of the DTPA. We hold that Swafford and Baker are entitled to recover attorney's fees under the express provisions of the statute.... *The jury found that View–Caps was liable for the event complained of by Purcell.* The statute expressly authorizes indemnity for attorney's fees in this situation.

*Id.* (emphasis added). We specifically noted that the indemnitor was found liable before concluding that recovery was proper. *Id.*

In the instant case, however, the indemnitor, U.S. Steel, has not been found liable for the event complained of by the plaintiff since the trial court's finding of liability was reversed by the court of appeals. There is no right of indemnity against a defendant who is not liable to the plaintiff. *See Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 553 (Tex.1981); *Brown & Root, Inc. v. Rust Eng'g,* 679 S.W.2d 576, 578 (Tex.App.—Texarkana 1984, writ ref'd n.r.e.). As a result, Plas–Tex's award of indemnity for attorney's fees was properly reversed by the court of appeals.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

772 S.W.2d 442, 8 UCC Rep.Serv.2d 991
**(Cite as: 772 S.W.2d 442)**

### IV.

[6][7] Plas–Tex also argues that the court of appeals erred in remanding Fiberex's claim against Plas–Tex for a new trial. Plas–Tex contends that since Fiberex did not appeal the trial court's judgment that it take nothing, the judgment is final as to that issue and remand is therefore improper. We agree.

Generally, when one party appeals from a judgment, a reversal as to that party will not justify a reversal as to other nonappealing parties. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 166 (Tex.1982). This rule does not apply, however, when the rights of the appealing and nonappealing parties are so interwoven or dependent on each other as to require a reversal of the entire judgment. *Id.*

Although the underlying conduct of the defendants that gave rise to this action may have been interwoven, the rights of the parties at this point are very distinct. There are three claims involved here: Fiberex's claim against Plas–Tex; Fiberex's claim against U.S. Steel; and Plas–Tex's cross-claim against U.S. Steel for indemnity. Fiberex's claim against Plas–Tex was resolved by a trial court judgment that Fiberex take nothing, which was not appealed; Plas–Tex therefore has no judgment against it and a new trial on this issue would be of no benefit. *See Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87, 92 (Tex.1973); *see also* **\*447***George v. Vick,* 686 S.W.2d 99, 100 (Tex.1984). Fiberex's claim against U.S. Steel must be tried again for the reasons stated above.

The remaining claim is Plas–Tex's cross-claim against U.S. Steel. Plas–Tex must be made a party to the case on remand for the sole purpose of determining whether it is entitled to indemnity for its attorney's fees. If U.S. Steel is found liable to Fiberex, then Plas–Tex can request to be indemnified for its attorney's fees.

### V.

Accordingly, we reverse that part of the judgment of the court of appeals which remanded Fiberex's claim against Plas–Tex; since there was no appeal of the trial court's judgment that Fiberex take nothing against Plas–Tex, that part of the trial court's judgment is final. In all other respects the judgment of the court of appeals is affirmed. Plas–Tex is a party to the trial on remand solely for the determination of its cross-claim against U.S. Steel for indemnity for attorney's fees.

Tex.,1989.
Plas-Tex, Inc. v. U.S. Steel Corp.
772 S.W.2d 442, 8 UCC Rep.Serv.2d 991

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



675 S.W.2d 503
**(Cite as: 675 S.W.2d 503)**



Supreme Court of Texas.
I. David PORRAS, Petitioner,
v.
A. B. CRAIG, Respondent.

No. C–2809.
July 11, 1984.
Rehearing Denied Sept. 19, 1984.

Owner brought action against neighboring landowner for title and damages to approximately two acres of land. The District Court No. 77, Freestone County, Bournias, J., awarded the owner title to the land, $7,000 in actual damages and $50,000 in exemplary damages against the neighboring landowner. Neighboring landowner appealed. The Waco Court of Civil Appeals, Tenth Supreme Judicial District, 665 S.W.2d 167, affirmed. Neighboring landowner brought error. The Supreme Court, Spears, J., held that: (1) the owner's testimony concerning the reduction in value of his land concerned personal value, not market value, and, therefore, there was no evidence to support the award of actual damages, and (2) because there was no evidence in support of the award of actual damages, the award of exemplary damages could not stand.

Judgment of Court of Appeals reversed and cause remanded to trial court.

Wallace, J., dissented with opinion in which Kilgarlin, J., joined.

West Headnotes

**[1] Damages 115 ⭐110**

115 Damages
  115VI Measure of Damages
    115VI(B) Injuries to Property
      115k107 Injuries to Real Property
        115k110 k. Permanent and Continuing Injuries. Most Cited Cases

In suit for permanent damage to land, measure of damages is difference in market value of land immediately before and immediately after trespass.

**[2] Evidence 157 ⭐474(18)**

157 Evidence
  157XII Opinion Evidence
    157XII(A) Conclusions and Opinions of Witnesses in General
      157k474 Special Knowledge as to Subject-Matter
        157k474(18) k. Value of Real Property. Most Cited Cases

In suit for permanent damage to land, proper way of proving difference in market value of land immediately before and immediately after trespass is opinion testimony and owner of property can testify to its market value, even if he could not qualify to testify about value of like property belonging to someone else.

**[3] Evidence 157 ⭐474(16)**

157 Evidence
  157XII Opinion Evidence
    157XII(A) Conclusions and Opinions of Witnesses in General
      157k474 Special Knowledge as to Subject-Matter
        157k474(16) k. Value in General. Most Cited Cases

In order for property owner to qualify as witness to damages to his property, his testimony must show that it refers to market value, rather than intrinsic or some other value of property.

**[4] Evidence 157 ⭐568(4)**

157 Evidence
  157XII Opinion Evidence
    157XII(F) Effect of Opinion Evidence
      157k568 Opinions of Witnesses in General
        157k568(4) k. Value. Most Cited

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cases

Where landowner's testimony concerning reduction in value of his land as result of trespass affirmatively showed that he referred to personal value rather than market value, that testimony was no evidence of market value and award of actual damages could not stand.

**[5] Trial 388 ☞105(2)**

388 Trial
   388IV Reception of Evidence
      388IV(C) Objections, Motions to Strike Out, and Exceptions
         388k105 Effect of Failure to Object or Except
            388k105(2) k. Nature of Evidence in General. Most Cited Cases

Although neighboring landowner did not object to owner's testimony concerning reduction in value of his property on ground that owner referred to personal value rather than market value, that failure was immaterial in that irrelevant evidence could not support judgment awarding actual damages.

**[6] Evidence 157 ☞474(20)**

157 Evidence
   157XII Opinion Evidence
      157XII(A) Conclusions and Opinions of Witnesses in General
         157k474 Special Knowledge as to Subject-Matter
            157k474(20) k. Damages. Most Cited Cases

Although owner's testimony referring to personal value with respect to damages caused by neighboring landowner's bulldozing of part of owner's property did go to prove heedless and reckless disregard on neighboring landowner's part, that testimony also showed that owner was not testifying about market value and, therefore, fact that evidence was relevant on issue of exemplary damages did not limit its lack of relevance on issue of actual damages.

**[7] Trespass 386 ☞56**

386 Trespass
   386II Actions
      386II(D) Damages
         386k56 k. Exemplary Damages. Most Cited Cases

Although there was some evidence that neighboring landowner acted in heedless and reckless disregard of owner's rights in bulldozing part of owner's property, absent a sustainable award of actual damages, exemplary damages could not be awarded in trespass case.

**[8] Trespass 386 ☞45(5)**

386 Trespass
   386II Actions
      386II(C) Evidence
        386k45 Admissibility
           386k45(5) k. Damages. Most Cited Cases

Evidence that a number of trees, some as much as four feet in diameter, were cut down by neighboring landowner when he bulldozed a portion of owner's property was admissible with regard to value of land before and after trespass.

**[9] Trespass 386 ☞50**

386 Trespass
   386II Actions
      386II(D) Damages
        386k50 k. Entry on and Injuries to Real Property. Most Cited Cases

If a defendant's cutting down shade or ornamental trees on owner's property does not reduce market value of property, courts are authorized to award damages for intrinsic value of trees.

**[10] Appeal and Error 30 ☞1177(7)**

30 Appeal and Error
   30XVII Determination and Disposition of Cause
      30XVII(D) Reversal
        30k1177 Necessity of New Trial
           30k1177(7) k. Failure to Introduce

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sufficient Evidence to Authorize Recovery or Establish Defense. Most Cited Cases

Owner, who presented no evidence of reduction in market value of property which would support award of actual damages against neighboring landowner for bulldozing portion of owner's property, was entitled to new trial to attempt to prove reduction in market value of his land, or, if he could not, to attempt to prove damages for intrinsic value of trees which were lost as result of bulldozing. Vernon's Ann.Texas Rules Civ.Proc., Rule 505.

**[11] Appeal and Error 30 🔑761**

30 Appeal and Error
    30XII Briefs
        30k761 k. Points and Arguments. Most Cited Cases

Where neighboring landowner brought error only with respect to actual and exemplary damage awards in action against him for title and damages to approximately two acres of land, he did not preserve for review any error relating to award of attorney fees to owner who brought action and, therefore, owner was entitled to attorney fees awarded by trial court.

**\*504** Haynes & Boone, William R. Allensworth, David C. Mattka and Barbara E. McElroy, Dallas, A.D. Henderson, Palestine, for petitioner.

Martin & Thomas, Holloway Martin and Michael Thomas, Mexia, for respondent.

SPEARS, Justice.

This is a suit for title and damages to approximately two acres in Freestone County. Based on jury findings, the trial court awarded respondent A.B. Craig, the plaintiff below, title to the land, $7,000 in actual damages, and $50,000 in exemplary damages against defendant and petitioner, David Porras. The court of appeals affirmed. 665 S.W.2d 167. We reverse the judgment of the court of appeals and remand the cause to the trial court.

Craig is the owner of 24 acres in Freestone County. In 1982, petitioner Porras purchased approximately 2,600 acres adjacent to Craig's land for use as a ranch. Porras had his tract surveyed, bulldozed everything that the survey showed to be his property, including an existing fence and two acres on Craig's side of that fence, and built a new fence on the survey line. In so doing, Porras cut down a number of large trees, some as much as four feet in diameter. Porras never contacted Craig before clearing the land.

Craig filed suit for title and damages to the land on his side of the old fence. The jury found that Craig had title to the land in question by virtue of adverse possession; that finding is not in dispute here. The primary complaint is that there is no evidence to support the award of actual damages to the land.

[1][2] In a suit for permanent damage to land, (which the parties agree this suit is), the measure of damages is the difference in the market value of the land immediately before and immediately after the trespass. *Cummer-Graham Co. v. Maddox,* 155 Tex. 284, 285 S.W.2d 932 (1956). The proper way of proving this difference in value is opinion testimony. *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194 (1936); 2 R. Ray, *Texas Law of Evidence Civil and Criminal* § 1422 (3d ed 1980). Opinion testimony concerning these damages is subject to the same requirements as any other opinion evidence, with one exception: the owner of the property can testify to its market value, even if he could not qualify to testify about the value of like property belonging to someone else. *State v. Berger,* 430 S.W.2d 557 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.).

[3] Even an owner's testimony, however, is subject to some restrictions. In **\*505** order for a property owner to qualify as a witness to the damages to his property, his testimony must show that it refers to market, rather than intrinsic or some other value of the property. This requirement is usually met by asking the witness if he is familiar with the market value of his property. *Moody v. Castleberry,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

151 S.W.2d 960 (Tex.Civ.App.—Texarkana 1941, no writ); *Krenek v. South Texas Electric Cooperative, Inc.,* 502 S.W.2d 605 (Tex.Civ.App.—Corpus Christi 1973, no writ).

[4] At trial, two witnesses testified concerning the reduction in market value of the land. Porras's expert witness testified that in his opinion the value of the land had been enhanced by the clearing operation. On the other hand, plaintiff Craig testified that he had been damaged $20,000. His testimony was as follows:

Q. Mr. Craig, what in your opinion was the value of the property immediately before the fencing, the bulldozing of the old fence, and the clearing operations of the Defendant, I. David Porras?

A. About Thirty-five thousand dollars.

Q. What in your opinion was the value of the property immediately after the bulldozing operations, the fencing and clearing of the property in question by Mr. I. David Porras?

A. About fifteen.

Q. Now there is a difference there of twenty thousand dollars, is that correct?

A. Yes, sir.

Q. I want you to tell the jury your reasons for the difference of twenty thousand dollars and how you arrived at it.

A. Well I bought this land to build a retirement home on and I am fifty-seven and my wife is fifty-six and she's not—she's crippled so she wants to get out in the country, too. And we bought that for that reason and now we are afraid to build out there. And the reason we're afraid is because of the exotic animals that will be put next to us. Also they patrol the fence with guns. A sign on their fence they'll shoot if you go across that fence. And about a month ago there was a fire started on the grass on my property and burned in under my trees and if my wife had been there by herself she couldn't have got away.

We hold that this testimony is no evidence of market value. We should not be understood as retreating from the general rule that an owner is qualified to testify about the market value of his property. Moreover, this is not just a case in which the lawyer failed to ask his client if he was familiar with the market value of the property. Instead, in this case the owner's testimony affirmatively showed that he referred to personal rather than market value. *See Stinson v. Cravens, Dargan & Co.,* 579 S.W.2d 298 (Tex.Civ.App.—Dallas 1979, no writ). Mr. Craig was qualified to give an opinion of the market value of his land; he simply failed to do so.

[5][6] Craig points out to this court that Porras did not object to the introduction of this testimony on the ground that it referred to personal rather than market value. Although Porras did not so object, the failure is immaterial. Irrelevant evidence, even when admitted without objection, will not support a judgment. *Aetna Insurance Co. v. Klein,* 160 Tex. 61, 325 S.W.2d 376 (1959). Craig also argues that the testimony set out above was relevant on the issue of exemplary damages, not actual. It is true that the testimony did go to prove heedless and reckless disregard on Porras's part. At the same time, however, the testimony also showed that Craig was not testifying about market value. The fact that the evidence was helpful to Craig in one regard does not limit its relevance in another adverse to him.

[7] Because we have held that there was no evidence of actual damages, the award of exemplary damages must also fall. There was some evidence that Porras acted in heedless and reckless disregard of Craig's rights, and the jury so found. However, absent a sustainable award of actual damages, exemplary damages cannot be awarded in a trespass case. *Giraud v. Moore,* 86 Tex. 675, 26 S.W. 945 (1894); ***506** Phillips v. Wertz,* 546 S.W.2d 902 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

675 S.W.2d 503
**(Cite as: 675 S.W.2d 503)**

[8] Having held that Craig produced no evidence of the reduction in market value of his property, we reverse the judgment of the court of appeals. We must now determine the proper disposition of the case. There was substantial evidence at trial that Craig was injured by Porras's activities. For instance, it was shown that a number of trees, some as much as four feet in diameter, were cut down. This evidence was properly admitted. Evidence of any fact that may reasonably affect the value of the land can be introduced into evidence. *Spindar v. Lo-Vaca Gathering Co.,* 529 S.W.2d 63 (Tex.1975). However, there was no evidence of a reduction in market value. Porras's expert witness testified that, although it would be prohibitively expensive to replace the destroyed trees, the market value of the land had actually been increased.

[9][10] In this situation, some courts have applied a conditional measure of damages, one contingent on a showing of no reduction in market value. If a defendant's cutting down shade or ornamental trees does not reduce the market value of the property, courts are authorized to award damages for the intrinsic value of the trees. Although this court has never addressed the intrinsic value rule, a number of courts of appeals have adopted it. See *Miloszar v. Gonzalez,* 619 S.W.2d 283 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Hamilton v. Fant,* 422 S.W.2d 495 (Tex.Civ.App.—Austin 1967, no writ); *Moran Corporation v. Murray,* 381 S.W.2d 324 (Tex.Civ.App.—Texarkana 1964, no writ); *Lucas v. Morrison,* 286 S.W.2d 190 (Tex.Civ.App.—San Antonio 1956, no writ). We think the rule is a sound one. Because the record shows evidence that might have allowed Craig to recover under a different theory, in the interest of justice we remand the cause for a new trial. Tex.R.Civ.P. 505; *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *Morrison v. Farmer,* 147 Tex. 122, 213 S.W.2d 813 (1948). If, on retrial, Craig can show that the market value of his land was reduced, he can recover under that theory; if not, he can attempt to prove damages by the intrinsic value measure. Because

Porras has not contested the adverse possession findings, we do not remand to retry the title issues.

WALLACE, J., filed dissenting opinion in which KILGARLIN, J., joined.

WALLACE, Justice, dissenting.

I respectfully dissent. The court's opinion is based upon its interpretation of Craig's testimony as to the difference in the value of his land before and after the trespass by Porras. The fatal error in the opinion lies in placing undue emphasis on that portion of Craig's testimony which is favorable to Porras and ignoring another portion of his testimony which supports the trial court's judgment. The omitted testimony of Craig, the owner of the land in question, was:

Q: (Porras' attorney). Now you're telling the jury that the two acres have been damaged twenty thousand dollars worth or is worth twenty thousand dollars. Is that what you're telling them?

A: (Craig) I'm telling them what I thought the land was valued before it was tore up and after it was tore up.

Q. Okay. So what you're saying is that particular two acres is worth approximately twenty thousand dollars?

A. It is to me.

As stated in the court's opinion, if the owner of real property has an opinion, he may testify as to the value of property owned by him. *State v. Berger,* 430 S.W.2d 557, 559 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.). The jury returned a verdict of $7,000 damages to Craig's property. We must sustain that verdict if there is any evidence to support it. *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981). I would hold that the above testimony of Craig is some evidence to support the jury's verdict.

**\*507** The court's opinion holds that Craig's

675 S.W.2d 503
**(Cite as: 675 S.W.2d 503)**

testimony is no evidence of the value of the land because the magic word "market" did not precede the word "value" in the questions propounded to Craig and in his answers. When the testimony concerning value is considered in its entirety one is lead to the obvious conclusion that the values being discussed are market values. Porras contends that Craig was testifying as to intrinsic value to him, not to market value. Porras emphasizes the last response of Craig's which was: "It is to me." Contrary to Porras' contention, the obvious meaning of that sentence was that Craig was testifying as to his opinion of the value and not to anybody elses.

The opinion of the court refuses to distinguish betwen the testimony of Mr. Craig as to exemplary damages and as to actual damages. When testifying as to exemplary damages he referred to the setting of fires by Porras' employees and permitting them to invade Craig's property; posting notices on the fence that anyone crossing it would be shot; and the reckless disregard by Porras of the rights of not only Craig but other owners whose property abutted that of Porras. I would hold that the testimony of Craig quoted above is some evidence of the market value of the property which was damaged by Porras. Since there is some evidence to support the jury's verdict we should affirm that verdict.

I would affirm the judgment of the court of appeals and of the trial court.

KILGARLIN, J., joins in this dissenting opinion.
 ON MOTION FOR REHEARINGPER CURIAM.
[11] Craig asks the court to clarify whether he is entitled to the attorney's fees awarded by the trial court. Since Porras only asked this court for relief from the actual and exemplary damage awards, he has not preserved any error relating to the award of attorney's fees. Consequently, Craig is entitled to the $11,040.00 awarded as attorney's fees. The only issues on remand are those relating to actual and exemplary damages for the trespass.

The motion for rehearing is overruled.

Tex.,1984.
Porras v. Craig
675 S.W.2d 503

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


397 S.W.3d 184, 56 Tex. Sup. Ct. J. 470
**(Cite as: 397 S.W.3d 184)**

H

Supreme Court of Texas.
Carla STRICKLAND, Petitioner,
v.
Kathryn and Jeremy MEDLEN, Respondents.

No. 12–0047.
April 5, 2013.

**Background:** Dog owners brought action against employee of animal shelter, alleging that employee negligently euthanized dog, and seeking non-economic damages for loss of companionship. The County Court at Law No. 1, Tarrant County, Don Pierson, J., dismissed action. Owners appealed. The Fort Worth Court of Appeals, 353 S.W.3d 576, reversed and remanded. Shelter employee petitioned for review.

**Holding:** The Supreme Court, Willett, J., held that dog owners could not recover non-economic damages for loss of companionship.

Reversed.

West Headnotes

**[1] Animals 28 ⚷44**

28 Animals
    28k43 Injuring or Killing Animals in General
        28k44 k. Civil liability. Most Cited Cases
    Owners of dog that had been negligently euthanized at animal shelter were not entitled to recover non-economic damages for loss of companionship; dog was personal property, loss of companionship was a component of loss of consortium, a type of damages available only for a few especially close family relationships, and rule allowing recovery for intrinsic value for loss of cherished heirlooms could not be extended to allow recovery for loss of a pet.

**[2] Animals 28 ⚷44**

28 Animals
    28k43 Injuring or Killing Animals in General
        28k44 k. Civil liability. Most Cited Cases
    Where a dog's market value is unascertainable, the correct measure of damages for loss of dog is the dog's special or pecuniary value, in other words its actual value: the economic value derived from its usefulness and services, not value drawn from companionship or other non-commercial considerations.

**\*185** Alison M. Rowe, John Hill Cayce Jr., Mallory Ann Beagles, Paul Boudloche, for Petitioner.

Randall E. Turner, Sondrea King, Susan Bleil, for Respondent.

Justice WILLETT delivered the opinion of the Court.[FN*]

> FN* CHIEF JUSTICE JEFFERSON joins all but footnote 58 and Part II–C of this opinion. JUSTICE JOHNSON joins all but Part II–C.

*Beauty without Vanity, Strength without Insolence, Courage without Ferocity, And all the Virtues of Man without his Vices* [FN1]

> FN1. Lord Byron, Inscription on the Monument of a Newfoundland Dog, in 7 THE WORKS OF LORD BYRON: WITH HIS LETTERS AND JOURNALS, AND HIS LIFE 292–93 n. 2 (Thomas Moore ed., 1832).

Texans love their dogs. Throughout the Lone Star State, canine companions are treated—and treasured—not as mere personal property but as beloved friends and confidants, even family members. Given the richness that companion animals add to our everyday lives, losing "man's best friend" is undoubtedly sorrowful. Even the gruffest among us tears up (every time) at the end of *Old Yeller.*[FN2]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN2. OLD YELLER (Walt Disney 1957).

This case concerns the types of damages available for the loss of a family pet. If a cherished dog is negligently killed, can a dollar value be placed on a heartsick owner's heartfelt affection? More pointedly, may a bereaved dog owner recover emotion-based damages for the loss? In 1891, we effectively said no, announcing a "true rule" that categorized dogs as personal property, FN3 thus disallowing non-economic damages. In 2011, however, a court of appeals said yes, FN4 effectively creating a novel—and expansive—tort claim: loss of companionship for the wrongful death of a pet.

FN3. *Heiligmann v. Rose,* 81 Tex. 222, 16 S.W. 931, 932 (1891).

FN4. *Medlen v. Strickland,* 353 S.W.3d 576, 581 (Tex.App.–Fort Worth 2011).

In today's case, involving a family dog that was accidentally euthanized, we must decide whether to adhere to our restrictive, 122–year–old precedent classifying pets as property for tort-law purposes, or to instead recognize a new common-law loss-of-companionship claim that allows noneconomic damages rooted solely in emotional attachment, a remedy the common law has denied those who suffer the wrongful death of a spouse, parent, or child, FN5 and is available in Texas only by statute. FN6

FN5. *See Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 345 (Tex.1992) ("common law rule" was that "no cause of action [could] be brought for the death of another person").

FN6. TEX. CIV. PRAC. & REM.CODE § 71.002.

We acknowledge the grief of those whose companions are negligently killed. Relational attachment is unquestionable. But it is also uncompensable. We reaffirm our long-settled rule, which tracks the overwhelming weight of authority nationally, plus the bulk of amicus curiae briefs from several pet-welfare organizations (who understand the deep emotional bonds between people and their animals): Pets are property in the eyes of the law, and we decline to permit non-economic damages rooted solely in an owner's subjective feelings. True, a beloved companion dog is **\*186** not a fungible, inanimate object like, say, a toaster. The term "property" is not a pejorative but a legal descriptor, and its use should not be misconstrued as discounting the emotional attachment that pet owners undeniably feel. Nevertheless, under established legal doctrine, recovery in pet-death cases is, barring legislative reclassification, limited to loss of value, not loss of relationship.

We reverse the court of appeals' judgment and render judgment in favor of the Petitioner.

**I. Factual and Procedural Background**

In June 2009, Avery, a mixed-breed dog owned by Kathryn and Jeremy Medlen, escaped the family's backyard and was promptly picked up by Fort Worth animal control. Jeremy went to retrieve Avery but lacked enough money to pay the required fees. The shelter hung a "hold for owner" tag on Avery's cage to alert employees that the Medlens were coming for Avery and ensure he was not euthanized. Despite the tag, shelter worker Carla Strickland mistakenly placed Avery on the euthanasia list, and he was put to sleep.

Jeremy and his two children learned of Avery's fate a few days later when they returned to retrieve him. Devastated, the Medlens sued Strickland for causing Avery's death and sought "sentimental or intrinsic value" damages since Avery had little or no market value and "[could not] be replaced." Strickland specially excepted, contending such damages are unrecoverable in pet-death cases. The trial court directed the Medlens to amend their pleadings to "state a claim for damages recognized at law." The Medlens amended their petition to drop the words "sentimental value" but realleged damages for Avery's "intrinsic value." Strickland specially excepted on the same basis, and the trial court, sure that Texas law barred such damages,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

dismissed the suit with prejudice.

The court of appeals reversed, becoming the first Texas court to hold that a dog owner may recover intangible loss-of-companionship damages in the form of intrinsic or sentimental-value property damages. Addressing our 1891 decision in *Heiligmann v. Rose,*[FN7] which pegged dog-loss damages to market value or a value ascertained from the dog's "usefulness and services," the court of appeals stated, "Texas law has changed greatly since 1891" and "sentimental damages may now be recovered for ... all types of personal property."[FN8] Specifically, the court said our more recent, non-dog property cases "explicitly held that where personal property has little or no market value, and its main value is in sentiment, damages may be awarded based on this intrinsic or sentimental value."[FN9] The court of appeals pivoted, too, on our expression in *Heiligmann* that the dogs "were of a special value to the owner,"[FN10] and took from this phrase that special value "may be derived from the attachment that an owner feels for his pet."[FN11] Emphasizing these iron truths—that "[d]ogs are unconditionally devoted to their owners"[FN12] and owners, reciprocally, have a deep attachment "to their beloved family pets"[FN13]—the court of appeals declared**\*187** "the special value of 'man's best friend' should be protected."[FN14] Thus, given "the special position pets hold in their family, we see no reason why existing law should not be interpreted to allow recovery in the loss of a pet at least to the same extent as any other personal property."[FN15] Reinstating the Medlens' claim, the court of appeals concluded: "Because an owner may be awarded damages based on the sentimental value of lost personal property, and because dogs are personal property, the trial court erred in dismissing the Medlens' action against Strickland."[FN16]

FN7. 16 S.W. 931.

FN8. 353 S.W.3d at 576–80.

FN9. *Id.* at 578.

FN10. *Id.* at 580 (quoting *Heiligmann,* 16 S.W. at 932).

FN11. *Id.*

FN12. *Id.*

FN13. *Id.*

FN14. *Id.* at 580–81.

FN15. *Id.* at 580.

FN16. *Id.* at 581.

This appeal followed, posing a single, yet significant, issue: whether emotional-injury damages are recoverable for the negligent destruction of a dog.[FN17]

FN17. Though no one disputes that Strickland was acting within the scope of her governmental employment, she did not move for dismissal under section 101.106(f) of the Texas Tort Claims Act, TEX. CIV. PRAC. & REM.CODE § 101.106(f), to which she would have been entitled, *Franka v. Velasquez,* 332 S.W.3d 367 (Tex.2011), as the Medlens concede. Instead, she sought dismissal based on her special exceptions, which the trial court sustained. Dismissal under section 101.106(f) is not automatic; Strickland was required to file a motion. *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia,* 324 S.W.3d 544, 551 (Tex.2010); *see also Univ. of Tex. Health Sci. Ctr. at San Antonio v. Bailey,* 332 S.W.3d 395, 401 (Tex.2011) ("Substitution of the [governmental body] as the defendant was not automatic; [plaintiff] was required to file a motion."). At the court of appeals, Strickland raised a cross-point urging dismissal on immunity grounds under section 101.106(f). 353 S.W.3d at 581. She requested that if the court of appeals reinstated the Medlens' action, it should re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

397 S.W.3d 184, 56 Tex. Sup. Ct. J. 470
**(Cite as: 397 S.W.3d 184)**

mand the case to the trial court where she would file the required motion to dismiss. *Id.* The courts of appeals, however, went straight to the merits and declined to reach Strickland's jurisdictional issue, reasoning that it was remanding anyway by sustaining the Medlens' sole issue on appeal. *Id.* This appeal followed. As Strickland has not satisfied section 101.106(f)'s prerequisites for dismissal, we proceed to the only issue before us, the merits: whether emotion-based damages are recoverable.

### II. Discussion

America is home to 308 million humans [FN18] and 377 million pets. [FN19] In fact, "American pets now outnumber American children by more than four to one." [FN20] In a nation where roughly 62% of households own a pet—with about 78 million dogs and 86 million cats (and 160 million fish) [FN21]—it is unsurprising that many animal owners view their pets not as mere personal property but as full-fledged family members, and treat them as such:

> FN18. *State and County Quick Facts,* U.S. CENSUS BUREAU (Mar. 14, 2013, 11:17 AM), http:// quick facts. census. gov/ qfd/ states/ 00000. html (listing the 2010 U.S. population as almost 309 million).

> FN19. *Pet Industry Market Size & Ownership Statistics,* AM. PET PRODS. ASS'N, , http:// www. american pet products. org/ press_ industrytrends. asp (last visited Apr. 3, 2013).

> FN20. JONATHAN V. LAST, WHAT TO EXPECT WHEN NO ONE'S EXPECTING: AMERICA'S COMING DEMOGRAPHIC DISASTER 2 (2013) (noting that as birth rates plummet in America—the so-called "baby bust" generation—pet ownership soars).

> FN21. *Pet Industry Market Size & Owner-*

> *ship Statistics, supra* note 19.

• A study found that 70% of pet owners thought of their pets as family members. [FN22]

> FN22. William C. Root, *" Man's Best Friend": Property or Family Member? An Examination of the Legal Classification of Companion Animals and its Impact on Damages Recoverable for Their Wrongful Death or Injury,* 47 VILL. L.REV.. 423, 436 (2002).

• 45% of dog owners take their pets on **\*188** vacation. [FN23]

> FN23. *Id.* at 423.

• Over 50% of pet owners say they would rather be stranded on a deserted island with a dog or cat than with a human. [FN24]

> FN24. *Id.*

• 50% of pet owners report being "very likely" to put their own lives in danger to save their pets, and 33% are "somewhat likely" to risk their lives. [FN25]

> FN25. *Id.*

• In 2012, Americans spent roughly $53 billion on their pets. [FN26]

> FN26. *Pet Industry Market Size & Ownership Statistics, supra* note 19.

The human-animal bond is indeed powerful. As the Medlens' second amended petition states: "The entire Medlen family was devastated by the loss of Avery, who was like a family member to them." Countless Texas families share this pets-as-family view, but Texas law, for a century-plus, has labeled them as "property" for purposes of tort-law recovery.

### A. Our Precedent Limits Damages in Dog–Death Tort Cases to "Market Value, If the Dog Has

Any," or "Special or Pecuniary Value" Linked
to the Dog's "Usefulness and Services"

*1. Our 1891 Heiligmann Decision Ties "Special
Value" to a Dog's Economic Attributes, Not Sub-
jective or Emotional Considerations*

[1] Our analysis begins with *Heiligmann v. Rose,* [FN27] our 1891 case upholding $75 in damages for the poisoning of three "well trained" Newfoundland dogs. *Heiligmann* articulated some key valuation principles for animal cases. First, we classified dogs as personal property for damages purposes, not as something giving rise to personal-injury damages. [FN28] Second, we declared a "true rule" for damages that flags two elements: (1) "market value, if the dog has any," [FN29] or (2) "some special or pecuniary value to the owner, that may be ascertained by reference to the usefulness and services of the dog." [FN30]

> FN27. 16 S.W. 931.
>
> FN28. *Id.* at 932.
>
> FN29. *Id.*
>
> FN30. *Id.*

In *Heiligmann,* the dogs "were of fine breed, and well trained," with one using different barks to signal whether an approaching person was a man, woman, or child. While the owner could sell each dog for $5, they had no market value beyond that, but the Court upheld damages of $25 each:

> There is no evidence in this case that the dogs had a market value, but the evidence is ample showing the usefulness and services of the dogs, and that they were of special value to the owner. If the jury from the evidence should be satisfied that the dogs were serviceable and useful to the owner, they could infer their value when the owner, by evidence, fixes some amount upon which they could form a basis. [FN31]

> FN31. *Id.*

The Medlens insist that *Heiligmann* does not limit recovery to an amount based *solely* on the dog's economic usefulness and services. Rather, when the Court mentioned certain dogs lacking market value but having "a special value to the owner," we meant something far broader and distinct from the dogs' commercial attributes. Similarly, argue the Medlens, when the Court in *Heiligmann* noted a **\*189** dog's "special or pecuniary value to the owner," the word "or" indicates two distinct categories of non-market value dogs—those with a special value to the owner, and those with a pecuniary value to the owner. We disagree.

Given its ordinary, contextual meaning, *Heiligmann* tied the recovery of "special or pecuniary value" to the dogs' "usefulness and services" [FN32] —their economic value, not their sentimental value. While we referenced evidence "showing the usefulness and services of the dogs, and that they were of a special value to the owner," [FN33] the next conditional sentence pegs the jury's valuation decision to the dogs' economic attributes: "If the jury from the evidence should be satisfied that the dogs were serviceable and useful to the owner...." [FN34] The decision never references, even by implication, any evidence regarding companionship or owner affection.

> FN32. *Id.*
>
> FN33. *Id.*
>
> FN34. *Id.*

Thus, a dog's "special or pecuniary value" refers not to the dog-human bond but to the dollars-and-cents value traceable to the dog's usefulness and services. Such value is economic value, not emotional value based on affection, attachment, or companionship. In short, *Heiligmann's* use of the word "special" does not authorize "special damages" and does not refer generically to a dog's ability to combat loneliness, ease depression, or provide security. The valuation criteria is not emotional and subjective; rather it is commercial and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

objective.

### 2. *Our Post–*Heiligmann *Cases Do Not Relax the No Emotional–Injury Damages Rule for Animal–Death Cases*

Alternatively, the Medlens assert that three post- *Heiligmann* decisions— *City of Tyler v. Likes,* [FN35] *Porras v. Craig,* [FN36] and *Brown v. Frontier Theatres, Inc.* [FN37] —viewed collectively, entitle property owners to seek intrinsic or sentimental-value damages for certain destroyed property that lacks market value or "special or pecuniary" value. Because dogs are considered property under Texas law, they should be treated no differently, argue the Medlens. Accordingly, Avery's intrinsic value to them, including companionship, is recoverable. We decline to stretch our post- *Heiligmann* decisions this far.

FN35. 962 S.W.2d 489 (Tex.1997).

FN36. 675 S.W.2d 503 (Tex.1984).

FN37. 369 S.W.2d 299 (Tex.1963).

Our decision a half-century ago in *Brown* involved irreplaceable family heirlooms such as a wedding veil, pistol, jewelry, hand-made bedspreads and other items going back several generations—in other words, family keepsakes that "have their primary value in sentiment." [FN38] Such one-of-a-kind memorabilia have a "special value ... to their owner," and damages may factor in "the feelings of the owner for such property." [FN39] Notably, on the same day we decided *Brown* fifty years ago, we reaffirmed in another case the default damages rule for destroyed non-heirloom property lacking market or replacement value: "the actual worth or value of the articles to the owner ... excluding any fanciful or sentimental considerations." [FN40]

FN38. *Id.* at 304–05.

FN39. *Id.* at 305.

FN40. *Crisp v. Sec. Nat'l Ins. Co.,* 369 S.W.2d 326, 328 (Tex.1963).

While they rely chiefly on *Brown,* the Medlens also cite our decisions in *Porras* **\*190** and *Likes,* but neither offers much pertinent guidance here. In *Porras,* a landowner sued someone for clearing several large trees from his land. [FN41] The landowner testified about what the land meant to him and his wife, not in market terms but in personal terms. [FN42] We recognized that the landowner had been injured by the destruction of trees, even though the property's overall market value may have actually *increased.* [FN43] We remanded for a new trial to determine the "intrinsic value" of the felled trees—that is, its ornamental (aesthetic) value and its utility (shade) value. [FN44] That assessment concerning real property is not rooted in an owner's subjective emotions, as here. While *Porras* permitted recovery of the "intrinsic value" of the trees, the plaintiff did not seek, nor did the Court discuss, the trees' sentimental value. Here, the Medlens have suffered lost companionship and are seeking, as a form of "intrinsic value" property damages, recovery for Avery's role as a cherished family member. The court of appeals read too much into *Porras,* which did not import sentimental considerations into measuring "intrinsic value." And we decline to expand *Porras's* notion of "intrinsic value" to animal cases, specifically to include the subjective value a dog owner places on his pet's companionship, particularly when *Porras* itself excluded such subjective notions.

FN41. 675 S.W.2d at 504.

FN42. *Id.* at 505.

FN43. *Id.* at 506.

FN44. *See id.*

*Likes* is likewise uninstructive. In Likes, the plaintiff alleged that a municipality negligently flooded her house and destroyed "many personal irreplaceable items." [FN45] The principal issue was whether mental-anguish damages are recoverable for the negligent destruction of personal property. We answered no, though we acknowledged *Brown's*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

397 S.W.3d 184, 56 Tex. Sup. Ct. J. 470
**(Cite as: 397 S.W.3d 184)**

sentimental-value rule for property of which the "greater value is in sentiment and not in the market place."[FN46] Again, mental anguish is a form of personal-injury damage, unrecoverable in an ordinary property-damage case. The Medlens' emotion-based claim is, like the mental-anguish claim in *Likes,* based wholly on negligent damage to personal property. But *Likes* bars personal-injury-type damages in a case alleging negligent property damage. In short, neither *Porras* nor *Likes* provides the Medlens much support. Distilled down, the pivotal question today is straightforward: whether to extend *Brown's* special rules for family heirlooms to negligently destroyed pets.

> FN45. 962 S.W.2d at 493.
>
> FN46. *Id.* at 497 (quoting *Brown,* 369 S.W.2d at 304–05).

*Heiligmann* remains our lone case directly on point, and after a century-plus we are loathe to disturb it. An owner's fondness for a one-of-a-kind, family heirloom is sentimental, existing at the time a keepsake is acquired and based not on the item's attributes but rather on the nostalgia it evokes, but an owner's attachment to a beloved pet is more: It is emotional, formed over time and based on the pet's specific attributes, namely the rich companionship it provides. Pets afford here-and-now benefits—company, recreation, protection, etc.—unlike a passed-down heirloom kept around chiefly to commemorate past events or passed family members. We agree with the amicus brief submitted by the American Kennel Club (joined by several other pet-welfare groups): "While no two pets are alike, the emotional attachments a person establishes with each pet cannot be shoehorned **\*191** into keepsake-like sentimentality for litigation purposes." Finally, as explained below, permitting sentiment-based damages for destroyed heirloom property portends nothing resembling the vast public-policy impact of allowing such damages in animal-tort cases.

Loss of companionship, the gravamen of the Medlens' claim, is fundamentally a form of *person-*al-injury* damage, not property damage. It is a component of loss of consortium, including the loss of "love, affection, protection, emotional support, services, companionship, care, and society."[FN47] Loss-of-consortium damages are available only for a few especially close family relationships,[FN48] and to allow them in lost pet cases would be inconsistent with these limitations. Therefore, like courts in the overwhelming majority of other states,[FN49] the Restatement of the Law of Torts,[FN50] and **\*192** the other Texas courts of appeals that have considered this question,[FN51] we reject emotion-based liability and prohibit recovery for loss of the human-animal bond.

> FN47. *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990).
>
> FN48. *See, e.g., Roberts v. Williamson,* 111 S.W.3d 113, 118 (Tex.2003); *Ford Motor Co. v. Miles,* 967 S.W.2d 377, 383–84 (Tex.1998); *Reagan,* 804 S.W.2d at 467.
>
> FN49. *See Mitchell v. Heinrichs,* 27 P.3d 309, 312–14 (Alaska 2001); *Kaufman v. Langhofer,* 223 Ariz. 249, 222 P.3d 272, 278–79 (Ct.App.2009); *McMahon v. Craig,* 176 Cal.App.4th 1502, 97 Cal.Rptr.3d 555, 566–68 (2009); *Myers v. City of Hartford,* 84 Conn.App. 395, 853 A.2d 621, 626 (2004); *Naples v. Miller,* 2009 WL 1163504, at \*2–4 (Del.Super.Ct. Apr. 30, 2009), *aff'd,* 992 A.2d 1237 (Del.2010); *Kennedy v. Byas,* 867 So.2d 1195, 1198 (Fla.Dist.Ct.App.2004); *Gill v. Brown,* 107 Idaho 1137, 695 P.2d 1276, 1277 (Ct.App.1985); *Jankoski v. Preiser Animal Hosp., Ltd.,* 157 Ill.App.3d 818, 110 Ill.Dec. 53, 510 N.E.2d 1084, 1087 (1987); *Lachenman v. Stice,* 838 N.E.2d 451, 461 (Ind.Ct.App.2005); *Nichols v. Sukaro Kennels,* 555 N.W.2d 689, 691 (Iowa 1996); *Ammon v. Welty,* 113 S.W.3d 185, 187–88 (Ky.Ct.App.2002); *Kling v. U.S. Fire Ins. Co.,* 146 So.2d 635, 642

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(La.Ct.App.1962), *overruled in part by Holland v. Buckley,* 305 So.2d 113, 114 (La.1974); *Krasnecky v. Meffen,* 56 Mass.App.Ct. 418, 777 N.E.2d 1286, 1289–90 (2002); *Koester v. VCA Animal Hosp.,* 244 Mich.App. 173, 624 N.W.2d 209, 211 (2000); *Fackler v. Genetzky,* 257 Neb. 130, 595 N.W.2d 884, 891–92 (1999) ; *Harabes v. Barkery, Inc.,* 348 N.J.Super. 366, 791 A.2d 1142, 1145–46 (2001); *Wilcox v. Butt's Drug Stores, Inc.,* 38 N.M. 502, 35 P.2d 978, 979 (1934); *DeJoy v. Niagara Mohawk Power Corp.,* 13 A.D.3d 1108, 786 N.Y.S.2d 873, 873 (2004) (mem.); *Shera v. N.C. State Univ. Veterinary Teaching Hosp.,* 723 S.E.2d 352, 357–58 (N.C.Ct.App.2012); *Pacher v. Invisible Fence of Dayton,* 154 Ohio App.3d 744, 798 N.E.2d 1121, 1125–26 (2003); *Oberschlake v. Veterinary Assocs. Animal Hosp.,* 151 Ohio App.3d 741, 785 N.E.2d 811, 812–15 (2003); *Lockett v. Hill,* 182 Or.App. 377, 51 P.3d 5, 7–8 (2002); *Daughen v. Fox,* 372 Pa.Super. 405, 539 A.2d 858, 864–65 (1988); *Rowbotham v. Maher,* 658 A.2d 912, 912–13 (R.I.1995); *Scheele v. Dustin,* 188 Vt. 36, 998 A.2d 697, 700–04 (2010); *Goodby v. Vetpharm, Inc.,* 186 Vt. 63, 974 A.2d 1269, 1273–74 (2009); *Kondaurov v. Kerdasha,* 271 Va. 646, 629 S.E.2d 181, 187 (2006); *Sherman v. Kissinger,* 146 Wash.App. 855, 195 P.3d 539, 548, 549 n. 9 (2008); *Carbasho v. Musulin,* 217 W.Va. 359, 618 S.E.2d 368, 370–71 (2005); *Rabideau v. City of Racine,* 243 Wis.2d 486, 627 N.W.2d 795, 798–99, 801–02 (2001). *But see Knowles Animal Hosp., Inc. v. Wills,* 360 So.2d 37, 38 (Fla.Dist.Ct.App.1978) (per curiam); *Barrios v. Safeway Ins. Co.,* 97 So.3d 1019, 1022–24 (La.Ct.App.2012); *Corso v. Crawford Dog & Cat Hosp., Inc.,* 97 Misc.2d 530, 530–31, 415 N.Y.S.2d 182 (Civ.Cit.1979).

FN50. RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 47 cmt. m (2012)(emphasis in original):

> Recovery for emotional harm resulting from negligently caused harm to personal property is not permitted under this Section. Emotional harm due to harm to personal property is insufficiently frequent or significant to justify a tort remedy. While pets are often quite different from other chattels in terms of emotional attachment, an actor who negligently injures another's pet is not liable for emotional harm suffered by the pet's owner. This rule against liability for emotional harm secondary to injury to a pet limits the liability of veterinarians in the event of malpractice and serves to make veterinary services more readily available for pets. Although harm to pets (and chattels with sentimental value) can cause real and serious emotional harm in some cases, lines—arbitrary at times—that limit recovery for emotional harm are necessary. Indeed, injury to a close personal friend may cause serious emotional harm, but that harm is similarly not recoverable under this Chapter. However, recovery for *intentionally* inflicted emotional harm is not barred when the defendant's method of inflicting harm is by means of causing harm to property, including an animal. See § 46, Comment *d.*

FN51. In the 122 years since *Heiligmann,* five Texas courts of appeals have decided dog-death cases, and all but one (the court of appeals in this case) have concluded that Texas law prohibits non-economic damages. *See Petco Animal Supplies, Inc. v. Schuster,* 144 S.W.3d 554 (Tex.App.–Austin 2004, no pet.); *Zeid v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Pearce,* 953 S.W.2d 368 (Tex.App.–El Paso 1997, no writ); *Bueckner v. Hamel,* 886 S.W.2d 368 (Tex.App.–Houston [1st Dist.] 1994, writ denied); *Young's Bus Lines, Inc. v. Redmon,* 43 S.W.2d 266 (Tex.Civ.App.–Beaumont 1931, no writ).

We do not dispute that dogs are a special form of personal property. That is precisely why Texas law forbids animal cruelty generally (both civilly [FN52] and criminally [FN53]), and bans dog fighting [FN54] and unlawful restraints of dogs specifically [FN55] —because animals, though property, are unique. Most dogs have a simple job description: provide devoted companionship. We have no need to overrule *Brown's* narrow heirloom exception today; neither do we broaden it to pet-death cases and enshrine an expansive new rule that allows recovery for what a canine companion meant to its owner. The Medlens find it odd that Texas law would permit sentimental damages for loss of an heirloom but not an Airedale. Strickland would find it odd if Texas law permitted damages for loss of a Saint Bernard but not for a brother Bernard. The law is no stranger to incongruity, and we need not jettison *Brown* in order to refuse to extend it to categories of property beyond heirlooms.

FN52. TEX. HEALTH & SAFETY CODE §§ 821.021–.026.

FN53. TEX. PENAL CODE § 42.09–.092.

FN54. *Id.* § 42.10.

FN55. TEX. HEALTH & SAFETY CODE §§ 821.076–.081.

[2] The "true rule" in Texas remains this: Where a dog's market value is unascertainable, the correct damages measure is the dog's "special or pecuniary value" (that is, its actual value)—the economic value derived from its "usefulness and services," [FN56] not value drawn from companionship or other non-commercial considerations. [FN57]

FN56. *Heiligmann,* 16 S.W. at 932.

FN57. *Id.* The Texas rule falls squarely within the national mainstream, which cuts overwhelmingly against sentimental-damages recovery. As noted earlier, most other states likewise do not allow pet owners to recover emotional-injury damages. *See supra* note 49. "Fair market value" remains the predominant measure of damages nationally. Some courts, though, have adopted an "actual value" approach when market value for the animal (1) is nonexistent, (2) cannot be ascertained, or (3) is not a true measure of its worth. *See, e.g., Mitchell,* 27 P.3d at 313–14; *Jankoski,* 110 Ill.Dec. 53, 510 N.E.2d at 1087; *Brousseau v. Rosenthal,* 110 Misc.2d 1054, 443 N.Y.S.2d 285, 286 (Civ.Ct.1980); *Shera,* 723 S.E.2d at 357–58; *Sokolovic v. Hamilton,* 195 Ohio App.3d 406, 960 N.E.2d 510, 513 (2011); *McDonald v. Ohio State Univ. Veterinary Hosp.,* 67 Ohio Misc.2d 40, 42–43, 644 N.E.2d 750 (1994). Other jurisdictions have permitted punitive damages where the wrongdoer injured or killed an animal with malice. *See* CAL. CIV.CODE § 3340 (West 2012); *Martinez v. Robledo,* 210 Cal.App.4th 384, 147 Cal.Rptr.3d 921, 926 (2012); *Plotnik v. Meihaus,* 208 Cal.App.4th 1590, 146 Cal.Rptr.3d 585, 600 (2012); *Bruister v. Haney,* 233 Miss. 527, 102 So.2d 806, 807 (1958).

**\*193** We recognize that the benefit of most family dogs like Avery is not financial but relational, and springs entirely from the pet's closeness with its human companions. Measuring the *worth* of a beloved pet is unquestionably an emotional determination—what the animal *means* to you and your family—but measuring a pet's *value* is a legal determination. We are focused on the latter, and as a matter of law an owner's affection for a dog (or ferret, or parakeet, or tarantula) is not compensable. [FN58]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN58. While actual value cannot include the owner's "feelings," unlike *Brown's* narrow exception for one-of-a-kind heirlooms, 369 S.W.2d at 305, it *can* include a range of other factors: purchase price, reasonable replacement costs (including investments such as immunizations, neutering, training), breeding potential (if any), special training, any particular economic utility, veterinary expenses related to the negligent injury, and so on. *See Mitchell,* 27 P.3d at 313–14; *see also Heiligmann,* 16 S.W. at 932 (taking into account breed and special training in determining damages); *Nichols,* 555 N.W.2d at 692 ("In determining the measure of damages for injuries to a dog, factors include its market value, which may be based on purchase price, relatively long life of breed, its training, usefulness and desirable traits." (quoting 4 AM.JUR. 2d *Animals* § 162 (1964))). Emotional attachment, however, is not a component of actual value.

### B. Compelling Pet Welfare and Social–Policy Reasons Counsel Against Permitting Emotion–Based Damages in Dog–Death Cases

This is a significant case not only for pet owners but also, as several animal-welfare groups underscore, for pets themselves. Appreciating this case's significant implications, numerous animal-advocacy organizations have submitted amicus curiae briefs. And while there is no unanimous "pro-pet" position—organizations committed to animal well-being are arrayed on both sides FN59 —the vast majority of pet-friendly groups oppose the Medlens' request for emotion-based damages, FN60 lest greater liability raise **\*194** the cost of pet ownership and ultimately cause companion animals more harm than good.

FN59. Supporting the Medlens (and thus favoring emotional-injury damages) are the Texas Dog Commission (TDC) and a group of law professors. The TDC says the

court of appeals' decision follows *Heiligmann* and tracks prevailing law. The law professors say *Heiligmann* divided personal property into three categories, "based on where the greatest value of the property lies"—(1) personal property with market value, (2) personal property with use value, and (3) personal property that has sentiment as its primary value—"and created a different damages test for each." This case, they contend, falls neatly within category three in light of our post- *Heiligmann* cases that allow intrinsic value when market or pecuniary valuations are out of place.

FN60. Supporting Strickland (and thus opposing emotional-injury damages) are the Texas Municipal League, the Texas City Attorneys Association, and the City of Arlington, Texas (collectively "Municipal Amici"); the American Kennel Club, Cat Fanciers' Association, Animal Health Institute, American Veterinary Medical Association, National Animal Interest Alliance, American Pet Products Association, and Pet Industry Joint Advisory Council (collectively "AKC"); the Texas Veterinary Medical Association (TVMA); the Texas Civil Justice League (TCJL); and the Property Casualty Insurers Association of America, American Insurance Association, and National Association of Mutual Insurance Companies (collectively "Insurer Amici").

The Municipal Amici argue the court of appeals' ruling essentially allows "wrongful death" damages for dogs that are barred for human beings. Also, such damages would irrationally expose to unrestricted damages municipalities, veterinarians, and other service providers who must make difficult, on-the-fly decisions in the field. The AKC

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

warns that allowing such liability will necessarily increase the costs of pet "health care, pet products, and other pet services." The TVMA says allowing emotion-based damages may actually harm pets "by driving up the basic costs of pet ownership," and that litigation and insurance costs will cause veterinarians to boost prices to offset the threat of noneconomic damages. The TCJL contends such damages offend well-settled law, put Texas jurisprudence far outside the mainstream, and force a radical policy change better left to the Legislature. The Insurer Amici assert that allowing subjective, emotional-injury damages for harmed personal property will skew "the underwriting of risk, the setting of rates, and the payment of claims." This abrupt imbalance, they argue, will impact not only veterinary insurance, but insurance more generally, particularly homeowner's and automobile coverage.

Several animal-welfare groups—organizations that understand the intense grief and despair occasioned by a pet's death—insist that relational-injury damages would adversely impact pet welfare. For example, the American Kennel Club, joined by the Cat Fanciers' Association and other pro-animal nonprofits, worry that "pet litigation will become a cottage industry," exposing veterinarians, shelter and kennel workers, animal-rescue workers, even dog sitters, to increased liability: "Litigation would arise when pets are injured in car accidents, police actions, veterinary visits, shelter incidents, protection of livestock and pet-on-pet aggression, to name a few." As risks and costs rise, there would be fewer free clinics for spaying and neutering, fewer shelters taking in animals, fewer services like walking and boarding, and fewer people adopting pets, leaving more animals abandoned and ultimately put down. The Texas Veterinary Medical Association sounds alarms of "vast unintended consequences,"

asserting its members would have no choice but to practice defensive medicine "to safeguard against potential claims of malpractice." The unfortunate outcome, they contend, would be higher prices for veterinary care, thus fewer owners bringing in their pets for needed treatment. Families, particularly lower-income families, will avoid preventive care for their pets, not seek needed care for ill or injured pets, and be more apt to euthanize a pet. The Texas Municipal League and other government associations worry about police officers and animal-service employees being second-guessed for split-second decisions they must make in the field when they encounter loose and potentially dangerous animals. Not all dogs are good-natured, they warn, and government workers must be free to take swift action to protect citizens rather than worrying about lawsuits that, even if successfully defended, drain finite taxpayer resources. Various insurance groups caution that expanded damages would spike the cost of insurance across the board, not just for veterinarians but also for homeowners and automobile drivers, "inflat[ing] the value of property loss far above that which insurance contracts have been written to cover with serious consequences for the affordability and availability of insurance in Texas."

The opposing amici, including the Texas Dog Commission and eleven Texas law professors, emphasize that the court of appeals' judgment is consistent with our post- *Heiligmann* property-valuation precedent, which they contend allows for sentimental-value damages for the loss of a dog. On this heirloom point, the Medlens pose a unique hypothetical, asserting they could seek sentimental damages if a *taxidermied* Avery had been negligently destroyed. If property is property, and if they could seek sentimental value for a stuffed Avery destroyed long after death, why can't they recover for a euthanized Avery destroyed while alive? For the reasons stated above and below, we are unpersuaded.

A decade ago we explained: "When recogniz-

ing a new cause of action and the accompanying expansion of duty, we must **\*195** perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified." FN61 On this score, the pet-welfare amici make a forceful case. While recognizing that dogs are treasured companions whose deaths generate tremendous sorrow, we are persuaded that allowing loss-of-companionship suits raises wide-reaching public-policy implications that legislators are better suited to calibrate. Our carefulness is augmented by two legal-policy concerns: (1) the anomaly of elevating "man's best friend" over multiple valuable human relationships; and (2) the open-ended nature of such liability.

> FN61. *Roberts,* 111 S.W.3d at 118.

The court of appeals' decision works a peculiar result, effectively allowing "wrongful death" damages for pets. Loss of companionship is a component of loss of consortium FN62 —a form of personal-injury damage, not property damage—and something we have "narrowly cabined" to two building-block human relationships: husband-wife FN63 and parent-child. FN64 The Medlens request something remarkable: that pet owners have the same legal footing as those who lose a spouse, parent, or child.

> FN62. *See Reagan,* 804 S.W.2d at 467.
>
> FN63. *Whittlesey v. Miller,* 572 S.W.2d 665, 667 (Tex.1978).
>
> FN64. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551 (Tex.1985) (allowing a child to recover loss-of-companionship damages when a parent dies), *overruled in part on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 533 (Tex.1998); *Sanchez v. Schindler,* 651 S.W.2d 249, 252–53 (Tex.1983) (allowing a parent to recover such damages when a child dies).

Moreover, they seek damages they plainly could not seek if other close relatives (or friends) were negligently killed: siblings, step-children, grandparents, dear friends, and others. FN65 Our cases reject loss-of-consortium recovery for such losses. Losing one's pet, even one considered family, should not invite damages unavailable if an actual human family member were lost. Put differently, the Medlens seek emotion-based damages for the death of "man's best friend" when the law denies such damages for the death of a human best friend. For all their noble and praiseworthy qualities, dogs are not human beings, and the Texas common-law tort system should not prioritize human-animal relationships over intimate human-human relationships, particularly familial ones. Analogous would be anomalous.

> FN65. *See Miles,* 967 S.W.2d at 382–84 (refusing to allow loss-of-consortium recovery by siblings and step-parents).

It would also invite seemingly arbitrary judicial line-drawing. Certainly, if we anointed a common-law claim for loss of pet companionship, we could prescribe limits, but the issue is not whether the Court *can* draw lines, but whether it *should.* After all, people form genuine bonds with a menagerie of animals, so which "beloved family pets" (the court of appeals' description FN66) would merit such preferred treatment? Domesticated dogs and cats only (as in a Tennessee statute FN67)? Furry, but not finned or feathered? What about goldfish? Pythons? Cockatiels? There seems to be no cogent stopping point, at least none that doesn't resemble judicial legislation.

> FN66. 353 S.W.3d at 580.
>
> FN67. TENN.CODE ANN. § 44–17–403 (2012).

Similarly, while statutory damage caps exist in various types of cases involving people, the court of appeals' decision leaves matters wholly unconfined. Such broad, unstructured liability would in-

vite peculiar results. Under *Heiligmann,* for **\*196** example, if a Westminster best-of-breed champion with a $20,000 market value is negligently destroyed, that would be its owner's top-end recovery. But if a 15–year–old frail dog with no market value dies, the owner could sue for unlimited emotional-injury damages. We could impose damages limits, but such fine-tuning is more a legislative function than a judicial one. The Medlens and amici urge a damages model based on a pet's primary value, but that, too, invites gamesmanship. The owner of a well-trained dog with legitimate market or pecuniary value, like a service animal, would be better off saying his beloved pet was a "worthless mutt" (to avoid a less-rewarding recovery under *Heiligmann),* yet a lovable, part-of-the-family mutt that the owner adored with all his heart (to maximize sentimental damages under *Brown* ). Our tort system cannot countenance liability so imprecise, unbounded, and manipulable.

### C. The Legislature Is Best Equipped to Weigh and Initiate Broad Changes to Social and Civil–Justice Policy, Including Whether to Liberalize Damages Recovery in Pet–Death Cases

The Medlens seek a sweeping alteration of Texas tort-law principles, upending a century-plus of settled rights, duties, and responsibilities. The judiciary, however, while well suited to adjudicate individual disputes, is an imperfect forum to examine the myriad policy trade-offs at stake here. Questions abound: who can sue, who can be sued, for what missteps, for what types of damages, for how much money? And what of the societal ripple effects on veterinarians, animal-medicine manufacturers, homeowners and drivers seeking insurance, pet owners, pet caretakers, and ultimately pets themselves? Animal-death suits portend fundamental changes to our civil-justice system, not incremental adjustments on a case-by-case basis. They require detailed findings and eligibility criteria, which in turn require the careful balancing of a range of views from a range of perspectives, something best left to our 181–member Legislature. If lawmakers wish, they can hold hearings and then,

after hearing testimony and weighing arguments, craft meticulous, product-of-compromise legislation that allows non-economic damages to a controllable and predictable degree.

We also draw counsel from the history of Texas common law, which, though it has allowed sentimental damages for the loss of an heirloom, has not done so for the loss of a person, instead deferring to the Legislature. One explanation is that with heirlooms, the value is sentimental; with people, the value is emotional. The reason the common law historically declined to create a wrongful-death action is not because the common law is incapable of setting reasonable parameters, or because such parameters are impossible or necessarily capricious. Rather it is because such parameters are most optimally informed by policy- and value-laden judgments the Legislature is best equipped to make. The difficulties of measuring damages for the loss of human life and identifying the beneficiaries entitled to recover were deemed by the common law too great. Because the judiciary was an imperfect decider, courts decided legislatures should decide. And our Legislature did so, authorizing a statutory wrongful-death action for reasons it was better suited to gauge. [FN68] Having historically declined to **\*197** recognize a common-law action for the loss of a human, the common law should not, for mostly the same reasons, recognize one for the loss of a pet.

> FN68. *See* TEX. CIV. PRAC. & REM.CODE §§ 71.001–.011 (current version of the Texas wrongful-death statute).

Our precedent on the legal valuation of companion animals has endured for 122 years, and while we decline today to expand the damages available to bereaved pet owners, we understand the strength of the human-animal bond. Few Texans consider their pets throw-away commodities. Perhaps the Legislature will enact a more generous valuation formula for family pets. Valuation derives fundamentally from values, and elected legislators may favor scrapping the "property" label and re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

classifying companion pets as something more elevated. The Legislature has passed a wrongful-death statute for humans; it has not (yet) for animals. Given the competing public-policy considerations, we believe if there is to be expanded recovery in pet-death cases, it, too, should be confronted legislatively, not judicially.

In 2000, Tennessee enacted legislation authorizing non-economic damages, up to $5,000, when someone negligently or intentionally kills a companion animal.[FN69] The T–Bo Law[FN70] (named for the senate sponsor's beloved Shih Tzu)[FN71] narrowly defines "pet" as a domesticated dog or cat, limits recovery to "the deceased pet's owner or caretaker," and immunizes veterinarians and animal shelters from negligence liability.[FN72] The Maryland Legislature has likewise limited damages in pet cases, restricting damages to fair market value plus the necessary costs of veterinary care, not to exceed $7,500 total.[FN73] An Illinois statute allows non-economic damages, but it, too, tries to narrow them, allowing emotional-distress recovery only in cases of aggravated cruelty or torture or when an animal is injured or killed in bad faith when seized or impounded.[FN74] That is, it forbids non-economic damages for acts of ordinary negligence.

FN69. TENN.CODE ANN. § 44–17–403 (2012).

FN70. 2000 Tenn. Pub. Acts Ch. 762.

FN71. *See* Susan Cover, *Maine Bill Would Raise Status of Pets That Are Killed,* PORTLAND PRESS HERALD (Feb. 15, 2013), http:// www. press herald. com/ politics/ bill- would- raise- status- of- pets- that- are- killed_ 2013– 02– 16. html.

FN72. TENN.CODE ANN. § 44–17–403.

FN73. MD.CODE ANN., CTS. & JUD. PROC. § 11–110 (2012).

FN74. 510 ILL. COMP. STAT. ANN.N. 70/16.3 (West 2013).

As a matter of Texas common law, emotion-based damages are unrecoverable, but whether to permit such liability statutorily is a quintessential legislative judgment. Societal attitudes inexorably change, and shifting public views may persuade the Legislature to extend wrongful-death actions to pets. Amid competing policy interests, including the inherent subjectivity (and inflatability) of emotion-based damages, lawmakers are best positioned to decide if such a potentially costly expansion of tort law is in the State's best interest, and if so, to structure an appropriate remedy.

### III. Conclusion

*To his dog, every man is Napoleon; hence the constant popularity of dogs.*[FN75]

> FN75. Aldous Huxley, *as quoted in* ROBERT ANDREWS, THE CONCISE COLUMBIA DICTIONARY OF QUOTATIONS 83 (1990).

It is an inconvenient, yet inescapable, truth: "Tort law ... cannot remedy every wrong."[FN76] Lines, seemingly arbitrary, are required. No one disputes that a family **\*198** dog—"in life the firmest friend"[FN77]—is a treasured companion. But it is also personal property, and the law draws sensible, policy-based distinctions between types of property. The majority rule throughout most of America—including Texas since 1891—leavens warm-heartedness with sober-mindedness, applying a rational rule rather than an emotional one. For the reasons discussed above, we decline to (1) jettison our 122–year–old precedent classifying dogs as ordinary property, and (2) permit noneconomic damages rooted in relational attachment.

FN76. *Roberts,* 111 S.W.3d at 118.

FN77. Lord Byron, *supra* note 1, at 293.

Under Texas common law, the human-animal bond, while undeniable, is uncompensable, no matter how it is conceived in litigation—as a measure of property damages (including "intrinsic value" or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

397 S.W.3d 184, 56 Tex. Sup. Ct. J. 470
**(Cite as: 397 S.W.3d 184)**

"special value ... derived from the attachment that an owner feels for his pet" [FN78]), as a personal-injury claim for loss of companionship or emotional distress, or any other theory. The packaging or labeling matters not: Recovery rooted in a pet owner's feelings is prohibited. We understand that limiting recovery to market (or actual) value seems incommensurate with the emotional harm suffered, but pet-death actions compensating for such harm, while they can certainly be legislated, are not something Texas common law should enshrine.

> FN78. 353 S.W.3d at 580.

We reverse the court of appeals' judgment and render judgment in favor of Strickland.

Tex.,2013.
Strickland v. Medlen
397 S.W.3d 184, 56 Tex. Sup. Ct. J. 470

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.




Supreme Court of Texas.
Venkateswarlu THOTA, M.D. and North Texas
Cardiology Center, Petitioners,
v.
Margaret YOUNG, individually, and as Representative of the Estate of William R. Young, Respondent.

No. 09–0079.
Argued Nov. 10, 2011.
Decided May 11, 2012.

**Background:** On behalf of herself and her deceased husband's estate, widow brought medical malpractice action against physician and cardiology center after husband died following complications from internal bleeding caused by cardiac catheterization. Following jury trial, the 30th District Court, Wichita County, Robert P. Brotherton, J., entered judgment for defendants. Widow appealed. The Court of Appeals, 271 S.W.3d 822,Terrie Livingston, J., reversed and remanded. Physician sought review which was granted.

**Holdings:** The Supreme Court, Green, J., held that:
(1) presumed harm analysis did not apply to a broad-form submission in a single-theory-of-liability case; disapproving of *Block v. Mora*, 314 S.W.3d 440;
(2) any error associated with the inclusion of a jury question regarding patient's negligence was harmless; and
(3) any error in the trial court's submission of the new and independent cause instruction was harmless.

Reversed and remanded.

West Headnotes

**[1] Appeal and Error 30 ⚷969**

30 Appeal and Error

30XVI Review
30XVI(H) Discretion of Lower Court
30k969 k. Conduct of trial or hearing in general. Most Cited Cases
Supreme Court reviews a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review.

**[2] Trial 388 ⚷182**

388 Trial
388VII Instructions to Jury
388VII(A) Province of Court and Jury in General
388k182 k. Authority to instruct jury in general. Most Cited Cases

**Trial 388 ⚷215**

388 Trial
388VII Instructions to Jury
388VII(B) Necessity and Subject–Matter
388k215 k. Submission to jury for special findings. Most Cited Cases
The trial court has considerable discretion to determine proper jury instructions; if an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper.

**[3] Trial 388 ⚷232(1)**

388 Trial
388VII Instructions to Jury
388VII(C) Form, Requisites, and Sufficiency
388k231 Sufficiency as to Subject-Matter
388k232 In General
388k232(1) k. In general. Most Cited Cases

**Trial 388 ⚷238**

388 Trial
388VII Instructions to Jury
388VII(C) Form, Requisites, and Sufficiency

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

388k231 Sufficiency as to Subject-Matter
388k238 k. Matters of law. Most Cited Cases

**Trial 388 ⊂═250**

388 Trial
  388VII Instructions to Jury
    388VII(D) Applicability to Pleadings and Evidence
      388k249 Application of Instructions to Case
      388k250 k. In general. Most Cited Cases

A jury instruction is proper if it: (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.

**[4] Appeal and Error 30 ⊂═1064.1(1)**

30 Appeal and Error
  30XVI Review
    30XVI(J) Harmless Error
      30XVI(J)18 Instructions
        30k1064 Prejudicial Effect
        30k1064.1 In General
          30k1064.1(1) k. In general. Most Cited Cases

Jury charge error is generally considered harmful as required for reversal of a judgment if it relates to a contested, critical issue. Rules App.Proc., Rules 44.1(a), 61.1.

**[5] Appeal and Error 30 ⊂═230**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k230 k. Necessity of timely objection. Most Cited Cases

**Appeal and Error 30 ⊂═231(9)**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k231 Necessity of Specific Objection
        30k231(9) k. Instructions. Most Cited Cases

**Appeal and Error 30 ⊂═242(1)**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k242 Necessity of Ruling on Objection or Motion
        30k242(1) k. In general. Most Cited Cases

The procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**[6] Appeal and Error 30 ⊂═230**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k230 k. Necessity of timely objection. Most Cited Cases

**Appeal and Error 30 ⊂═231(9)**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k231 Necessity of Specific Objection
        30k231(9) k. Instructions. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

Under Supreme Court's preservation rules, a timely objection plainly informing the court that a specific element should not be included in a broad-form question because there is no evidence to support its submission preserves the error for appellate review. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**[7] Appeal and Error 30 ☞230**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(B) Objections and Motions, and Rulings Thereon
            30k230 k. Necessity of timely objection. Most Cited Cases

**Appeal and Error 30 ☞231(9)**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(B) Objections and Motions, and Rulings Thereon
            30k231 Necessity of Specific Objection
                30k231(9) k. Instructions. Most Cited Cases

Specific and timely no-evidence objection to jury charge question on patient's contributory negligence and specific objection to the disputed instruction on new and independent cause was sufficient to place the trial court on notice that patient's widow believed the evidence did not support an inclusion of patient's contributory negligence or instruction on new and independent cause, and, thus, issue was preserved for appeal, although widow did not cite or specifically reference *Casteel*, a case which held that, when a single broad-form liability question erroneously commingled valid and invalid liability theories and the appellant's objection was timely and specific, the error was harmful when it could not be determined whether the improperly submitted theories formed the sole basis for the jury's finding. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**[8] Appeal and Error 30 ☞1031(6)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
            30XVI(J)1 In General
                30k1031 Presumption as to Effect of Error
                    30k1031(6) k. Instructions. Most Cited Cases

Presumed harm analysis, for when jury question incorporated multiple theories of liability, of which at least one was invalid, or when it commingled damage elements that were unsupported by legally sufficient evidence, did not apply to a broad-form submission in a single-theory-of-liability case in action by patient's widow against physician and cardiology center for medical malpractice, even if negligence charge included both an improper defensive theory of contributory negligence and an improper inferential rebuttal instruction, where charge provided two separate blanks for the jury to answer the single-theory-of-liability question, the only theory of liability asserted against physician was negligence, and the jury's findings on that theory were clear that physician was not negligent; disapproving of *Block v. Mora*, 314 S.W.3d 440. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**[9] Appeal and Error 30 ☞1031(6)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
            30XVI(J)1 In General
                30k1031 Presumption as to Effect of Error
                    30k1031(6) k. Instructions. Most Cited Cases

While appellate courts may presume harm when meaningful appellate review is precluded because the submitted charge mixes valid and invalid theories of liability or commingles improper damage elements, the courts do not presume harm be-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause of improper inferential rebuttal instructions on defensive theories.

**[10] Appeal and Error 30 ⬕1064.1(8)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)18 Instructions
            30k1064 Prejudicial Effect
               30k1064.1 In General
                  30k1064.1(2) Particular Cases
                  30k1064.1(8) k. Negligence and torts in general. Most Cited Cases

Any error in negligence charge including both an improper defensive theory of contributory negligence and an improper inferential rebuttal instruction may be harmless when jury questions are submitted in a manner that allows the appellate court to determine that the jury's verdict was actually based on a valid liability theory. Vernon's Ann.Texas Rules Civ.Proc., Rules 277, 278.

**[11] Trial 388 ⬕252(1)**

388 Trial
   388VII Instructions to Jury
      388VII(D) Applicability to Pleadings and Evidence
         388k249 Application of Instructions to Case
         388k252 Facts and Evidence
            388k252(1) k. In general. Most Cited Cases

**Trial 388 ⬕350.1**

388 Trial
   388IX Verdict
      388IX(B) Special Interrogatories and Findings
         388k350 Questions to Be Submitted
            388k350.1 k. In general. Most Cited Cases

Regardless of whether a granulated or broad-form charge is submitted, the trial court's duty is to

submit only those questions, instructions, and definitions raised by the pleadings and the evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 278.

**[12] Appeal and Error 30 ⬕969**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k969 k. Conduct of trial or hearing in general. Most Cited Cases

When a trial court abuses its discretion by including erroneous charge questions or instructions in a single-theory-of-liability case, Supreme Court's traditional harmless error analysis applies and the entire record should be reviewed to determine whether the charge errors probably caused the rendition of an improper judgment. Rules App.Proc., Rule 61.1(a).

**[13] Appeal and Error 30 ⬕1062.1**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)17 Submission of Issues or Questions to Jury
            30k1062.1 k. In general. Most Cited Cases

When jury charge questions are submitted in a manner that allows the appellate court to determine whether the verdict was actually based on a valid theory of liability, the error may be harmless.

**[14] Appeal and Error 30 ⬕1062.1**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)17 Submission of Issues or Questions to Jury
            30k1062.1 k. In general. Most Cited Cases

Any error associated with the inclusion of a jury question regarding patient's negligence was

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

harmless in action by patient's widow against physician and cardiology center for medical malpractice, where physician could only have been negligent in causing the tear in patient's artery, but the jury failed to find that he was negligent, and clarifying instructions made it clear that jury could answer question regarding whether physician or patient were negligent in any of the following combinations: (1) "Yes" to both physician and patient, (2) "No" to both, or (3) "Yes" to one and "No" to the other, the choice the jury ultimately made. Rules App.Proc., Rule 61.1(a).

**[15] Appeal and Error 30 ☜1062.5**

30 Appeal and Error
  30XVI Review
    30XVI(J) Harmless Error
      30XVI(J)17 Submission of Issues or Questions to Jury
        30k1062.5 k. Immaterial issues. Most Cited Cases

When the answer to a jury question cannot alter the effect of the verdict, the reviewing court considers that question immaterial. Rules App.Proc., Rule 61.1(a).

**[16] Health 198H ☜823(1)**

198H Health
  198HV Malpractice, Negligence, or Breach of Duty
    198HV(G) Actions and Proceedings
      198Hk815 Evidence
        198Hk823 Weight and Sufficiency, Particular Cases
          198Hk823(1) k. In general. Most Cited Cases

Fact that defendant-physician in medical malpractice action testified on his own behalf did not negate the weight that the jury could give to his testimony.

**[17] Appeal and Error 30 ☜930(1)**

30 Appeal and Error

30XVI Review
  30XVI(G) Presumptions
    30k930 Verdict
      30k930(1) k. In general. Most Cited Cases

In circumstances where a reasonable jury could resolve conflicting evidence either way, Supreme Court presumes the jury did so in favor of the prevailing party.

**[18] Appeal and Error 30 ☜1064.1(8)**

30 Appeal and Error
  30XVI Review
    30XVI(J) Harmless Error
      30XVI(J)18 Instructions
        30k1064 Prejudicial Effect
          30k1064.1 In General
            30k1064.1(2) Particular Cases
              30k1064.1(8) k. Negligence and torts in general. Most Cited Cases

Any error in the trial court's submission of the new and independent cause instruction was harmless in action by patient's widow against physician and cardiology center for malpractice, where review of the entire record provided no clear indication that the new and independent cause instruction, if erroneous, probably caused the rendition of an improper verdict. Rules App.Proc., Rule 61.1(a).

**\*680** Diana L. Faust, R. Brent Cooper, Cooper & Scully P.C., Dallas, J. Wade Birdwell, D. Michael Wallach, Jennifer M. Andrews, Wallach & Andrews P.C., Fort Worth, Marc Maraman Tittlebaum, Richard Clark Harrist, Cooper & Scully P.C., Matthew Christopher Kawalek, Sodal Security Administration, Michelle E. Robberson, Cooper & Scully, P.C., Dallas, for Venkateswarlu Thota, M.D.

Doug Perrin, Jerry Mark Perrin, The Perrin Law Firm, Dallas, for Margaret Young.

Justice GREEN delivered the opinion of the Court.
We have held that reversible error is presumed when a broad-form question submitted to the jury

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

incorporates multiple theories of liability and one or more of those theories is invalid, *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000), or when the broad-form question commingles damage elements that are unsupported by legally sufficient evidence, *Harris Cnty. v. Smith,* 96 S.W.3d 230, 233–34 (Tex.2002). We have not, however, addressed whether that presumed harm analysis applies to a broad-form submission in a single-theory-of-liability case when the negligence charge includes both an improper defensive theory of contributory negligence and an improper inferential rebuttal instruction. For the reasons explained below, we hold that it does not, and that meaningful appellate review is provided through a traditional harm analysis. Inasmuch as the court of appeals ruled otherwise, we reverse its judgment and remand the case to that court for further consideration consistent with this opinion.

## I. Background

William R. Young (Ronnie) died of leukemia on March 10, 2005, at the age of **\*681** fifty-seven. Prior to his death, Ronnie suffered from several physical ailments, including a rare blood disorder called polycythemia vera, coronary artery disease, hypertension, and angina. In late 2001, Ronnie visited Venkateswarlu Thota, M.D., a cardiologist at the North Texas Cardiology Center (NTCC), complaining of chest pains. After medications failed, Dr. Thota recommended that Ronnie undergo a coronary angiography—a test using dye and x-rays to observe how blood flows through the heart—to evaluate Ronnie's heart condition. Dr. Thota performed the cardiac catheterization procedure —insertion and threading of a thin tube into the coronary arteries, through which dye is released into the bloodstream—on the morning of March 4, 2002, at the United Regional Health Care System in Wichita Falls, Texas. Ronnie was released from the hospital at approximately 2:30 p.m. that afternoon and given routine instructions to call if he experienced any problems. Ronnie's wife, Margaret, drove him home after the catheterization procedure.

Later that evening, Ronnie experienced abdominal pain. Ultimately, Ronnie's condition worsened, and he fell from his reclining chair around 11:30 p.m. Margaret called 911, and Ronnie returned by ambulance to the hospital's emergency room at approximately 1:15 a.m. Dr. Thota's partner, Siriam Sudarshan, M.D., saw Ronnie in the emergency room. An abdominal CT scan showed bleeding from the puncture site—where the needle and catheter were inserted during the catheterization procedure—at Ronnie's right external iliac artery, as well as a large hematoma. Because of those results, Dr. Sudarshan consulted Olyn Walker, M.D., a vascular surgeon in Wichita Falls, concerning Ronnie's condition. Soon thereafter, Dr. Walker performed an emergency surgery to repair a tear in Ronnie's right external iliac artery, allegedly caused by the catheterization procedure. During the emergency surgery, Dr. Walker discovered a large hematoma from severe bleeding in Ronnie's peritoneal cavity. After repairing the tear in the iliac artery and draining the retroperitoneal hematoma, the emergency care providers placed Ronnie on a ventilator.

Ronnie remained on the ventilator for several months and required additional procedures to treat injuries resulting from the severe bleed. Ronnie suffered acute renal failure that required dialysis, had multiple blood transfusions, underwent a splenectomy, and had his gallbladder removed because it had turned gangrenous as a result of ischemia—the lack of blood supply—caused from the bleed. Ronnie ultimately lost his vision in one eye and suffered numerous strokes and blood clots, all allegedly as a result of the catheterization. Later, Ronnie was transferred from the Wichita Falls hospital to Baylor University Medical Center in Dallas to receive treatment for various other ailments. After several months of additional treatment, Ronnie was released from the hospital in August 2002. Nearly three years after the catheterization procedure, Ronnie died of leukemia, which had developed as a complication of his prolonged struggle with polycythemia vera.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

### A. The Medical–Malpractice Lawsuit

Following Ronnie's death, Margaret brought this suit both individually and on behalf of Ronnie's estate (collectively, Young) against Dr. Thota and NTCC (collectively, Dr. Thota).[FN1] Young alleged that **\*682** Dr. Thota was negligent by: (1) failing to obtain Ronnie's complete medical history; (2) failing to heed Ronnie's underlying medical conditions, which may have exacerbated his risk of potential complications; (3) failing to properly locate Ronnie's femoral artery during the catheterization procedure and lacerating his right iliac artery instead; (4) failing to discover the iliac artery tear before discharging Ronnie from the hospital; and (5) failing to diagnose and treat the artery tear. Young sought damages for Ronnie's pain and suffering and mental anguish, medical expenses, physical disfigurement, and lost earnings. Additionally, Young sought damages for Margaret's loss of consortium and loss of household services.

> FN1. Young alleged that NTCC was liable for Ronnie's injuries on the basis of respondeat superior.

In his answer, Dr. Thota generally denied all of Young's claims and, alternatively, claimed that Ronnie's injuries were the result of an unavoidable accident, a new and independent cause, or preexisting or subsequent medical conditions. Dr. Thota's answer also contended that Ronnie's injuries were partially the result of Ronnie's own negligence and included a counterclaim against Young for contribution due to Young's alleged failure to mitigate his damages.

The case proceeded to a week-long jury trial. At the charge conference, both parties raised several objections and argued over the proper questions and instructions that the trial court should submit to the jury. Young's theory of liability rested on the claim that Dr. Thota breached the standard of care by puncturing Ronnie's iliac artery instead of the femoral artery, resulting in the extensive bleeding and concomitant injuries that Ronnie suffered. In contrast, Dr. Thota's theory of the case considered Ronnie's injury to be the extensive bleed. Accordingly, Dr. Thota alleged that Ronnie was negligent in failing to return to the hospital at the first sign of pain, which would have substantially alleviated Ronnie's resulting health problems. Dr. Thota averred that the negligence, if any, resulted from the concurrent actions of both parties, which made this a contributory negligence issue rather than a mitigation-of-damages issue.

At the charge conference, Young objected to the inclusion of the definitions of negligence, ordinary care, and proximate cause in reference to Ronnie, arguing that contributory negligence was not supported by the evidence and that any delay on Ronnie's part in seeking medical treatment was a mitigation-of-damages issue. The trial court overruled Young's objection and included a question on Ronnie's contributory negligence in the charge. Additionally, the trial court overruled Young's objections to the inclusion of instructions on new and independent cause and unavoidable accident. Neither party advised the trial court that the charge might contain a *Casteel* problem, which arises when a broad-form charge mixes valid and invalid theories of liability, making it impossible for the appellate courts to determine if the jury answered the liability question based on an invalid theory, nor did either party request separate submissions for the negligence of Dr. Thota and Young. *See Casteel,* 22 S.W.3d at 388–89. Instead, Young's objections rested on the argument that there was no evidence to support the inclusion of the disputed jury charge items in the broad-form question.

The charge included one broad-form submission as to the single theory of liability—negligence—and additional questions regarding apportionment and calculation of damages. Question 1 addressed both parties' liability and stated:

> Did the negligence, if any, of those named below, proximately cause the injury in question, if any?

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*683** "Negligence," when used with respect to the conduct of Venkat Thota, M.D., means failure to use ordinary care, that is, failing to do that which a cardiologist of ordinary prudence would have done under the same or similar circumstances or doing that which a cardiologist of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of Venkat Thota, M.D., means that degree of care that a cardiologist of ordinary prudence would use under the same or similar circumstances.

"Proximate Cause," when used with respect to the conduct of Venkat Thota, M.D., means that cause which, in a natural and continuous sequence unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a cardiologist using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

"New and independent cause," when used with respect to the conduct of Venkat Thota, M.D., means the act or omission of a separate and independent agency, not reasonably foreseeable by a cardiologist exercising ordinary care, that destroys the causal connection, if any, between the act or omission inquired about and the injury in question and thereby becomes the immediate cause of such injury.

"Negligence," when used with respect to the conduct of [Ronnie] Young means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of [Ronnie] Young means that degree of care that a person of ordinary prudence would use under the same or similar circumstances.

"Proximate cause," when used with respect to the conduct of [Ronnie] Young means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

An injury may be an "unavoidable accident," that is, an event not proximately caused by the negligence of any party to it.

Answer "Yes" or "No".

Venkat Thota, M.D.: ____

[Ronnie] Young: ____

If you have answered "Yes" to Question 1 for both of those named in Question 1, then answer Question 2. Otherwise do not answer Question 2.

If you have answered "Yes" to Question 1 only as to Mr. Young, then do not answer Questions 2, 3, or 4.

If you have answered "Yes" to Question 1 only as to Dr. Thota, then answer Questions 3 and 4.

Question 2 conditionally asked about Dr. Thota's and Ronnie's comparative negligence, and Questions 3 and 4 concerned the amount of damages owed for Ronnie's and Margaret's injuries.

**\*684** The jury answered Question 1 with a "No" as to Dr. Thota's negligence and a "Yes" as to Ronnie's negligence. On July 18, 2005, the trial court entered final judgment that Young take noth-

ing. Young filed a motion for new trial, arguing that the trial court had erred in overruling Young's objections to the jury charge and that the jury's findings were against the great weight and preponderance of the evidence or based on insufficient evidence. The trial court denied Young's motion for new trial, and Young timely appealed.

### B. Appellate Court Proceedings

On appeal, Young raised the same issues presented in the motion for new trial. Specifically, Young challenged the trial court's judgment for the following reasons: (1) the jury's finding of no negligence as to Dr. Thota was against the great weight and preponderance of the evidence and was manifestly unjust and/or the opposite answer was conclusively proven as a matter of law; (2) the evidence was insufficient to support the jury's findings as to Ronnie's contributory negligence, and the trial court erred by overruling Young's objection to the inclusion of contributory negligence in the jury charge; and (3) the trial court erred in overruling Young's objections and submitting jury instructions on unavoidable accident and new and independent cause.

The court of appeals held that the trial court's inclusion of the question on Ronnie's contributory negligence and the new and independent cause instruction in the jury charge was an abuse of discretion and constituted harmful error; accordingly, it reversed the trial court's judgment and remanded the case for a new trial. 271 S.W.3d 822, 841 (Tex.App.-Fort Worth 2008, pet. granted). The appellate court found that the "injury in question" was the tear in Ronnie's iliac artery and, contrary to Dr. Thota's arguments, not the extensive bleed. *Id.* at 834–35. The court of appeals compared the parties' theories of liability and concluded that Dr. Thota's premise for Ronnie's contributory negligence was "based upon Ronnie's alleged negligence occurring *after* the tear, not Ronnie's negligence in *causing* the tear." *Id.* at 833. The court recognized that contributory negligence must have a causal connection with the original accident, while a failure to mitig-

ate damages "arises from an injured party's duty to act reasonably in reducing his damages." *Id.* (citing *Hygeia Dairy Co. v. Gonzalez,* 994 S.W.2d 220, 226 (Tex.App.-San Antonio 1999, no pet.)). Because it found that Dr. Thota's theory pointed only to Young's "*subsequent* negligence that might have increased his damages as opposed to Dr. Thota's original negligence," the court concluded "that Ronnie's negligence, if any, only increased the damages he suffered after the catheterization or tear, as opposed to causing the 'injury,' 'accident,' or 'occurrence' itself." *Id.*

The appellate court then considered whether the disputed inferential rebuttal instructions on new and independent cause and unavoidable accident were proper. *Id.* at 836–39. Finding that Dr. Thota presented some evidence that the tear in Ronnie's artery could have been a natural result of Ronnie's then-existing illnesses or an unexpected catastrophe, the court of appeals held that the trial court did not abuse its discretion in submitting the un-avoidable accident instruction.[FN2] *Id.* at 837. **\*685** The court concluded that Ronnie's massive bleed and resulting injuries were foreseeable risks in the catheterization procedure and held that the trial court abused its discretion by submitting the new and independent cause instruction in connection with Dr. Thota's negligence. *Id.* at 838.

> FN2. In this Court, the parties do not contest the court of appeals' holding as to the unavoidable accident instruction. Therefore, our opinion focuses solely on the disputed charge issues concerning the inclusion of Ronnie's contributory negligence and the instruction on new and independent cause.

After holding that the trial court erred in submitting the question of Ronnie's contributory negligence and the new and independent cause instruction as to Dr. Thota, the court of appeals considered which level of harm analysis applied. *Id.* at 839. The court, sua sponte, held that Young's objections to these specific aspects of the charge invoked

*Casteel*'s presumed harm analysis because the improperly submitted broad-form question commingled valid and invalid theories of liability. *Id.* at 836 (citing *Casteel,* 22 S.W.3d at 388–89).[FN3] The court acknowledged our opinion in *Bed, Bath & Beyond, Inc. v. Urista,* 211 S.W.3d 753 (Tex.2006), which held that *Casteel*'s presumed harm analysis does not apply to broad-form questions based on a single theory of liability that are submitted with improper inferential rebuttal instructions, *id.* at 757, but distinguished Young's situation because "the jury was not only given an erroneous defensive instruction on new and independent cause that benefitted only Dr. Thota but also an erroneous jury question on liability—Ronnie's contributory negligence—a theory not supported by the evidence." 271 S.W.3d at 839. Concluding that *Casteel*'s presumed harm analysis applied, the court of appeals reasoned:

> FN3. As mentioned by Young's counsel at oral argument, at least one other appellate court has followed this approach and held that a broad-form charge that includes separate blanks for multiple parties' fault, under a single theory of liability, presents a *Casteel* issue. *See Block v. Mora,* 314 S.W.3d 440, 450 (Tex.App.-Amarillo 2009, pet. dism'd by agr.). In *Block,* Question 1 of the jury charge asked: "Did the negligence, if any, of those named below proximately cause the injuries, if any, to [the plaintiff]?" *Id.* at 444. Question 1 included two separate answer blanks next to the names of the plaintiff and the defendant. *Id.* The jury answered "Yes" to the plaintiff's negligence and "No" to the defendant's negligence. *Id.* On appeal, the plaintiff complained that the evidence supported judgment in his favor because the defendant's negligence was established as a matter of law. *Id.* The plaintiff also alleged that there was no evidence of his contributory negligence nor any evidence that he had proximately caused the accident or his injuries, and he claimed that the trial court erred in submitting his negligence to the jury. *Id.* On appeal, the court of appeals held that it was error to submit the invalid theory of the plaintiff's contributory negligence to the jury. *Id.* at 450. Like the court of appeals in *Thota,* the *Block* court held that because "the trial court submitted two competing theories of liability within one broad-form liability question that asked whether the negligence of the two parties involved in the accident caused the plaintiff's injuries," it could not "determine whether the jury truly found that [the defendant] was not negligent in causing the accident or [that the plaintiff] was solely negligent in causing his injuries (both of which findings would be against the great weight and preponderance of the evidence)." *Id.* The court cited to *Casteel*'s presumed harm analysis, but held, under the traditional harmless error analysis that the charge error "likely caused the rendition of an improper judgment." *Id.; see* TEX.R.APP. P. 44.1.

We simply cannot determine, on this evidence, whether the jury properly found Dr. Thota not negligent, properly found that his negligence was excused based upon the unavoidable accident instruction, or improperly found that his negligence was excused based upon the new and independent cause instruction alone or combined with its improper finding of Ronnie's negligence. *Id.* Specifically, the court held that the charge commingled Dr. Thota's improper theory of liability (the extensive bleeding) with Young's proper theory of liability (the torn artery) and, consequently, prevented **\*686** the appellate court "from being able to determine whether the jury's finding of no liability as to Dr. Thota was a finding of no negligence on his part, an erroneous finding of contributory negligence on Ronnie's part, or an erroneous finding of new and independent cause." *Id.* at 841. The court concluded:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Because these instructions likely caused rendition of an improper judgment or, at least, prevented [Young] from properly presenting her case on appeal, we conclude that such error was harmful." *Id.*

### C. Dr. Thota's Petition for Review

Dr. Thota petitioned our Court for review, and we granted his petition on rehearing. 54 Tex.Sup.Ct.J. 682 (Mar. 18, 2011). Dr. Thota argues that the court of appeals erred in holding that the trial court's inclusion of Ronnie's contributory negligence and the inferential rebuttal instruction constituted an abuse of discretion. Dr. Thota claims that even if there were error in the jury charge, it was harmless, and *Casteel*'s presumed harm analysis does not apply. Furthermore, Dr. Thota claims that the court of appeals improperly reversed the trial court's judgment based on unassigned error because Young neither raised a *Casteel* issue before the court of appeals nor made a timely or specific objection before the trial court to assert that the submission of Young's contributory negligence or the inferential rebuttal instruction would improperly commingle valid and invalid theories of liability and, therefore, prevent the appellate court from conducting a meaningful appellate review. Finally, Dr. Thota claims that the appellate court misapplied our holding in *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992), by holding that the trial court abused its discretion by submitting a question on Ronnie's contributory negligence instead of an instruction on Ronnie's duty to mitigate his damages.

Young counters that the trial court's submission of Ronnie's contributory negligence and the inferential rebuttal instruction on new and independent cause was an abuse of discretion. According to Young, the court of appeals correctly interpreted *Elbaor* because Ronnie could not have been negligent in causing the tear to his iliac artery and any fault on Ronnie's part should have been submitted only through an instruction on Ronnie's failure to mitigate his damages. *See Elbaor,* 845 S.W.2d at 244–45. Young asserts that *Casteel*'s presumed

harm analysis applies because the submitted jury charge was based on one valid and one invalid theory of liability, which obviously confused the jury to such a degree that an appellate court cannot determine whether the jury based its decision on the valid or invalid theory. Young claims that direct mention of *Casteel* to the trial court was not required to preserve the *Casteel* error, and Young's timely and specific no-evidence objections to the charge errors were sufficient to inform the trial court of the *Casteel* problem. Alternatively, Young claims that the trial court's judgment must be reversed even under the traditional harmless error analysis.

### II. Harm Analysis

Assuming, but not deciding, that it was error for the trial court to submit the question on Ronnie's contributory negligence and the instruction on new and independent cause, we consider whether these charge issues constituted harmful error. *See, e.g.,* TEX.R.APP. P. 61.1; *Urista,* 211 S.W.3d at 756. We first address whether the court of appeals correctly applied *Casteel*'s presumed harm analysis to the contested jury charge. We hold that it did not. For reasons stated below, we further hold that even if the submission of the contested charge issues were an abuse of **\*687** discretion, a review of the entire record provides no clear indication that the contested charge issues probably caused the rendition of an improper judgment and, therefore, we must conclude that the trial court's submission was harmless. *See* TEX.R.APP. P. 44.1(a), 61.1(a).

### A. General Law

[1][2][3][4] "We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000). The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *La.-Pac. Corp. v. Knighten,* 976 S.W.2d 674, 676 (Tex.1998)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 855–56 (Tex.2009). An appellate court will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." TEX. R. APP. P. 61.1; *see* TEX.R.APP. P. 44.1(a).[FN4] "Charge error is generally considered harmful if it relates to a contested, critical issue." *Hawley,* 284 S.W.3d at 856; *see also Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex.2001) ("An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting....")

> FN4. Rule 61.1 is the Supreme Court version of the harmful error rule. *See* TEX.R.APP. P. 61.1. Similarly, the appellate court provision, Rule 44.1(a), states:
>
> No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals.
>
> TEX.R.APP. P. 44.1(a).

### B. *Casteel* and Its Progeny

*Casteel* involved a dispute between an insurance agent and the insurer. 22 S.W.3d at 381. In *Casteel,* the trial court submitted a single broad-form question on the issue of the insurer's liability to the agent, which included thirteen independent grounds for liability. *Id.* at 387. We determined that five of the thirteen independent grounds for liability did not apply and held that the trial court erred by submitting the invalid grounds for liability in the

charge. *Id.* We then considered whether the charge error was harmful. *Id.* Because the single broad-form charge mixed valid and invalid theories of liability, we held that the charge error constituted harmful error, explaining:

> It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law. Yet, when a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error. The best the court can do is determine that some evidence *could* have supported the jury's conclusion on a legally valid theory. To hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant *should* be held liable on proper, legal grounds.

**\*688** *Id.* at 388. Therefore, we held: "When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.* at 389.

Following *Casteel,* we have clarified the extent of its presumed harm analysis on several occasions. *See Urista,* 211 S.W.3d 753; *Romero v. KPH Consolidation, Inc.,* 166 S.W.3d 212 (Tex.2005); *Harris Cnty.,* 96 S.W.3d 230. In *Harris County,* we extended *Casteel*'s presumed harm analysis to a broad-form question that commingled valid and invalid elements of damages for which there was no evidence. 96 S.W.3d at 233–34. In *Romero,* we applied *Casteel*'s presumed harm analysis to a single broad-form proportionate responsibility question that included a factually-unsupported malicious credentialing claim. 166 S.W.3d at 227–28 (noting that "unless the appellate court is 'reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it,' the error is reversible" (citations omitted)). Later, in *Urista,* we

declined to extend *Casteel*'s presumed harm analysis to the trial court's submission of an erroneous inferential rebuttal instruction. 211 S.W.3d at 756–57. In *Urista,* we explained:

We specifically limited our holdings in *Casteel* and *Harris County* to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements. We have never extended a presumed harm rule to instructions on defensive theories such as unavoidable accident, and we decline to do so now.... When, as here, the broad-form questions submitted a single liability theory (negligence) to the jury, *Casteel*'s multiple-liability-theory analysis does not apply. Moreover, when a defensive theory is submitted through an inferential rebuttal instruction, *Casteel*'s solution of departing from broad-form submission and instead employing granulated submission cannot apply. Unlike alternate theories of liability and damage elements, inferential rebuttal issues cannot be submitted in the jury charge as separate questions and instead must be presented through jury instructions. Therefore, although harm can be presumed when meaningful appellate review is precluded because valid and invalid liability theories or damage elements are commingled, we are not persuaded that harm must likewise be presumed when proper jury questions are submitted along with improper inferential rebuttal instructions.

*Id.* (citations omitted). *Cf. Hawley,* 284 S.W.3d at 865 (applying Rule 61.1(b) in a non- *Casteel* context where the trial court omitted the defendant's proposed instruction in a single-theory-of-liability case, thereby allowing the jury to potentially find the defendant liable on an invalid basis). Because we held that *Casteel*'s presumed harm analysis did not apply to the inferential rebuttal question in *Urista,* we applied the traditional harmless error analysis, which considers whether the instruction "probably caused the rendition of an improper judgment." 211 S.W.3d at 757; *see* TEX.R.APP. P. 61.1(a); *see also Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995) ("Error in the jury charge is reversible only if, in the light of the entire record, it was reasonably calculated to and probably did cause the rendition of an improper judgment."). After reviewing the entire record, we concluded in *Urista* that there was some evidence the plaintiff failed to meet his burden of proof and therefore held that the unavoidable accident instruction did not probably cause the **\*689** jury to render an improper verdict. 211 S.W.3d at 758–59.

Notwithstanding *Casteel*'s presumed harm analysis in situations that erroneously commingle valid and invalid theories of liability, we have repeatedly reaffirmed our longstanding, fundamental commitment to broad-form submission. *See, e.g., Harris Cnty.,* 96 S.W.3d at 235–36. We first expressed our preference for broad-form practice in 1973 and, after issuing multiple opinions in which we supported broad-form submission, we modified Rule 277 of the Texas Rules of Civil Procedure in 1988 to more expressly mandate the use of broad-form submission. *See id.*; *see also Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984) (explaining our progression from separate, granulated charge issues to the broad-form charge). *See generally* William G. "Bud" Arnot, III & David Fowler Johnson, *Current Trends in Texas Charge Practice: Preservation of Error and Broad–Form Use,* 38 ST. MARY'S L.J. 371, 416–40 (2007) (providing a more detailed history of Texas jury charge practice); William L. Davis, *Tools of Submission: The Weakening Broad–Form "Mandate" in Texas and the Roles of Jury and Judge,* 24 REV. LITIG. 57 (2005) (same). Since 1988, Rule 277 has stated, in pertinent part: "In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions." TEX.R. CIV. P. 277. *Casteel* and its progeny denote situations where broad-form submission may be unfeasible. *See, e.g., Casteel,* 22 S.W.3d at 389. But "whenever feasible," broad-form submission should be the norm. *See* TEX.R. CIV. P. 277; *Harris Cnty.,* 96 S.W.3d at 235–36; *see also Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990) (interpreting "whenever feasible" to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

mandate broad-form submission "in any or every instance in which it is capable of being accomplished").

### C. Preservation of Error

[5] We first address Dr. Thota's argument that the court of appeals improperly reversed the judgment of the trial court based on unassigned and unpreserved error. Our procedural rules govern the preservation requirements for raising a jury charge complaint on appeal and require the complaining party to make an objection before the trial court. TEX.R. CIV. P. 274; TEX.R.APP. P. 33.1. Rule 274 requires that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection," and states that "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX.R. CIV. P. 274. Additionally, to preserve error for appellate review, the rules generally require the complaining party to (1) make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and (2) obtain a ruling. TEX.R.APP. P. 33.1. As we stated twenty years ago, the procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *State Dep't of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

Although Young made a timely and specific objection at the charge conference to the inclusion of the question on Ronnie's contributory negligence and the instruction on new and independent cause, Dr. Thota argues that because Young failed to specifically state that these charge issues **\*690** raised a *Casteel* problem or notify either the trial or appellate court that the charge would prevent Young from obtaining meaningful appellate review, Young

waived the right to invoke *Casteel* and the court of appeals improperly reversed the trial court on unassigned error. In essence, Dr. Thota argues that because Young did not cite *Casteel* or specifically object to the form of the charge question, Young waived any benefit of the presumed harm analysis.

Contrary to Dr. Thota's narrow and technical interpretation of our preservation of error requirements, we have never held that a no-evidence objection in this context is insufficient to preserve a broad-form complaint on appeal. *See, e.g., Romero,* 166 S.W.3d at 229; *Harris Cnty.,* 96 S.W.3d at 236; *Casteel,* 22 S.W.3d at 387, 389. Moreover, we have long favored a common sense application of our procedural rules that serves the purpose of the rules, rather than a technical application that rigidly promotes form over substance. *See Alaniz v. Jones & Neuse, Inc.,* 907 S.W.2d 450, 451–52 (Tex.1995) (per curiam) (citing *Payne,* 838 S.W.2d at 241) ("While *Payne* does not revise the requirements of the rules of procedure regarding the jury charge, it does mandate that those requirements be applied in a common sense manner to serve the purposes of the rules, rather than in a technical manner which defeats them.").

In addition, Dr. Thota's reliance on our opinions in *In re A.V.,* 113 S.W.3d 355, 362 (Tex.2003), and *In re B.L.D.,* 113 S.W.3d 340, 349–50 (Tex.2003), to support his contention that Young failed to preserve any complaint regarding the charge's broad-form submission is misplaced. Although in those cases we did hold that complaints of harmful charge error were not preserved, those cases are distinguishable from this case because in both *A.V.* and *B.L.D.,* the complaining party raised no objections to items included in the broad-form charge. *See A.V.,* 113 S.W.3d at 357; *B.L.D.,* 113 S.W.3d at 349. Moreover, the charge complaint at issue in those parental-rights-termination cases was that separate statutory grounds for terminating the parents' parental rights should not have been submitted within a single broad-form question. *See A.V.,* 113 S.W.3d at 357; *B.L.D.,* 113 S.W.3d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349. The basis for the parents' complaints was not that the charge should not include the termination grounds at all, but that it was error for the trial court to submit them in a broad-form question. *See A.V.,* 113 S.W.3d at 357; *B.L.D.,* 113 S.W.3d at 349. In those circumstances, it was necessary for the complaining party to make a specific objection to the form of the charge to put the trial court on notice of the alleged error and afford the court an opportunity to correct the error. *See A.V.,* 113 S.W.3d at 363 (holding that the parent failed to preserve the issue for appellate review because he did not make "a specific objection to the charge to put [the] trial court on notice to submit a granulated question to the jury"); *B.L.D.,* 113 S.W.3d at 349; TEX. R. APP. P. 33.1. *Cf. Keetch v. Kroger Co.,* 845 S.W.2d 262, 267 (Tex.1992) (stating that "[e]rror in the charge must be preserved by distinctly designating the error and the grounds for the objection" and holding that error was not preserved when the complaint of the trial court's failure to submit in broad form was first raised in this Court). In this case, a separate objection to the form of the charge question was not necessary to inform the trial court of Young's complaint—that the inclusion of Ronnie's contributory negligence and the instruction on new and independent cause should not be submitted to the jury. A granulated submission would have cured the alleged charge defect in *A.V.* and *B.L.D.,* but here, even if the trial court submitted the issue of Ronnie's contributory**\*691** negligence in a separate question, this would not have cured Young's no-evidence objection.

[6][7] In every case in which we have considered *Casteel*'s presumed harm analysis, including *Casteel* itself, we have emphasized the need for the complaining party to make a timely and specific objection to preserve complaints of error in broad-form submission. *See, e.g., Casteel,* 22 S.W.3d at 387–89; *Romero,* 166 S.W.3d at 229. As we stated in *Harris County,* under our preservation rules: "A timely objection, plainly informing the court that a specific element ... should not be included in a broad-form question because there is *no evidence to*

*support its submission,* therefore preserves the error for appellate review." 96 S.W.3d at 236 (emphasis added). Again in *A.V.* and *B.L.D.,* we quoted that statement from *Harris County* and held that without some objection to the charge, claiming the submitted theory had no evidentiary support, or an objection to the form of the charge, any complaint of charge error was not preserved for review by the court of appeals. *See A.V.,* 113 S.W.3d at 362–63; *B.L.D.,* 113 S.W.3d at 349–50. In contrast to *A.V.* and *B.L.D.,* Young made a specific and timely no-evidence objection to the charge question on Ronnie's contributory negligence and also specifically objected to the disputed instruction on new and independent cause. In addition to Young's timely and specific objections at the charge conference, Young submitted a proposed charge to the trial court, which omitted any inclusion of Ronnie's contributory negligence and the new and independent cause instruction and presented the charge according to Young's theory of the case. This was sufficient to place the trial court on notice that Young believed the evidence did not support an inclusion of Ronnie's contributory negligence or instruction on new and independent cause, and our procedural rules require nothing more.

By making timely and specific objections that there was no evidence to support the disputed items submitted in the broad-form charge and raising these issues for the court of appeals to consider, Young properly preserved these issues for appellate review; Young did not have to cite or reference *Casteel* specifically to preserve the right for the appellate court to apply the presumed harm analysis, if applicable, to the disputed charge issues. *See, e.g., Harris Cnty.,* 96 S.W.3d at 236; *Casteel,* 22 S.W.3d at 387–88, 390. *Cf. Pat Baker Co., Inc. v. Wilson,* 971 S.W.2d 447, 450 (Tex.1998) (per curiam) ("It is axiomatic that an appellate court cannot reverse a trial court's judgment absent properly assigned error."). With the charge issues properly preserved and contested on appeal, an appellate court reviews the basis of the complaints and reverses only if the alleged charge errors were harm-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ful. TEX.R.APP. P. 44.1(a), 61.1. Because Young properly preserved error as to the disputed charge issues, we must consider whether the appellate court properly applied the correct harm analysis. *See Urista,* 211 S.W.3d at 757.

### D. Application of Harm Analysis Law

[8] Young alleges, and the court of appeals agreed, that the trial court erred by submitting a jury question on Dr. Thota's theory of the case—Ronnie's contributory negligence. Even if Young is correct, *Casteel*'s presumed harm analysis does not apply because the separate answer blanks allow us to determine whether the jury found Dr. Thota negligent. Unlike *Casteel,* which involved thirteen independent grounds for liability with one answer blank for the defendant's liability, here, the charge provided two separate blanks for the jury to answer the single-theory-of-**\*692** liability question. *See Casteel,* 22 S.W.3d at 387. The charge mirrors the *Texas Pattern Jury Charges's* longstanding use of separate blanks when multiple parties' negligence are in issue. *See* Comm. On Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 (2010). The only theory of liability asserted against Dr. Thota was negligence, and the jury's findings on that theory are clear: Dr. Thota was not negligent. We hold that this charge question simply does not raise a *Casteel* issue, and the court of appeals erred in applying *Casteel*'s presumed harm analysis.

Additionally, we hold that the new and independent cause instruction fails to present a *Casteel* situation. *See Urista,* 211 S.W.3d at 756–57. In concluding that the new and independent cause instruction constituted harmful error, the appellate court reasoned:

Here, however, the jury was not only given an erroneous defensive instruction on new and independent cause that benefitted only Dr. Thota but also an erroneous jury question on liability—Ronnie's contributory negligence—a theory not supported by the evidence. So, we should not

be limited to *Urista*'s traditional harm analysis when trying to determine the impact of the improperly submitted instruction on new and independent cause when combined with the improperly submitted question of Ronnie's contributory negligence. We simply cannot determine, on this evidence, whether the jury properly found Dr. Thota not negligent, properly found that his negligence was excused based upon the unavoidable accident instruction, or improperly found that his negligence was excused based upon the new and independent cause instruction alone or combined with its improper finding of Ronnie's negligence.

271 S.W.3d at 839. And in response to the dissent, the majority added:

It is the combination of these two incorrect theories that prevents us from being able to determine whether the jury's finding of no liability as to Dr. Thota was a finding of no negligence on his part, an erroneous finding of contributory negligence on Ronnie's part, or an erroneous finding of new and independent cause.

Importantly, we are not trying to extend *Casteel*'s presumed harm analysis to defensive theories; we are applying it to a single broad-form question that erroneously includes two different theories of liability. This error is only exacerbated by the erroneous defensive instruction of new and independent cause.

*Id.* at 841.

[9] We disagree with the court of appeals' interpretation of our holding in *Urista* and hold that, even assuming the new and independent cause instruction in this charge constituted error, it does not raise a *Casteel* issue. Like *Urista,* this case involves a single liability theory—negligence—so *Casteel*'s multiple-liability-theory analysis does not apply. *See* 211 S.W.3d at 756–57. Moreover, as we noted in *Urista,* "when a defensive theory is submitted through an inferential rebuttal instruction, *Casteel*'s solution of departing from broad-form submission and instead employing granulated submission can-

not apply." *Id.* at 757. Inferential rebuttal issues are distinct from theories of liability and damage elements because they "cannot be submitted in the jury charge as separate questions and instead must be presented through jury instructions." *Id.* Like the inferential rebuttal instruction on unavoidable accident in *Urista,* the new and independent cause instruction "was given in reference to the causation element **\*693** of the plaintiff's negligence claim." *Id.* at 756–57. While appellate courts may presume harm when meaningful appellate review is precluded because the submitted charge mixes valid and invalid theories of liability or commingles improper damage elements, the courts do not presume harm because of improper inferential rebuttal instructions on defensive theories. *See id.* at 757. Therefore, assuming without deciding that the submission of the new and independent cause instruction was an abuse of discretion, we hold that this charge error does not present a *Casteel* problem.

[10][11] Even if the inclusion of a jury question regarding a party's contributory negligence and an inferential rebuttal instruction were erroneous in a single-theory-of-liability case, the combination of these errors would not automatically trigger a situation where the appellate court must presume the error was harmful. If presumed harm analysis were required, then our fundamental commitment to submitting broad-form questions, whenever feasible, would routinely be discarded for separate, granulated submissions to the jury. *See* TEX.R. CIV. P. 277; *Harris Cnty.,* 96 S.W.3d at 235–36. Moreover, even in multiple-theory-of-liability cases like *Casteel,* the presumed harm analysis is not automatic. *See Casteel,* 22 S.W.3d at 389–90; *Romero,* 166 S.W.3d at 227–28. As we stated in *Casteel,* "when questions are submitted in a manner that allows the appellate court to determine that the jury's verdict was actually based on a valid liability theory, the error may be harmless." 22 S.W.3d at 389 (citing *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995)). And regardless of whether "a granulated or broad-form charge is submitted, the trial court's duty is to submit only those questions,

instructions, and definitions raised by the pleadings and the evidence." *Harris Cnty.,* 96 S.W.3d at 236; *see* TEX.R. CIV. P. 278; *Elbaor,* 845 S.W.2d at 243.

[12] While *Casteel*'s presumed harm analysis is necessary in instances where the appellate court cannot determine "whether the improperly submitted theories formed the sole basis for the jury's finding" because the broad-form question mixed valid and invalid theories of liability, *Casteel,* 22 S.W.3d at 389, or when the broad-form question commingled damage elements that are unsupported by legally sufficient evidence, *Harris Cnty.,* 96 S.W.3d at 235, an improper inferential rebuttal instruction and improper defensive theory of contributory negligence presented in a broad-form question with separate answer blanks in a single-theory-of-liability case does not prevent the harmed party from obtaining meaningful appellate review. When a trial court abuses its discretion by including erroneous charge questions or instructions in a single-theory-of-liability case, our traditional harmless error analysis applies and the appellate courts should review the entire record to determine whether the charge errors probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1, 61.1; *Urista,* 211 S.W.3d at 757.

Because we hold that *Casteel*'s presumed harm analysis does not apply, we next consider whether, applying traditional harmless error analysis, the alleged charge errors constitute reversible error. *See* TEX.R.APP. P. 61.1(a); *Urista,* 211 S.W.3d at 757. We address Young's objections to the inclusion of Ronnie's contributory negligence and the instruction of new and independent cause in turn.

### 1. Contributory Negligence

[13][14] When charge questions are submitted in a manner that allows the appellate court to determine whether the **\*694** verdict was actually based on a valid theory of liability, the error may be harmless. *Casteel,* 22 S.W.3d at 389; *see also Alvarado,* 897 S.W.2d at 752 ("Submission of an improper jury question can be harmless error if the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

jury's answers to other questions render the improper question immaterial."); *Boatland of Hous., Inc. v. Bailey,* 609 S.W.2d 743, 750 (Tex.1980) (holding that the potentially erroneous submission of defensive theories was harmless error because the jury found for the defendant on independent grounds and the complaining party failed to show how it probably resulted in an improper verdict). Young's argument that the inclusion of Ronnie's contributory negligence was harmful error fails for several reasons. First, Dr. Thota could only have been negligent in causing the tear in Ronnie's artery, and the jury failed to find that he was. The jury's finding as to Dr. Thota's non-negligence is entirely separate from its finding as to Ronnie's negligence. Perhaps the jury was confused about whether to find Ronnie negligent and, despite the unavoidable accident instruction, believed that they had to find someone negligent. Either way, any error associated with the inclusion of a jury question regarding Ronnie's negligence was harmless.

Moreover, when determining whether harm occurred, we consider the entire charge. *See, e.g., Tex. Emp'rs Ins. Assoc. v. McKay,* 146 Tex. 569, 210 S.W.2d 147, 149 (1948). Here, the clarifying instructions at the end of Question 1 made it clear that the jury could answer in any of the following combinations: (1) "Yes" to both Dr. Thota and Ronnie; (2) "No" to both; or (3) "Yes" to one and "No" to the other—the choice the jury ultimately made. The charge's definition of proximate cause also clearly informed the jury that "[t]here may be more than one proximate cause of an event." In light of the entire charge and the separate answer blanks for Dr. Thota and Ronnie, it is evident that the jury was well aware that its findings as to Dr. Thota's and Ronnie's negligence were separate and that there could be more than one proximate cause of an event.

[15] When the answer to a jury question cannot alter the effect of the verdict, the reviewing court considers that question immaterial. *See Alvarado,* 897 S.W.2d at 752. In *Alvarado,* we held that even

if it were error for the trial court to submit a question as to the deceased plaintiff's negligence, that question was immaterial because of the jury's finding of "No" as to the defendant's liability for negligence. *Id.* Like *Alvarado,* any error in submitting the question of Ronnie's contributory negligence to the jury was harmless and rendered immaterial in light of the jury's finding of no negligence as to Dr. Thota. Once the jury answered "No" to whether any negligence of Dr. Thota proximately caused Ronnie's injury, Dr. Thota was exonerated, and neither a "Yes" nor a "No" answer as to Ronnie's contributory negligence could alter the verdict. *See id.*

### 2. New and Independent Cause

Assuming without deciding that the new and independent cause instruction was improper, a review of the record does not indicate that it probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 61.1(a); *Urista,* 211 S.W.3d at 757; *Reinhart,* 906 S.W.2d at 473. At trial, Dr. Thota testified on his own behalf, and Neill Doherty III, M.D. testified as Young's expert witness. The evidence from the medical records and Dr. Thota's testimony indicated that good hemostasis was most likely obtained, which would mean that Ronnie was in a stable condition by the time he was released from the hospital. Even Young's own medical expert, Dr. Doherty, admitted on cross-examination **\*695** that there was a 99% chance that Ronnie was not bleeding when he was released after the catheterization procedure and that, based on the totality of the medical records, there was no objective evidence that Ronnie was bleeding or experiencing any complications at the time he was discharged from the hospital. Both Dr. Thota and Dr. Doherty testified that if there had been an improper puncture in the iliac artery preventing hemostasis, Ronnie would likely have developed signs of bleeding before his discharge. Dr. Doherty also testified that the cardiac catheterization was a reasonable procedure, given Ronnie's condition, and that the medical records did not indicate Dr. Thota had incorrectly performed the procedure.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Both parties' experts based their opinions, in part, on their interpretations of the doctors' reports from the emergency surgery the night of Ronnie's catheterization procedure. The report by Dr. Thota's partner, Dr. Sudharshan, noted that Ronnie had a "puncture site just about the inguinal ligament" and that a CT scan "apparently revealed bleeding from [the] external iliac artery puncture site." Based on Dr. Sudharshan's assessment, Dr. Walker performed the emergency surgery, and Dr. Walker's report noted that he repaired a "high tear" in Ronnie's right external iliac artery. Neither Dr. Sudharshan nor Dr. Walker testified at trial.

At trial, Dr. Thota's and Dr. Doherty's testimony about Ronnie's medical reports conflicted. Dr. Doherty testified that the standard of care for cardiac catheterization was to insert a needle and catheter into the right femoral artery below the inguinal ligament. In Dr. Doherty's opinion, Dr. Thota punctured Ronnie's artery at the wrong location, above the inguinal ligament and into the right external iliac artery. Dr. Doherty's opinion was based on Dr. Walker's report, the CT scan mentioned on Dr. Sudharshan's report, and the bleed in Ronnie's retroperitoneal cavity, which could occur when the puncture is too high, rather than the more visible femoral bleed that would occur if the puncture is in the femoral artery. In contrast, Dr. Thota claimed at trial that he did not breach the standard of care during Ronnie's catheterization procedure. He testified that he had no problems inserting the catheter and that he believed he entered the artery at the appropriate location. Dr. Thota stated that Dr. Sudharshan's finding that the puncture site was at "about the inguinal ligament," would indicate that the puncture site was correct. He further testified that Dr. Walker's report was ambiguous as to what he repaired and how far above or below the inguinal ligament the bleed originated. Also, Dr. Thota testified that a retroperitoneal bleed can occur with a femoral artery stick as well as an iliac artery stick and that, based on his review of the medical records and his own knowledge of the procedure, he met the standard of care.

[16][17] Like many medical malpractice cases, this record contains conflicting expert opinions. The fact that Dr. Thota testified on his own behalf does not negate the weight that the jury could give to his testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005) (holding that the proper test for legal-sufficiency review must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not"); *see also Wilson v. Scott,* 412 S.W.2d 299, 303 (Tex.1967) (noting that the defendant physician's own testimony can establish the standard of care). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller,* 168 S.W.3d at 819. Because of the conflicting testimony **\*696** of Dr. Doherty and Dr. Thota, and because both testifying experts agreed that Ronnie was likely not bleeding upon his discharge from the hospital, the jury could have reasonably believed Dr. Thota's opinions and discounted Dr. Doherty's opinions. In circumstances where a reasonable jury could resolve conflicting evidence either way, we presume the jury did so in favor of the prevailing party. *See id.* at 821.

[18] Based on the conflicting evidence, the jury could have reasonably concluded that Dr. Thota did not breach the standard of care without reaching the issue of proximate cause. In that case, the jury would not have relied on the new and independent cause instruction because it pertains only to the proximate cause element. *See Hawley,* 284 S.W.3d at 856 ("New and independent cause is a component of the proximate cause issue."). Thus, the record supports the jury's finding of no negligence as to Dr. Thota. Accordingly, our review of the entire record provides no clear indication that the new and independent cause instruction, if erroneous, probably caused the rendition of an improper verdict. We therefore conclude that any error in the trial court's submission of the new and independent cause instruction was harmless. *See Urista,* 211 S.W.3d at 759.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671
**(Cite as: 366 S.W.3d 678)**

### III. Conclusion

In sum, we hold that Young's timely and specific no-evidence objections were sufficient to preserve the disputed charge issues for appellate review. Because the trial court submitted a broad-form question on a single theory of liability that included separate answer blanks for Dr. Thota's and Ronnie's negligence, we hold that the court of appeals misapplied *Casteel* and its presumed harm analysis.[FN5] Even assuming the trial court abused its discretion by including a question as to Ronnie's contributory negligence and an instruction on new and independent cause, for the reasons explained above, we hold that these alleged charge errors were harmless and did not probably cause the rendition of an improper judgment. Because *Casteel*'s presumed harm analysis does not apply and any error in the disputed charge issues was harmless, we need not address Dr. Thota's remaining issues. Accordingly, we reverse the court of appeals' judgment and, without addressing whether the trial court erred by submitting the question as to Ronnie's contributory negligence or the instruction on new and independent cause, we remand the case to the court of appeals to consider Young's remaining issues.

> FN5. To the extent that it conflicts with this opinion, we expressly disapprove the appellate court's opinion in *Block v. Mora,* 314 S.W.3d 440 (Tex.App.-Amarillo 2009, pet. dism'd by agr.).

Tex.,2012.
Thota v. Young
366 S.W.3d 678, 55 Tex. Sup. Ct. J. 671

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



102 S.W.3d 706, 46 Tex. Sup. Ct. J. 530
**(Cite as: 102 S.W.3d 706)**

H

Supreme Court of Texas.
WAL–MART STORES, INC., Petitioner,
v.
Brian Lynn MILLER, Respondent.

No. 01–1148.
March 27, 2003.

Licensee who was injured in fall on stairs at store brought premises defect claim against store operator. Following jury verdict for licensee, the 206th District Court, Hidalgo County, Rose Guerra Reyna, J., granted operator's motion for judgment notwithstanding the verdict (JNOV). Licensee appealed, and the Corpus Christi Court of Appeals reversed, 54 S.W.3d 481. On petition for review, the Supreme Court held that, as matter of law, licensee had actual knowledge of stairway's dangerous condition, precluding operator's liability for licensee's injuries.

Judgment of Court of Appeals reversed; judgment rendered.

West Headnotes

**[1] Appeal and Error 30 ⟜863**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k862 Extent of Review Dependent on Nature of Decision Appealed from
            30k863 k. In General. Most Cited Cases

A trial court's decision to grant a judgment notwithstanding the verdict should be affirmed if there is no evidence to support one or more of the jury findings on issues necessary to liability.

**[2] Appeal and Error 30 ⟜1001(3)**

30 Appeal and Error
   30XVI Review
      30XVI(I) Questions of Fact, Verdicts, and Findings
         30XVI(I)2 Verdicts
            30k1001 Sufficiency of Evidence in Support
               30k1001(3) k. Total Failure of Proof. Most Cited Cases

In reviewing a "no evidence" point, appellate court must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary.

**[3] Appeal and Error 30 ⟜863**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k862 Extent of Review Dependent on Nature of Decision Appealed from
            30k863 k. In General. Most Cited Cases

If more than a scintilla of evidence supports the jury's findings, the jury's verdict and not the trial court's judgment notwithstanding the verdict (JNOV) must be upheld.

**[4] Negligence 272 ⟜1040(3)**

272 Negligence
   272XVII Premises Liability
      272XVII(C) Standard of Care
         272k1034 Status of Entrant
            272k1040 Licensees
               272k1040(3) k. Care Required in General. Most Cited Cases

If the licensee has the same knowledge about the dangerous condition as the licensor, then no duty to the licensee exists. Restatement (Second) of Torts § 342.

**[5] Negligence 272 ⟜1110(2)**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

272 Negligence
   272XVII Premises Liability
      272XVII(D) Breach of Duty
         272k1100 Buildings and Structures
            272k1110 Steps, Stairs and Ramps
               272k1110(2) k. Substances and Objects. Most Cited Cases

**Negligence 272 ☞1289**

272 Negligence
   272XVII Premises Liability
      272XVII(L) Defenses and Mitigating Circumstances
         272k1281 Plaintiff's Conduct or Fault
            272k1289 k. Buildings and Structures. Most Cited Cases

Licensee who fell at store while descending slippery stairway had actual knowledge of stairway's dangerous condition, thus precluding his recovery against store on a premises defect claim, where licensee noticed as he climbed stairs that some of them were "slippery or slick" and also noticed that stacked boxes on the side obstructed his access to handrail, and co-worker warned licensee about slippery stairway as co-worker led the way back down. Restatement (Second) of Torts § 342.

**\*707** Kevin D. Jewell,Magenheim Bateman & Helfand, P.L.L.C., Houston, Douglas W. Alexander, Scott Douglass & McConnico, Austin, for Petitioner.

Randall P. Crane, San Benito, for Respondent.

PER CURIAM.

In this premises liability case, we must decide whether there is some evidence to support the jury's finding that the licensee, Bryan Miller, lacked actual knowledge about the dangerous condition. Because we conclude no evidence supports a finding that Miller lacked actual knowledge, we hold that Wal–Mart did not have a duty to warn or make safe the dangerous condition, and thus, the trial court correctly granted Wal–Mart's motion for judgment notwithstanding the verdict. Accordingly, we reverse the court of appeals' judgment and render judgment for Wal–Mart.

Wal–Mart hired a plumbing company to install an eyewash machine in the mechanics bay of a Wal–Mart store. Brian Miller, an employee of the plumbing company, went to the Wal–Mart store with a co-worker to show him where to install the machine. A Wal–Mart employee escorted Miller and his co-worker to the door leading to a storeroom. In the storeroom, there was a stairway leading to the water lines and shut-off valve.

After entering the storeroom, Miller noticed that Wal–Mart employees in the stockroom were unloading boxes from trucks and placing the boxes on the stairs. **\*708** Miller led his co-worker up the stairs, and on the way up, Miller noticed the stairs were "kind of slippery or slick" and that boxes were stacked along both sides of the stairway's middle section. Neither Miller nor his co-worker used the stairway's handrail while ascending the stairs.

After looking at the water lines and shut-off valve, Miller and his co-worker walked down the stairs. Miller's co-worker, who walked in front, warned Miller "to be careful of the stairs because they were kind of slippery." Miller testified that he held onto the stairway's one handrail, but, about halfway down the stairs, Miller released the handrail to walk around the boxes stacked along the side. Miller's foot then caught on one of the boxes, and he slipped on a step and fell. Miller's co-worker did not see the fall; he only turned to see Miller on the ground when a box hit the back of his legs.

Miller sued Wal–Mart under a premises defect theory. His petition alleges that Wal–Mart failed to make the stairway safe and failed to warn Miller about the dangerous condition—specifically, a slippery stairway with boxes stacked on it. The instructions submitted to the jury, a licensee-licensor premises liability charge, provided:

With respect to conditions of the premises,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

WAL–MART STORES, INC., was negligent if-

a. The condition posed an unreasonable risk of harm; and

b. WAL–MART STORES, INC., had actual knowledge of the danger; and

c. BRIAN LYNN MILLER did not have actual knowledge of the danger; and

d. WAL–MART STORES, INC., failed to adequately warn BRIAN LYNN MILLER of the condition; and

e. WAL–MART STORES, INC., failed to make the condition reasonable [sic] safe.

The jury found Wal–Mart 70% negligent and Miller 30% negligent and awarded Miller damages and pre-judgment interest. The trial court granted Wal–Mart's motion for judgment notwithstanding the verdict, which asserted, among other things, that Miller's actual knowledge of the dangerous condition precluded his recovery.

Miller appealed and argued that the trial court erred in granting a judgment notwithstanding the verdict because evidence supported each element of his premises defect claim. A divided court of appeals, sitting *en banc,* held that there was some evidence that Miller lacked knowledge of the dangerous condition and reversed the trial court's judgment notwithstanding the verdict. *Miller v. Wal-Mart,* 54 S.W.3d 481, at 485 (Tex.App.-Corpus Christie 2001).<sup>FN1</sup>

> FN1. Wal–Mart contends that the court of appeals lacked authority to decide this case *en banc,* because (1) Wal–Mart argued the appeal before a panel only, (2) the court of appeals failed to notify Wal–Mart about the *en banc* consideration, and (3) Wal–Mart had no opportunity to argue before the entire court. While we recognize that *en banc* consideration is generally disfavored, our appellate rules authorize

courts of appeals to consider a case *en banc* if the circumstances require and the court votes to do so. TEX.R.APP. P. 41.1(a); 41.2(c)

Before this Court, Wal–Mart contends that the evidence conclusively shows Miller had actual knowledge of the stairway's dangerous condition. Thus, according to Wal–Mart, the trial court correctly granted the judgment notwithstanding the verdict. In response, Miller argues that, even though he knew about the wet steps and boxes stacked on the stairway's sides, he did not know the danger these conditions **\*709** presented. Moreover, Miller asserts that his not noticing the stairs were slippery until he was at least half way up the stairs, and his not noticing that the boxes blocked his access to the stairway's handrail until he began to go down the stairs, precludes a determination that he "appreciated the gravity of the harm threatened by the stairs' dangerous condition." We disagree with Miller and conclude that, as a matter of law, Miller had actual knowledge about the stairway's dangerous condition.

[1][2][3] A trial court's decision to grant a judgment notwithstanding the verdict should be affirmed if there is no evidence to support one or more of the jury findings on issues necessary to liability. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990). In reviewing a "no evidence" point, we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). If more than a scintilla of evidence supports the jury's findings, the jury's verdict and not the trial court's judgment must be upheld. *Mancorp, Inc.,* 802 S.W.2d at 228.

[4] This Court has explained the circumstances under which a licensor owes a duty to a licensee for an alleged premises defect:

It is well settled in this State that if the person injured was on the premises as a licensee, the duty

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that the proprietor or licensor owed him was not to injure him by willful, wanton or gross negligence.... An exception to the general rule is that when the licensor has knowledge of a dangerous condition, and the licensee does not, a duty is owed on the part of the licensor to either warn the licensee or to make the condition reasonably safe.

*State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974) (citations omitted). Accordingly, to establish liability for a premises defect, a licensee must prove, among other things, that the licensee did not actually know about the alleged dangerous condition. *See, e.g., State v. Williams,* 940 S.W.2d 583, 584 (Tex.1996); *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 237 (Tex.1992) (citing *Tennison,* 509 S.W.2d at 562; RESTATEMENT (SECOND) OF TORTSSSSS § 342). If the licensee has the same knowledge about the dangerous condition as the licensor, then no duty to the licensee exists. *Tennison,* 509 S.W.2d at 562; *see also Williams,* 940 S.W.2d at 584; *Payne,* 838 S.W.2d at 237.

For example, in *Lower Neches Valley Auth. v. Murphy,* this Court held that "[a] licensee is not entitled to expect that the possessor [of land] will warn him of conditions that are perceptible to him, or the existence of which can be inferred from facts within his present or past knowledge." 536 S.W.2d 561, 564 (Tex.1976). In other words, a licensor owes no duty to a licensee so long as the evidence conclusively establishes the licensee perceived the alleged dangerous condition. *See id.* at 564.

[5] Here, Miller alleges the combination of the slippery steps and the boxes on the stairs blocking his path and access to the handrail caused him to fall. In determining if there is some evidence of Miller's actual knowledge about the dangerous condition to support the jury's finding, the court of appeals relied on Miller's testimony that he did not notice the stairway was slippery until he was halfway up the stairs, and he did not notice the boxes blocked the handrail until he was going down the stairs. 54 S.W.3d at 484. Then, the court of ap-

peals held that a reasonable inference from this "ambiguous evidence" is "that Miller did not comprehend the fact that the stairway was 'unreasonably' dangerous **\*710** until the moment he fell...." *Id.* at 484–85.

But the court of appeals' inference is unreasonable in light of Miller's undisputed testimony that, before he ascended the stairs, Miller noticed boxes "stacked along the sides" of the stairway's middle section. Moreover, as he ascended the stairs, he noticed some of the stairs were "slippery or slick." And, as Miller descended the stairs, he noticed the boxes obstructed his access to the handrail. He recognized all these factors—the very factors he alleges created a dangerous condition—before he fell on the stairs.

The corroborating testimony of his co-worker further supports that Miller knew about the stairway's dangerous condition; the co-worker similarly noticed the boxes stacked on the stairs before they went up, and he warned Miller about the slippery stairway when he led the way down. Thus, the uncontroverted evidence demonstrates that, prior to his fall, Miller perceived and thus had actual knowledge of the dangerous condition. Because Miller had actual knowledge of the alleged dangerous condition, Wal–Mart was relieved of any duty to warn or make safe the dangerous condition. *See Murphy,* 536 S.W.2d at 563 ("[The plaintiff licensee] had the same knowledge of this [dangerous] condition that [the Authority] could have had...."); *Tennison,* 509 S.W.2d at 562 ("[W]hen the licensor has knowledge of a dangerous condition, and the licensee does not, a duty is owed on the part of the licensor to either warn the licensee or to make the condition reasonably safe.").

Because no evidence exists to support the jury's finding that Miller did not know about the dangerous condition, the trial court correctly rendered a judgment notwithstanding the verdict. Accordingly, we grant Wal–Mart's petition, and without hearing oral argument, reverse the court of appeals' judgment, and render judgment for Wal–Mart. *See*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

102 S.W.3d 706, 46 Tex. Sup. Ct. J. 530
**(Cite as: 102 S.W.3d 706)**

TEX.R.APP. P. 59.1.

Tex.,2003.
Wal-Mart Stores, Inc. v. Miller
102 S.W.3d 706, 46 Tex. Sup. Ct. J. 530

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.